Randal J. French
BAUER & FRENCH
1501 Tyrell Lane
Post Office Box 2730
Boise, Idaho 83701-2730
Telephone (208) 383-0090
Facsimile 383-0412
E-Mail rfrench@bauerandfrench.com
  ISB No. 3032

Attorneys for Tamarack Resort, LLC

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Bkr. Case No. 09-03911-TLM |
| TAMARACK RESORT, LLC, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### TAMARACK RESORT, LLC'S CLOSING ARGUMENT

COMES NOW the alleged Debtor, Tamarack Resort, LLC ("TRLLC"), by and through its counsel of record, Randal J. French of the firm of Bauer & French, and hereby submits its Closing Argument.

Under Code § 303(b), an involuntary petition must be filed by three or more creditors, when an alleged Debtor has twelve or more holders, each of which holds a claim that is "not contingent as to liability or the subject of a *bona fide* dispute as to liability or amount." The noncontingent, undisputed claims must aggregate at least $13,475 more than the value of any lien the petitioning creditors have on the Debtor's property.

Prior to the BAPCPA amendments, the claim of a petitioning creditor could not be "contingent as to liability or the subject of a *bona fide* dispute." *In re Excavation, Etc., LLC,* Slip Copy, 2009 WL 1871682 (Bkrtcy.D.Or. 2009). Before BAPCPA, the Ninth Circuit Court of Appeals had held that a "dispute as to the amount of the claim gives rise to a *bona fide* dispute only when (1) it does not arise from a wholly separate transaction, *and* (2) 'netting out the claims of debtors' could take the petitioning creditors below the amount threshold of § 303." *In Focus*

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 1

*Media,* 378 F.3d 916, 926 (9th Cir. 2004); *In re Seko Investment, Inc.,* 156 F.3d 1005 (9th

Cir.1998).

The BAPCPA amendments of 2005 amended § 303 to require that a claim would be

excluded if subject to a *bona fide* dispute *as to liability or amount,* overruling *Seko* and *In Focus.*

> If the *In Focus* rule were to remain in effect, the "and amount" language would be
> superfluous, since under *In Focus* the only dispute as to amount is a dispute over
> the entire claim, or at least a big enough dispute that netting out would take the
> claim below the monetary threshold. It is a basic canon of statutory construction
> that language be given its full effect. *See e.g., U.S. v. Church of Scientology
> Western U.S.,* 973 F.2d 715, 717 (9th Cir.1992); *U.S. v. Allen,* 341 F.3d 870, 878
> (9th Cir.2003). That would not occur if *In Focus* is applied.

*In re Excavation, Etc., LLC*, Slip Copy, 2009 WL 1871682 (Bkrtcy. D.Or. 2009).  The

*Excavation, Etc.* Court's point can not be overstated.  **Prior to BAPCPA,** the only dispute as to

amount had to be **a dispute over the entire amount** of the claim, or at least enough to reduce the

claim below the threshold.  If BAPCPA had an effect, by specifically stating that a creditor was

disqualified from acting as a petitioning creditor if its claim was subject to a *bona fide* dispute,

that change could only be to provide that the *bona fide* dispute did not have to reach the entire

amount of the claim.

When Congress wanted to make clear that it was addressing a claim that was in dispute as

to the total amount of the claim, it had a word that it used consistently: unliquidated.  An

unliquidated claim is one for which the entire amount of the claim is in dispute and the amount

of the claim is uncertain until determined - "liquidated" - in an appropriate proceeding.  Congress

did not require that a claim be unliquidated to disqualify the holder of the claim from being an

eligible petitioning creditor.  The entire amount of the claim need not be in dispute for a claim to

be the subject of a *bona fide* dispute, so as to eliminate a creditor from being eligible to be a

petitioning creditor under §303(b).

The petitioning creditors have the burden of showing that there is no *bona fide* dispute.

*In re Vortex Fishing Systems, Inc.*, 277 F3d 1057, 1064 (9th Cor. 2002), *citing In re Rubin,* 769

F.2d 611, 615 (9th Cir.1985).  The Ninth Circuit applied the test for determination if there is a

*bona fide* dispute adopted in *In re Busick*, 831 F.2d 745, 750 (7th Cir.1987) and first enunciated

in *In re Lough*, 57 BR 993, 996-997 (Bankr. E.D. Mich. 1986).  277 F3d at 1064.  This court is to

"determine whether there is an objective basis for either a factual or a legal dispute as to the

validity of the debt.  [Citation omitted.]."  *Vortex Fishing*, 277 F. 3d at 1064.  "[I]f there is either

a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention

as to the application of law to undisputed facts, then the petition must be dismissed."  *Id.,*

*quoting In re Lough,* 57 B.R. 993, 996-997.  A bankruptcy court is not asked to evaluate the

potential outcome of a dispute, but merely to determine whether there are facts that give rise to a

legitimate disagreement over whether money is owed, or, in certain cases, how much."  *Vortex*

*Fishing*, 277 F. 3d at 1064.

