# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| In Re: | ) Chapter 11 |
|  | ) |
| TAMARACK RESORT LLC, | ) Case No. 09 -03911 |
|  | ) |
| Debtor. | ) |
|  | ) |

## MOTION FOR ENTRY OF ORDER (I) AUTHORIZING POST-PETITION FINANCING; (II) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL; AND (III) GRANTING ADEQUATE PROTECTION

Tamarack Resort LLC, the above-captioned debtor and debtor in possession (the "Debtor"), by and through undersigned counsel, hereby moves for the entry of an order, the proposed form of which is attached hereto as Exhibit A (the "DIP Order"), (i) authorizing the Debtor to obtain post-petition secured superpriority financing pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(d) and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001.1(b) of the Local Bankruptcy Rules; (ii) authorizing the Debtor to use cash collateral; and (iii) granting adequate protection (the "Motion"), and respectfully states as follows:

### Preliminary Statement

1.      The Debtor has spent many months seeking financing to permit it to progress its chapter 11 case and either reorganize or market and sell its assets.  The financing proposed by this Motion is, in the Debtor's business judgment, the most favorable proposal for the reasons set forth herein.  Without this financing, the Debtor will not be able to winterize or maintain its assets or administer this chapter 11 case.

2.      During the course of negotiations between the Debtor and its secured creditors, it

became clear that a management change would serve as the necessary catalyst to permit the

financing to proceed and, consequently, to move this chapter 11 case forward. The proposed

financing is conditioned upon transitioning management for the Debtor, including the

appointment of a Responsible Officer with full power and authority to manage the affairs of the

Debtor, approval for which is being sought concurrently herewith by motion for entry of an order

pursuant to sections 105 and 1107 of the Bankruptcy Code approving the appointment of Links

Realty Advisors, Inc., by and through Michael Fleischer, to serve as the Responsible Officer to

act as or on behalf of the Debtor.

### Jurisdiction

3.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334.

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory predicates for the relief requested herein are sections 105, 361, 362,

363, 364(c)(1), 364(c)(2), 364(d) and 507 of the Bankruptcy Code.

### Background

7.      On December 11, 2009, an involuntary petition was filed against the Debtor by

Banc of America Leasing & Capital LLC, Petra Incorporated, Hobson Fabricating, and

TMG/DPMiller LLC.  The Court entered an Order for Relief against the Debtor on March 17,

2010 [Docket No. 151].

8.      The Debtor filed a Notice of Conversion to Chapter 11 of the Bankruptcy Code on

April 7, 2010 [Docket No. 187], and an order converting the case was entered on April 9, 2010

[Docket No. 190].  No trustee has been appointed in the case and the Debtor continues to operate

its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this chapter 11 case.

9.      On September 10, 2010, an Official Committee of Unsecured Creditors was appointed in this case

10.     The Debtor is a Delaware limited liability company that owns and operates a luxury resort located in Tamarack, Idaho.  The resort features a lodge, townhomes, cottages, chalets, and estate homes and includes a golf course and ski resort.

### Debtor's Pre-Petition Financing

11.     The Debtor entered into a financing arrangement with certain lenders to the Credit Agreement dated as of May 19, 2006 (the "Pre-Petition Credit Agreement Lenders"), with Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), as agent, that is secured by substantially all the Debtor's assets.  As of the filing of the petition, the Pre-Petition Credit Agreement Lenders were owed approximately $292,626,844.47.

12.     The Debtor's former receiver, Douglas P. Wilson, entered into a financing arrangement with certain lenders to the Second Amended and Restated Receivership Credit Facility Agreement dated as of May 18, 2009 (the "Receivership Lenders" and, together with the Pre-Petition Credit Agreement Lenders, the "Pre-Petition Lenders") with Credit Suisse, as agent, that is secured by substantially all the Debtor's assets.

13.     In addition to the security interest of the Pre-Petition Lenders in the Debtor's assets, numerous other parties have allegedly acquired liens against the Debtor's assets.  Certain lien priority issues with respect to these additional liens are currently being adjudicated in the action entitled In re Tamarack Resort Foreclosure And Related Proceedings, Case No. CV-08-

114C, filed in the Fourth Judicial District of the State of Idaho, in and for the County of Valley
(the "Judicial Foreclosure Action").

14.    Banner-Sabey is a general contractor that has asserted a lien on six commercial
buildings being built in the Village Plaza project. The Debtor expended approximately $75
million towards the construction of these commercial buildings. On information and belief,
Banner Sabey asserts, in the Judicial Foreclosure Action, a lien of approximately $7.2 million.

15.    BAG Holdings is litigating, in the Judicial Foreclosure Action, a claim to a
vendee's lien against certain property (known as Belvedere, Whitewater, and B21/22), for which
it had an option which it never exercised. BAG Holdings asserts that its lien (which, on
information and belief based upon rulings in the Judicial Foreclosure Action, does not exceed $2
million) is senior to the blanket lien of Credit Suisse.

16.    Given that the Debtor was a resort under construction during the pre-petition
period, there are many materialmen, architects, construction entities, and utilities which have
also asserted various statutory and other liens against the Debtor's assets, which asserted liens
are not described herein. Liens have also been asserted for unpaid real and personal property
taxes.[1]

## Relief Requested

17.    By this Motion, the Debtor requests (i) authorization to obtain post-petition
secured super priority financing pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2),
364(d) and 507 of title 11 of the Bankruptcy Code and Rule 4001 of the Bankruptcy Rules;
(ii) authorizing the Debtor to use cash collateral; and (iii) granting adequate protection.

---

[1] Pursuant to that certain Order Regarding the Amended Motion of Credit Suisse, AG for Relief from the Automatic
Stay [Docket No. 101] entered on February 3, 2010, the validity, priority and amount of any and all mortgages,
liens, claims or interests regarding the Real Property (as defined in that Order and Exhibit A thereto) are to be
determined by the State Court in the Judicial Foreclosure Action.

18.    A summary of the proposed financing, as provided for and authorized by the proposed DIP Order, is as follows (unless otherwise defined here, capitalized terms shall have the meanings ascribed to such terms in the term sheet (the "Term Sheet") attached hereto as Exhibit B, to which is attached thereto the proposed "DIP Budget"):

| | |
|---|---|
| **Borrower:** | Tamarack Resort LLC, a Delaware limited liability company (the "Borrower"), as a debtor and debtor-in-possession. |
| **DIP Loan:** | A senior secured first priority DIP term loan in the principal amount not to exceed $2,000,000, of which Candlewood Investment Group or its affiliates will fund at least 51% and up to 100.0%. DIP Loan proceeds shall be used as follows: |

(i) to fund, no more frequently than on a biweekly basis, an operating account ("Operating Account") which in turn shall be used to fund (a) the State Lease payment due 1/1/2010 in the amount of $250,000 (the "State Lease Payment") subject to conditions acceptable to the DIP Agent, (b) costs and expenses for maintenance and preservation of the Borrower's assets and a contingency for emergency repairs (it being understood that the Tamarack Resort is not presently an operating resort and unless otherwise approved by the DIP Agent, Borrower will not conduct any operations other than the performance of necessary maintenance and preparation for the sale of its assets and other operations contemplated by the Approved DIP Budget), (c) expenses of marketing the Borrower's properties and assets, (d) liability and casualty insurance premiums, (e) professional (i.e. legal and accounting) fees and expenses incurred by the Borrower and its estate, (f) Lender Expenses (as defined below), and (g) other costs pursuant to the Approved DIP Budget (defined below); and

(ii) to periodically pay interest due the DIP Lenders under the DIP Loan (other than Default Interest (as defined below)) (collectively, the "DIP Loan"). No portion of the DIP Loan shall be used to fund any types of expenses not included in a specific line item of the Approved DIP Budget other than the contingency line item.

The DIP Order shall be in form and substance acceptable to DIP Agent. In the event the DIP Order is stayed, reversed, vacated or modified by a court of competent jurisdiction (including, without limitation, on appeal), or in the event the DIP Agent or the DIP Lenders (or any of them) shall at any time not have the protections of section 364(e) of the Bankruptcy Code in connection with the DIP Loan, no further amounts shall be made available for borrowing under the DIP Loan, and all amounts then outstanding under the DIP Loan shall be immediately due and payable.

| | |
|---|---|
| **Maturity Date:** | Borrower shall repay any outstanding advances and loans under the DIP Loan on the earliest of (i) six (6) months from the Closing Date; (ii) the date of the acceleration of the DIP Loan after the occurrence and during the continuation of an Event of Default; (iii) the date of any stay, reversal, vacatur or modification of the DIP Order, including without limitation any determination that DIP Agent and/or the DIP Lenders (or any of them) are not entitled to the protections of section 364(e) of the Bankruptcy Code in connection with the DIP Loan; and (iv) the effective date of a plan of reorganization in Borrower's Chapter 11 Case. |
| **Interest:** | Interest on the DIP Loan will be payable at the end of each month, at an annual rate equal to 15% per annum (the "Interest Rate"). |
| **Default Rate:** | During the continuance of a default, the Interest Rate applicable to the DIP Loan will be increased by 5% *per annum*. The incremental interest attributable to the Default Rate, if in effect, shall not be paid out of the Disbursement Account. |
| **Loan Fee:** | The DIP Loan shall be subject to a loan fee of 1% of the total commitment amount, to be paid out of the DIP Loan proceeds on the Closing Date. |
| **Administrative Agency Fee:** | $50,000.00, payable to the DIP Agent, to be paid out of the DIP Loan proceeds on the Closing Date. |
| **Collateral:** | To secure all obligations of Borrower under the DIP Loan, the DIP Agent, for the benefit of the DIP Lenders, will receive a fully perfected first priority security interest in all pre-petition and post-petition assets of Borrower other than as expressly set forth herein (the "Collateral") including without limitation all rights, claims, and other causes of action of Borrower's estate (including any actions asserted by Borrower or any subsequently appointed trustees or representatives of Borrower's estate under any section of the Bankruptcy Code), and in each case, all proceeds resulting or arising therefrom; provided, however, that the Collateral shall not include any claims, defenses, causes of action or rights as arise under sections 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code. |
| | "Collateral" shall also include any and all of the following to the extent they relate, in whole or in part, to the Collateral: (a) all entitlements, permits, licenses, leases and approvals (collectively, "Permits"), including but not limited to any and all Permits issued by any federal, state, county, city or local governmental entity or agency, (b) appurtenances, (c) water rights, (d) interests or memberships or rights (whether in homeowners associations, golf courses or similar memberships or rights), (e) deposits or reservations of any kind or nature to the extent permitted by applicable law, (f) rights as a lessee under any leases for real or personal property, and (g) contract rights. |
| | "Collateral" shall also include any and all rents, issues, profits, products, proceeds and offspring generated by any item of Collateral, without the |

necessity of any further action of any kind or nature by the DIP Lenders or DIP Agent in order to claim or perfect such rents, issues, profits, products, proceeds and/or offspring.

Notwithstanding anything to the contrary herein, "Collateral" shall not include (i) the equipment which was subject to the lease of BALC, and for which stay relief was granted by the Bankruptcy Court by its Summary Order entered May 25, 2010, Docket 238; and the assets subject to orders lifting stay entered in favor of Bank of the West, Docket 185; G.E. Capital, Docket 192; and Hopkins Growth Fund LLC, Docket 87; (ii) that certain Dopplemayr CTEC "Wildwood Express Detachable Quad Chairlift" and Dopplemayr CTEC "Whitewater Chair" Quad Fixed Grip Chairlift, which are identified in UCC Financing Statement recorded in the official records of Valley County, Idaho on December 13, 2006, as Instrument No. 313620; and (iii) a cash deposit of $40,340 held by Idaho Power to secure payment for that utility.

All obligations of Borrower under and with respect to the DIP Loan (the "DIP Obligations") will be secured by, pursuant to sections 364(c)(1), and (2) and section 364(d)(1) of the Bankruptcy Code, a first priority lien senior to all prepetition liens and will also receive and be entitled to a super-priority administrative expense claim (the "Superpriority Claim") over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out. The liens described in this and the preceding paragraphs are sometimes referred to as the "DIP Priming Lien."

The obligations of Borrower under the DIP Loan shall have super-priority over any and all other administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out.

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, satisfactory to DIP Agent, and, subject to customary exceptions, none of the Collateral shall be subject to any other pledges, security interests or mortgages other than prepetition liens that are in each case junior in all respects to the DIP Priming Liens.

**Carve-Out:**   So long as there is no Event of Default (or an event which with the giving of notice or lapse of time or both would constitute an Event of Default), the allowed professional fees and disbursements incurred in Borrower's Chapter 11 Case may be paid (but only after first exhausting any retainer amounts held by each such professional as of the Conversion Date) to the extent authorized in the Approved DIP Budget and the DIP Order (as defined below) and subject further to final Bankruptcy Court approval of any such professional fees and disbursements. There shall be no limitation on the right of any party to object to any interim or final fee applications filed in the Chapter 11 Case by any professionals.

In addition, the DIP Priming Lien on the Collateral and claims, including

any Superpriority Claims, will be subject to a Carve-Out (the "Carve-Out"), for the purpose of, and in an amount not to exceed (i) all allowed professional fees and expenses incurred by Borrower prior to delivery by DIP Agent to Borrower and its counsel of record of a notice of cessation of funding from the Disbursement Account, but which fees and expenses shall not exceed the amounts set forth in the Approved DIP Budget for such items through the date of such notice less any amounts actually paid to or on account of such professionals with respect to such period of time, plus (ii) the Disposition Fee, if due, to Links Realty Advisors, as such fee is defined in its Engagement Letter, plus (iii) $25,000 for the payment of allowed professional fees and expenses arising after DIP Agent delivers notice to Borrower and its counsel of record of cessation of funding from the Disbursement Account, plus (iv) fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Bankruptcy Court, to the extent such fees were incurred prior to delivery by DIP Agent to Borrower of a notice of an Event of Default. After expiration or termination of the DIP Loan, the beneficiaries of the Carve Out shall be paid ratably within ten (10) days of the date the DIP Agent receives any repayment of DIP Loan but in no event shall these beneficiaries receive a greater amount than they were entitled to receive under the Carve Out; provided, however, the Disposition Fee shall be paid by the DIP Lenders no later than twelve months from the date of such termination or expiration of the DIP Loan.

Notwithstanding the foregoing, no portion of the Carve-Out, and no portion of any amounts approved for payment prior to an Event of Default, shall be utilized in a manner prohibited in the Use of Proceeds section of the Term Sheet.

**Closing Date:** A date on or before October 29, 2010, upon which all Conditions to Closing are satisfied (the "Closing Date"). The parties shall use their commercially reasonable efforts to close before October 29, 2010.

**Voting:** Amendments and waivers of the definitive credit documentation will require the approval of DIP Lenders subject to exceptions to be set forth in the definitive credit documentation. Amendments to agency provisions of the definitive credit documentation will require the approval of the DIP Agent.

**Reservation of Rights:** DIP Agent and the DIP Lenders will expressly reserve all rights, including, but not limited to all rights to seek additional adequate protection and/or relief from the automatic stay to enforce any rights under the DIP Loan.

**Remedies:** Upon the occurrence and during the continuation of an Event of Default, DIP Agent shall have customary remedies, including that upon ten (10) days' written notice to Borrower the automatic stay under section 362 of the Bankruptcy Code shall be deemed lifted without further order or application to the Court, to permit the DIP Agent to do one or more of the following: (i) reduce the amount of or terminate any outstanding commitments; (ii) terminate the DIP Loan; (iii) charge the default rate of

interest on the DIP Loan; (iv) declare the entirety of the DIP Loan to be due and payable; and (v) realize on any or all of the Debtor Accounts and exercise any and all remedies under the DIP Loan and any control agreement with respect to the Debtor Accounts and to set off or seize amounts in the Debtor Accounts maintained with or under the control of the DIP Agent for the benefit of the DIP Lenders. In addition, upon the occurrence and during the continuation of an Event of Default, the DIP Agent, without notice, may (a) immediately withdraw and disburse all amounts in the Disbursement Account as provided in the section entitled "DIP Loan" above; and (b) exercise its remedies under the control agreements with respect to the Debtor Accounts and Borrower's pre-petition bank accounts, to order such banks to (i) immediately dishonor all withdrawals from such bank accounts ordered by Borrower, and (ii) immediately transfer all funds in such bank accounts into the Disbursement Account and then daily thereafter transfer any additional funds deposited into such accounts into the Disbursement Account.