> "[S]ubstantial factual and legal questions raised by [a] debtor preclude [a] finding of
> involuntary bankruptcy." *B.D.W. Associates, Inc. v. Busy Beaver Building Centers, Inc.,*
> 865 F.2d 65, 66-67 (3rd Cir.1989) (citing and following In re Lough, 57 B.R. 993, 997
> (Bankr.E.D.Mich.1986)), "with [the] gloss" in In re Busick, 831 F.2d 745 (7th Cir.1987).

> The outcome of a dispute need not be resolved, only its presence or absence.
> Consequently, the court need only engage in a limited analysis of the claims at issue.  *See
> In re Ramm Industries, Inc.*, 83 B.R. 815, 822 (Bankr.M.D.Fla.1988). The Court must
> not, when determining whether there is a *bona fide* dispute, resolve any genuine issues of
> fact or law. If the court determines that there is indeed a *bona fide* dispute, this ought not
> be construed as an indication of how the court would resolve that dispute.  *In re Lough*,
> 57 B.R. 993, 997 (Bankr.E.D.Mich.1986).

> *In re Prisuta*, 121 B.R. 474, 476 (Bankr.W.D.Pa.1990). *See also In re Marketing and
> Creative Solutions, Inc.,* 338 B.R. 300, 305 (6th Cir.BAP2006).

*In re Regional Anesthesia Associates PC*, 360 B.R. 466 (Bkrtcy. W.D. Pa. 2007), *quoting In re*

*Euro-American Lodging Corp.,* 357 B.R. 700 (Bankr.S.D.N.Y.2007).

There are numerous genuine issues of material fact, or a meritorious contention as to the

application of law to undisputed facts, that bear upon TRLLC's liability to the petitioning

creditors.  This Court should so rule, and should dismiss the petition.

## <u>APPLICATION TO THE FACTS</u>

TRLLC asserts that the petitioning creditors identified below do not satisfy the

requirements of 11 U.S.C. § 303(b).

# I. PETRA, INC.

Petra Inc. asserts that it has a claim both in contract and in fraud, arising out of the same

transaction.  Petra's claims are subject to a *bona fide* dispute as to liability, on the fraud claim,

and as to amount, as to both the fraud and contract claims.

## A.    The Fraud Claim is subject to a *bona fide* dispute.

Petra asserts that it holds a claim for fraud.  Under Idaho law,

> Nine elements must be proved to sustain an action for fraud: (1) a statement of fact; (2)
> its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's
> intent to induce reliance; (6) the hearer's ignorance of the falsity of the statement; (7)
> reliance by the hearer; (8) the hearer's right to rely; and (9) consequent and proximate
> injury. *Lettunich v. Key Bank Nat'l Ass'n,* 141 Idaho 362, 368, 109 P.3d 1104, 1110
> (2005). The party alleging fraud must plead with particularity the factual circumstances
> constituting fraud, I.R.C.P. 9(b), and ultimately each of the elements must be proven by
> clear and convincing evidence. G & M Farms v. Funk Irrigation Co., 119 Idaho 514, 518,
> 808 P.2d 851, 855 (1991).

*County Cove Development, Inc.,* 143 Idaho 595, 600, 150 P.3d 288, 293.

Petra's president and CEO, Jerrold Franks, testified that Tamarack, through its agents,

made various statements through 2007 that Tamarack's success was assured, and Petra would be

paid.  Mr. Franks testified that Petra continued working because of these representations.

> As a general rule, fraud cannot be based upon statements promissory in nature that relate
> to future actions or upon the mere failure to perform a promise or an agreement to do
> something in the future.  *Pacific States Auto. Fin. Corp. v. Addison,* 45 Idaho 270, 261 P.
> 683 (1927). The allegedly false representation must concern past or existing material
> facts. *Maroun v. Wyreless Systems, Inc.,* 141 Idaho 604, 114 P.3d 974 (2005). We have
> recognized two exceptions to the general rule that fraud cannot be based upon the mere
> failure to perform a promise. One exception is if the speaker made the promise without
> any intent to keep it, but to induce action on the part of the promise. *Pocatello Sec. Trust
> Co. v. Henry,* 35 Idaho 321, 206 P. 175 (1922). The second exception is if the promise
> was accompanied by statements of existing fact which show the promisor's ability to
> perform the promise and those statements were false. *Id.*

Gillespie v. Mountain Park Estates, L.L.C., 142 Idaho 671, 673-674, 132 P.3d 428, 430-431

(Idaho 2006).

Petra has established a *bona fide* dispute as to the liability on the fraud claim by its own

testimony.  Mr. Frank's testimony fell far short of establishing even a *prima facie* case of fraud.

The first four elements that Petra must prove are that Tamarack made a statement of fact,

its falsity, its materiality and the speaker's knowledge of its falsity.  Statements that Tamarack's

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 4

Closing argument.Redline.wpd\nrg\030310

success was guaranteed and that Petra would be paid were clearly not statements of past or existing material facts.  They were typically optimistic statements of a business which was very optimistic about its future, and a statement of future intentions.  Petra has not made even a *prima facie* case that any statement made by Tamarack was false at the time that it was made, that any statement was material to Petra's decision to continue working on the project or that Tamarack knew that any statement was false.