**Indemnification:**    Borrower shall indemnify and hold harmless, and provide limitations of liability to, DIP Agent, the DIP Lenders, and each of their affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives (each, an "Indemnified Party"), in connection with the DIP Loan, subject to customary limitations for gross negligence and willful misconduct.

**Exculpation:**    The members and officers of Borrower shall have no personal liability for any actions taken by taken by the Responsible Officer or by the Borrower at the direction of the Responsible Officer, and from and after the Court's approval of the retention of the Responsible Officer, the members and officers of the Borrower shall have no duty to operate or manage the estate of Borrower.

**Non-Interference Agreement:**    The following shall be an additional condition precedent to the DIP Agent's and the DIP Lenders' obligations under the definitive documentation for the DIP Loan:

The Guarantors shall have entered into a standstill and non-interference agreement, binding on the Guarantors and all insiders and affiliates of Borrower, including without limitation, Friends of Tamarack, LLC, Cross Atlantic Real Estate LLC, VPG Investments, Inc., Resort, LLC, A&M Development, LLC and Albert Consulting & Management, LLC (collectively, with the Guarantors, the "Insider Parties"), with the Borrower and DIP Agent acceptable to the Responsible Officer and Borrower's counsel and DIP Agent and its Counsel, and approved by the Bankruptcy Court, providing that until the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or the Effective Date of the Plan, whichever is earlier, no Insider Parties shall engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP Loan or the Pre-Petition Obligations or the liens on or security interests in the assets of Borrower securing the DIP Loan or the Pre-

Petition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Pre-Petition Obligations, or engage in or support any investigation or assertion of any claims or causes of action (or supporting the assertion of the same) against (x) the DIP Lenders, the DIP Agent and/or the Lead Arranger, (y) the Pre-Petition Agents and/or (z) the Pre-Petition Lenders.

The following shall be an additional condition precedent to the parties' obligations under the definitive documentation for the DIP Loan:

**Litigation Stay; Standstill**

Subject to (a) the approval by the Bankruptcy Court of the DIP Motion and the entry of the DIP Order, and (b) the approval by the Bankruptcy Court of the Responsible Officer Motion and the entry of the order approving the Debtor's appointment of the Responsible Officer, (i) the administrative agent under the Pre-Petition Credit Agreement and the Guarantors shall join in a motion seeking a stay of the proceedings in Case No. CV 08-139-S-EJL pending in the United Stated District Court for the District of Idaho against Jean-Pierre Boespflug and Alfredo Miguel Afif, (ii) subject to the entry of an order of the District Court approving the stay referred to in clause (i) immediately hereinabove, the Pre-Petition Agents shall agree not to bring any similar actions in any other jurisdiction, and (iii) Guarantors shall agree not to bring, file or prosecute any action or proceeding against the DIP Agent or any of its affiliates (including the Pre-Petition Agent) or any of the Pre-Petition Agents or  Pre-Petition Lenders related to the DIP Loans or the Pre-Petition Loans or the validity or enforceability of Guarantors' guarantees or seeking any relief, including declaratory relief, respecting same, in any jurisdiction; in each case for a period of six (6) months from the Closing Date.

**Lender Expenses:**

Borrower shall pay the expenses of the DIP Agent and the DIP Lenders, including, without limitation, the reasonable fees and disbursements of counsel and third party appraisers, collateral agents, consultants, advisors and auditors advising the DIP Agent and the DIP Lenders, including a financial advisor selected by the DIP Agent, internally allocated charges and expenses relating to the DIP Agent's initial and ongoing DIP Loan examinations, expenses in connection with periodic field audits, the monthly and other monitoring of assets, syndication, enforcement of rights, other miscellaneous disbursements, in connection with the preparation and negotiation of the DIP Loan and any amendments thereto, including the fees and expenses of counsel (collectively, the "Lender Expenses").

**Adequate Protection for Pre-petition Lenders:**

As adequate protection to the Pre-Petition Lenders for any diminution in the value of their interests in Borrower's property resulting from (i) the priming liens granted in favor of the DIP Agent for the benefit of the DIP Lenders under the DIP Loan pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use, sale or lease of Borrower's property (including any cash collateral) pursuant to section 363(c) of the Bankruptcy

Code, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

(a) The Pre-Petition Lenders will, subject to the terms of the DIP Order, maintain liens on the Collateral, junior and subordinate to the Carve-Out and the liens securing the DIP Loan;

(b) The Pre-Petition Lenders shall be granted replacement liens on, and security interests in, the Collateral, subject only to the Carve-Out and the liens on, and security interests in, the Collateral granted to the DIP Agent under the DIP Loan and the DIP Order, as the case may be, and any bona fide prior third party liens; and

(c) The Pre-Petition Lenders shall be granted an administrative claim with priority over all administrative expense claims and unsecured claims against Borrower, subject only to the Carve-Out and to the Superpriority Claims granted to DIP Agent under the DIP Loan and the DIP Order, as the case may be.

**Basis for Relief**

19.    Section 364 of the Bankruptcy Code provides a debtor-in-possession the authority to obtain post-petition financing. Sections 364(a) and (b) allow a debtor to obtain unsecured financing as an allowable administrative expense. 11 U.S.C. § 364(a), (b). However, if the debtor is unable to obtain financing on an unsecured basis, section 364(c) and (d) offer additional incentives for debtors to provide to lenders.

20.    Sections 364(c) and (d) of the Bankruptcy Code provide that:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3) secured by a junior lien on property of the estate that is subject to a lien.

(d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–
(A) the trustee is unable to obtain such credit otherwise; and
(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien

> is proposed to be granted.
> (2) In any hearing under this subsection, the trustee has the burden of
> proof on the issue of adequate protection.

11 U.S.C. § 364(c), (d).

21.    Debtors who exercise sound business judgment, within the confines of the

policies underlying the Bankruptcy Code, in obtaining post-petition financing are afforded

deference by the courts. See, e.g., In re Ames Dept. Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y.

1990).

**A.    The DIP Loan Should Be Approved**

22.    If a debtor is unable to obtain postpetition credit on an unsecured basis, a court

may authorize the debtor to obtain postpetition credit or incur postpetition debt which entitles the

postpetition lender to a junior lien on encumbered property, a first-priority lien on unencumbered

property of the debtor, and superpriority administrative expense status.  11 U.S.C. § 364(c)(1),

(2), and (3).  Bankruptcy Code section 364(d) allows post-petition financing that provides a

postpetition lender a senior or equal lien on a debtor's encumbered property (a "priming" lien) if

(i) the debtor could not obtain alternative financing and (ii) the interests of the secured parties

whose security interests are being primed are adequately protected. 11 U.S.C. § 364(d)(1).

23.    The debtor is granted deference by the court if the court finds the debtor acted

within its business judgment when seeking out alternative sources of financing. See, e.g., Bray v.

Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085 (4th Cir. 1986).  A

debtor is not required to seek out exhaustively every potential source of postpetition financing.

See id.; see also In re Mid-State Raceway, Inc., 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); In re

Baxco Corp., 148 B.R. 855, 860 (Bankr. N.D. Ill. 1992).  The debtor may incur secured

financing pursuant to § 364 by exercising reasonable business judgment that the financing is in

the best interests of the estate. See In re Simasko Production Co., 47 B.R. 444, 449 (Bankr. D.

Colo. 1985) (debtor exercised best business judgment by seeking financing to continue

operations reasonable and necessary for the benefit of the estate); In re Ames Dept. Stores, 115

B.R. at 38 (debtors are permitted to exercise business judgment to fulfill their fiduciary duties).

24.     The Debtor has spent considerable time and effort contacting a number of

potential financing sources. Given that substantially all of Debtor's assets are encumbered, the

Debtor has concluded that the DIP Loan provides the most viable financing option for the

Debtor. The Debtor sought financing from numerous parties and was unable to find financing on

better terms than the terms provided by the DIP Lenders. Moreover, all secured lenders will be

adequately protected because, in the absence of the financing and as described further below, the

value of their collateral will be significantly diminished. In addition, the Debtor has directed CB

Richard Ellis to market the Debtor's properties for sale. Multiple parties have submitted

indications of interest to purchase the resort and various assets within the resort. The DIP Loan

is needed in order to advance the chapter 11 case, to fund the marketing of the project, to pay

certain limited ongoing expenses of the Debtor while it is engaged in that process, and to sell the

property as well as provide a means for a plan to be confirmed.

25.     The Debtor negotiated in good faith and extensively at arm's length with the DIP

Agent and the DIP Lenders. Accordingly, the Debtor's efforts to obtain necessary post-petition

financing satisfy the requirements of Bankruptcy Code Section 364(c) and (d).

**B.     The DIP Loan Was the Most Favorable Financing Proposed**

26.     Substantially all of the Debtor's assets are encumbered and, despite the diligent

efforts of the Debtor, the Debtor has been unable to procure the required funding absent the

proposed superpriority claims and priming liens. The Debtor has made numerous attempts to

seek other sources of debtor-in-possession financing. Other potential lenders have either declined to offer a loan, or would only agree to provide a loan under substantially similar "priming" terms. Many of the lenders have responded to the Debtor's inquiries that the small amount of the loan coupled with its complexity make this loan undesirable.

27.    The Debtor has negotiated the best possible terms to obtain the funding it needs to maintain sufficient liquidity to preserve its assets over the course of its chapter 11 case, and the DIP Lenders are unwilling to provide the DIP Loan without the proposed priming liens. Accordingly, the first requirement of Bankruptcy Code section 364(c) and (d)(1) is satisfied.

**C.    The Debtor's Pre-Petition Secured Creditors Will Receive Adequate Protection.**

28.    The Bankruptcy Code does not define adequate protection. Section 361 of the Bankruptcy Code, however, lists three examples that qualify as adequate protection where a decrease in the value of an entity's interest in the property will result from the grant of a priming lien: (i) a cash payment or periodic cash payments, (ii) an additional or replacement lien; or (iii) other relief that will result in the indubitable equivalent of the entity's interest in the property. A determination of whether an entity is adequately protected is made on a case-by-case basis. See MNBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1397 (10th Cir. 1987); Martin v. United States (In re Martin), 761 F.2d 472, 474 (8th Cir. 1995). Adequate protection is required to protect a lienholder from any diminution in value of their interest as a result of the imposition of a priming loan. See In re O'Connor, 808 F.2d at 1398.

29.    The Debtor will be providing adequate protection to all secured creditors through the preservation of its assets with the use of the necessary funds from the DIP Loan. Without the DIP Loan, the value of secured creditors' collateral would be greatly reduced. In In re Snowshoe Co., 789 F.2d 1085 (4th Cir. 1986), the court was faced with the similar factual situation of a ski

resort that needed debtor-in-possession financing in order to maintain the value of the estate assets. Without the financing the resort would not have been properly maintained and the value of the debtor's assets would have lost between 50% and 90% of their fair market value. Id. at 1087. With the upcoming winter, the court found that "time is of the essence in an effort to preserve a vulnerable seasonal enterprise." Id. at 1088.

30.    In Snowshoe, the court recognized the drastic loss that would be recognized by secured parties in that case if the debtor were unable to maintain the facilities. In this case, while the Tamarack Resort is not conducting ongoing business operations at this time, it is nonetheless the case that if the Debtor is unable to maintain and winterize its facilities, the value of the secured parties' liens will be drastically reduced. The DIP Loan will maintain the value of the property with the ultimate goal of preserving and maximizing the value of the Debtor's assets through a consensual sale process, for the ultimate benefit of creditors and the estate. In addition, if the Debtor is not permitted to complete its chapter 11 case, the Debtor could lose its rights under the ground lease with the State of Idaho.[2] In this event, the secured creditors would lose substantially all of the value of their collateral. Thus, by permitting the Debtor to retain its real property lease and winterize and maintain its assets, the Debtor's secured creditors will receive adequate protection through this financing.

**D.    The DIP Loan Is Necessary, Benefits the Estate, and Has Been Negotiated in Good Faith.**

31.    The Debtor has an immediate need to obtain the DIP Loan in order to permit the funding of the Debtor's chapter 11 case, pay certain ongoing expenses in order to ensure the orderly maintenance and preservation of its assets, to maintain existing relationships with

---

[2] The Debtor leases approximately 2,000 acres of land containing the ski resort, golf course, and all related property from the State of Idaho Land Board. In the event of non-payment, the lessor has the ability to terminate the Debtor's real property lease. See Debtor's State Lease, copy attached hereto as Exhibit C, pp. 63-64.

vendors, suppliers and customers, to make payroll, to satisfy other working capital and operational needs, and to pay administrative and professional expenses. Without the DIP Loan, the Debtor is unable to meet any of these obligations or to maintain and winterize its assets.

32.     Before determining to enter into the DIP Loan under the terms in the Term Sheet, the Debtor, the DIP Agent and the DIP Lenders conducted arm's-length and good faith negotiations. The Debtor ultimately determined that the proposal for debtor-in-possession financing provided by the DIP Lenders was the most favorable under the circumstances, with this process aided by the DIP Lenders' status as certain of the Debtor's prepetition lenders.

33.     The terms set forth in the DIP Order have been negotiated in good faith and at arm's-length among the Debtor, the DIP Agent and the DIP Lenders, are fair and reasonable under the circumstances, reflect the Debtor's sound exercise of business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

34.     The DIP Order contains certain provisions that limit the estate and parties in interest with respect to investigations of or challenges to the validity, priority and perfection of the Pre-petition Lenders' liens. All of these provisions are necessary to secure the facility, and have been granted in recognition of the real business risks that the DIP Lenders will incur in making the DIP Loan available to the Debtor. The Debtor maintains that ample "cause" exists for the approval of such provisions in accordance with paragraph (b) of Appendix I to the Local Bankruptcy Rules, "Guidelines Regarding Motions to Use Cash Collateral or to Obtain Credit, or Stipulations Regarding the Same" ("Guidelines").

35.     Absent the proposed DIP Loan and the particular security for the repayment thereof recited above, the Debtor will suffer immediate and irreparable harm, and its reorganization effort will be fatally threatened. The Debtor is not able to mount a reorganization

effort using cash collateral alone and, in the absence of the post-petition funding provided by the DIP Lenders, would be unable to maintain the properties and facilities and maximize value to the creditors through a reorganization or sale of the resort as a going concern. These reasons compel the conclusion that approval of the Motion and entry of the DIP Order is in the best interests of the Debtor and the estate, creditors and other parties in interest.

36.     The Debtor has concluded in the exercise of its business judgment that the DIP Loan provides the best opportunity to offer post-petition financing that can meet the Debtor's immediate and ongoing operational needs and expenses within the exigencies of its current business circumstances. Since the DIP Loan has been negotiated in good faith and at arm's length and no consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Loan other than as described in the Term Sheet, the DIP Loan should be accorded the benefits of section 364(e) of the Bankruptcy Code for all of the reasons set forth herein.[3]

**Statement Pursuant to Local Bankruptcy Rule Appendix I**

37.     Pursuant to Local Bankruptcy Rule 4001.1(b)(7), the following is a statement of the provisions from Appendix I, paragraph (b), of the Local Bankruptcy Rules that are relevant to this Motion. The DIP Loan includes the following:

- provisions that prime the liens and/or security interests of secured creditors who are not parties to the agreement; and

- provisions that provide carve out treatment for certain post-petition professional expenses but such provisions do not treat such expenses inequitably.

38.     As discussed in this Motion, cause exists for the approval of the DIP Loan, including the provisions highlighted in the paragraph above, because the DIP Loan is necessary

---

[3] Section 364(e) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."

for a resolution of this chapter 11 case and is the only reasonably available source of funding.