Mr. Frank did not offer testimony as to a particular time when any particular statement was made, but generally stated that Tamarack made the allegedly offending statements during the entire time Petra worked on the project.  It would appear that for a substantial time, these statements of future expectations were borne out by the success that Tamarack had.  Mr. Frank testified that while payments were sometimes late, Petra did get paid.  When, in 2006, Tamarack became late, it did eventually line up new financing through Credit Suisse and paid Petra sufficiently current that Petra did not want to walk away from the project.  Mr. Frank testified that he believed the project was sufficiently successful that he was not being paid from the financing Credit Suisse supplied, but from the profitable sales of real estate.  Mr. Frank's testimony establishes that Tamarack made ongoing efforts to fulfill its stated intention to pay Petra.

Petra did not prove that any statement concerning Tamarack's success or ability to pay was false at the time that it was made.  In part, that is because Petra's allegations as to timing are so vague.  In a fluid business environment, Petra must establish a particular time for any allegedly offending statement so as to provide the timing for which a context of the statement can be established.  Petra did not establish any particular time, so neither Petra nor Tamarack could establish the context in which any particular statement was made.

What Petra admits is that Tamarack paid Petra $44,722,285.04, out of $46,090,209.25 owed.  It is hard to see an unpaid balance of less than three percent of the total amount Petra billed to Tamarack as the result of fraud.  That Tamarack paid Petra more than 97% of amounts billed speaks volumes as to the lack of intention to mislead or defraud Petra.

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 5

Even assuming for the sake of argument, but not conceding, that Tamarack made any statements that might have been misleading, Petra can not show its ignorance as to the falsity of any statement it allegedly relied on, its actual reliance on any of Tamarack's statements, or its right to rely on any statements which it asserts were false and form the basis for a fraud claim. Throughout the development, Petra was well aware of the financial difficulties that Tamarack was making heroic efforts to overcome.  It was not ignorant of those difficulties.  It did not have the right to ignore everything that it saw happening, in terms of delayed payments, and an increasing amount of unpaid monthly bills.

Mr. Frank testified on cross-examination that he had come to his own conclusion that Tamaracks finances were in order from his observations of the lot sales. He specifically denied being told about Tamarack's finances. There is no false statement or representation about Tamarack's financial condition.

Mr. Frank also admitted on cross that in March, 2007, when he wasn't getting paid, he knew Tamarack's financial condition was tough, but continued to work.  He said he knew Tamarack was seeking additional financing in Fall, 2007, and knew they didn't get it because he "would have been told."

Mr. Frank testified  that the mortgage Trillium provided to him was supposed to be of "free and clear" lots.  However, he admitted that he knew that Credit Suisse came on as a lender in 2006.  He also acknowledged on re-direct examination that he was subordinate to Credit Suisse's mortgage, but didn't say exactly when he learned that Credit Suisse had a mortgage.  He also did not explain how he might believe that, given Tamarack's continuing cash flow problems, he might reasonably have believed that Tamarack had any real property that was not encumbered by Credit Suisse.

Mr. Franks testified that as of mid-2005, Petra knew that Tamarack was falling behind on payments on its bills.  He testified that, through mid-2006, Tamarack was behind on payments until Credit Suisse extended financing.  He testified that for most of 2007, Tamarack was behind on payments.

Petra's Exhibit 321 demonstrates the significant efforts Tamarack was making, even if it was not fully performing its stated intention.  Tamarack paid Petra $1,057,000 for June, 2007 and an additional $424,000 for July 2007, according to a July 19, 2007 email from Scott Normandin, VP of Construction for Tamarack Resort, LLC, to Mr. Frank and others.  Tamarack noted that the "total deferred" was $1,162,000, which was well within the $2,000,000 of bills which, before July 19, 2007, Petra had agreed could be deferred.  Tamarack, with that email, asked Petra to request that the subcontractors resume work immediately.

Mr. Frank testified that he believed that Petra had agreed that it would carry the unpaid balance due on its monthly billings until September, 2007.  Tamarack told Petra that it would pay interest on the past due balance, at the rate of prime plus 1% when Tamarack caught up, *most likely in October.*  Tamarack told Petra that it was working "in good faith in accordance with our recent and longer term agreements."

Mr. Frank admitted that he and others met with Tamarack representatives to negotiate a resolution of the issues with delinquent payments on billings in August 2007.  From at least July 19, 2007, and maybe from January 2007, if not well before, Petra was well aware that Tamarack was facing ongoing difficulties, and that it was acting diligently and professionally to resolve the difficulties.  Petra admitted that Tamarack was making payments according to an agreement with Petra, which included an agreement that Tamarack could defer payment on up to $2,000,000 of billings.