**Notice**

39.    Notice of this Motion has been given by facsimile, electronic transmission, overnight delivery, first-class U.S. Mail (postage pre-paid), or hand delivery to (a) counsel for the United States Trustee for the District of Idaho, (b) proposed counsel for the Committee, (c) each of the other twenty-five (25) largest unsecured creditors, (d) counsel for those creditors listed on Schedule D to the Debtor's Schedules and Statement of Financial Affairs , and (e) all other parties in interest who have filed requests for notices and pleadings in this case.  The Debtor submits that no other notice need be given.

WHEREFORE, for the reasons stated herein, the Debtor respectfully requests that the Court:  (a) enter its Order, in the form attached as Exhibit A 1 hereto, *inter alia* (i) authorizing the Debtor to obtain postpetition secured superpriority financing, (ii) authorizing the Debtor to use cash collateral, and (iii) granting adequate protection, all as more fully set forth in such proposed Order; and (b) grant such other and further relief as may be just and proper.

Dated:    September 25 2010          VENABLE LLP


/S/ _____
Jorian Rose (*pro hac vice*)
Rockefeller Center
1270 Avenue of the Americas
Twenty-Fifth Floor
New York, New York 10020
(212) 307-5500
(212)(307-5598 (fax)
jlrose@venable.com

Special Counsel for Debtor and Debtor in Possession

DATED this __25__ day of September, 2010.

BAUER & FRENCH

/s/

Randal J. French of the firm, Attorney for
Debtor

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| In re: | Chapter 11 |
| TAMARACK RESORT, LLC, | Case No. 09-03911-TLM |
| Debtor. | Hearing Date:      [___] [_], 2010<br>Hearing Time:      [_____] |

### FINAL ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE DEBTOR'S LIMITED USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364

Upon the motion of the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), dated [____] [_], 2010 [Docket No. [__]] (the "Motion"),[1] requesting the entry of a final order (this "Order") pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d) and 364(e) of title 11 of the United States Code, 11 U.S.C. § 101–1532 (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things:

(a)      authorization for the Debtor to obtain senior secured post-petition financing in an aggregate principal amount of up to $2,000,000.00 (the "DIP Loan"), pursuant to section 364 of the Bankruptcy Code, from Credit Suisse, Cayman Islands Branch ("Credit Suisse") as administrative agent and as collateral agent (in such capacity, the "DIP Agent") and Credit Suisse, or its affiliates or branches as it may designate, as a lender under the DIP Loan together with any person who shall become a lender under the DIP Loan (collectively, the "DIP Lenders") all pursuant to the terms of this Order and that certain DIP Credit Agreement by and among the Debtor, the DIP Agent, and the DIP Lenders in substantially the form attached to hereto as Exhibit A (as the same may be

---

[1]  Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Motion.  The Debtor, as defined herein, is the "Borrower" under the DIP Credit Agreement and the other Loan Documents.



amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), and any related documents required to be delivered by or in connection with the DIP Credit Agreement (collectively, the "Loan Documents");

     (b)    authorization for the Debtor to execute and enter into the Loan Documents and to perform such other and further acts as may be required in connection with the Loan Documents;

     (c)    the grant of security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to section 364(c)(2) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Lenders, to secure all obligations of the Debtor under and with respect to the DIP Loan;

     (d)    authorization for the Debtor's limited use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), on the terms and conditions set forth in this Order and in the DIP Credit Agreement;

     (e)    the grant of adequate protection to the Prepetition Agents (as defined below) for the benefit of the Prepetition Lenders (as defined below), whose liens and security interests are being primed by the DIP Loan, as more fully set forth in this Order; and

     (f)    the modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor, the DIP Agent, the Prepetition Agents, the DIP Lenders and the Prepetition Lenders to implement the terms of this Order.

A hearing on the Motion was held by this Court on [_____] [__], 2010 (the "Hearing").  The Court read and considered the Motion, and all pleadings related thereto including all objections to the Motion, as well as the record made by the Debtor and other entities at the Hearing, and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**

I.      **Background, Jurisdiction and Notice.**

      A.      On December 11, 2009, an involuntary petition under chapter 7 of the Bankruptcy Code was filed against the Debtor (the "Petition Date").

      B.      Prior to the Petition Date, the Prepetition Lenders made certain loans and other financial accommodations to the Debtor pursuant to that certain Credit Agreement dated as of May 19, 2006, among the Debtor, the lenders party thereto (the "Prepetition Credit Agreement Lenders"), Credit Suisse AG, Cayman Islands Branch, as administrative agent and as collateral agent (the "Prepetition Agent"), and other persons party thereto (as amended, the "Prepetition Credit Agreement").  Pursuant to the Prepetition Credit Agreement, the Prepetition Lenders agreed to extend revolving and term credit facilities to Debtor from time to time in the aggregate principal amount of $250,000,000.

      C.      Prior to the Petition Date, the Receivership Lenders made certain loans and other financial accommodations to the receiver for the receivership estate of the Debtor, pursuant to that certain Second Amended and Restated Receivership Credit Facility Agreement dated as of May 18, 2009 (the "Receivership Credit Agreement" and, collectively with the Pre-Petition Credit Agreement, the "Prepetition Obligations"), by and among Douglas P. Wilson as court-appointed receiver (the "Receiver"), the lenders party thereto (the "Receivership Lenders" and, together with the Prepetition Credit Agreement Lenders, the "Prepetition Lenders"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and as collateral agent (the "Receivership Agent" and together with the Prepetition Agent, the "Prepetition Agents"').  Pursuant to the Receivership Credit Agreement, the Receivership Lenders agreed to extend term loans to the Receiver as court-appointed receiver on behalf of the Debtor, from time to time, in the aggregate principal amount of $12,162,810.

      D.      On February 3, 2010, this Court entered its Order Regarding the Amended Motion of Credit Suisse AG for Relief From the Automatic Stay (CR 101) (the "Stay Relief Order"). The Stay Relief Order allows the state court in In re Tamarack Resort Foreclosure And Related

Proceedings, Case No. CV-08-114C, filed in the Fourth Judicial District of the State of Idaho, in and for the County of Valley (the "State Court Proceeding"), to proceed to determine the validity, priority and amount (including attorneys fees and costs) of any and all mortgages, liens, claims or interests regarding the Debtor's Real Property (as defined in the Stay Relief Order).

E.      On April 9, 2010, this Court granted the Debtor's motion to convert its case from a case under chapter 7 of the Bankruptcy Code to the Chapter 11 Case (CR 190).  The Debtor is managing its respective properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

F.      On August 27, 2010, this Court entered its Order Authorizing Debtor's Limited Use of Cash Collateral and Granting Adequate Protection to Agent Pursuant to Bankruptcy Code §§ 105, 361, 362, 363 and 507 and Bankruptcy Rule 4001 (CR 303) (the "Cash Collateral Order").  The Cash Collateral Order approved the Debtor's limited use of the Prepetition Agents' Cash Collateral.

G.      On September 10, 2010, an Official Committee of Unsecured Creditors (the "Committee") was appointed.

H.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

I.      The Debtor has complied with Bankruptcy Rule 4001(b), (c) and (d), and Local Rule 4001.1(b) of the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court for the District of Idaho (the "Local Rules") by serving the Motion and providing notice of the Hearing to:  (i) the U.S. Trustee; (ii) proposed counsel to the Committee; (iii) counsel to the DIP Agent; and (iv) all other creditors identified on the certificate of service filed with the Motion. Given the nature of the relief sought in the Motion, the Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rule 4001 and Local Rule 4001.1 in all respects.

## II.    Findings Regarding the Post-Petition Financing.

J.    The Debtor has an immediate and critical need to obtain post-petition financing under the DIP Loan and to use Cash Collateral in order to, among other things, fund the state lease payment due 1/1/2010 in the amount of $250,000.00 (the "State Lease Payment"), pay maintenance expenses, certain lender expenses, professional fees and expenses incurred by the Debtor in this Chapter 11 Case, and fund the costs associated with the Debtor's retention of a responsible officer ("Responsible Officer") and real estate broker ("Broker") to ensure that the Debtor's property is marketed in such a manner so as to maximize the value of the Debtor's estate.  The Debtor's access to sufficient working capital and liquidity through the incurrence of post-petition financing under the DIP Loan and the use of Cash Collateral under the terms of this Order is vital to the preservation and maximization of the value of the Debtor's estate. Consequently, without access to the DIP Loan and the continued use of Cash Collateral, to the extent authorized pursuant to this Order, the Debtor and its estate would suffer immediate and irreparable harm.

K.    The use of Cash Collateral alone would be insufficient to meet the Debtor's post-petition liquidity needs.  The Debtor is unable to obtain (1) adequate unsecured credit allowable under either (a) sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) section 364(c)(1) of the Bankruptcy Code, (2) adequate credit secured by (a) a senior lien on unencumbered assets of its estate under section 364(c)(2) of the Bankruptcy Code and (b) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (3) adequate secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Loan.  The only sufficient source of credit available to the Debtor under the facts and circumstances of this case is the DIP Loan.  The Debtor requires both additional financing under the DIP Loan and the continued use of Cash Collateral under the terms of this Order to satisfy its post-petition liquidity needs.

L.    The DIP Lenders have indicated a willingness to provide the Debtor with certain financing, but solely on the terms and conditions set forth in this Order and in the Loan

Documents.  After considering all of its alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of this Order and the Loan Documents represents the best financing presently available to the Debtor.

M.      The Prepetition Agents and the Requisite Lenders (as defined under the Prepetition Obligations) are prepared to consent to:  (i) the imposition of certain liens under section 364(d)(1) of the Bankruptcy Code in favor of the DIP Agent, for the benefit of the DIP Lenders, but solely on the terms and conditions set forth in this Order and in the Loan Documents, which DIP Liens (as defined in paragraph 20(c) below) will prime the existing liens that presently secure the Prepetition Obligations (the "Prepetition Liens"), and (ii) the Debtor's use of the Prepetition Agents' collateral (the "Prepetition Collateral"), including Cash Collateral, provided that the Court authorizes the Debtor, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, to grant to the Prepetition Agents, for the benefit of themselves and the Prepetition Lenders, the Adequate Protection Liens (as defined below).

N.      The consent of the Prepetition Agents and the Requisite Lenders (as defined under the Prepetition Obligations) to the priming of their liens by the DIP Liens is limited to the DIP Loan presently before the Court, with Credit Suisse as DIP Agent and certain of the Prepetition Lenders as DIP Lenders, and shall not extend to any other post-petition financing or to any modified version of the DIP Loan, including with any party other than Credit Suisse as DIP Agent.  Furthermore, the consent of the Prepetition Agents and the Requisite Lenders (as defined under the Prepetition Obligations) to the priming of their liens by the DIP Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Agents and the Prepetition Lenders that their interests in the Prepetition Collateral are adequately protected pursuant to this Order or otherwise.

O.      The security interests and liens granted pursuant to this Order to the DIP Agent, for the benefit of the DIP Lenders, are appropriate under section 364(d) of the Bankruptcy Code because, among other things:  (i) such security interests and liens do not impair the interests of

any holder of a valid, binding, continuing, enforceable and fully-perfected prepetition security interest or lien in the property of the Debtor's estate except to the extent such prepetition security interest or lien is junior to the Prepetition Liens and therefore such security interest or lien is not entitled to adequate protection pursuant to section 361 of the Bankruptcy Code; (ii) the holders of such valid, binding, continuing, enforceable and fully-perfected prepetition security interests and liens, or their agents, to the extent such prepetition interests and liens are not junior to the Prepetition Liens, have consented to the security interests and priming liens granted pursuant to this Order to the DIP Agent for the benefit of the DIP Lenders; or (iii) the holders of such valid, binding, continuing, enforceable and fully-perfected prepetition security interests and liens, or their agents, to the extent such prepetition interests and liens are not junior to the Prepetition Liens, are adequately protected pursuant to section 361 of the Bankruptcy Code because the value of the property on which such interests or liens attach is being preserved through the Debtor's use of the DIP Loan.

P.      The security interests and liens granted pursuant to this Order to the Prepetition Agents, for the benefit of themselves and the Prepetition Lenders, are appropriate under section 364(d) of the Bankruptcy Code because, among other things, such security interests and liens do not impair the interests of any holder of a valid, binding, continuing, enforceable and fully-perfected prepetition security interest or lien in the property of the Debtor's estate except to the extent such prepetition security interest or lien is junior to the Prepetition Liens and therefore such security interest or lien is not entitled to adequate protection pursuant to section 361 of the Bankruptcy Code.

Q.      Good cause has been shown for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), and, to the extent it applies, Bankruptcy Rule 6003, as the Court finds that entry of this Order is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

R.      The authorization granted herein for the Debtor to execute the Loan Documents, to use Cash Collateral, to obtain financing on a final basis, including on a priming lien basis, and

to provide adequate protection of certain interests, is necessary, essential and appropriate to avoid immediate and irreparable harm to the Debtor and its estate. Entry of this Order is in the best interest of the Debtor, its estate and its creditors. The terms of the Loan Documents (including the Debtor's use of Cash Collateral) are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

S.    The Debtor, the DIP Agent, the DIP Lenders and the Prepetition Agents have negotiated the terms and conditions of the Loan Documents (including the Debtor's use of Cash Collateral) and this Order in good faith and at arm's-length, and any credit extended and loans made to the Debtor pursuant to this Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

T.    The Debtor stipulates that in making the decision to finance the Debtor's Chapter 11 Case through the DIP Loan, in making the decision to permit the Debtor to use the Cash Collateral, in administering any loans, or in taking any other actions permitted by this Order or the Loan Documents, none of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders, as applicable, shall be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person," "owner or operator" or part of any "control group" with respect to the Debtor or the operation or management of the Debtor.

U.    Based on the foregoing, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is approved on a final basis on the terms and conditions set forth in this Order.  Any objections to the Motion that have not been withdrawn or resolved are hereby overruled on the merits.  This Order shall become effective immediately upon its entry.  To the extent the terms of the Loan Documents differ in any material respect from the terms of this Order, this Order shall control.

III.    **Authorization of the Post-Petition Financing, Entry Into the Loan Documents and the Use of Cash Collateral.**

2.      The terms and conditions of the DIP Credit Agreement and other Loan Documents are hereby approved.  The Debtor is hereby authorized to enter into the Loan Documents, including the DIP Credit Agreement, and such additional documents, instruments, and agreements as may be reasonably required by the DIP Agent, at the direction of the Requisite DIP Lenders (as defined in the Term Sheet), to implement the terms or effectuate the purposes of this Order.  The Debtor is hereby authorized to borrow money under the DIP Credit Agreement in the principal amount of up to $2,000,00.00 plus interest, fees and other expenses, all in accordance with this Order, the DIP Credit Agreement, the other Loan Documents.

3.      The Debtor is hereby authorized and directed to pay on demand all fees, expenses and other amounts payable under the terms of the DIP Credit Agreement, including, without limitation, all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders in accordance with the terms of the DIP Credit Agreement (including, without limitation, the fees and disbursements of legal counsel, financial advisors and consultants advising the DIP Agent and the DIP Lenders).  None of such costs, fees, and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.  All such unpaid fees and expenses of the DIP Agent and the DIP Lenders shall constitute DIP Obligations (as hereafter defined) and shall be secured by the Collateral (as defined below) and afforded all of the

priorities and protections afforded to the DIP Obligations under this Order and the Loan Documents.

4.      The Debtor is hereby authorized to use the Cash Collateral and to incur the DIP Obligations (as hereinafter defined) solely in accordance with the Approved DIP Budget and the financial covenants and other terms and conditions set forth in the DIP Credit Agreement and this Order.

**IV.    DIP Loan Obligations**

5.      Upon execution and delivery of the Loan Documents, the Loan Documents shall constitute valid, binding and continuing obligations of the Debtor enforceable against the Debtor in accordance with the terms thereof as modified by this Order.  No obligation, payment, transfer or grant of security under the Loan Documents or this Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      All loans made to or for the benefit of the Debtor on or after the Petition Date under the Loan Documents, all interest thereon, and all fees, costs, expenses, indemnification obligations and other liabilities owing by the Debtor to the DIP Agent and the DIP Lenders under the Loan Documents and this Order shall hereinafter be referred to as the "DIP Obligations." The DIP Obligations:  (i) shall be evidenced by the books and records of the DIP Agent or the DIP Lenders; (ii) shall bear interest payable at the rates set forth in the DIP Credit Agreement; (iii) shall be secured in the manner specified in paragraph 20 below; (iv) shall be payable in accordance with the terms of the Loan Documents; and (v) shall otherwise be governed by the terms set forth herein and in the Loan Documents.