Petra can not show that it relied upon any statement that Tamarack allegedly made.  Mr. Franks testified that he relied upon the continuing promises of payment, and that he believed that he would get paid from Tamarack's sales revenue.  However, Mr. Franks admitted that Petra had experienced trouble getting paid from mid-2005.  He admitted that when Tamarack obtained financing in mid 2006, he had signed an Agreement and Estoppel of Contractor identifying Credit Suisse as the new lender.  He acknowledged that he was never asked to sign such an agreement at a later time, for a new lender.

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 7

Mr. Franks testified that Tamarack was to pay Petra on a monthly billing cycle.  Any month in which payment in full was not made was sufficient to inform Petra that Tamarack was facing financial difficulties.  The fact that Tamarack had to find financing from Credit Suisse, rather than paying Petra in full from its ongoing real estate sales, was sufficient to inform Petra that Tamarack faced rather common financial difficulties in building a world-class year round resort from scratch.

Petra can also not show any consequent and proximate injury arising from the statements that it alleges as a basis for fraud.  Mr. Franks also acknowledged that he had received payments of over $700,000 after August 1, 2007.  He testified that the balance due as of August 1, 2007, was over $2,000,000.

Petra's exhibit 320, a chronological listing of outstanding invoices, shows that as of the date of hearing, Petra had only three invoices that dated to before August 1, 2007.  Petra asserts that it still has outstanding invoices no. 1348, dated 206/07, for $77.25, invoice number 1522 dated 07/03/07 for $27,342.56, and invoice number 070630a, dated 07/05/07, for $165,858.27.  Those invoices total $193,278.08, before accrued interest which Petra claims on these invoices, totaling $62,193.19.  Based upon Mr. Frank's testimony, it appears that Tamarack paid Petra over $1.8 million on outstanding invoices after the allegedly offensive representations were made.

No court has adjudicated Petra's fraud claims.  Whether in state court, using a clear and convincing evidence standard, or in bankruptcy court, using a preponderance of the evidence burden of proof, Petra's allegations of fraud are fraught with factual issues which TRLLC disputes.

This Court must conclude that "there are facts that give rise to a legitimate disagreement over whether money is owed, or, . . . how much."  *Vortex Fishing*, 277 F. 3d at 1064.  This Court must conclude that "there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, [so that] the petition must be dismissed."  Petra's claim of fraud, based upon any representations that

Tamarack made, is clearly the subject of a *bona fide* dispute. Petra is not an eligible petitioning creditor based upon its claim of fraud.

**B.**    **Petra's Contract Claim is Subject to a *bona fide* dispute.**

Petra asserts a claim based upon contract. Petra's contracts show that it contracted with Tamarack Resort, LLC, Exhibits 308, 309 and 313; Tamarack Whitewater Construction, LLC, Ex. 310, 311; and Tamarack Trillium Valley Construction, LLC, Ex. 312. These are each separate legal entities. Petra has provided no evidence to the contrary. Petra has also not offered any evidence to suggest that Tamarack signed any guaranty of any of these obligations, or any other document by which it became liable on any debt owed by Tamarack Whitewater Construction, LLC, or Tamarack Trillium Valley Construction, LLC. Petra's president, Mr. Frank, testified that Tamarack owned Tamarack Whitewater Construction, LLC and Tamarack Trillium Valley Construction, but he didn't explain why Tamarack might be liable for the debt or obligations of Tamarack Whitewater Construction, LLC, and Tamarack Trillium Valley Construction.

As the proponent of an allegation of fact, Petra had the burden of proof on that issue. Petra failed to provide evidence establishing that TRLLC had assumed liability for the claims of Tamarack Whitewater Construction, LLC, or Tamarack Trillium Valley Construction, LLC. *Accord In re Vortex Fishing Systems, Inc.*, 277 F3d 1057, 1068 (9th Cor. 2002)("First, the evidence does not clearly establish that Debtor assumed liability for these claims when the Vortex Agreement was executed.").

Each contract addressed construction on separate parts of the resort. Tamarack Resort, LLC entered into contracts for a project identified as "Tamarack Chalet I / Bitterroot - Eight (8) Units, Ex. 308, and for a project identified as "Tamarack Phase 2 Chalet I / Bitterroot - Nine (9) Units. Ex. 309. It also entered into a contract for a project identified as "Mid Mountain Restaurant, Tamarack Resort." Ex. 313.

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 9
Closing argument.Redline.wpd\nrg\030310

Tamarack Whitewater Construction, LLC, entered into contracts for a project identified as "Payette, Staircase & Haystack Chalets, Tamarack Resort," Ex. 310, and for a project identified as "Clearwater Cottages, Tamarack Resort."  Ex. 311.

Tamarack Trillium Valley Construction, LLC entered into contracts for a project identified as "Trillium Valley Cottages, Tamarack Resort." Ex. 312.