**V.     Use of Loan Proceeds.**

7.      Subject to the terms and conditions set forth in this Order and in the Loan Documents, the DIP Loan shall be used as follows:

(a)      to fund, no more frequently than on a biweekly basis, an operating account ("Operating Account") which in turn shall be used to fund (i) the State Lease payment

due 1/1/2010 in the amount of $250,000 (the "State Lease Payment") subject to conditions acceptable to the DIP Agent, (ii) costs and expenses for maintenance and preservation of the Debtor's assets and a contingency for emergency repairs (it being understood that the Tamarack Resort is not presently an operating resort and, unless otherwise approved by the DIP Agent, the Debtor will not conduct any operations other than the performance of necessary maintenance and preparation for the sale of its assets and other operations contemplated by the Approved DIP Budget), (iii) expenses of marketing the Debtor's properties and assets, (iv) liability and casualty insurance premiums, (v) professional (i.e., legal and accounting) fees and expenses incurred by the Debtor and its estate, (vi) fees and expenses of the DIP Agent and the DIP Lenders, and (vii) other costs pursuant to the Approved DIP Budget (defined below); and

(b)    to periodically pay interest due the DIP Lenders under the DIP Loan.

8.    No portion of the DIP Loan shall be used to fund any types of expenses not included in a specific line item of the Approved DIP Budget (as defined below) other than the contingency line item. All of the Debtor's expenditures must comply at all times with the specific line items of the Approved DIP Budget, subject to re-allocation among categories of expenses; provided, however, that no category of expense increases more than twenty (20) percent in the aggregate over the amount provided in the Approved DIP Budget for each such category, net of the application of the budgeted contingency; and provided further, that the Debtor's total actual expenses shall not exceed the total expenses provided in the Approved DIP Budget, measured on a rolling monthly basis, including the carryover for prior periods.

9.    On the Closing Date, each of the DIP Lenders will fund its portion of the DIP Loan to a trust account for the benefit of the DIP Lenders at the Bank of New York Mellon or another bank acceptable to the DIP Agent (the "Disbursement Account"). Provided no Event of Default under the DIP Loan has occurred and is continuing, the funds held in the Disbursement Account (i) shall be disbursed monthly by the DIP Agent for payment of interest on the DIP Loan (other than Default Interest) and (ii) may be disbursed from time to time to the Debtor by

DIP Agent on the terms and conditions provided in this Order and in the Loan Documents (each such disbursement under this clause (ii), a "Disbursement"). Upon the occurrence of any Event of Default (as defined in the DIP Credit Agreement), the DIP Agent may (and shall at the direction of the Requisite DIP Lenders) disburse the balance of funds in the Disbursement Account, after deducting any expenses due DIP Agent under the DIP Loan documents, to the DIP Lenders in their respective pro rata shares. Neither the Debtor nor its estate shall have any interest in the Disbursement Account, nor any interest in or right to receive any funds held in the Disbursement Account.

10.     On or after the first business day following the entry of this Order but no more frequently than once every fourteen (14) days, the Debtor may submit to the DIP Agent a written request for Disbursement in form acceptable to the DIP Agent (a "Disbursement Authorization") for expenses identified in such Disbursement Authorization that are required to be paid by the Debtor, including a reasonable contingency reserve, pursuant to the Approved DIP Budget in the succeeding two (2) week period. During any period described in this paragraph, the Debtor shall not submit a request for Disbursement any more frequently than stated in this paragraph. Upon satisfaction of the conditions precedent specified in this Order and in the Loan Documents, the DIP Agent shall cause to be disbursed to the Debtor funds from the Disbursement Account on the applicable disbursement date to the Operating Account, in an aggregate amount equal to the Disbursement requested.

11.     For the avoidance of doubt, no portion of the DIP Loan or the Collateral, including Cash Collateral, shall be utilized for the purpose of:

(a)     making adequate protection or other payments to or for the benefit of Bank of America Leasing & Capital, LLC ("BALC"), West Mountain Golf ("WMG"), Pacific Continental Bank, Raven Golf, or any other person or entity who is a creditor of WMG or another affiliate of Debtor, in each case without the prior written consent of the DIP Agent;

      (b)      challenging the validity, perfection, priority, extent or enforceability of the DIP Loan, the DIP Obligations or the obligations under the Prepetition Obligations or the liens on or security interests in the assets of the Debtor securing the DIP Loan, the DIP Obligations or the Prepetition Obligations; or

      (c)      investigating or prosecuting any other claims or causes of action against (i) the DIP Lenders, DIP Agent, and Lead Arranger (as defined in the DIP Credit Agreement), (ii) the Prepetition Agents and/or (iii) the Prepetition Lenders; provided, however, that the Committee may expend up to $10,000 in fees and expenses in investigating the foregoing (as opposed to asserting a claim or challenge under paragraph 11(b) above) during an investigation period that shall not exceed the earlier of (x) sixty (60) days from the date of entry of this Order, and (y) sixty (60) days from the date of appointment of the Committee by the United States Trustee.

## VI.      Reserves and Accounts.

12.      The Debtor is authorized and directed to establish the Operating Account and all other accounts of the Debtor (collectively, the "Debtor Accounts") which shall be managed accounts held at a financial institution to be selected by the DIP Agent from the list of approved financial institutions published by the United States Trustee.  The funds in each of the Debtor Accounts shall be the Cash Collateral of the DIP Agent for the benefit of the DIP Lenders and shall only be disbursed in accordance with the provisions of this Order and the Loan Documents.

13.      The DIP Agent, for the benefit of the DIP Lenders, shall have a first priority security interest in the Debtor Accounts.  Funds in the Operating Account shall be disbursed at the direction of the Debtor directly to the applicable recipient through a cash management system (the "Cash Management System") to be established by the Debtor and acceptable to the DIP Agent, for payment in accordance with the Approved DIP Budget.

14.      No funds shall be disbursed from the Disbursement Account for either the payment of interest on the DIP Loan or to the Operating Account if an Event of Default has occurred and is continuing.  In addition, no funds in the Disbursement Account shall be

disbursed to the Operating Account unless, together with the Disbursement Authorization, the

Debtor simultaneously represents in writing to the DIP Agent that, to the Debtor's knowledge, (i)

there have been no material adverse changes since the entry of this Order, (ii) no Event of

Default has occurred and is continuing, and (iii) the Debtor reaffirms that the representations and

warranties in the definitive Loan Documents are true and correct in all material respects on and

as of such date, except to the extent such representations and warranties expressly relate to an

earlier date.  The Responsible Officer shall have no personal liability for representations and

warranties made by the Debtor.

       15.    The Debtor shall deposit, immediately upon receipt, all Cash Collateral and all

proceeds of the Collateral, including all proceeds the Debtor contemplates recovering under the

Approved DIP Budget, into the Operating Account.  In addition, all cash generated, received or

recovered by the Debtor, including all proceeds of, and recoveries related to, the exercise of any

surcharge right pursuant to section 506(c) of the Bankruptcy Code exercised by the Debtor shall

be immediately deposited into the Operating Account.  Further, until the obligations of Borrower

in connection with the DIP Loan shall have been satisfied in full, all other revenues,

reimbursements and receipts of Borrower, of any kind and from time to time, shall be deposited

in the Operating Account for contingency reserves provided that the amount of such reserves at

any one time shall not exceed $50,000, and after such reserves equal such amount, all such

revenues, reimbursements and receipts shall be paid to the DIP Agent and held in the

Disbursement Account and disbursed pursuant to the terms of the Loan Documents and

paragraph 27 below, other than amounts for the Carve-Out.

       16.    The Cash Management System and all accounts established in connection

therewith shall be used for the purposes and on the terms and conditions set forth in the DIP

Credit Agreement and the other Loan Documents.  The Debtor is authorized and directed to

establish and maintain control agreements on the Debtor Accounts in favor of DIP Agent for the

benefit of the DIP Lenders.  The control agreements shall confirm the first priority perfected lien

on the Debtor Accounts granted pursuant to this Order in favor of the DIP Agent for the benefit of the DIP Lenders.

## VII.   **DIP Budget**

17.     On the first day of every month beginning after the entry of this Order, the Debtor shall submit, for the DIP Agent's approval, an operating budget consisting of a forecast for the remainder of the original 6-month period on a line item basis (the "DIP Budget") in the form attached hereto as Exhibit B.  When the DIP Budget is approved by the DIP Agent at the direction of the Requisite DIP Lenders, it shall become the "Approved DIP Budget."  Each updated DIP Budget provided to the DIP Agent and the DIP Lenders shall be of no force and effect unless and until it is approved in writing by the DIP Agent at the direction of the Requisite DIP Lenders.  A DIP Budget, upon the written approval of the DIP Agent, shall become the Approved DIP Budget as of the date of such approval, and shall prospectively replace the prior Approved DIP Budget.  The DIP Budget attached hereto as Exhibit B is an Approved DIP Budget.

## VIII.   **Grant of Superpriority DIP Claims and DIP Liens.**

18.     The collateral securing the DIP Loan shall include, without limitation (collectively, the "Collateral"):

(a)     all property of the Debtor's estate of any kind and wherever located, including all Cash Collateral;

(b)     all rights, claims, and other causes of action of the Debtor's estate (including any actions asserted by the Debtor or any subsequently appointed trustees or representatives of the Debtor's estate under any section of the Bankruptcy Code), and in each case, all proceeds resulting or arising therefrom; provided, however, that the Collateral shall not include any claims, defenses, causes of action or rights arising under sections 510, 542, 543, 544, 545, 546, 547 and 548 of the Bankruptcy Code;

(c)     any and all of the following to the extent they relate, in whole or in part, to the Collateral: (i) all entitlements, permits, licenses, leases and approvals (collectively,

"Permits"), including but not limited to any and all Permits issued by any federal, state, county, city or local governmental entity or agency; (ii) appurtenances; (iii) water rights; (iv) interests or memberships or rights (whether in homeowners associations, golf courses or similar memberships or rights); (v) deposits or reservations of any kind or nature to the extent permitted by applicable law; (vi) rights as a lessee under any leases for real or personal property; and (vii) contract rights; and

(d)      any and all rents, issues, profits, products, proceeds and offspring generated by any item of Collateral, without the necessity of any further action of any kind or nature by the DIP Lenders or the DIP Agent in order to claim or perfect such rents, issues, profits, products, proceeds and/or offspring.

19.      Notwithstanding anything to the contrary in this Order, "Collateral" shall not include: (i) the equipment which was subject to the lease of BALC, and for which stay relief was granted by the Bankruptcy Court by its Summary Order entered May 25, 2010 (CR 238); (ii) the assets subject to orders lifting stay entered in favor of Bank of the West (CR 185); G.E. Capital (CR 192), and Hopkins Growth Fund LLC (CR 87); (iii) that certain Dopplemayr CTEC "Wildwood Express Detachable Quad Chairlift" and Dopplemayr CTEC "Whitewater Chair" Quad Fixed Grip Chairlift, which are identified in UCC Financing Statement recorded in the official records of Valley County, Idaho on December 13, 2006, as Instrument No. 313620; and (iv) a cash deposit of $40,340 held by Idaho Power to secure payment for that utility.

20.      As security for the full and timely payment of the DIP Obligations, the DIP Agent, for the benefit of the DIP Lenders, is hereby granted, subject to the Carve-Out:

(a)      pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed claim in the Chapter 11 Case of the Debtor having priority over any and all administrative expenses (including the Adequate Protection Liens granted to the Prepetition Lenders) and all other claims against the Debtor, whether now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code (the "Superpriority DIP Claim");

(b)      pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien on all Collateral of the Debtor that is not otherwise subject to a lien, which shall include all tangible and intangible property of the Debtor and its estate in the Chapter 11 Case, including, without limitation, all present and future accounts receivable, inventory, general intangibles, chattel paper, real property, leaseholds, fixtures, machinery and equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of any subsidiaries of the Debtor and on all cash and investments, including funds held in the Debtor Accounts and all proceeds of the foregoing (the "Senior DIP Lien"); and

(c)      pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully-perfected first priority senior priming security interest in and senior priming lien on all Collateral that is subject to any existing lien or security interest, which shall include all tangible and intangible property of the Debtor and its estate in the Chapter 11 Case, including, without limitation, all present and future accounts receivable, inventory, general intangibles, chattel paper, real property, leaseholds, fixtures, machinery and equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of any subsidiaries of the Debtor and on all cash and investments, including funds held in the Debtor Accounts and all proceeds of the foregoing (the "Priming DIP Lien" and collectively with the Superpriority DIP Claim, and the Senior DIP Lien, the "DIP Liens").

21.      Subject to the Carve-Out, the Debtor shall assign and convey as security, grant a security interest in, hypothecate, mortgage, pledge and set over unto the DIP Agent for the benefit of the DIP Lenders all of the right, title and interest of the Debtor in all of the tangible and intangible property of the Debtor and its estate in the Chapter 11 Case, including, without limitation, all present and future accounts receivable, inventory, general intangibles, chattel

paper, real property, leaseholds, fixtures, machinery and equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of any Subsidiaries of the Debtor and on all cash and investments, including funds held in the Debtor Accounts and all proceeds of the foregoing.

22.     The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject to challenge and shall attach and become valid, binding, continuing, enforceable, fully-perfected and non-avoidable by operation of law as of the Petition Date without any further action by the Debtor, the DIP Agent, the DIP Lenders or any other person, and without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, or other documents.  None of the Collateral shall be subject to any other pledges, security interests or mortgages other than the DIP Liens, the Adequate Protection Liens and all existing valid pre-petition liens that are in each case junior in all respects to the Priming DIP Lien.

23.     The Debtor, upon the request of the DIP Agent, (i) shall enter into separate mortgages in recordable form on terms reasonably satisfactory to the DIP Agent with respect to any real property Collateral identified by the DIP Agent, (ii) shall authorize the DIP Agent to file and record such financing statements and fixture filings with respect to any Collateral identified by the DIP Agent, and (iii) shall take any such other action as required by the DIP Agent with respect to Collateral identified by the DIP Agent in order to perfect the DIP Liens granted herein. The DIP Agent is authorized to file or record such documents in its discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Order.

## IX.     Carve-Out

24.     Upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), the DIP Liens, the Adequate Protection Liens and any other junior liens on the Collateral shall be subject to the payment of the Carve-Out.  For

purposes of this Order, the "Carve-Out" shall mean an amount not to exceed (i) all allowed professional fees and expenses incurred by the Debtor prior to delivery by the DIP Agent to the Debtor and its counsel of record of a notice of cessation of funding from the Disbursement Account, but which fees and expenses shall not exceed the amounts set forth in the Approved DIP Budget for such items through the date of such notice less any amounts actually paid to or on account of such professionals with respect to such period of time, plus (ii) $25,000 for the payment of allowed professional fees and expenses arising after the DIP Agent delivers notice to the Debtor and its counsel of record of cessation of funding from the Disbursement Account, plus (iii) fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the Clerk of the Bankruptcy Court, to the extent such fees were incurred prior to delivery by the DIP Agent to the Debtor of a notice of an Event of Default.

25.      No portion of the Carve-Out, and no portion of any amounts approved for payment prior to an Event of Default, shall be utilized in a manner prohibited by this Order or the Loan Documents.

## X.      Asset Sales

26.      No part of the Collateral shall be conveyed, transferred or assigned by the Debtor (an "Asset Sale") without the prior written approval of the DIP Agent, at the direction of the Requisite DIP Lenders, and the prior approval of the Court.