There is no evidence to suggest that Tamarack Resort LLC is liable on the contracts Petra entered into with Tamarack Whitewater Construction, LLC and Tamarack Trillium Valley Construction, LLC.  Petra, in its Ex. 319, carefully distinguished the Customer on each job. Petra identified "Customer : TAMRES Tamarack Resort, LLC" as the customer on virtually all jobs identified in Ex. 319, pp. PETRA_TAM033503 - PETRA_TAM033512.  Thereafter, Petra identified Tamarack Whitewater Construction, LLC and Tamarack Trillium Valley Construction, LLC as the customer on the vast majority of jobs.

Petra admits that Trillium Valley Construction gave it a promissory note, Ex. 322, dated January 30, 2008, in the amount of $780,161.89.  The note provides that "[Trillium Valley Construction, LLC] gives this Note in recognition and acknowledgment of monies due [Petra Incorporated] for the construction of improvements at the request of Maker."  Any reference to Tamarack Resort, LLC was specifically crossed out and replaced with the name of Trillium Valley Construction, LLC.

Trillium Valley Construction, LLC also executed a Mortgage in favor of Petra, Incorporated, to secure the promissory note.  See Ex. 323.  Any reference to Tamarack Resort, LLC was specifically crossed out and replaced with the name of Trillium Valley Construction, LLC.  Mr. Frank testified that this was necessary because Trillium Valley Construction, LLC was the owner of the real estate which the mortgage encumbered.  The mortgage further stated that

> This mortgage is given to secure that certain promissory note ("Note") of Mortgagor dated January 30th, 2008, in the original principal sum of Seven Hundred Eighty Thousand One Hundred Sixty One Dollars and 89/100 ($780,161.89).  The obligation represents monies due and payable under construction contacts between Mortgagor and Mortgagee.

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 10
Closing argument.Redline.wpd\nrg\030310

Petra admits that this promissory note was to pay $780,161.89 of the account balance Petra now claims Tamarack Resort, LLC owed it.  It did not credit the account on which Tamarack Resort LLC is liable, by the amount of that promissory note.  Petra did not offer any evidence that Tamarack Resort, LLC had assumed liability on this obligation.  Absent that proof, Petra can not show that the amount of its claim is correct and accurate.  Petra has not carried its burden to show that there is no *bona fide* dispute as to liability or amount of the claimed debt.

Petra has acknowledged that its claim is in dispute.  See Ex. 116, Stipulation Between Credit Suisse AG and Petra, Inc., Docket No. 86, filed 01/15/10.

In Paragraph 4, p. 3, Petra also stipulates that "the amount of the Petra Lien shall be determined by an arbitrator, to be chosen by Credit Suisse and Petra, whose decision regarding the amount of the Petra Lien shall be final between Credit Suisse and Petra, . . ."  It would appear that the amount of the Petra lien is in fact the amount that Petra is owed.  Petra has therefore stipulated that the amount TRLLC owes Petra remains subject to a *bona fide* dispute.

Tamarack has demonstrated that the amount it owes Petra is subject to a *bona fide* dispute.  Petra is not an eligible petitioning creditor.

## II.  BANC OF AMERICA LEASING & CAPITAL, LLC

Banc of America Leasing & Capital, LLC ("BALC") asserts that it qualifies as a petitioning creditor.   However, its claim is subject to a *bona fide* dispute at least as to the amount owed to BALC.

BALC's witness, Todd Wittenberg, admitted that BALC's claim includes "Legal / Costs" of $155,862.20, which has not in fact been awarded by any court.  BALC's Master Lease Agreement defines "Attorney Fees" as "reasonable attorney's fees and expenses."  Para. 7(a), p. 2 of Ex. 206, Master Lease Agreement Number 16789-9000 dated October 3, 2006, applicable to Schedule Number 001, Used Mack Truck and 2006 Glaval Titan 24 Passenger Shuttle Bus, Ex. 207; Ex. 208 "Master Lease Agreement Number 16789-0900," dated November 28, 2006, applicable to Schedule 001, 2 ski lifts, Ex. 209, and applicable to Schedule Number 002, 2007

Glaval Titan 45 Passenger Shuttle Bus, Ex. 210, and Schedule Number 003, Pisten Bully 600

Snow Plow, Ex. 211.

There has been no determination of what amount of attorney fees and expenses may be

found reasonable.  BALC has not carried its burden of proof in showing that this part of its claim

is not subject to a *bona fide* dispute.

Mr. Wittenberg also admitted that BALC has failed to give TRLLC credit for amounts

applied to the debt, arising out of the foreclosure of certain real property identified as the Arling

Center.  He admitted in cross-examination that Bank of America, N.A. was the beneficiary of

TRLLC's deed of trust, assignment of rents, security agreement and fixture filing, dated

March 14, 2006, which encumbered real estate known as the Arling Center.  He admitted that the

obligation TRLLC owed to Bank of America and secured by that deed of trust, was about $5

million.