27.      Net cash proceeds from any Asset Sale approved by the DIP Agent, at the direction of the Requisite DIP Lenders, and the Court shall be applied in the following order of priority, and subject to the Carve-Out:

(a)      First, to pay all amounts under the DIP Loan that represent the reasonable and necessary costs and expenses of preserving the asset that is sold;

(b)      Second, to pay any fees, expenses and accrued interest under the DIP Loan;

(c)      Third, to prepay amounts outstanding under the DIP Loan in an amount equal to the outstanding amount of the DIP Loan minus the balance in the Debtor Accounts on the date of the repayment;

(d)      Fourth, to the DIP Agent for deposit to the Disbursement Account, which moneys can be periodically drawn down by the DIP Agent to prepay amounts described in item (c) above as the balance in the Debtor Accounts is reduced to fund the items in the Approved DIP Budget; and

(e)      Fifth, upon satisfaction of the DIP Obligations in full, to the Debtor, provided, however, that the proceeds received by the Debtor pursuant to this subparagraph 27(e) will be subject in all respects to the liens securing the Prepetition Obligations, the Adequate Protection Liens, and all other existing valid pre-petition liens.

## XI.   **Adequate Protection.**

28.    As adequate protection to the Prepetition Lenders for any diminution in the value of their interests in the Debtor's property resulting from (i) the DIP Liens granted in favor of DIP Agent, (ii) the use, sale or lease of the Debtor's property (including any Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

(a)      the Prepetition Lenders will maintain their existing liens on the Collateral, junior and subordinate to the Carve-Out and the DIP Liens;

(b)      the Prepetition Lenders are hereby granted replacement liens, in the same priority as currently exists between the Receivership Lenders and the Prepetition Lenders, on, and security interests in, the Collateral, subject to the DIP Liens; and

(c)      the Prepetition Lenders are hereby granted an administrative claim, in the same priority as currently exists between the Receivership Lenders and the Prepetition Lenders, with priority over all administrative expense claims and unsecured claims against the Debtor, subject only to the Carve-Out and to the Superpriority DIP Claim

granted to the DIP Agent for the benefit of the DIP Lenders (collectively, the "Adequate
Protection Liens").

## XII.   Waiver of 11 U.S.C. §§ 506(c), 552 and 726 Rights.

29.    The Debtor has irrevocably waived and has agreed not to assert any surcharge
claim or right under section 506(c) of the Bankruptcy Code or otherwise, for any costs and
expenses incurred in connection with the preservation, protection or enhancement of, or
realization by the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders
upon, the Collateral.

30.    The Debtor has irrevocably waived and has agreed not to assert any claim or right
under sections 552 or 726 of the Bankruptcy Code or otherwise seeking to avoid the imposition
of the liens of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders
on any property acquired by the Debtor or its estate or to seek to surcharge any costs or expenses
incurred in connection with the preservation, protection or enhancement of, or realization by, the
DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders upon, the
Collateral.

31.    The Debtor is authorized to make the foregoing waiver of its rights under sections
506(c), 552 and 726 of the Bankruptcy Code and to agree not to assert certain claims and rights.
Furthermore, in no event shall the DIP Agent or the DIP Lenders be subject to the equitable
doctrine of marshaling or any similar doctrine with respect to the Collateral.

## XIII.   Restrictions on Additional Claims or Liens.

32.    Except for the Carve-Out and the Adequate Protection Liens, no claim having a
priority superior to or *pari passu* with those granted pursuant to this Order shall be allowed
without the consent of the DIP Agent, and no lien having a priority superior to, *pari passu* with,
or junior to those granted pursuant to this Order shall be granted without the consent of the DIP
Agent, in the Debtor's Chapter 11 Case while any portion of the DIP Loan (or any refinancing
thereof), remains outstanding.  Except as expressly permitted by the DIP Credit Agreement and
this Order, or as expressly consented to by the DIP Agent in writing, the Debtor shall not grant

mortgages, security interests, or liens in the Collateral to any parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

## XIV.    11 U.S.C. § 364(e) Protections.

33.    If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any of the DIP Obligations incurred pursuant this Order or the Loan Documents, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the Loan Documents with respect to any of the DIP Obligations, including, without limitation, the DIP Liens and the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral the incurrence of DIP Obligations by the Debtor and the imposition of the DIP Liens and the Adequate Protection Liens shall be governed in all respects by the provisions of this Order and the Loan Documents, and the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Order, and the Loan Documents with respect to all uses of Cash Collateral, the incurrence of the Obligation by the Debtor and the imposition of the DIP Liens and the Adequate Protection Liens.

## XV.    Relief from Stay.

34.    Notwithstanding section 362 of the Bankruptcy Code, the automatic stay is hereby vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in this Order, the Loan Documents or applicable law.

35.    Without limiting the generality of the forgoing paragraph, upon the occurrence and during the continuation of an Event of Default and upon ten (10) days' written notice to the Debtor, the automatic stay under section 362 of the Bankruptcy Code shall be deemed lifted without further order or application to the Court, to permit the DIP Agent to do one or more of the following:  (i) reduce the amount of or terminate any outstanding commitments; (ii) terminate

the DIP Loan; (iii) charge the default rate of interest on the DIP Loan; (iv) declare the entirety of the DIP Loan to be due and payable; and (v) realize on any or all of the Debtor Accounts and exercise any and all remedies under the DIP Loan and any control agreement with respect to the Debtor Accounts and to set off or seize amounts in the Debtor Accounts maintained with or under the control of the DIP Agent for the benefit of the DIP Lenders.

36.    In addition, upon the occurrence and during the continuation of an Event of Default, without notice, the DIP Agent may:  (i) immediately withdraw and disburse all amounts in the Disbursement Account; and (ii) exercise its remedies under the control agreements with respect to the Debtor Accounts and the Debtor's pre-petition bank accounts, to order such banks to (a) immediately dishonor all withdrawals from such bank accounts ordered by the Debtor, and (b) immediately transfer all funds in such bank accounts into the Disbursement Account and then daily thereafter transfer any additional funds deposited into such accounts into the Disbursement Account.

37.    The rights and remedies of the DIP Agent and the DIP Lenders specified in this Order are cumulative and not exclusive of any rights or remedies that the DIP Agent or the DIP Lenders may have under the Loan Documents or otherwise.

## XVI.   Termination

38.    The Debtor's authority to use the proceeds of the DIP Loan or any Collateral, including Cash Collateral, shall each terminate upon the earliest of (each a "Termination Event"):

(a)    six (6) months from the Closing Date (as defined in the DIP Credit Agreement);

(b)    the date of any stay, reversal, vacatur or modification of this Order, including without limitation any determination that DIP Agent and/or the DIP Lenders (or any of them) are not entitled to the protections of section 364(e) of the Bankruptcy Code in connection with the DIP Loan;

(c)    the breach of any obligations under this Order;

(d)    the date upon which any material provision of this Order shall for any reason ceases to be valid and binding, or the Debtor shall so assert in any pleading filed in any court;

(e)    the effective date of a plan of reorganization or a plan of liquidation in the Chapter 11 Case;

(f)    the date of the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; and

(g)    the date of any occurrence of an Event of Default under the Loan Documents, unless waived by the DIP Agent.

39.    All DIP Obligations, and any obligations owed on account of the Adequate Protection Liens, shall be due and payable in immediately available funds upon the occurrence of a Termination Event.

## XVII. **Miscellaneous Provisions.**

40.    The provisions of this Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders, the Debtor, and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed for or on behalf of the Debtor's estate or with respect to the Debtor's property).

41.    The provisions of this Order and any actions taken pursuant thereto: (a) shall survive the entry of any order (i) confirming any plan of reorganization in the Chapter 11 Case, (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or (iii) dismissing the Chapter 11 Case; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Order shall maintain their priority as provided by this Order until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the terms of this Order and the DIP Credit Agreement.

42.     The Debtor is hereby authorized, without further order of this Court, to enter into agreements with the DIP Agent and the DIP Lenders providing for (i) modifications to the Approved DIP Budget pursuant to the terms of the DIP Credit Agreement, (ii) non-material modifications to the DIP Credit Agreement, or (iii) any other modifications to the DIP Credit Agreement necessary to conform the DIP Credit Agreement to this Order.

43.     Upon fourteen (14) days notice to all parties in interest (the "Amendment Notice"), the Debtor, the DIP Agent and the DIP Lenders are authorized to amend or modify the Loan Documents as necessary, subject to the terms of the Loan Documents, to extend or increase the amount of the DIP Loan without further action of the Court.  The Amendment Notice shall be filed with the Court and shall contain (i) the proposed material changes to the Loan Documents and (ii) notice of the recipients' opportunity to file an objection to such changes with the Court.

44.     The Debtor reserves all rights related to the liens or security interests (the "Third Party Liens") held by parties other than the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, including, without limitation, the right to surcharge the assets securing the Third Party Liens pursuant to section 506(c) of the Bankruptcy Code and the right to challenge the validity, priority and extent of the Third Party Liens allegedly relating to post-petition assets of the Debtor under section 552 of the Bankruptcy Code.

45.     In addition to the monthly operating reports required under the United States Trustee Guidelines, the Debtor will provide to the DIP Agent and the DIP Lenders:  (i) biweekly reporting on actual cash flows versus budgeted cash flow forecast; (ii) within twenty-five (25) days after each month-end, monthly financial statements (including a monthly comparison of actual financial results to the projected financial results set forth in the Approved DIP Budget, a monthly analysis of capital expenditures and a monthly listing of payments to and receipts from related parties); and (iii) notice of any material change in financial condition.  The Debtor will also provide, as requested, other information reasonably requested by the DIP Agent or the DIP Lenders.

46.    The Debtor shall make itself available to discuss all financial issues and issues regarding the Chapter 11 Case with the DIP Agent and the DIP Lenders on a monthly basis.  In addition, the Responsible Officer shall make himself available for telephonic and in-person meetings, on reasonable notice under the circumstances, to provide information to (and answer questions from) the DIP Agent and the DIP Lenders with respect to the marketing and sale process, and shall also make the Broker available for such telephonic and in-person meetings.

47.    This Order is not subject to the 14-day stay provision of Rule 4001(a)(3) of the Bankruptcy Rules.

48.    The findings of fact and conclusions of law of this Court pursuant to this Order shall be deemed effective upon the entry of this Order. To the extent that any such findings of fact may constitute conclusions of law, and vice versa, they hereby are deemed as such.

49.    This Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Order.

IT IS SO ORDERED.  //end of text//

Order Submitted by: Randal J. French, Attorney for the Debtor

SEPTEMBER 24, 2010

TAMARACK RESORT LLC

SUMMARY OF PRELIMINARY TERMS AND CONDITIONS
FOR DEBTOR-IN-POSSESSION FINANCING

THIS SUMMARY OF PRINCIPAL TERMS AND CONDITIONS ("*TERM SHEET*") IS
INTENDED AS AN OUTLINE OF CERTAIN OF THE MATERIAL TERMS OF A DIP
LOAN ("*DIP LOAN*") FOR TAMARACK RESORT LLC AS DEBTOR AND DEBTOR-IN-
POSSESSION.  IT DOES NOT INCLUDE DESCRIPTIONS OF ALL OF THE TERMS,
CONDITIONS AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE
DOCUMENTATION RELATING TO SUCH DIP LOAN.  THIS TERM SHEET IS
PROVIDED PURSUANT TO SETTLEMENT DISCUSSIONS SUBJECT TO THE
PROVISIONS OF FEDERAL RULE OF EVIDENCE 408 AND ALL APPLICABLE STATE
RULES AND STATUTES.

| | |
|---|---|
| **Borrower:** | Tamarack Resort LLC, a Delaware limited liability company (the "Borrower"), as a debtor and debtor-in-possession under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in Case No. 09-03911-TLM (the "Chapter 11 Case"), pending in the United States Bankruptcy Court for the District of Idaho (the "Bankruptcy Court"). |
| **DIP Lenders:** | The banks, funds and financial institutions listed on Schedule 1 attached hereto, which are members of the Tamarack senior secured lender group or receivership lender group (the "DIP Lenders"). |
| **DIP Agent:** | Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent for the DIP Lenders ("DIP Agent").  The DIP Agent will act at the direction of the requisite DIP Lenders ("Requisite DIP Lenders"). Whenever this Term Sheet provides for a consent, approval or action by DIP Agent, such approval or action shall require consent, approval and/or direction of Requisite DIP Lenders in the exercise of their sole discretion (unless this Term Sheet expressly provides for reasonable discretion). Further, all liens and security interests granted to the DIP Agent in connection with the DIP Loan will be granted to the DIP Agent for the benefit of the DIP Lenders. |
| **DIP Loan:** | A senior secured first priority DIP term loan in the principal amount not to exceed $2,000,000, of which Candlewood Investment Group or its affiliates will fund at least 51% and up to 100.0%.  DIP Loan proceeds shall be used as follows: |
| | (i) to fund, no more frequently than on a biweekly basis, an operating account ("Operating Account") which in turn shall be used to fund (a) the |


EXHIBIT
*B*

State Lease payment due 1/1/2010 in the amount of $250,000 (the "State Lease Payment") subject to conditions acceptable to the DIP Agent, (b) costs and expenses for maintenance and preservation of the Borrower's assets and a contingency for emergency repairs (it being understood that the Tamarack Resort is not presently an operating resort and unless otherwise approved by the DIP Agent, Borrower will not conduct any operations other than the performance of necessary maintenance and preparation for the sale of its assets and other operations contemplated by the Approved DIP Budget), (c) expenses of marketing the Borrower's properties and assets, (d) liability and casualty insurance premiums, (e) professional (i.e. legal and accounting) fees and expenses incurred by the Borrower and its estate, (f) Lender Expenses (as defined below), and (g) other costs pursuant to the Approved DIP Budget (defined below); and

(ii) to periodically pay interest due the DIP Lenders under the DIP Loan (other than Default Interest (as defined below)) (collectively, the "DIP Loan"). No portion of the DIP Loan shall be used to fund any types of expenses not included in a specific line item of the Approved DIP Budget (defined below) other than the contingency line item. No portion of the DIP Loan shall be utilized for the purpose of making adequate protection or other payments to or for the benefit of Bank of America Leasing & Capital, LLC ("BALC"), West Mountain Golf ("WMG"), Pacific Continental Bank ("PCB"), Raven Golf ("Raven"), or any other person or entity who is a creditor of WMG or another affiliate of Borrower, in each case without the prior written consent of the DIP Agent.

On the Closing Date, each of the DIP Lenders will fund its portion of the DIP Loan consistent with the above terms to a trust account for the benefit of the DIP Lenders at the Bank of New York Mellon or another bank determined by DIP Agent (the "Disbursement Account"). The Disbursement Account shall not be an interest-bearing account. Provided no Event of Default under the DIP Loan has occurred and is continuing, the funds held in the Disbursement Account (i) shall be disbursed monthly by the DIP Agent for payment of interest on the DIP Loan (other than Default Interest) and (ii) may be disbursed from time to time to the Borrower by DIP Agent on the terms and conditions provided herein and in the definitive DIP Loan documents (each such disbursement under this clause (ii), a "Disbursement"). Upon the occurrence of any Event of Default (defined below), DIP Agent may (and shall at the direction of the Requisite DIP Lenders) disburse the balance of funds in the Disbursement Account, after deducting any expenses due DIP Agent under the DIP Loan documents, to the DIP Lenders in their respective pro rata shares. Neither the Borrower nor its estate shall have any interest in the Disbursement Account nor any interest in or right to receive any funds held in the Disbursement Account.

LA1 1872682v.17

Subject to all other terms and conditions herein, the Closing of the DIP Loan shall occur only after entry of a final order of the Bankruptcy Court approving the DIP Loan (the "DIP Order") The DIP Order shall be in form and substance acceptable to the DIP Agent. In the event the DIP Order is stayed, reversed, vacated or modified by a court of competent jurisdiction (including, without limitation, on appeal), or in the event DIP Agent or the DIP Lenders (or any of them) shall at any time not have the protections of section 364(e) of the Bankruptcy Code in connection with the DIP Loan, no further amounts shall be made available for borrowing under the DIP Loan, and all amounts then outstanding under the DIP Loan shall be immediately due and payable.