Mr. Wittenberg further admitted that, on December 8, 2006, it and Bank of America N.A.

entered into an "Intercreditor Agreement."  The parties agreed that Bank of America "holds a

first priority security interest in [Tamarack Resort LLC's] real property known as 'The Arling

Center at Tamarack Resort' (the 'Bank Collateral') under a Loan Agreement, mortgage and other

related documents (together the 'Loan Documents'); . . ."  Ex. 102, p. 1, 3rd paragraph.  The

parties provided in their Agreement that "as a condition precedent to entering into the Lease,

BALC is requiring that Bank and BALC mutually share in the Bank Collateral and the BALC

Collateral on a pari passu basis."  Ex. 102, p. 1, 4th paragraph.  Each agreed, *inter alia* "that they

*shall* share the Bank Collateral [the Arling Center real estate] and the BALC Collateral and all

proceeds therefrom on a pari passu basis, which means, that the proceeds of any repossession,

sale, collection or other disposition of any of the Bank Collateral and/or BALC Collateral will be

distributed proportionally to Bank and BALC based upon . . ." a certain formula. [Emphasis

added.]  Ex. 102, para. No. 2. P. 1.

The parties agreed that "[u]pon the occurrence and during the existence of any Event of

Default under the terms of the Loan Documents or the Lease, or in the event of commencement

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 12

of foreclosure proceedings or comparable proceedings under either such agreement, Bank and BALC agree to cooperate in the exercise of remedies in order [to] (sp) maximize recovery on Bank Collateral and the BALC Collateral."  Ex. 102 p. 2. para. No. 3, "Exercise of Remedies." Each agreed "to give the other any notice of default, termination, demand for payment, acceleration, disposition of collateral, or other exercise of remedies under the Lease and the Bank Documents, respectively."  *Id.* at para. 6(a).

Mr. Wittenberg testified on cross-examination that Bank of America, N.A. caused a foreclosure sale of the real property known as the Arling Center in August, 2009.  He admitted that Bank of America bid about $989,000.  Mr. Wittenberg admitted that BALC has never credited the balance of that portion of the Bank of America, N.A. credit bid which Bank of America, N.A. owed BALC, based upon the Intercreditor Agreement, against the balance that BALC computes as due under its lease agreement.

BALC asserts that because Bank of America made a credit bid, that was not a real cash purchase and Bank of America was not yet obligated to make any payment to BALC.  However, there can be no dispute that the foreclosure sale was a "repossession, sale, collection, or other disposition of any of the Bank Collateral."  Bank of America is now the owner of that property, not TRLLC.

There is no language in the Intercreditor Agreement that limits its application to only dispositions to parties other than either Bank of America or BALC.  Whether the foreclosure occurred under the Idaho mortgage foreclosure provisions, I.C. §6-101(1) or under the provisions for foreclosure by trustee's sale of a deed of trust, I.C.§45-1506, the result is a sale.  In a mortgage foreclosure, "the court may . . . direct a sale of the encumbered property . . . and the application of the proceeds of the sale to the payment of . . . the amount due to the plaintiff; . . ." I.C. §6-101(1).  That the sale is by credit bid does not make it less a sale.

Under I.C.§45-1506(1) and (8), the trustee forecloses a trust deed by sale of the property covered by the trust deed.  "The purchaser at the sale shall forthwith pay the price bid ."  *Id.*  The

trustee shall deliver the trustee's deed to the purchaser. *Id.* The beneficiary may be a purchaser at the sale. *Id.*

Bank of America, N.A. foreclosed and purchased the Arling Center for $989,137.22. It owns the real property, and the amount of its bid, less costs and expenses of the foreclosure and sale, was applied to the balance due on the obligation foreclosed. I.C.§6-101, I.C. §45-1507. BALC admitted that it was entitled to between 35% and 45% of the total proceeds of that sale. BALC overstates its claim by 35% to 455 of the $989,137.22 purchase price at the sale, or between $346,000 and $445,000.

Tamarack therefore asserts that it has a *bona fide* dispute as to the amount due to BALC.

### III.  TMG

TMG asserts it was either a registered contractor as of June 13, 2006, Ex. 503, or that it substantially complied with Idaho Code § 54-5217(2).

> No person engaged in the business or acting in the capacity of a contractor, unless otherwise exempt, may bring or maintain any action in any court of this state for the collection of compensation for the performance of any act or contract for which registration is required by this chapter without alleging and proving that he was a duly registered contractor, or that he was otherwise exempt as provided for in this chapter, at all times during the performance of such act or contract.

I.C.§54-5217(2).

No Idaho court has ruled on how this language is to be interpreted. However, the interpretation of a statute "must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written." *Harrison v. Binnion,* 147 Idaho 645,----, 214 P.3d 631, 635 (2009), *quoting McLean v. Maverik Country Stores, Inc.,* 142 Idaho 810, 813, 135 P.3d 756, 759 (2006).

By the plain language of the statute, unless it can allege and prove that it was a duly registered contractor *at all times* during the performance of such act or contract, TMG/DP Miller is prohibited from bringing any action for the collection of compensation. TMG/DP Miller can not prove that it was a registered contractor at all times during the performance of the contract.