**Maturity Date:** Borrower shall repay any outstanding advances and loans under the DIP Loan on the earliest of (i) six (6) months from the Closing Date; (ii) the date of the acceleration of the DIP Loan after the occurrence and during the continuation of an Event of Default; (iii) the date of any stay, reversal, vacatur or modification of the DIP Order, including without limitation any determination that DIP Agent and/or the DIP Lenders (or any of them) are not entitled to the protections of section 364(e) of the Bankruptcy Code in connection with the DIP Loan; and (iv) the effective date of a plan of reorganization in Borrower's Chapter 11 Case.

**Interest:** Interest on the DIP Loan will accrue commencing on the Closing Date and be paid and payable at the end of each month with all unpaid accrued interest payable at maturity, at an annual rate equal to 15% per annum (the "Interest Rate").

**Default Rate:** During the continuance of a default, the Interest Rate applicable to the DIP Loan will be increased by 5% *per annum*. The incremental interest attributable to the Default Rate, if in effect, shall not be paid out of the Disbursement Account.

**Loan Fee:** The DIP Loan shall be subject to a loan fee of 1% of the total commitment amount, to be paid out of the DIP Loan proceeds on the Closing Date.

**Administrative Agency Fee:** $50,000.00 payable to the DIP Agent, to be paid out of the DIP Loan proceeds on the Closing Date.

**Use of Proceeds:** The proceeds of the DIP Loan will be used solely as provided for in the first paragraph opposite the heading of "DIP Loan" above (and to pay the Loan Fee referenced immediately above).

No portion of the DIP Loan, the Collateral (as defined below), including any cash collateral, or the Carve-Out (as defined below) are to be used to (i) challenge the validity, perfection, priority, extent or enforceability of the DIP Loan or the obligations under either (a) the Amended and Restated Receivership Credit Facility Agreement dated as of March 23, 2009, by and among Douglas P. Wilson as court-appointed receiver, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (the "Receivership Credit Agreement"), or (b)

that certain Credit Agreement dated as of May 19, 2006, among Borrower, the lenders party thereto, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and other persons party thereto (the "Pre-Petition Credit Agreement") (collectively, the "Pre-Petition Obligations") or the liens on or security interests in the assets of Borrower securing the DIP Loan or the Pre-Petition Obligations; or (ii) investigate or prosecute any other claims or causes of action against (a) DIP Lenders, DIP Agent, and Lead Arranger, (b) the agents under the Receivership Credit Agreement and Pre-Petition Credit Agreement (collectively, the "Pre-Petition Agents"), and/or (c) the lenders that are from time to time parties to either the Receivership Credit Agreement or the Pre-Petition Credit Agreement (collectively, "Pre-Petition Lenders"), provided that a statutory committee of unsecured creditors (if appointed, "Committee") may expend up to $10,000 in fees and expenses in investigating the foregoing (as opposed to asserting a claim or challenge under subparts (i) or (ii) above) during an investigation period that shall not exceed the earlier of (x) sixty (60) days from the date of entry of the DIP Order, and (y) sixty (60) days from the date of appointment of the Committee by the United States Trustee for the District of Idaho. In addition, as set forth under "DIP Loan" above, no portion of the DIP Loan shall be utilized for the purpose of making adequate protection or other payments to or for the benefit of BALC, WMG, PCB, Raven, or any other person or entity who is a creditor of WMG or another affiliate of Borrower, in each case without the prior written consent of the DIP Agent.

**Disbursements and Debtor Accounts:**    On or after the first business day following the entry of the DIP Order but no more frequently than once every fourteen (14) days, the Borrower may submit to the DIP Agent a written request for Disbursement in form acceptable to the DIP Agent (a "Disbursement Authorization") for expenses identified in such Disbursement Authorization that are required to be paid by the Borrower, including a reasonable contingency reserve, pursuant to the Approved DIP Budget in the succeeding two (2)) week period. During any period described in this paragraph, the Borrower shall not submit a request for Disbursement any more frequently than stated in this paragraph. Upon satisfaction of the conditions precedent specified below and in the definitive DIP Loan documentation, DIP Agent shall cause to be disbursed to the Borrower funds from the Disbursement Account on the applicable disbursement date to the Operating Account, in an aggregate amount equal to the disbursement requested.

The Operating Account and all other accounts of the Borrower (collectively, the "Debtor Accounts") shall be managed accounts held at a financial institution to be selected by DIP Agent from the list of approved financial institutions published by the United States Trustee for the District of Idaho. Key Bank N.A. is an acceptable financial institution for these purposes. The Debtor Accounts shall be subject to the control of the DIP Agent pursuant to control agreements reasonably satisfactory to the DIP Agent. The funds in each of the Debtor Accounts shall be cash collateral of

LA1 1872682v.17

the DIP Agent for the benefit of the DIP Lenders and shall be disbursed in accordance with the provisions below.

DIP Agent for the benefit of the DIP Lenders shall have a first priority security interest in the Debtor Accounts. Funds in the Operating Account shall be disbursed at the direction of Borrower directly to the applicable recipient through a cash management system to be established by Borrower and acceptable to the DIP Agent, for payment in accordance with the Approved DIP Budget.

No funds shall be disbursed from the Disbursement Account for either the payment of interest on the DIP Loan or to the Operating Account if an Event of Default has occurred and is continuing. In addition, no funds in the Disbursement Account shall be disbursed to the Operating Account unless, together with the Disbursement Authorization, Borrower simultaneously represents in writing to the DIP Agent that, to Borrower's knowledge, (i) there have been no material adverse changes since the Closing Date (as defined below), (ii) no Event of Default has occurred and is continuing, and (iii) Borrower reaffirms that the representations and warranties in the definitive DIP Loan documents are true and correct in all material respects on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date. The Responsible Officer shall have no personal liability for representations and warranties made by the Borrower.

Borrower shall deposit, immediately upon receipt, all cash collateral and all proceeds of the Collateral (as defined below), including all proceeds Borrower contemplates recovering under the Approved DIP Budget, into the Operating Account.

Borrower shall establish the Debtor Accounts and a cash management system acceptable to the DIP Agent and shall not be permitted to open any additional bank accounts, deposit accounts, checking accounts, money market funds, certificates of deposit or other similar accounts or financial instruments without the consent of the DIP Agent.

**Collateral:**    To secure all obligations of Borrower under the DIP Loan, DIP Agent, for the benefit of the DIP Lenders, will receive a fully perfected first priority security interest in all pre-petition and post-petition assets of Borrower other than as expressly set forth herein (the "Collateral") including without limitation all rights, claims, and other causes of action of Borrower's estate (including any actions asserted by Borrower or any subsequently appointed trustees or representatives of Borrower's estate under any section of the Bankruptcy Code), and in each case, all proceeds resulting or arising therefrom; provided, however, that the Collateral shall not include any claims, defenses, causes of action or rights as arise under sections 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

"Collateral" shall also include any and all of the following to the extent

LA1 1872682v.17

they relate, in whole or in part, to the Collateral:  (a) all entitlements, permits, licenses, leases and approvals (collectively, "Permits"), including but not limited to any and all Permits issued by any federal, state, county, city or local governmental entity or agency, (b) appurtenances, (c) water rights, (d) interests or memberships or rights (whether in homeowners associations, golf courses or similar memberships or rights), (e) deposits or reservations of any kind or nature to the extent permitted by applicable law, (f) rights as a lessee under any leases for real or personal property, and (g) contract rights.

"Collateral" shall also include any and all rents, issues, profits, products, proceeds and offspring generated by any item of Collateral, without the necessity of any further action of any kind or nature by the DIP Lenders or DIP Agent in order to claim or perfect such rents, issues, profits, products, proceeds and/or offspring.

Notwithstanding anything to the contrary herein, "Collateral" shall not include (i) the equipment which was subject to the lease of BALC, and for which stay relief was granted by the Bankruptcy Court by its Summary Order entered May 25, 2010, Docket 238; and the assets subject to orders lifting stay entered in favor of Bank of the West, Docket 185; G.E. Capital, Docket 192; and Hopkins Growth Fund LLC, Docket 87; (ii) that certain Dopplemayr CTEC "Wildwood Express Detachable Quad Chairlift" and Dopplemayr CTEC "Whitewater Chair" Quad Fixed Grip Chairlift, which are identified in UCC Financing Statement recorded in the official records of Valley County, Idaho on December 13, 2006, as Instrument No. 313620; and (iii) a cash deposit of $40,340 held by Idaho Power to secure payment for that utility.

All obligations of Borrower under and with respect to the DIP Loan (the "DIP Obligations") will be secured by, pursuant to sections 364(c)(1), (2) and (3) and section 364(d)(1) of the Bankruptcy Code, a first priority lien senior to all pre-petition liens and will also receive and be entitled to a super-priority administrative expense claim (the "Superpriority Claim") over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out (as defined below).  The liens described in this and the preceding paragraphs are sometimes referred to as the "DIP Priming Lien."

The obligations of Borrower under the DIP Loan shall have super-priority over any and all other administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out (as defined below).

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, satisfactory to the DIP Agent, and, subject to customary exceptions, none of the Collateral shall be subject to any other pledges, security interests or mortgages other than pre-petition liens that are in each case junior in all respects to the DIP Priming

Liens.

**Carve-Out:**  So long as there is no Event of Default (or an event which with the giving of notice or lapse of time or both would constitute an Event of Default), the allowed professional fees and disbursements incurred in Borrower's Chapter 11 Case may be paid (but only after first exhausting any retainer amounts held by each such professional as of the Conversion Date) to the extent authorized in the Approved DIP Budget and the DIP Order (as defined below) and subject further to final Bankruptcy Court approval of any such professional fees and disbursements. There shall be no limitation on the right of any party to object to any interim or final fee applications filed in the Chapter 11 Case by any professionals.

In addition, the DIP Priming Lien on the Collateral and claims, including any Superpriority Claims, will be subject to a Carve-Out (the "Carve-Out"), for the purpose of, and in an amount not to exceed (i) all allowed professional fees and expenses incurred by Borrower prior to delivery by DIP Agent to Borrower and its counsel of record of a notice of cessation of funding from the Disbursement Account, but which fees and expenses shall not exceed the amounts set forth in the Approved DIP Budget for such items through the date of such notice less any amounts actually paid to or on account of such professionals with respect to such period of time, plus (ii) $25,000 for the payment of allowed professional fees and expenses arising after DIP Agent delivers notice to Borrower and its counsel of record of cessation of funding from the Disbursement Account, plus (iii) fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Bankruptcy Court, to the extent such fees were incurred prior to delivery by DIP Agent to Borrower of a notice of an Event of Default.

Notwithstanding the foregoing, no portion of the Carve-Out, and no portion of any amounts approved for payment prior to an Event of Default, shall be utilized in a manner prohibited in the Use of Proceeds section above.

**Disposition Fee:**  In the event any sale of assets of the Borrower to a third party occurs and (a) such sale generates cash proceeds, (b) such sale (a "Non-Chapter 11 Sale") does not occur either (i) pursuant to the Plan or (ii) otherwise with the approval of the DIP Agent and the Bankruptcy Court within the Chapter 11 Case and (c) the Disposition Fee (as defined in the Borrower's motion for approval of the retention of the Responsible Officer, to be filed substantially concurrently with the DIP Motion and acceptable to DIP Agent ("Responsible Officer Motion")) has not previously been paid by the Borrower to the Responsible Officer, then the cash proceeds of such sale (net of all costs of sale and unreimbursed costs and expenses of the DIP Agent and the DIP Lenders) that would otherwise be applied to the payment of the DIP Loan shall be distributed *pari passu* to (x) the Responsible Officer in accordance with the unpaid amount of the Disposition Fee payable with respect to such Non-Chapter 11 Sale and (y) the DIP Agent (for further distribution to the DIP Lenders pro rata in accordance with their respective portions of the DIP Loans) in accordance

with the unpaid amount of the DIP Loan, until the Disposition Fee and the DIP Loan have been repaid in full.

**Asset Sales:** The definitive documentation for the DIP Loan shall provide that no land, lots or other assets constituting Collateral shall be conveyed, transferred or assigned by Borrower without the prior written approval of the DIP Agent and the prior written approval of the Bankruptcy Court.

**Application of Proceeds from Asset Sales; and Mandatory Prepayments:** Net cash proceeds from any asset sale approved by DIP Agent and the Bankruptcy Court shall be applied in the following order of priority, and subject to the Carve-Out:

(i)     First, to pay all amounts under the DIP Loan that represent the reasonable and necessary costs and expenses of preserving the asset that is sold;

(ii)    Second, to pay any fees, expenses and accrued interest under the DIP Loan;

(iii)   Third, to prepay amounts outstanding under the DIP Loan in an amount equal to the outstanding amount of the DIP Loan minus the balance in the Debtor Accounts on the date of the repayment; and

(iv)    Fourth, to the DIP Agent for deposit to the Disbursement Account, which moneys can be periodically drawn down by DIP Agent to prepay amounts described in item (iii) above as the balance in the Debtor Accounts is reduced to fund the items in the Approved DIP Budget.

Mandatory prepayments of the outstanding DIP Loan upon the occurrence of other events (e.g., insurance claims, equity issuances, changes of control and other circumstances) to be discussed, but such provision shall exclude proceeds that the Approved DIP Budget contemplates being used to fund expenses.

Until the obligations of Borrower in connection with the DIP Loan shall have been satisfied in full, all other revenues, reimbursements and receipts of Borrower, of any kind and from time to time, shall be deposited in the Operating Account for contingency reserves provided that the amount of such reserves at any one time shall not exceed $50,000, and after such reserves equal such amount, all such revenues, reimbursements and receipts shall be paid to the DIP Agent and held in the Disbursement Account and disbursed pursuant to subparagraphs (i), (ii), (iii) and (iv) above, other than amounts for the Carve-Out.

**Closing Date:** A date on or before October 29, 2010, upon which all Conditions to Closing are satisfied (the "Closing Date"). The parties shall use their commercially reasonable efforts to close before October 29, 2010.

**Conditions to Closing:** The documents evidencing the DIP Loan shall contain the following conditions precedent to the occurrence of the Closing Date and the making of the DIP Loan (including customary exceptions and qualifiers):

(i)  Provision to the DIP Agent and the DIP Lenders and review and
approval by DIP Agent of an operating budget consisting of a 6-
month forecast on a line item basis (the "DIP Budget"). When the
DIP Budget is approved by DIP Agent, it shall become the "Approved
DIP Budget."

(ii)  The retention by Borrower of a responsible officer ("Responsible
Officer") reasonably acceptable to the DIP Agent, and the approval of
such retention by the Bankruptcy Court pursuant to an order that is in
full force and effect, and not subject to any stay by any court, as of the
Closing Date. The Responsible Officer shall be appointed as the
responsible officer of Borrower pursuant to Bankruptcy Rule 9001(5),
with full power and authority to act as debtor in possession in the
Borrower's chapter 11 bankruptcy case, without the need for further
approval by, and without interference from, Borrower's directors,
managers, members or officers. J.P. Boespflug and Alfredo Miguel
Afif, the existing members of the Board of Directors of Borrower,
shall (i) have resigned their positions as members of the Board of
Directors of Borrower, either prior to or effective upon the retention
by Borrower of the Responsible Officer, and (ii) covenant, on behalf
of themselves and their respective affiliated entities (including,
without limitation, Cross Atlantic Real Estate and VPG Investments,
Inc.), not to interfere in any way with the Responsible Officer's
management of Borrower from and after his appointment, pursuant to
documentation (which may include provisions in the order of the
Bankruptcy Court approving the appointment of the Responsible
Officer) in form and substance acceptable to the DIP Agent. The
Responsible Officer shall be independent of (a) any broker retained by
the Borrower, (b) Borrower and (c) their respective affiliates.