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 14
Closing argument.Redline.wpd\nrg\030310

TMG/DP Miller admits, by its registration, that it was required to register as a contractor. It admits that it was not registered until June 13, 2006, Ex. 503. TMG/DP Miller admits that it began work on April 24, 2006. Ex. 530 (TMG/DP Miller "did on the 24th day of April, 2006, begin to sell, furnish and deliver, all concrete and rebar materials . . . "). For fifty (50) days of the contract performance, TMG/DP Miller was not a registered contractor *at all times* during the performance of such act or contract.

The statute does not limit its application to claims arising only while a contractor is not registered. The phrase "*at all times*" would not seem to be ambiguous. Interpreting the statute with the plain, usual, and ordinary meaning of the phrase "*at all times*," TMG/DP Miller may not assert any claim at all or enforce any lien that it might otherwise have. TMG/DP Miller's claim is subject to a *bona fide* dispute as to liability and amount.

Likewise, TMG/DP Miller has no lien rights, because it was not *at all times* a registered contractor. I.C. §54-5208. TMG/DP Miller also admitted that it did not timely record a mechanics lien for part of the project, Building 25 ("B-25"). It therefore waived the legal remedy available to it as to that claim, which could be asserted against the owner of Building 25. TMG/DP Miller also did not prove the identity of the record owner of Building 25, against whom it might have asserted a lien.

Because TMG/DP Miller did not exhaust its legal remedies, it may not pursue the equitable remedies of quantum meruit and unjust enrichment. *Great Plains Equipment, Inc. v. Northwest Pipeline Corp.*, 132 Idaho 754, 979 P.2d 627 (Idaho 1999), *quoting  Dale's Service,* 96 Idaho 662, 666-67, 534 P.2d 1102, 1106-07 (Idaho 1975).

Even if TMG/DP Miller were entitled to recover on a theory of quantum meruit or unjust enrichment, the amount that TMG/DP Miller might be awarded is contingent and unliquidated. Recovery on quantum meruit is limited to the reasonable value of services rendered or materials provided. *Great Plains Equipment, Inc. v. Northwest Pipeline Corp.*, 132 Idaho at 767, 979 P.2d at 640. Recovery on an unjust enrichment claim is limited to "the amount of enrichment which, as between two parties it would be unjust for one party to retain." *Id.; see also Beco Constr. Co.,*

*Inc. v. Bannock Paving Co., Inc.,* 118 Idaho 463, 466, 797 P.2d 863, 866 (1990). TMG/DP Miller

would have to prove that Tamarack Resort LLC received a benefit and the amount of the benefit

which Tamarack Resort unjustly retained. *Blaser v. Cameron,* 121 Idaho 1012, 1017, 829 P.2d

1361, 1366 (Ct. App.1992).

That TMG/DP Miller might ultimately be determined to have some claim is not relevant.

TMG/DP Miller can not say what the amount of any claim for quantum meruit or unjust

enrichment might be, assuming it was able to prevail on either theory.  That gives rise to a *bona

fide* dispute as to the amount of any claim which TMG/DP Miller might have.

## CONCLUSION

Tamarack asserts that it has a *bona fide* dispute as to the liability and amount of the

claims of both Petra, Incorporated and TMG/DP Miller.  Tamarack asserts that there is a *bona

fide* dispute as to the amount of BALC's claim.  It is enough, under the analysis identified above,

to show that "there are facts that give rise to a legitimate disagreement over whether money is

owed, or, in certain cases, how much." *Vortex Fishing*, 277 F. 3d at 1064.  For each of thee three

creditors, Tamarack Resort, LLC has established facts which give rise to a legitimate

disagreement over whether money is owed or how much.  Under §303(b), as amended by

BAPCPA, the Bankruptcy Abuse and Consumer Protection Act of 2005, that is sufficient to

make each ineligible to be a petitioning creditor.

For these reasons, the Court should dismiss this Involuntary Petition.

## REQUEST FOR ATTORNEY FEES

If this Court does dismiss the Involuntary Petition, TRLLC requests that this Court award

TRLLC a judgment against the petitioners and in favor of TRLLC for its costs, and for a

reasonable attorney's fee, pursuant to § 303(i)(1).  TRLLC asserts that a reasonable attorney's fee

for services rendered would be $15,000.  TRLLC requests that this Court make an award of

attorney fees in the amount of $15,000, jointly and severally, against Petra, Inc. BALC and

TMG/DP Miller.  TRLLC will submit its affidavit of fees and costs after the conclusion of

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 16

briefing in this matter.  TRLLC reserves the right to supplement its affidavit of fees and costs as necessary.

In exercising its discretion to award costs and attorney fees, this Court is to apply a totality of the circumstances analysis.  *Higgins v. Vortex Fishing Sys., Inc.*, 379 F.3d 701, 707 (9th Cir.2004).  "[A]lthough the Code has liberalized standards for instituting involuntary cases, because of the potential adverse impact on the debtor and the need to encourage discretion in filing such cases, unsuccessful involuntary petitioners should routinely expect to pay the debtor's legal expenses arising from the involuntary filing." *In re Macke Intern. Trade, Inc.*, 370 B.R. 236 (9th Cir. BAP 2007), *citing Higgins* 379 F.3d at 707.  The *Higgins* Court applied a rebuttable presumption in favor of an award of costs and attorney fees, following a motion for costs and attorney fees, after a dismissal under §303(i).  *Id.*  These creditors will not be able to present facts sufficient to rebut the presumption in favor of an award of costs and attorney fees.[1]

RESPECTFULLY SUBMITTED this   3   day of  March, 2010.