(iii)  Entry of the DIP Order by the Bankruptcy Court, after notice given
and a hearing conducted in accordance with Rule 4001(c) of the
Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and the
Local Bankruptcy Rules for the United States Bankruptcy Court for
the District of Idaho, authorizing and approving the transactions
contemplated by the documents evidencing the DIP Loan and finding
that the DIP Lenders are extending credit to Borrower in good faith
within the meaning of section 364(e) of the Bankruptcy Code, which
Order shall (a) approve the payment by Borrower of all of the fees
provided for herein, (b) otherwise be in form and substance
satisfactory to the DIP Agent, and (c) be in full force and effect and
shall not have been stayed, reversed, vacated, subject to appeal, or
otherwise modified in a manner adverse to the DIP Lenders or DIP
Agent.

(iv)  Execution and delivery by Borrower of all documentation in respect
of the DIP Loan, satisfactory to the DIP Agent, including evidence of
due authorization of the borrowings and other transactions

contemplated by the DIP Loan documents.

(v) Except to the extent such amounts are due to be paid on a different date, payment of all costs and expenses owing to the DIP Lenders or DIP Agent as referenced herein, the payment of which shall be made on the Closing Date from the proceeds of the DIP Loan.

(vi) Cash management systems satisfactory to the DIP Agent and consistent with the provisions of this Term Sheet shall have been established by Borrower.

(vii) Confirmation of sufficient insurance coverage for all property of Borrower, general liability insurance and other forms of insurance in amounts, with deductibles and with such additional insured and/or loss payee endorsements as DIP Agent may require consistent with the Approved Budget.

(viii) Except as may otherwise be disclosed in writing to the DIP Agent and the DIP Lenders prior to the Closing Date, no material adverse change, individually or in the aggregate, shall have occurred in the business or financial condition of Borrower taken as a whole, or the Collateral taken as a whole.

Other conditions that are customary and reasonable for a loan of this size and nature.

**Representations and Warranties:** The documents evidencing the DIP Loan shall contain representations and warranties usually and customarily contained in DIP credit facilities of the type referenced herein, including customary exceptions and qualifiers. Such representations and warranties shall include but not be limited to the following: (i) Borrower's financial condition and absence of material undisclosed liabilities; (ii) corporate existence and compliance with law; (iii) corporate power and authority; (iv) enforceable obligations; (v) no conflict with law; (vi) no material litigation; (vii) taxes; (viii) subsidiaries; (ix) ownership of real and personal property and liens; (xi) pension plans and compliance with ERISA; (xii) intellectual property; (xii) environmental matters; (xiii) loan parties not being covered by the Investment Company Act; (xiv) bank accounts; (xv) insurance; (xvi) material contracts; (xvii) affiliate transactions; (xviii) no brokers other than a broker retained by Borrower with approval of the DIP Agent; (xix) use of proceeds; and (xx) creation and perfection of security interests. The Responsible Officer shall have no personal liability for representations and warranties made by the Borrower. DIP Agent and the DIP Lenders may require additional representations and warranties.

**Affirmative Covenants:** The documents evidencing the DIP Loan shall contain affirmative covenants usually and customarily contained in DIP credit facilities of the type referenced herein, including customary exceptions and qualifiers. Such affirmative covenants shall include but not be limited to the following:

LA1 1872682v.17

(i)     delivery of financial statements and reports (including, without limitation, consolidated statements of income and cash flows) to the DIP Agent as specified in the Financial Reporting section below;

(ii)     payment of all post-petition taxes and other post-petition obligations when due unless being contested in good faith;

(iii)     continuation of business and maintenance of existence and material rights and privileges;

(iv)     compliance with applicable laws;

(v)     maintenance of adequate hazard, property and casualty insurance;

(vi)     maintenance of books and records;

(vii)     continued retention of a Responsible Officer reasonably acceptable to the DIP Agent;

(viii)  right of the DIP Agent or its designee, on behalf of the DIP Lenders, to inspect property and books and records;

(ix)     delivery of notices of defaults, litigation and other material events to the DIP Agent;

(x)     compliance with environmental laws;

(xi)     service of all pleadings filed by Borrower in the Chapter 11 Case on DIP Agent;

(xii)     compliance at all times with the Approved DIP Budget (subject to re-allocation among categories of expenses provided no category of expense increases more than 10% in the aggregate over that provided in the Approved DIP Budget for such category, net of application of the budgeted contingency, and provided further that the total actual expenses shall not exceed the total expenses provided in the Approved DIP Budget, measured on a rolling monthly basis, and including the carryover for prior periods);

(xiii)  monthly delivery of an updated DIP Budget for the remainder of the original 6-month period to the DIP Agent; each updated DIP Budget provided to the DIP Agent shall be of no force and effect unless and until it is approved in writing by DIP Agent. The DIP Budget, upon the written approval of the DIP Agent, shall become the Approved DIP Budget as of the date of such approval, and shall prospectively replace the prior Approved DIP Budget;

(xiv)  delivery to the DIP Agent of a draft plan of reorganization and disclosure statement for Borrower, within forty-five (45) days after the Closing Date;

(xv)     filing with the Bankruptcy Court of a motion seeking approval of sale procedures ("Sale Procedures Motion") within thirty (30) days after the Closing Date, with respect to the marketing and sale of all or

substantially all of Borrower's properties and assets (including, without limitation, all rights of redemption), including, without limitation, proposed marketing and due diligence periods; procedures and qualifications for the identification of qualified bidders; deadline for the submission of bids by qualified bidders; maximum overbid protections that may be provided to any "stalking horse" bidder that may be identified and proposed to the Bankruptcy Court; procedures with respect to the conducting of an auction in the Bankruptcy Court at which qualified bidders may submit their final bids or any overbids; procedures acceptable to the DIP Agent with respect to the exercise of credit bid rights by DIP Agent; and other procedures of a type ordinarily included in sale procedures motions with respect to the sale of all or substantially all of a debtor's properties and assets. The Sale Procedures Motion shall be in form and substance satisfactory to the DIP Agent.

(xvi) filing with the Bankruptcy Court within sixty (60) days after the Closing Date, a plan of reorganization ("Plan") and disclosure statement ("Disclosure Statement") acceptable to the DIP Agent. The Plan shall include, among other provisions, (i) provisions with respect to the sale of all or substantially all of Borrower's properties and assets (including, without limitation, all rights of redemption) to the highest qualified bidder (which may, in accordance with the Sale Procedures Motion, be DIP Agent to the extent of the exercise by DIP Agent of its right to credit bid) in accordance with the Sale Procedures Motion, and (ii) waivers and release of any and all claims of Borrower and its bankruptcy estate arising from or related to the Pre-Petition Lenders' and Pre-Petition Agent's claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of the DIP Loan or the Pre-Petition Obligations or the liens on or security interests in the assets of Borrower securing the DIP Loan or the Pre-Petition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Pre-Petition Obligations. For avoidance of doubt but without limiting the foregoing, it is understood that a plan of reorganization that purports in any way to compensate, pay or distribute proceeds of sale of Collateral to persons that are not creditors of the Borrower or otherwise purports to use assets of the estate of Borrower for the benefit of insiders or non-debtor affiliates of Borrower shall not be deemed acceptable (for example, and not in limitation, a plan shall not be deemed acceptable which proposes to pay persons who are creditors of insiders or non-debtor affiliates of the Borrower but not creditors of the Borrower, or which seeks to use assets of the Borrower's estate to acquire other assets not in the estate of Borrower as of the Closing Date in order to sell such assets together with the estate's assets in a bulk sale).

LA1 1872682v.17

**Financial Reporting:**   The documents evidencing the DIP Loan will require that, in addition to the monthly operating reports required under the United States Trustee Guidelines, Borrower provide (i) biweekly reporting on actual cash flows versus budgeted cash flow forecast, (ii) within twenty-five (25) days after each month-end, monthly financial statements (including a monthly comparison of actual financial results to the projected financial results set forth in the Approved DIP Budget, a monthly analysis of capital expenditures and a monthly listing of payments to and receipts from related parties); and (iii) notice of any material change in financial condition. Borrower will provide on an as-requested basis other information reasonably requested by DIP Agent or the DIP Lenders. All financial statements shall be prepared on a consolidated basis, provided that inclusion of information from entities in which Borrower has a minority or non-controlling interest is dependent on the receipt by Borrower of such information from such entities.

Borrower shall make itself available to discuss the foregoing financial issues and issues regarding the Chapter 11 Case with DIP Agent and the DIP Lenders on a monthly basis. In addition, the Responsible Officer shall make himself/herself available for telephonic and in-person meetings, on reasonable notice under the circumstances, to provide information to (and answer questions from) DIP Agent and the DIP Lenders with respect to the marketing and sale process, and shall also make the broker retained by Borrower with DIP Agent's approval available for such telephonic and in-person meetings.

**Negative Covenants:**   The documents evidencing the DIP Loan shall contain negative covenants usually and customarily contained in DIP credit facilities of the type referenced herein, including customary exceptions and qualifiers, and will apply to Borrower. Such negative covenants shall include but not be limited to limitations on the following: (i) indebtedness; (ii) liens; (iii) guaranty obligations; (iv) mergers, consolidations, liquidations and dissolutions; (v) sales of assets; (vi) issuance of stock and payment of dividends or any other restricted payments; (vii) investments (including joint ventures), loans and advances; (viii) cash management; (ix) use of proceeds; (x) changes in operations or lines of business unless otherwise approved by DIP Agent; (xi) changes in control; (xii) any material adverse change in the assets of Borrower, taken as a whole, other than those customarily caused by the filing of a chapter 11 case; (xiii) transactions with affiliates, subsidiaries, equity owners or related parties; (xiv) payment of claims existing prior to the Conversion Date (other than as set forth in the Approved DIP Budget); (xv) consenting to or asserting any claims against DIP Agent, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Lenders regarding the DIP Loan or the Pre-Petition Obligations which arise under sections 506(c) or 552(b) of the Bankruptcy Code, or the commencement against such entities of any other actions adverse to their

respective rights and remedies under the DIP Loan, the Pre-Petition Obligations or any Bankruptcy Court order; and (xvi) the existence of any claims entitled to super-priority under section 364(c)(1) of the Bankruptcy Code equal to or greater than the Superpriority Claims in favor of the DIP Lenders.

**Milestone Events and Milestone Dates:**

Each of the following actions or events is a "Milestone Event", and the date by which such actions or events are to be taken or shall occur as specified in such paragraphs is a "Milestone Date":

(i)    Each action and event specified in paragraphs (xiv) through (xviii) under "Affirmative Covenants", above;

(ii)    the entry of the DIP Order shall have occurred within ten (10) days after the completion of the hearings thereon;

(iii)    an order granting Borrower's motion or motions seeking approval of Borrower's retention of a Responsible Officer shall have been entered prior to or concurrently with the entry of the DIP Order;

(iv)    an order approving the Sale Procedures Motion shall have been entered within forty-five (45) days after the Closing Date;

(v)    the Disclosure Statement, acceptable to the DIP Agent, shall have been approved by the Bankruptcy Court within ninety (90) days after the Closing Date;

(vi)    the Plan, acceptable to the DIP Agent, including the sale of Borrower's properties and assets pursuant to such Plan in accordance with the Sale Procedures Motion and order approving same, shall have been confirmed within one hundred and fifty (150) days after the Closing Date; and

(vii)    the Plan acceptable to the DIP Agent shall have become effective within thirty (30) days after it has been confirmed.

Failure of a Milestone Event to occur by the applicable Milestone Date therefor shall be an Event of Default.

**Events of Default:**

The documents evidencing the DIP Loan shall contain events of default usually and customarily contained in DIP credit facilities (each an "Event of Default"). Such Events of Default may include but not be limited to

(subject to customary exceptions and qualifiers):

(i)     the entry of an order dismissing Borrower's Chapter 11 Case or converting Borrower's Chapter 11 Case to a chapter 7 case that, in each case, is not stayed within ten (10) days following entry;

(ii)    the entry of an order appointing a chapter 11 trustee in Borrower's Chapter 11 Case that is not stayed within ten (10) days following entry;

(iii)   the entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Agent on behalf of the DIP Lenders;

(iv)    the entry of an order staying, reversing, vacating or otherwise modifying, without the prior written consent of the DIP Agent, the DIP Loan, the DIP Order approving the DIP Loan;

(v)     the entry of an order in Borrower's Chapter 11 Case appointing an examiner having enlarged powers to operate or manage the financial affairs of Borrower;

(vi)    the entry of an order in Borrower's Chapter 11 Case under sections 506(c) and/or 552(b) of the Bankruptcy Code against DIP Agent or the DIP Lenders or the Pre-Petition Lenders or the Pre-Petition Agents regarding the DIP Loan or the Pre-Petition Obligations adverse to their respective rights and remedies under the DIP Loan, the Pre-Petition Obligations or any Bankruptcy Court order;

(vii)   the filing by Borrower of a plan of reorganization that does not indefeasibly pay in full in cash all obligations owed to the DIP Lenders under the DIP Loan;

(viii)  the filing of any pleading by Borrower, any of its members or any affiliate of any of them, seeking, or otherwise consenting to or supporting, any of the matters set forth in clauses (i) through (vii) above;

(ix)    failure of Borrower to pay (a) interest, fees or other amounts owing in connection with the DIP Loan when due and such default shall continue for ten (10) days or (b) principal on the DIP Loan when due;

(x)     failure of Borrower to comply with any negative covenants or any covenant relating to use of proceeds and the delivery of notices of default;

(xi)    failure of Borrower to perform or comply with any other term or covenant (other than certain affirmative covenants, which shall be subject to a grace period of not more than ten (10) days following notice from DIP Agent, and other than Milestone Events, failure of which to occur by the applicable Milestone Dates therefor shall not be curable or subject to any grace period) and such default shall

continue unremedied for a period of ten (10) days following the earlier of (a) the date on which Borrower became aware of such default and (b) the date on which notice of such failure is given by DIP Agent or any DIP Lender;

(xii)   any representation or warranty by Borrower shall be incorrect or misleading in any material respect when made;

(xiii)  (a) Borrower or any insider or affiliate of Borrower engaging in or supporting any challenge to the validity, perfection, priority, extent or enforceability of the DIP Loan or the Pre-Petition Obligations or the liens on or security interests in the assets of Borrower securing the DIP Loan or the Pre-Petition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Pre-Petition Obligations, or (b) Borrower or any affiliate or insider of Borrower engaging in or supporting any investigation or their assertion of any claims or causes of action (or supporting the assertion of the same) against (x) the DIP Lenders, the DIP Agent and/or the Lead Arranger, (y) the Pre-Petition Agents and/or (z) the Pre-Petition Lenders;

(xiv)   the failure of a Milestone Event to have occurred by the applicable Milestone Date therefor;

(xv)    the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material assets of Borrower;

(xvi)   the Committee (if appointed) shall seek standing to file or otherwise shall file a complaint or initiate any other action against DIP Agent or any of the DIP Lenders or otherwise shall file an objection to such DIP Agent's or DIP Lenders' claims or file any similar pleading which seeks to affect such DIP Agent's or DIP Lenders' claims or liens on the Collateral;

(xvii)  the sale of all or substantially all of Borrower's assets unless consented to by DIP Agent or pursuant to a confirmed and effective plan of reorganization acceptable to the DIP Agent;

(xviii) the filing by Borrower of any motion or proceeding which could reasonably be expected to result in material impairment of the DIP Agent's or the DIP Lenders' rights under the DIP Loan documentation; or

(xix)   from and after the date of entry thereof, the DIP Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of three (3) business days, reversed, modified or amended).

**Voting:**     Amendments and waivers of the definitive credit documentation will require the approval of DIP Lenders subject to exceptions to be set forth in the definitive credit documentation. Amendments to agency provisions of

Page 16 of 21

LA1 1872682v.17

the definitive credit documentation will require the approval of the DIP Agent.

**Reservation of Rights:**

DIP Agent and the DIP Lenders will expressly reserve all rights, including, but not limited to all rights to seek additional adequate protection and/or relief from the automatic stay to enforce any rights under the DIP Loan.