BAUER & FRENCH


/s/
Randal J. French of the firm, Attorney for Debtor

---

[1] TRLLC reserves its request for punitive damages, made in its Answer to Involuntary Petition, pending this Court's determination of the merits of the involuntary petition and answer.

## CERTIFICATION OF SERVICE

I hereby certify that on the __3__ day of March, 2010, a true and correct copy of the foregoing was served upon:

Office of the U.S. Trustee
Washington Group Central Plaza
720 Park Blvd., Ste. 220
Boise, ID 83712-7764

Jeffrey M Wilson
Wilson & McColl
PO Box 1544
Boise, ID 83701-1544

Brad A. Goergen
Graham & Dunn PC
2801 Alaskan Way Ste 300
Seattle, WA  98121-1128

Mark D. Perison
Mark D. Perison, P.A.
PO Box 6575
Boise, ID  83707-6575

Thomas G. Walker
Cosho Humphrey,  LLP
PO Box 9518
Boise, ID  83707-9518

Charles W. Fawcett
Skinner Fawcett
PO Box 700
Boise, ID 83701-0700

David Penny
Cosho Humphrey, LLP
PO Box 9518
Boise, ID  83707-9518

David T. Krueck
Trout Jones Gledhill Fuhrman, P.A.
PO Box 1097
Boise, ID 83701-1617

Jill S. Holinka
White Peterson, PA
5700 E Franklin Rd Ste 200
Nampa, ID  83687-7901

Terry C. Copple
Davison Copple Copple & Copple, LLP
PO Box 1583
Boise, ID 83701-1583

T.J. Angstman
Angstman, Johnson & Associates, PLLC
3649 N Lakeharbor Ln
Boise, ID  83703-6913

Soo Y. Kang
Greener Burke Shoemaker P.A.
950 W Bannock St Ste 900
Boise, ID  83702-6138

Wyatt B. Johnson
Angstman, Johnson & Associates, PLLC
3649 N Lakeharbor Ln
Boise, ID  83703-6913

Lynnette Davis
Hawley Troxell Ennis & Hawley LLP
PO Box 1617
Boise, ID  83701-1617

Douglas B. Marks
Elsaesser Jarzabek Anderson Marks Elliott &
McDonald, Chtd.
PO Box 1049
Sandpoint, ID  83864-0855

P. Bruce Badger
Fabian & Clendenin
215 S State St Ste 1200
Salt Lake City, UT  84111-2334

Randall A. Peterman
Moffatt Thomas Barrett Rock & Fields, Chtd
PO Box 829
Boise, ID 83701-0829

Bart W. Harwood
Hall Farley Oberrecht & Blanton PA
PO Box 1271
Boise, ID 83701-1271

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 18

Larry E. Prince
Holland & Hart LLP
PO Box 2527
Boise, ID 83701-2527

Terri R. Pickens
Pickens Law, PA
PO Box 915
Boise, ID 83701-0915

John R. Hammond, Jr.
Batt Fisher Pusch & Alderman LLP
PO Box 1308
Boise, ID 83701-1308

John W. Kluksdal
Hepworth Janis & Brody, Chtd.
PO Box 2582
Boise, ID 83701-2582

Anna E. Eberlin
Meuleman Mollerup LLP
755 W Front St Ste 200
Boise, ID 83702-5802

Elizabeth W. Walker
Sidley Austin, LLP
555 W 5th St
Los Angeles, CA 90013-1010

Arnold L. Wagner
Meuleman Mollerup LLP
755 W Front St Ste 200
Boise, ID 83702-5802

Stephen J. Lord
Attorney At Law
800 W State St Ste 200
Boise, ID 83702-5851

Kenneth C. Howell
Hawley Troxell Ennis & Hawley LLP
PO Box 1617
Boise, ID 83701-1617

William F. Nichols
Davis F. VanderVelde
White Peterson
5700 E Franklin Rd Ste 200
Nampa, ID 83687-7901

I FURTHER CERTIFY that on the __3__ day of March, 2010, a true and correct copy of the foregoing was served on non-CM/ECF Registered Participants by U.S. Mail addressed as follows:

Manuel Cachan
Munger Tolles & Olson
355 S Grand Ave 35th Fl
Los Angeles, CA 90071-1560

TW Telecom Inc.
Linda Boyle
10475 Park Meadows Dr Ste 400
Lone Tree, CO 80124-5454

BAUER & FRENCH

/s/
_____
Randal J. French of the firm, Attorney for Debtor

TAMARACK RESORT, LLC'S CLOSING ARGUMENT, p. 19