**Remedies:**

Upon the occurrence and during the continuation of an Event of Default, DIP Agent shall have customary remedies, including that upon ten (10) days' written notice to Borrower the automatic stay under section 362 of the Bankruptcy Code shall be deemed lifted without further order or application to the Court, to permit DIP Agent to do one or more of the following: (i) reduce the amount of or terminate any outstanding commitments; (ii) terminate the DIP Loan; (iii) charge the default rate of interest on the DIP Loan; (iv) declare the entirety of the DIP Loan to be due and payable; and (v) realize on any or all of the Debtor Accounts and exercise any and all remedies under the DIP Loan and any control agreement with respect to the Debtor Accounts and to set off or seize amounts in the Debtor Accounts maintained with or under the control of the DIP Agent for the benefit of the DIP Lenders. In addition, upon the occurrence and during the continuation of an Event of Default, DIP Agent, without notice, may (a) immediately withdraw and disburse all amounts in the Disbursement Account as provided in the section entitled "DIP Loan" above; and (b) exercise its remedies under the control agreements with respect to the Debtor Accounts and Borrower's pre-petition bank accounts, to order such banks to (i) immediately dishonor all withdrawals from such bank accounts ordered by Borrower, and (ii) immediately transfer all funds in such bank accounts into the Disbursement Account and then daily thereafter transfer any additional funds deposited into such accounts into the Disbursement Account.

**Indemnification:**

Borrower shall indemnify and hold harmless, and provide limitations of liability to, DIP Agent, the DIP Lenders, and each of their affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives (each, an "Indemnified Party"), in connection with the DIP Loan, subject to customary limitations for gross negligence and willful misconduct.

**Exculpation:**

The members and officers of Borrower shall have no personal liability for any actions taken by taken by the Responsible Officer or by the Borrower at the direction of the Responsible Officer, and from and after the Court's approval of the retention of the Responsible Officer, the members and officers of the Borrower shall have no duty to operate or manage the estate of Borrower.

**Non-Interference Agreement:**

The following shall be an additional condition precedent to the DIP Agent's and the DIP Lenders' obligations under the definitive documentation for

the DIP Loan:

The Guarantors shall have entered into a standstill and non-interference agreement, binding on the Guarantors and all insiders and affiliates of Borrower, including without limitation, Friends of Tamarack, LLC, Cross Atlantic Real Estate LLC, VPG Investments, Inc., Resort, LLC, A&M Development, LLC and Albert Consulting & Management, LLC (collectively, with the Guarantors, the "Insider Parties"), with the Borrower and DIP Agent acceptable to the Responsible Officer and Borrower's counsel and DIP Agent and its Counsel, providing that until the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or the Effective Date of the Plan, whichever is earlier, no Insider Parties shall engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP Loan or the Pre-Petition Obligations or the liens on or security interests in the assets of Borrower securing the DIP Loan or the Pre-Petition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Pre-Petition Obligations, or engage in or support any investigation or assertion of any claims or causes of action (or supporting the assertion of the same) against (x) the DIP Lenders, the DIP Agent and/or the Lead Arranger, (y) the Pre-Petition Agents and/or (z) the Pre-Petition Lenders.

**Litigation Stay; Standstill:**

The following shall be an additional condition precedent to the parties' obligations under the definitive documentation for the DIP Loan:

Subject to (a) the approval by the Bankruptcy Court of the Borrower's motion for entry of order authorizing the DIP Loan in form acceptable to the DIP Agent (the "DIP Motion") and the entry of the DIP Order, and (b) the approval by the Bankruptcy Court of the Responsible Officer Motion and the entry of the order approving the Debtor's appointment of the Responsible Officer, (i) the administrative agent under the Pre-Petition Credit Agreement and the Guarantors shall join in a motion seeking a stay of the proceedings in Case No. CV 08-139-S-EJL pending in the United Stated District Court for the District of Idaho against Jean-Pierre Boespflug and Alfredo Miguel Afif, (ii) subject to the entry of an order of the District Court approving the stay referred to in clause (i) immediately hereinabove, the Pre-Petition Agents shall agree not to bring any similar actions in any other jurisdiction, and (iii) Guarantors shall agree not to bring, file or prosecute any action or proceeding against the DIP Agent or any of its affiliates (including the Pre-Petition Agent) or any of the Pre-Petition Agents or Pre-Petition Lenders related to the DIP Loans or the Pre-Petition Loans or the validity or enforceability of Guarantors' guarantees or seeking any relief, including declaratory relief, respecting same, in any jurisdiction; in each case for a period of six (6) months from the Closing Date.

**Lender Expenses:**

Borrower shall pay the expenses of the DIP Agent and the DIP Lenders, including, without limitation, the reasonable fees and disbursements of

counsel and third party appraisers, collateral agents, consultants, advisors and auditors advising DIP Agent and the DIP Lenders, including a financial advisor selected by DIP Agent, internally allocated charges and expenses relating to the DIP Agent's initial and ongoing DIP Loan examinations, expenses in connection with periodic field audits, the monthly and other monitoring of assets, syndication, enforcement of rights, other miscellaneous disbursements, in connection with the preparation and negotiation of the DIP Loan and any amendments thereto, including the fees and expenses of counsel (collectively, the "<u>Lender Expenses</u>").

| | |
|---|---|
| **Governing Law:** | New York except as may be governed by the Bankruptcy Code or the Bankruptcy Rules. |
| **DIP Orders:** | The DIP Order shall be in form and substance acceptable in all respects to Agent and shall include, without limitation provisions: (i) approving in all respects the definitive documentation evidencing the DIP Loan, and authorizing and directing Borrower to execute and become bound by such definitive documentation; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the DIP Order and the documents evidencing the DIP Loan, including, without limitation, to permit the creation and perfection of the DIP Agent's liens on the Collateral for the benefit of the DIP Lenders; (iii) in the manner described in "Remedies", providing for the automatic relief from the automatic stay to permit the enforcement of the DIP Agent's remedies under the DIP Loan; (iv) in the DIP Order, prohibiting the assertion of claims arising under section 506(c) or 552(b) of the Bankruptcy Code against (a) the DIP Lenders and/or DIP Agent, and (b) the Pre-Petition Lenders and/or the Pre-Petition Agents, or the commencement of any other actions adverse to any such party or their respective rights and remedies under the DIP Loan, the Receivership Credit Agreement, the Pre-Petition Credit Agreement or any Bankruptcy Court order; (v) prohibiting the incurrence of debt with priority equal to or greater than that of the DIP Agent, the DIP Lenders, the Pre-Petition Agents under the Receivership Credit Agreement or the Pre-Petition Credit Agreement, or the Pre-Petition Lenders; (vi) prohibiting the granting or imposition of any liens other than the permitted liens and other liens acceptable to the DIP Agent; (vii) prohibiting Borrower's use of the DIP Agent's cash collateral other than as expressly contemplated by the DIP Order and the DIP Budget prior to the payment in full of Borrower's obligations under the DIP Loan; and (viii) authorizing Borrower, DIP Agent and the DIP Lenders to agree to amend, modify, extend or increase the amount of the DIP Loan without further action of the Bankruptcy Court, but upon ten (10) business days' notice of the material change(s) and of their opportunity to object, to all parties in interest. |
| **Adequate Protection for Pre-Petition Lenders:** | As adequate protection to the Pre-Petition Lenders for any diminution in the value of their interests in Borrower's property resulting from (i) the priming liens granted in favor of the DIP Agent for the benefit of the DIP Lenders under the DIP Loan pursuant to section 364(d)(1) of the |

Bankruptcy Code, (ii) the use, sale or lease of Borrower's property (including any cash collateral) pursuant to section 363(c) of the Bankruptcy Code, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

(a) The Pre-Petition Lenders will, subject to the terms of any Order, maintain liens on the Collateral, junior and subordinate to the Carve-Out and the liens securing the DIP Loan;

(b) The Pre-Petition Lenders shall be granted replacement liens on, and security interests in, the Collateral, subject only to the Carve-Out and the liens on, and security interests in, the Collateral granted to the DIP Agent under the DIP Loan and the DIP Order, as the case may be, and any bona fide prior third party liens; and

(c) The Pre-Petition Lenders shall be granted an administrative claim with priority over all administrative expense claims and unsecured claims against Borrower, subject only to the Carve-Out and to the Superpriority Claims granted to the DIP Agent under the DIP Loan and the DIP Order, as the case may be.

LA1 1872682v.17

**SCHEDULE 1**

**DIP LENDERS**

| Name | Commitment Amount |
|------|-------------------|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| Total: |  |

4.    <u>Water Quality Maintenance</u>.  In all events, and irrespective of whether or not addressed in the approved Vegetation Management and Erosion Control Plan, Lessee shall not allow the operations of the Ski Hill or the Golf Course, whether such operations occur on the Leased Premises or on other portions of the Ski Hill or the Golf Course to cause increased pollutant loading into the waters of Lake Cascade or waters on the Leased Premises.  Pollutant loading shall include, without limitation, sediment loading, nutrient loading (including nutrients applied onto the Ski Hill or the Golf Course and nutrients naturally occurring on the Ski Hill or the Golf Course), phosphorous pesticides, and any Hazardous Substance.

ARTICLE XIX

<u>LESSEE'S DEFAULT AND LESSOR'S REMEDIES</u>

A.    **Default by Lessee.**  Lessee shall be in default hereunder if any one or more of the following occurs:

1.    Lessee fails to pay when due any installment of Rent, or any other sum due hereunder;

2.    Lessee fails to observe or perform any other of the covenants, agreements, conditions or undertakings herein contained to be kept, observed and performed by Lessee under this Lease when the same become due;

3.    Proceedings in bankruptcy or for liquidation, reorganization or rearrangement of Lessee's affairs are instituted by or against the Lessee;

4.    A receiver or trustee is appointed for all or substantially all of the Lessee's business or assets;

5.    A trustee is appointed for Lessee after a petition has been filed for Lessee's reorganization under the United States Bankruptcy Code, or if this Lease be rejected under §365 of the United States Bankruptcy Code;

6.    Lessee shall make an assignment for the benefit of its creditors; or

7.    Lessee shall vacate or abandon the Leased Premises, including a cessation of the operations contemplated under the Development Plan for a period of more than eighteen (18) consecutive months.

B.    Notice of Default and Time for Lessee to Cure.

1.    As to any failure referred to in A.1. above, Lessee shall be allowed 15 days from the date of notice thereof to effect a cure by payment in full of such Rent or other sum due hereunder.

WestRock Lease



EXHIBIT

*C*

2.      As to any failure referred to in A.2. above Lessee shall be allowed the period specified in this Lease for cure, or if no period is specified, Lessee shall be allowed 30 days from the date of notice thereof to effect a cure, provided however, in the case of any curable failure referred to in A.2. above which cannot with diligence be cured within the applicable cure period, if Lessee shall commence to cure within the applicable cure period and thereafter to prosecute continuously to complete the curing of such failure with diligence, the time within which to cure the same shall be extended for such period as may be necessary to complete the curing of the same with diligence.

3.      As to an occurrence of any event described in A. 3, 4, or 5 above, but only if such is the result of action brought against Lessee and without Lessee's concurrence, Lessee shall be allowed a period of 60 days from the commencement of proceedings to have the same dismissed and any receiver or trustee appointed thereunder discharged.

4.      All default and grace periods shall be deemed to run concurrently and not consecutively.

C.      **Lessor's Remedies.**   In the event of any default by Lessee, if not cured within the applicable cure period, Lessor, at its election, may enforce, by judicial action or otherwise, any one, or any combination, of any and all remedies available at law or in equity, or without limitation of any such  remedies, any one, or any combination, of the following:

1.      Lessor may terminate this Lease, re-enter upon all or any part of the Leased Premises, either with or without process of law, (Lessee hereby waiving any demand for possession) and remove Lessee and any persons or property from the Leased Premises, and the rent shall become due thereupon and be paid up to the time of such re-entry, dispossession and/ or termination;

2.      Lessor may re-let the Leased Premises or any part or parts thereof, either in the name of Lessor or otherwise, for a term or terms, which may at Lessor's option be less than or exceed the period which would otherwise have constituted the balance of the term of this Lease and may grant concessions or free rent or charge a higher rental than that in this Lease; and/or

3.      Lessor may collect from Lessee damages for the failure of Lessee to observe and perform said Lessee's covenants herein contained, and any deficiency between the rent hereby reserved and/or covenanted to be paid under this Lease, and the net amount, if any, of the rents collected on account of the lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of the term of this Lease.

D.      **Failure to Re-let – Calculation and Payment of Damages.**   The failure of Lessor to re-let the Leased Premises or any part or parts thereof shall not release or affect Lessee's liability for damages. In computing such damages there shall be added

WestRock Lease                                        Page 64 of 70

**EXHIBIT D**

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In Re: | ) |
| | ) |
| TAMARACK RESORT LLC, | ) |
| | ) |
| Debtor. | ) |
| | ) |

Bkr. Case No. 09-03911-TLM
Chapter 11

### VERIFIED STATEMENT OF JEAN-PIERRE BOESPFLUG IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING POST-PETITION FINANCING; (II) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL; AND (III) GRANTING ADEQUATE PROTECTION

The undersigned, having been duly sworn, deposes and says:

1.    I am over eighteen (18) years of age.

2.    I have personal knowledge of and am competent to testify as to each of the matters set forth herein. I provide this Declaration in support of the Debtor's motion (the "Motion") for the entry of an order, the proposed form of which is attached hereto as <u>Exhibit A</u> (the "<u>DIP Order</u>"), (i) authorizing the Debtor to obtain post-petition secured superpriority financing pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(d) and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001.1(b) of the Local Bankruptcy Rules; (ii) authorizing the Debtor to use cash collateral; and (iii) granting adequate protection.[4]

3.    I am currently serving as the Chief Executive Officer and member of the Board of Directors for the Debtor.

4.    The Debtor is a Delaware limited liability company that owns and operates a luxury resort located in Tamarack, Idaho (the "Tamarack Resort").

---

[4] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

5.     I, and professionals on the Debtor's behalf, have made numerous attempts to seek sources of debtor-in-possession financing.  The Debtor was unable to procure a financing offer that did not require a first priority "priming" lien.  Those lenders that did discuss lending opportunities with the Debtor either declined to offer a loan, or would only agree to provide a loan under substantially similar "priming" terms.  Many of the lenders have responded to the Debtor's inquiries that the small amount of the loan coupled with its complexity make this loan undesirable.

6.     The Debtor conducted extensive negotiations with the DIP Agent and the DIP Lenders which took place during multiple months.  The DIP Lenders were unwilling to provide the DIP Loan without the proposed priming liens.  Attached hereto as <u>Exhibit B</u> is a true and correct copy of the DIP Term Sheet that has been negotiated with the DIP Agent and the DIP Lenders, to which is attached as an exhibit thereto the proposed "DIP Budget."

7.     The Debtor believes the terms offered by the DIP Lenders for the DIP Loan represent the most viable financing offer the Debtor will receive from any potential lenders, and that the post-petition loan being provided by the DIP Lenders is in the best interest of the Debtor, the estate and its creditors.

8.     The DIP Loan will permit the Debtor to fund its chapter 11 case, pay certain ongoing expenses in order to ensure the orderly maintenance and preservation of its assets, maintain existing relationships with vendors, suppliers and customers, make payroll, satisfy other working capital and operational needs, and pay administrative and professional expenses.  Without the DIP Loan, the Debtor will be unable to meet any of these obligations or to maintain and winterize its assets in order to protect them for the upcoming season.  If the properties are not

properly maintained and winterized, the value of such properties will diminish significantly, leading to a substantial decrease in the value of various secured lenders' collateral.

9.    I have directed representatives of CB Richard Ellis to market the Resort for sale. Multiple parties have submitted indications of interest to purchase the Resort and various assets within the Resort.  In order to advance this chapter 11 case, to fund a marketing, sale and confirmation process, to pay ongoing expenses, and to maintain and winterize the Debtor's assets, I believe the DIP Loan should be approved.

10.    The Debtor believes it has negotiated the best possible terms for the DIP Loan and the DIP Lenders are unwilling to provide the DIP Loan without the additional protection of a priming first priority lien in the collateral described therein.

I DECLARE under the penalty of perjury under 28 U.S.C. §1746 that the contents of the foregoing affidavit are true and correct.

Dated:        September 17th, 2010

Jean-Pierre Boespflug