**SIDLEY DRAFT – 10/8/10**

**DIP CREDIT AGREEMENT**

**DATED OCTOBER [_], 2010**

**Among**

**TAMARACK RESORT LLC,**
**as debtor and debtor-in-possession,**
**as the Borrower,**

**THE LENDERS LISTED HEREIN,**
**as the Lenders,**

**AND**

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,**
**as Administrative Agent and Collateral Agent**

**$2,000,000 FIRST PRIORITY (PRIMING) SECURED CREDIT FACILITY**

**SIDLEY DRAFT – 10/8/10**

# TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS .................................................................................2

    1.1    Certain Defined Terms. .......................................................................2
    1.2    Defined Terms; Accounting Terms. ..................................................23

SECTION 2. COMMITMENTS; LOANS; ACCOUNTS .....................................23

    2.1    Commitments; Loans. ........................................................................23
    2.2    Interest on Loans. ..............................................................................26
    2.3    Fees. ..................................................................................................26
    2.4    Repayments and Prepayments; General Provisions Regarding Payments. ...........27
    2.5    Use of Proceeds. ...............................................................................30
    2.6    Increased Costs; Taxes. .....................................................................31
    2.7    Mitigation Obligations; Replacement of Lenders. ...........................33
    2.8    Grants of Superpriority Nature of Obligations and Lenders' Liens. ......34
    2.9    No Discharge; Survival of Claims. ...................................................35
    2.10   Waiver of any Priming Rights. .........................................................35
    2.11   Pro Rata Treatment. ..........................................................................36
    2.12   Assignment of Commitments Under Certain Circumstances; Duty to Mitigate. ......36

SECTION 3. CONDITIONS TO EFFECTIVENESS ..........................................37

    3.1    Conditions to Effectiveness. .............................................................37

SECTION 4. REPRESENTATIONS AND WARRANTIES .................................42

    4.1    Organization and Qualification. .......................................................42
    4.2    Power and Authority. ........................................................................42
    4.3    Chapter 11 Case. ...............................................................................43
    4.4    No Conflict. .......................................................................................43
    4.5    Capital Structure. ..............................................................................44
    4.6    Insurance. ..........................................................................................44
    4.7    Transactions with Affiliates. ............................................................44
    4.8    Business Locations; Agent for Process ............................................44
    4.9    Title to Properties. ............................................................................44
    4.10   Permits; Franchises. ..........................................................................45
    4.11   Financial Condition; Approved Budget. ...........................................45
    4.12   Disclosure. ........................................................................................46
    4.13   Surety Obligations. ...........................................................................46
    4.14   Taxes. ................................................................................................46
    4.15   Brokers. .............................................................................................47
    4.16   Intellectual Property. ........................................................................47
    4.17   Governmental Authorization. ...........................................................47
    4.18   Compliance with Laws. ....................................................................47
    4.19   Litigation. ..........................................................................................47
    4.20   No Defaults. ......................................................................................48

**TAMARACK DIP CREDIT AGREEMENT**

| | | |
|---|---|---|
| 4.21 | Leases. | 48 |
| 4.22 | Employee Benefit Plans. | 48 |
| 4.23 | Labor Relations. | 49 |
| 4.24 | Not a Regulated Entity. | 49 |
| 4.25 | Margin Stock. | 49 |
| 4.26 | Environmental Matters. | 49 |
| 4.27 | Material Contracts; Affiliate Agreements. | 50 |
| 4.28 | Utilities. | 51 |
| 4.29 | Licenses. | 51 |
| 4.30 | Entitlements. | 51 |
| 4.31 | Notes Receivable.. | 51 |
| 4.32 | Transaction Documents. | 52 |

**SECTION 5. AFFIRMATIVE COVENANTS** ................................................................52

| | | |
|---|---|---|
| 5.1 | Visits and Inspections. | 52 |
| 5.2 | Notices. | 53 |
| 5.3 | Financial Statements and Other Reports. | 54 |
| 5.4 | Corporate Existence. | 57 |
| 5.5 | Payment of Taxes and Claims; Tax Consolidation. | 57 |
| 5.6 | Maintenance of Properties; Insurance. | 57 |
| 5.7 | Service of All Chapter 11 Case Notices. | 58 |
| 5.8 | Compliance with Laws, etc. | 58 |
| 5.9 | Environmental Disclosure and Inspection. | 58 |
| 5.10 | The Borrower's Remedial Action Regarding Hazardous Materials. | 60 |
| 5.11 | Future Subsidiaries; New Collateral. | 60 |
| 5.12 | Landlords', Mortgagees' and Bailees' Letters and Agreements. | 61 |
| 5.13 | Further Assurances. | 61 |
| 5.14 | Title. | 61 |
| 5.15 | Estoppels. | 61 |
| 5.16 | Entity Covenants.  The Borrower: | 62 |
| 5.17 | Maintenance of Entitlements. | 62 |
| 5.18 | Operating Cash Revenues. | 62 |
| 5.19 | Continued Retention of Responsible Officer. | 62 |
| 5.20 | Chapter 11 Case Actions.  The Borrower shall: | 63 |
| 5.21 | Accounts. | 63 |
| 5.22 | Approved Budget. | 64 |
| 5.23 | Milestone Requirements. | 64 |

**SECTION 6. NEGATIVE COVENANTS** .......................................................................65

| | | |
|---|---|---|
| 6.1 | Indebtedness. | 65 |
| 6.2 | Liens and Related Matters. | 65 |
| 6.3 | Investments. | 66 |
| 6.4 | Contingent Obligations. | 66 |
| 6.5 | Restricted Payments. | 67 |
| 6.6 | Restriction on Fundamental Changes or Change of Control. | 67 |
| 6.7 | Asset Sales; Other Transfers. | 67 |
| 6.8 | Transactions with Shareholders and Affiliates. | 67 |

**SIDLEY DRAFT – 10/8/10**

6.9     Conduct of Business. ......................................................................................67
6.10   Amendments or Waivers of Certain Agreements. ........................................67
6.11   Fiscal Year. ..................................................................................................68
6.12   Limitation on Development. .........................................................................68
6.13   Material Contracts. .......................................................................................68
6.14   Repayment of Indebtedness. .........................................................................68
6.15   Chapter 11 Claims and Case. ........................................................................68

SECTION 7. EVENTS OF DEFAULT; REMEDIES ...........................................................69

7.1     Events of Default. .........................................................................................69
7.2     Remedies. ......................................................................................................74
7.3     Waivers by Borrower. ...................................................................................75

SECTION 8. AGENTS ..........................................................................................................75

8.1     Appointment. ................................................................................................75
8.2     Rights as a Lender. .......................................................................................76
8.3     Exculpatory Provisions. ................................................................................77
8.4     Advances of Costs in Exercise of Remedies. ...............................................77
8.5     Reliance by the Agents. ................................................................................78
8.6     Delegation of Duties. ....................................................................................78
8.7     Resignation of Administrative Agent and/or Collateral Agent.....................78
8.8     Collateral Documents; Successor Collateral Agent. .....................................80
8.9     Non-Reliance on Agents and Other Lenders. ...............................................80
8.10   Withholding. .................................................................................................81

SECTION 9. MISCELLANEOUS ........................................................................................81

9.1     Assignments and Participations in Loans. ....................................................81
9.2     Expenses; Indemnity; Damage Waiver. .......................................................85
9.3     Right of Set Off. ...........................................................................................87
9.4     Sharing of Payments by Lenders. .................................................................87
9.5     Amendments and Waivers. ...........................................................................88
9.6     Independence of Covenants. ..........................................................................89
9.7     Notices. .........................................................................................................89
9.8     Survival of Representations, Warranties and Agreements. ...........................92
9.9     Failure or Indulgence Not Waiver; Remedies Cumulative. ..........................93
9.10   Marshalling; Payments Set Aside. ...............................................................93
9.11   Severability. ..................................................................................................93
9.12   Obligations Several; Independent Nature of the Lenders' Rights. .................93
9.13   Maximum Amount. .......................................................................................93
9.14   Headings. ......................................................................................................94
9.15   Applicable Law. ............................................................................................94
9.16   Successors and Assigns. ................................................................................94
9.17   Consent to Jurisdiction and Service of Process. ...........................................95
9.18   Waiver of Jury Trial. ....................................................................................96
9.19   Confidentiality. .............................................................................................96
9.20   Time of the Essence. .....................................................................................97
9.21   Counterparts; Integration; Effectiveness; Electronic Execution....................97

**TAMARACK DIP CREDIT AGREEMENT**

9.22    Lender Action. .................................................................................................98
9.23    USA Patriot Act Notification. ...........................................................................98
9.24    Prepetition Credit Agreements. .........................................................................98

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

# SCHEDULES

Schedule 1.1(a) ......................Permitted Existing Indebtedness
Schedule 1.1(b) ......................Permitted Title Exceptions
Schedule 1.1(c) .....................Specific Milestone Requirements
Schedule 2.1A ......................Commitments
Schedule 3.1F........................Real Property Collateral
Schedule 3.1L ......................Corporate Structure and Organization
Schedule 4.5..........................Capital Structure
Schedule 4.6..........................Insurance
Schedule 4.8 ........................Business Locations; Agents for Process
Schedule 4.9C ......................Special Assessment Districts
Schedule 4.11A .....................Borrower Accounts
Schedule 4.13........................Surety Obligations
Schedule 4.14........................FEIN
Schedule 4.15........................Brokers
Schedule 4.16........................Intellectual Property
Schedule 4.17........................Governmental Authorization
Schedule 4.18........................Compliance with Laws
Schedule 4.19........................Litigation
Schedule 4.21........................Leases
Schedule 4.22........................Pension Plans
Schedule 4.23........................Collective Bargaining Agreements
Schedule 4.26........................Environmental Matters
Schedule 4.27........................Existing Material Contracts
Schedule 4.30A .....................Existing Entitlements
Schedule 4.30B .....................Future Entitlements
Schedule 4.31 .......................Existing Notes Receivable
Schedule 9.7..........................Lender Notice Information

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

## EXHIBITS

Exhibit I ..................................Approved Budget
Exhibit II ...............................Form of Assignment Agreement
Exhibit III..............................DIP Order
Exhibit IV..............................Form of Disbursement Authorization
Exhibit V ...............................Map of Project

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

## DIP CREDIT AGREEMENT

This **DIP CREDIT AGREEMENT** dated as of October [**_**], 2010, and entered into by and among TAMARACK RESORT LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Chapter 11 Case (the "**Borrower**"), THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF (together with their respective successors and permitted assigns, each a "**Lender**", and collectively, the "**Lenders**"), and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH ("**Credit Suisse**"), as administrative agent for the Lenders (together with its successors in such capacity, the "**Administrative Agent**") and as collateral agent for the Lenders (together with its successors in such capacity, the "**Collateral Agent**" and collectively with the Administrative Agent, the "**Agents**").

## R E C I T A L S

**A.** **WHEREAS**, the definition of each initially capitalized term used herein shall be as provided or referenced in Section 1 hereof;

**B.** **WHEREAS**, on December 11, 2009, certain creditors of Borrower filed a petition for relief under chapter 7 of the United States Bankruptcy Code against Borrower in the United States Bankruptcy Court for the District of Idaho (the "**Bankruptcy Court**"), commencing an involuntary case (the "**Involuntary Case**") under Case No. 09-03911-TLM;

**C.** **WHEREAS**, on March 17, 2010, the Bankruptcy Court entered its order granting relief in the Involuntary Case;

**D.** **WHEREAS**, on April 7, 2010, Borrower filed its motion to convert the Involuntary Case to a case under chapter 11 of the Bankruptcy Code, and on April 9, 2010 (the "**Conversion Date**"), the Bankruptcy Court entered its order converting the Involuntary Case into a chapter 11 case (the "**Chapter 11 Case**"):

**E.** **WHEREAS**, Borrower, as a debtor and debtor-in-possession under the Chapter 11 Case, continues to own and manage its properties as a debtor and debtor-in-possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

**F.** **WHEREAS**, Borrower has requested that the Lenders provide a senior secured, super-priority credit facility to Borrower in the principal amount of Two Million Dollars ($2,000,000) (such amount, the "**DIP Loan Amount**") to fund, among other things, certain Permitted Expenses of Borrower during the pendency of the Chapter 11 Case; and

**G.** **WHEREAS**, Lenders are willing to make certain Loans to Borrower of up to the DIP Loan Amount upon the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree to enter into this Agreement as follows:

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

## SECTION 1.
## DEFINITIONS

**1.1    Certain Defined Terms.**

The following terms used in this Agreement shall have the following meanings:

"**Accounts**" means, collectively, the Operating Account and each other "securities account" and "deposit account" (as such terms are defined in the UCC) established by Borrower, each of which accounts shall be with a financial institution satisfactory to the Agents; each foregoing account, an "**Account**".

"**Administration Fee**" has the meaning assigned to such term in subsection 2.3B.

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an administrative questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to a specified Person, (a) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, and/or (b), if such Person is a natural person, such Person's parent, sibling, spouse or child.

"**Agents**" has the meaning assigned to that term in the preamble to this Agreement.

"**Agreement**" means this DIP Credit Agreement as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, the common law, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrower, the Project or any Collateral, or any of the other assets of the Borrower whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrower, at any time in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrower.

"**Approved Budget**" means an operating budget for the Project consisting of forecast of operating and development revenues and Permitted Expenses on a line item basis (with the sole exception of the costs and expenses of the Agents and Lenders as set forth in subsection 9.2A of this Agreement) from the Effective Date through the Scheduled Maturity Date, as approved in writing by the Requisite Lenders, as may be updated from time to time as required under Section 5.22. The initial Approved Budget is attached hereto as Exhibit I.

2

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition by the Borrower to any Person (other than the Borrower or its Affiliates) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock (including any of the Capital Stock of the Borrower), but "Asset Sales" shall not include Operating Leases or the use of Cash or Cash Equivalents for purposes permitted under this Agreement.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit II annexed hereto or in such other form as may be approved by the Administrative Agent.

"**BALC**" has the meaning assigned to that term in subsection 2.5A.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect and applicable to the Chapter 11 Case, or any successor statute.

"**Bankruptcy Court**" has the meaning assigned to that term in the recitals to this Agreement.

"**Base Rate**" means, at any time, a rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the higher of (a) the Prime Rate or (b) the rate which is 0.5% in excess of the Federal Funds Effective Rate.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Borrower**" has the meaning assigned to that term in the preamble to this Agreement.

"**Borrower Materials**" has the meaning assigned to that term in Section 9.7.

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401(a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by the Borrower.

"**Borrower's Knowledge**" shall mean the actual knowledge of the Responsible Officer, after reasonable inquiry given the resources available to the Responsible Officer.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

3

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including common stock, preferred stock, partnership interests (general and limited) and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Carve-Out**" shall have the meaning ascribed to it in the DIP Order, which shall include, without limitation, (i) all allowed professional fees and expenses incurred by Borrower prior to delivery by Administrative Agent to Borrower and its counsel of record of a notice of cessation of funding from the Disbursement Account, but which fees and expenses shall not exceed the amounts set forth in the Approved Budget for such items through the date of such notice less any amounts actually paid to or on account of such professionals with respect to such period of time, plus (ii) $25,000 for the payment of allowed professional fees and expenses arising after the Administrative Agent delivers notice to Borrower and its counsel of record of cessation of funding from the Disbursement Account, plus (iii) fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Bankruptcy Court, to the extent such fees were incurred prior to delivery by the Administrative Agent to Borrower of a notice of an Event of Default. Notwithstanding the foregoing, no portion of the Carve-Out and no portion of any amounts approved for payment by Agent pursuant to the terms of this Agreement prior to an Event of Default shall be utilized in any manner prohibited by Section 2.5A of this Agreement.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

"**Cash Equivalent Bank**" has the meaning assigned to that term in the definition of "**Cash Equivalents**" below.

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A 1 from S&P or at least P 1 from Moody's; and (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A 1 from S&P or at least P 1 from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $500,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**").

"**Cash Management System**" has the meaning assigned to that term in subsection 3.1J.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof

**TAMARACK DIP CREDIT AGREEMENT**

LA1 1887102v.9

**SIDLEY DRAFT – 10/8/10**

by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Chapter 11 Case**" shall have the meaning assigned to such term in the recitals of this Agreement.

"**Cleanup**" means all actions required to: (a) cleanup, remove, stabilize, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform studies and investigations and post remedial monitoring, operations and maintenance and abandonment of equipment.

"**Closing Date**" means a date on or before October 29, 2010, upon which all Conditions to Effectiveness set forth in Section 3.1 of this Agreement are satisfied.

"**Collateral**" means all of the properties and assets (including Real Property Assets) of the Borrower and its estate now or hereafter owned or acquired, excluding, however, the Excluded Assets.

"**Collateral Agent**" has the meaning assigned to it in the preamble, and any successor in such capacity.

"**Collateral Agreement**" means that certain Collateral Agreement dated as of the date hereof between the Borrower and the Collateral Agent.

"**Collateral Documents**" means any documents, instruments or agreements delivered by the Borrower pursuant to this Agreement or any of the other Loan Documents in order to grant, protect or perfect Liens on the Collateral as security for all or any of the Obligations.

"**Commercial Tort Claim**" means a claim arising in tort with respect to which: (a) the claimant is an organization; or (b) the claimant is an individual and the claim: (i) arose in the course of the claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in Section 2.1 of this Agreement in the amount set forth in the Register and shown on Schedule 2.1A.

"**Committees**" shall mean collectively, the official committee of unsecured creditors and any other committee formed, appointed, or approved in the Chapter 11 Case and each of such Committees shall be referred to herein as a "**Committee**".

"**Communications**" has the meaning assigned to that term in Section 9.7.

"**Condemnation Proceeds**" has the meaning assigned to that term in Section 2.4.

"**Conforming Disclosure Statement**" shall mean a disclosure statement prepared by the Borrower designed to provide "adequate information" as required by Section 1125 of the

5

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

Bankruptcy Code, which disclosure statement shall previously have been approved in writing by the Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion.

"**Conforming Plan**" means a plan of reorganization and filed with the Bankruptcy Court in connection with the Chapter 11 Case, which plan of reorganization previously shall have been approved in writing by the Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion.

"**Conforming Plan and Disclosure Statement**" means, collectively, the Conforming Plan and the Conforming Disclosure Statement.

"**Consent Decree**" means that certain Consent Decree filed by the Borrower and the United States Environmental Protection Agency and made effective pursuant to that certain order issued by the United States District Court for the District of Idaho on March 12, 2008.

"**Contingency Reserve Subaccount**" means a ledger-entry subaccount of the Operating Account (a) into which pursuant to the Approved Budget designated funds from the Loans and (in accordance with Section 5.18 of this Agreement) Operating Cash Revenues are deposited and (b) from which funds are disbursed in accordance with the Approved Budget and the applicable approved Disbursement Authorization.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, or (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings. Contingent Obligations shall include (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make, take or pay similar payments if required regardless of non performance by any other party or parties to an agreement and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

voting power, by contract or otherwise. **"Controlling"** and **"Controlled"** have meanings correlative thereto.

**"Control Agreement"** means a control agreement sufficient to satisfy the requirements of Section 9-104(a)(2) of the UCC and in form and substance acceptable to the Collateral Agent.

"**Conversion Date**" has the meaning assigned to such term in the recitals of this Agreement.

**"Court Documents"** means, collectively, the DIP Order, and all other orders issued by the Bankruptcy Court, District Court or other court of competent jurisdiction, related to this Agreement or the Loans.

**"Credit Suisse"** has the meaning assigned to such term in the preamble of this Agreement.

**"Default"** means a condition or event that, after notice or after any applicable grace period (if any) has lapsed, or both, would constitute an Event of Default.

**"Default Interest"** has the meaning assigned to that term in subsection 2.2C.

**"Default Rate"** has the meaning assigned to that term in subsection 2.2C.

**"Defaulting Lender"** shall mean any Lender that has (a) defaulted in any of its obligations hereunder or (b) notified the Administrative Agent or the Borrower in writing that it does not intend to satisfy any such obligation, or any Lender that has become insolvent or the assets or management of which has been taken over by any Governmental Authority.

**"Deposit Account"** means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

**"DIP Loan Amount"** shall have the meaning ascribed to such term in the recitals of this Agreement.

**"DIP Order"** means the order of the Bankruptcy Court in form and substance identical to the form attached as Exhibit III (as Modified with the approval of the Requisite Lenders in their sole discretion) entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which shall be in full force and effect and shall not have been stayed, reversed, vacated, subject to appeal, or otherwise Modified in a manner opposed by the Requisite Lenders in their sole discretion.

"**Disbursement**" has the meaning assigned to that term in subsection 2.1C.

"**Disbursement Account**" has the meaning assigned to that term in subsection 2.1C.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**Disbursement Authorization**" means a notice in the form of <u>Exhibit IV</u> annexed hereto delivered by the Borrower to the Administrative Agent pursuant to <u>subsection 2.1D</u> with respect to a proposed disbursement from the Disbursement Account.

"**Disbursement Date**" means any date a Disbursement is made pursuant to the terms herein.

"**Disposition Fee**" means the Disposition Fee of $175,000 specified in paragraph (c)iii under the heading "Retainers, Fees and Expenses" in that certain Engagement Letter dated September ___, 2010 by and between the Borrower and Links Realty Advisors, Inc., as approved by the Bankruptcy Court.

"**Disposition Fee Provision**" means that certain provision in the DIP Order describing the treatment of the Disposition Fee in paragraph [___] thereof.

"**District Court**" means the United States District Court for the District of Idaho.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Effective Date**" means the first Business Day following entry of the DIP Order.

"**Eligible Assignee**" means (i) a Lender, (ii) an Affiliate of a Lender, (iii) a Related Fund of a Lender, and (iv) any other Person (other than a natural person) approved by the Administrative Agent; provided that notwithstanding the foregoing, "Eligible Assignee" shall not include any Borrower or any of its Affiliates or any Insider Parties or any of their Affiliates.

"**Entitlement Documents**" has the meaning assigned to that term in <u>subsection 4.31A</u>.

"**Entitlements**" shall mean those certain Governmental Authorizations which are required to be obtained and maintained or appropriate in order to allow the expeditious and efficient completion of the development work for the Project and/or the sale of the Project (including the Real Property Collateral), and portions thereof as legal lots or parcels.

"**Environmental Claim**" means any claim, action, investigation or notice by any Person alleging potential liability (including potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Indemnity**" means that certain Environmental Indemnity Agreement dated as of the date hereof made by Borrower in favor of Collateral Agent for the benefit of the Secured Parties.

"**Environmental Laws**" means all federal, state, local and foreign laws, regulations, agency policies and common law relating to pollution or protection of public or worker health or the indoor or outdoor environment, including laws relating to Releases or threatened Releases of

8

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and laws relating to the management, use, preservation or protection or rehabilitation of natural resources, including endangered species, as now or may at any time hereafter be in effect.

"**Environmental Liabilities**"    means all Liabilities, obligations, responsibilities, obligations to conduct Cleanup, and all Environmental Claims pending or threatened against the Borrower or against any Person whose liability for any Environmental Claim the Borrower may have retained or assumed either contractually or by operation of law, arising from (a) environmental, health or safety conditions or circumstances, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrower is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrower is a member; and (c) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrower, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrower or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrower or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrower or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrower or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrower or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401(a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Plan fails to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" has the meaning given such term in Section 7.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Assets**" means (i) any and all claims, defenses, causes of action or rights of the Borrower or its estate as arise under sections 510 and 542 through and including 553 of the Bankruptcy Code, (ii) the equipment which was subject to the lease of BALC, and for which stay relief was granted by the Bankruptcy Court by its Summary Order entered May 25, 2010, Docket 238; and the assets subject to orders lifting stay entered in favor of Bank of the West, Docket 185; G.E. Capital, Docket 192; and Hopkins Growth Fund LLC, Docket 87, (iii) that certain Dopplemayr CTEC "Wildwood Express Detachable Quad Chairlift" and Dopplemayr CTEC "Whitewater Chair" Quad Fixed Grip Chairlift, which are identified in a UCC Financing Statement recorded in the official records of Adams County and Valley County, Idaho on December 13, 2006, as Instrument No. 313620, and (iv) a cash deposit of $40,340 held by Idaho Power to secure payment for that utility.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under subsection 2.12B), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lender Office) or is attributable to such Foreign Lender's failure (other than as a result of a Change in Law) to comply with Section 2.6E(v), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to subsection 2.6E(i).

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**Existing Entitlements**" means the Entitlements listed on Schedule 4.32A attached hereto.

"**Existing Guarantors**" means, collectively, Alfredo Miguel Afif, an individual, and Jean-Pierre Boespflug, an individual.

"**Existing Material Contracts**" has the meaning assigned to that term in subsection 4.28A.

"**Existing Notes Receivable**" has the meaning assigned to that term in Section 4.32.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**Fees**" shall mean the Loan Origination Fee and the Administration Fee.

"**First Priority Lien**" means any Lien created, pursuant to any Transaction Document, in or on any asset (including any real property) owned or controlled by the Borrower, which is the most senior Lien in or on such asset.

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrower ending on December 31 of each calendar year.

"**FLSA**" means the Fair Labor Standards Act of 1938, as amended from time to time, and any successor statute.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is a resident for tax purposes.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of its business.

"**Funding and Payment Office**" means the office of the Administrative Agent located at 11 Madison Avenue, New York, NY 10010 (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Borrower and the Lenders).

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**GAAP**" means, subject to the limitations on the application thereof set forth in <u>Section 1.2</u>, generally accepted accounting principles, as in effect in the United States of America and on the date of determination.

"**General Milestone Requirements**" means with respect to each Specific Milestone Requirement: (a) as of the Specific Milestone Date applicable to such Specific Milestone Requirement, no Default or Event of Default has occurred and is continuing; (b) at least three (3) Business Days prior to such applicable Specific Milestone Date, the Borrower shall have delivered an Officer's Certificate to the Administrative Agent representing as of the date of such Officer's Certificate that (i) there have been no Material Adverse Effects since the Effective Date, (ii) no Default or Event of Default has occurred and is continuing; (iii) the Borrower is in compliance with all covenants in the Loan Documents (subject to any applicable grace periods); and (iv) all of the representations and warranties contained herein and in the other Loan Documents are true and correct in all material respects to the same extent as though made the date of such Officer's Certificate except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date, and provided that if a representation and warranty is qualified as to materiality, the applicable materiality qualifier set shall be disregarded with respect to such representation and warranty for purposes of this condition.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Granting Lender**" has the meaning assigned to that term in <u>subsection 9.1G</u>.

"**Ground Lease**" means the Commercial Lease No. M-5042 dated June 11, 2002, as amended, by and between the State of Idaho, acting by and through the State Board of Land Commissioners, as lessor, and WestRock Associates, L.L.C., a Delaware limited liability company, as lessee.

"**Hazardous Materials**" means any man-made or natural chemical, material or substance, the generation, use, emission, storage, handling, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or requiring disclosure or reporting to any Person or which may or could pose a hazard to public or worker health or safety or to the indoor or outdoor environment.  Hazardous Materials including any mold, fungus or biological growth of any type or concentration if present under such conditions or circumstances or to impair or inhibit the use of any structure, or portion thereof, which constitutes Real Property Collateral.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA, current trade payables, accrued expenses or deferred compensation, in any such case, incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than performance bonds), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations, contingent or otherwise, as an account party under any letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person, (h) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock, (i) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (h) above or in respect of the payment of dividends on the Capital Stock of any other Person, and (j) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; provided, that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (j) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning assigned to that term in subsection 9.2B.

"**Insider Parties**" means (i) the Existing Guarantors, (ii) Friends of Tamarack, LLC, (iii) Cross Atlantic Real Estate LLC, (iii) VPG Investments, Inc., (iv) Resort, LLC, (v) A&M Development, LLC, (vi) Albert Consulting & Management, LLC and (vi) all Affiliates and Related Parties of any of the foregoing.

"**Insurance Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(a).

"**Intellectual Property**" means the intellectual property identified as such under Section 4.17 and as more particularly described in Schedule 4.17.

"**Interest Payment Date**" shall mean the last day of each calendar month during the term of the Loans or, if such day is not a Business Day, the immediately preceding Business Day.  For purposes hereof, the initial Interest Payment Date shall be November 30, 2010.

"**Interest Rate**" means fifteen percent (15.0%) per annum.

13

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

"**Investment**" means, with respect to any Person, (a) any direct or indirect purchase or other acquisition by such Person of, or of a beneficial interest in, Capital Stock or other Securities of, all or substantially all of the assets of, or any other investment in, any other Person or (b) any direct or indirect loan, advance, extension of credit (by way of guaranty or otherwise) or capital contribution by such Person to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write ups, write downs or write offs with respect to such Investment.

"**Involuntary Case**" has the meaning assigned to that term in the recitals to this Agreement.

"**Land And Operation Expenses**" means, for any period, the costs and expenditures incurred in connection with the operation, preservation and maintenance of the Project included in the Approved Budget, including and without duplication, the ownership and maintenance of the Collateral, including general and administrative expenses, winterization expenses, payments due under the Ground Lease, and carry costs.

"**Lender**" and "**Lenders**" has the meaning assigned to such terms in the preamble of this Agreement; provided that the term "Lender", when used in the context of a particular Commitment shall mean the Lender having that Commitment.

"**Lender's Commitment**" means the amount of each respective Lender's Commitment with respect to its Loan, as such Lender's commitment is set forth on Schedule 2.1A of this Agreement.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrower promptly but no later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrower and the Administrative Agent.

"**Liabilities**" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"**Lien**" means any lien, mortgage, pledge, collateral assignment, hypothecation, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any

14

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan**" or "**Loans**" has the meaning assigned to that term in <u>Section 2.1</u>.

"**Loan Documents**" means this Agreement, the Mortgages, the Collateral Agreement, the Environmental Indemnity, all Control Agreements and any other documents now or hereafter evidencing or securing the Obligations.

"**Loan Exposure**" means, with respect to any Lender at any time, the aggregate principal amount at such time of the outstanding Loans of such Lender (including any outstanding amounts funded by such Lender under <u>subsection 2.1B</u> with respect to a Loan that a Defaulting Lender failed to fund).

"**Loan Origination Fee**" has the meaning assigned to such term in <u>Section 2.3</u>.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets or financial condition of the Borrower, taken as a whole, (b) the material impairment of the ability of the Borrower to perform the Obligations, (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of this Agreement, any Collateral Document, or any other material Loan Document to which it is a party, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under any Loan Document or the DIP Order, (e) a material adverse effect upon the value of the Real Property Collateral, or (f) a material adverse effect upon the Entitlements and the intended development of the Real Property Collateral.

"**Material Contracts**" means, collectively, (or individually, a "**Material Contract**") (a) any contract entered into after the Conversion Date for which the approval by the Bankruptcy Court is or should be sought pursuant to section 363 of the Bankruptcy Code, or (b) any contract or other agreement the termination of which could reasonably be expected to result in a Material Adverse Effect.

"**Material Environmental Liability**" means an Environmental Liability which may result in (a) a discontinuation of a substantial portion of the business, operations or development of the Borrower, (b) potential Cleanup costs in excess of $50,000, or a violation of Environmental Laws which does, or reasonably can be expected to, result in a fine or penalty exceeding $50,000, (c) any designation of any portion of the Real Property Assets on a list maintained by any Governmental Authority of sites at which a Release of Hazardous Materials has occurred, or (iv) Environmental Claim where the amount alleged at issue exceeds $50,000.

"**Maturity Date**" means the earliest of (a) the Scheduled Maturity Date, (b) the date all amounts due under all Loans shall become due and payable as provided herein, whether by acceleration or otherwise, (c) the date of any stay, reversal, vacatur or modification of the DIP Order, including any determination that the Administrative Agent and/or the Lenders (or any of them) are not entitled to the protections of Section 364(e) of the Bankruptcy Code in connection

15

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

with the Loan; and (d) the effective date of the Conforming Plan in the Borrower's Chapter 11 Case.

"**Maximum Amount**" has the meaning assigned to that term in subsection 9.13A.

"**Modifications**" shall mean any amendments, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "**Modify**", "**Modified**" or related words shall have meanings correlative thereto.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a mortgage (or deed of trust), assignment of leases and rents, security agreement and fixture filing executed and delivered by the Borrower in connection with the Loan and encumbering the Collateral in such form as may be approved by the Collateral Agent.

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate is contributing or to which the Borrower or any ERISA Affiliate had an obligation to contribute within the last six years.

"**New Collateral**" has the meaning assigned to such term in subsection 5.11B.

"**Non-Consenting Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Non-Interference Agreement**" means that certain Non-Interference Agreement dated as of September 24, 2010 by and between the Existing Guarantors, the Agents and, for limited purposes specified therein, the Prepetition Agents.

"**Obligations**" means all obligations of every nature of the Borrower from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Transaction Documents.

"**OECD**" means the Organization for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the Board (if an officer) or chief executive officer or by the chief financial officer (or other principal financial officer) of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer (or other principal financial officer) or vice president, and (c) if such Person is the Borrower, the Responsible Officer Representative.

"**Operating Account**" means a separate operating account established by the Borrower with a financial institution satisfactory to the Agents (including Key Bank, N.A., which is deemed a satisfactory financial institution for this purpose), which account shall at all times be subject to an effective Control Agreement in favor of the Collateral Agent (for the benefit of the

16

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

Lenders) in form and substance reasonably satisfactory to the Collateral Agent and in which the Collateral Agent (for the benefit of the Lenders) has a perfected First Priority Lien.

"**Operating Cash Revenues**" means, for any period, all Cash (or its equivalent) actually received by the Borrower during such period resulting from (a) any operating revenues generated from or in connection with any Collateral and (b) payments received on account of any notes receivable from the obligors under such notes.

"**Operating Lease**" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**Ordinary Course of Business**" means, with respect to a specific Person, the ordinary course of such Person's business, and (a) undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document, and (b) which shall not in any event interfere with the ongoing operation of the assets of such Person in a manner consistent with similar properties of such Person and shall not interfere with the day-to-day operations of such assets as contemplated in the Loan Documents.

"**Organizational Authorizations**" means, with respect to any Person, incumbency certificates of its officers executing any applicable documents and/or its resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including managers and managing committees), if any, required by the Organizational Certificate or other Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, its Organizational Certificate, the by laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by laws, agreements or arrangements in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Health Act of 1970, as amended from time to time, and any successor statute.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

17

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**Participant**" has the meaning assigned to that term in subsection 9.1D.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrower or any ERISA Affiliate.

"**Permitted Encumbrances**" means the following:

      (a)    easements, covenants, conditions, rights of way, restrictions, minor defects, encroachments or irregularities in title and other similar charges or encumbrances entered into in the Ordinary Course of Business of the Borrower;

      (b)    zoning, building codes and other Governmental Authorizations regulating the use, development and/or occupancy of any Real Property Asset or activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property Asset which are not violated and would not be violated by the current and contemplated use, development and/or occupancy of such Real Property Asset or the operation of the business of the Borrower thereon;

      (c)    bankers liens and rights of setoff with respect to customary depository arrangements entered into in the Ordinary Course of Business and permitted pursuant to a Control Agreement; and

      (d)    with respect to the Real Property Collateral, only the Permitted Title Exceptions.

"**Permitted Existing Indebtedness**" means the Indebtedness set forth on Schedule 1.1(a) attached hereto.

"**Permitted Expenses**" means the following categories of expenses only to the extent contemplated in the Approved Budget: (a) the outstanding payment of $250,000 due under the Ground Lease, which payment shall be made subject to conditions acceptable to the Requisite Lenders in their sole discretion, (b) costs and expenses for maintenance and preservation of the Borrower's assets and a contingency reserve (it being understood that the Project is not presently an operating resort and Borrower will not, unless otherwise previously approved in writing by the Requisite Lenders, conduct any operations other than the performance of necessary maintenance and preparation for the sale of its assets and other operations contemplated by the Approved Budget), (c) expenses of marketing the Borrower's properties and assets including the Project, (d) liability and casualty insurance premiums to satisfy the insurance requirements set forth in subsection 5.6B of this Agreement, including other insurance reasonably required by the Responsible Officer such as director and officer insurance, professional management liability insurance, and environmental insurance, (e) professional (i.e. legal and accounting) fees and expenses incurred by the Borrower and its estate (to the extent (i) authorized in the Approved Budget and the DIP Order and subject further to final Bankruptcy Court approval of any such

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

professional fees and disbursements and (ii) after exhausting any retainer amounts held by each such professional as of the Effective Date), (f) the costs and expenses of the Agents and the Lenders as set forth in subsection 9.2A of this Agreement, and (g) other costs pursuant to the Approved Budget.

"**Permitted Title Exceptions**" means only those exceptions listed on Schedule 1.1(b) attached hereto.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, joint stock company, association, company, partnership, limited partnership, Governmental Authority or other entity of whatever nature.

"**Platform**" has the meaning assigned to that term in Section 9.7.

"**Prepetition Agents**" shall mean, collectively, the administrative agent(s) and/or collateral agent(s), as applicable, acting on behalf of the Prepetition Lenders in relation to the Prepetition Obligations.

"**Prepetition Credit Agreements**", each an "**Prepetition Credit Agreement**", means, collectively, (a) that certain Second Amended and Restated Receivership Credit Facility Agreement dated as of May 18, 2009, by and among Douglas P. Wilson as court-appointed receiver, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (the "**Receivership Credit Agreement**") and (b) that certain Credit Agreement dated as of May 19, 2006, among Borrower, the lenders party thereto, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and other persons party thereto.

"**Prepetition Lenders**" means the various lenders (and their respective successors and assigns) that are party to the Prepetition Credit Agreements.

"**Prepetition Loan Documents**" means the Prepetition Credit Agreements and all of the other loan documents related thereto and described in the Prepetition Credit Agreement as "Loan Documents".

"**Prepetition Obligations**" means the obligations owed to the "Agents" (as defined in the Prepetition Credit Agreements) and the Prepetition Lenders under the Prepetition Loan Documents.

"**Prime Rate**" means the rate of interest per annum announced from time to time by Credit Suisse as its prime commercial lending rate in effect at its principal office in New York City. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Credit Suisse or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by dividing (i) the Loan Exposure of that Lender by (ii) the aggregate Loan Exposure of all the Lenders; in any such case as the

19

**TAMARACK DIP CREDIT AGREEMENT**

applicable percentage may be adjusted by assignments permitted pursuant to <u>Section 9.1</u>. The initial Pro Rata Share of each Lender is set forth in the Register.

"**Proceedings**" has the meaning assigned to that term in <u>subsection 5.3(iv)</u>.

"**Project**" means that certain project located in the Counties of Adams and Valley in the State of Idaho, commonly known as the Tamarack Resort and depicted on the map attached hereto as <u>Exhibit V</u>.

"**Properly Contested**" means, in the case of any Indebtedness or other obligations of the Borrower (including any Taxes) that is not paid prior to delinquency or payable by reason of the Borrower's bona fide dispute concerning its liability to pay same or concerning the amount thereof: (a) such Indebtedness or other obligation is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (b) the non-payment of such Indebtedness or other obligation could not reasonably be expected to have a Material Adverse Effect; (c) the enforcement of any tax Lien is stayed during the period prior to the final resolution or disposition of such dispute; and (d) if the Indebtedness or other obligation results from, or is determined by the entry, rendition or issuance against the Borrower or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review.

"**Proposed Plan and Disclosure Statement**" means, collectively, a plan of reorganization and disclosure statement in connection with the Chapter 11 Case submitted by the Borrower to the Administrative Agent.

"**Public Lender**" has the meaning assigned to that term in <u>Section 9.7</u>.

"**Real Property Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) of the Borrower in any real property.

"**Real Property Collateral**" means the portion of the Collateral comprising Real Property Assets that are encumbered by a Lien in favor of the Collateral Agent for the benefit of the Lenders as provided pursuant to this Agreement and the DIP Order. As of the Effective Date, the "**Real Property Collateral**" is the Real Property Assets described on <u>Schedule 3.1F</u>.

"**Recovery Event**" has the meaning assigned to that term in <u>subsection 2.4B(ii)(a)</u>.

"**Register**" has the meaning assigned to that term in <u>subsection 9.1C</u>.

"**Registered Loan**" has the meaning assigned to that term in <u>subsection 9.1C</u>.

"<u>**Related Fund**</u>" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or active or passive migration of Hazardous Materials into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other receptacles containing any Hazardous Materials), or into or out of any property, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property.

"**Requisite Lenders**" means Lenders having or holding more than 50% of the sum of the aggregate Loan Exposure of all Lenders, provided, however, that the Loans of any Defaulting Lender shall be disregarded in the determination of the Requisite Lenders at any time.

"**Responsible Officer**" means Links Realty Services, Inc., acting by and through Michael Fleischer.

"**Responsible Officer Motion**" means that certain Motion for Entry of an Order Approving the Appointment of Links Realty Advisors, Inc., by and through Michael Fleischer, as Responsible Officer for the Debtor Effective as of September 24, 2010, filed with the Bankruptcy Court on September 25, 2010 (Docket 323).

"**Responsible Officer Representative**" means Michael Fleischer, President of the Responsible Officer.

"**Restricted Payment**" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock (or of any other Capital Stock) of the Borrower now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock (or of any other Capital Stock) of its, the Borrower now or hereafter outstanding, (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock (or of any other Capital Stock) of its, the Borrower now or hereafter outstanding, and (d) any payment of claims, Liens or encumbrances existing prior to the Conversion Date that is made against or encumbers the Borrower or any asset owned by the Borrower (except as otherwise expressly consented to by Administrative Agent and provided for in the Approved Budget).

"**S&P**" means Standard & Poor's, a division of the McGraw Hill Companies, Inc.

"**Scheduled Maturity Date**" means the date that is six (6) months after the Closing Date.

"**Sale Procedures Motion**" has the meaning assigned to that term in subsection 5.20B.

"**Secured Parties**" means the Lenders.

"**Securities**" means any Capital Stock, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, bonds, debentures, notes, or other

21

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

evidences of Indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Specific Milestone Dates**" means collectively (or individually, a "**Specific Milestone Date**"), the dates set forth on Schedule 1.1(c) by which Specific Milestone Requirements must be completed.

"**Specific Milestone Requirements**" means collectively (or individually, a "**Specific Milestone Requirement**") the completion of each of the actions set forth on Schedule 1.1(c) on or prior to the Specific Milestone Date specified therein.

"**SPV**" has the meaning assigned to that term in subsection 9.1G.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"**Supplemental Collateral Agent**" and "**Supplemental Collateral Agents**" shall have the meaning assigned to these terms in subsection 8.1B.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**TMA**" means the Tamarack Municipal Association, Inc., an Idaho nonprofit corporation.

"**Transaction Costs**" means the fees, costs and expenses payable by the Borrower in connection with the Transactions, including amounts payable to the Agents and the Lenders.

"**Transaction Documents**" means, collectively, the Loan Documents and the Court Documents.

"**Transactions**" means the consummation of the transactions contemplated under this Agreement.

"**Trustee**" means the United States Trustee for the District of Idaho.

"**UCC**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other state govern the method or

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

"**WMG**" has the meaning assigned to that term in Section 2.5A.

**1.2    Defined Terms; Accounting Terms.**

    **A.**    The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" as used in this Agreement shall be deemed to be followed by the phrase "without limitation". As used in this Agreement, the word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document in this Agreement shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise Modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement) and (e) the words "asset" and "property" as used herein shall be construed to have the same meaning and effect and to refer to and include any and all accounts, cash, chattel paper, commercial tort claims, documents, equipment, fixtures, general intangibles, goods, instruments, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, Intellectual Property, inventory, investment property, letter-of-credit rights, payment intangibles, software, real property, receivables and all proceeds thereof and therefrom.

    **B.**    Except as otherwise expressly provided in this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Should the accounting principles and policies of GAAP change such that the calculations of covenants, definitions or other provisions of this Agreement no longer reflect the intention of the Borrower and the Lenders as of the Effective Date, the Borrower, the Administrative Agent, and the Lenders shall negotiate in good faith to amend the financial definitions and related covenants to conform with such changes to GAAP. Notwithstanding anything to the contrary herein, Borrower may use cash basis accounting in the preparation of any financial reports required hereunder.

**SECTION 2.**
**COMMITMENTS; LOANS; ACCOUNTS**

**2.1    Commitments; Loans.**

    **A.**    **Loans**. Subject to the terms and conditions of this Agreement, each of the Lenders agrees to make on the Effective Date a loan in the amount equal to its Commitment

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

(each a "**Loan**", and collectively, the "**Loans**").  Such Commitments shall terminate immediately and without further action after giving effect to the making of the applicable Loan.  The proceeds of the Loans shall be used for the purposes identified in subsection 2.5A.  Loans, once repaid or prepaid, may not be reborrowed.

B.     **Funding of Loans.**  The Loans shall be made by the Lenders in the amounts of their respective Commitments, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder nor shall the Commitment of any Lender to make the Loan requested be increased or decreased as a result of a default by any other Lender in that other Lender's obligation to make a Loan requested hereunder.

Each Lender shall make the amount of its Loan available to the Administrative Agent not later than 12:00 Noon (New York time) on the Effective Date in same day funds at the Funding and Payment Office to such account in New York City designated by the Administrative Agent, and the Administrative Agent shall promptly thereafter credit the amounts so received to the Disbursement Account.  Notwithstanding anything herein to the contrary, the Effective Date shall not occur unless and until each Lender committed to make a Loan on the Effective Date as set forth in Schedule 2.1A has funded the amount of its Loan to the account designated by the Administrative Agent.  Only upon satisfaction or waiver of the conditions precedent specified in Section 3.1 and the funding of all Loans by all Lenders pursuant to their Commitments with respect to Loans to be funded on the Effective Date shall the proceeds of such Loans thereafter be available for disbursement to the Administrative Agent on the terms and subject to the conditions for Disbursement set forth in this Agreement.

Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Base Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

C.     **Disbursement Account**.  On the Effective Date, the proceeds of the Loans shall be funded into a trust account for the benefit of the Lenders at the Bank of New York Mellon, with the title "Credit Suisse Disbursement Account", Account No. [_____] (the "**Disbursement Account**").  The Disbursement Account shall not be an interest-bearing account.  Provided that no Event of Default has occurred and is continuing, the funds held in the Disbursement Account may be disbursed (i) on each Interest Payment Date to the Lenders by the Administrative Agent for the payment of accrued interest on the Loans in accordance with subsection 2.2B (provided, however, that in no event shall funds in the Disbursement Account be used to pay any Default Interest that may accrue under the Loans, which Default Interest shall be payable by the Borrower to the Lenders pursuant to the terms and conditions of subsection 2.2C) and (ii) from

24

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

time to time to the Borrower by the Administrative Agent on the terms and subject to the conditions provided herein, including the satisfaction of the requirements set forth in subsection 3.1A (each such disbursement under this clause (ii), a "**Disbursement**").

Upon the occurrence of any of the Events of Default described in Section 7.1, the Administrative Agent may (and shall at the direction of the Requisite Lenders) disburse the balance of funds in the Disbursement Account, after deducting any expenses due to the Administrative Agent under the Loan Documents, to the Lenders in their respective Pro Rata Shares. The Borrower shall have no interest in the Disbursement Account nor any interest in or right to receive any funds held in the Disbursement Account, and each Disbursement shall be deemed to be an executory financial accommodation conditioned upon satisfaction in full of all conditions precedent to a Disbursement as identified in this Agreement.

D.    **Disbursement Authorization.**  From and after the Effective Date and no more frequently than once every two (2) weeks thereafter, the Borrower may submit to the Administrative Agent a written request for Disbursement, in the form of a Disbursement Authorization, not later than 12:00 Noon (New York time), for expenses identified in such Disbursement Authorization as required to be paid by the Borrower in the succeeding two (2) week period. Borrower shall not submit a request for Disbursement any more frequently than stated in this paragraph. Upon satisfaction of all conditions precedent to such Disbursement specified in Section 3.1, the Administrative Agent shall cause to be disbursed to the Borrower funds from the Disbursement Account no later than two (2) Business Days following its receipt of the Borrower's Disbursement Authorization, by wire transfer, intra bank transfer or bank credit to the Operating Account, in an aggregate amount equal to the Disbursement in the applicable Disbursement Authorization.

The Borrower shall notify the Administrative Agent prior to the funding of any Loans or the disbursing of any Disbursement in the event that any of the matters to which the Borrower is required to certify in the applicable Disbursement Authorization are no longer true and correct as of the applicable Disbursement Date, and the acceptance by the Borrower of the proceeds of any Disbursement shall constitute a recertification by the Borrower, as of such Disbursement Date, as to the matters to which the Borrower is required to certify in the applicable Disbursement Authorization.

E.    **Operating Account**.  On the Effective Date and upon the satisfaction of the terms and conditions of subsections 2.1D and 3.1A, funds in the amount shown in the Approved Budget for release on said date, and as thereafter set forth in the Approved Budget with the consent of Administrative Agent, shall be released from the Disbursement Account to the Operating Account for the purpose of paying Permitted Expenses. Provided no Default or Event of Default has occurred and is continuing, funds in the Operating Account may be disbursed at the direction of the Borrower to other Accounts or directly to the applicable recipient through the Cash Management System, for the payment by the Borrower of Permitted Expenses, all in accordance with the Approved Budget. Upon the acceleration of the Loans and the demand for the repayment thereof, the Administrative Agent may withdraw and apply, without notice or demand to Borrower, all funds in every Account for the repayment of the Obligations in accordance with subsection 2.4E.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

2.2    **Interest on Loans.**

A.    **Rate of Interest**.  Subject to the provisions of <u>subsection 2.2C</u> and <u>D</u>, the Loans shall bear interest on the unpaid principal amount thereof outstanding at any time until the Maturity Date (whether by acceleration or otherwise) at the Interest Rate.

B.    **Interest Payments.**  Subject to the provisions of <u>subsection 2.4D</u> below, interest on each portion of a Loan outstanding shall be payable, in Cash, (i) in arrears on each Interest Payment Date, and provided that no Default or Event of Default shall have occurred and is continuing, on each Interest Payment Date the Administrative Agent shall cause to be disbursed to the Lenders from the Disbursement Account such interest then due and payable; (ii) upon any prepayment (to the extent accrued on the amount being prepaid); and (iii) at the Maturity Date.

C.    **Post-Default Interest.**  Upon the occurrence and during the continuation of any Event of Default, the then outstanding principal amount of all Loans and, to the extent permitted by applicable law, any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder, shall automatically thereafter bear interest (including post petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable to Lenders upon demand in Cash at a rate that is 5.0% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans (the **"Default Rate"**) (the interest payable at such incremental 5.0% rate is referred to herein as the **"Default Interest"**).  Payment or acceptance of the increased rates of interest provided for in this <u>subsection 2.2C</u> is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

D.    **Computation of Interest.**  Interest on the Loan shall be computed on the basis of a 360-day year and for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date the Loan is made shall be included, and the date of payment of such Loan shall be excluded; <u>provided</u> that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

2.3    **Fees.**

A.    **Loan Origination Fee.**  On the Effective Date, from the proceeds of the initial Disbursement, the Borrower shall pay to the Administrative Agent for the benefit of each Lender (which is not a Defaulting Lender) an amount equal to one percent (1.0%) of the DIP Loan Amount (i.e. $20,000) ("**Loan Origination Fee**").  The Loan Origination Fee shall be distributed to the Lenders, *pari passu*, in proportion to their respective Pro Rata Shares, provided, however, that any Loan Origination Fee owing to a Lender that is a Defaulting Lender may be withheld by the Administrative Agent, for so long as such Lender remains a Defaulting Lender.  The Borrower acknowledges that the Loan Origination Fee shall be fully earned upon the Effective Date and shall not be refundable under any circumstances.  The Borrower acknowledges and agrees that the rate of interest charged on the Loans would be greater absent the Loan Origination Fee and that the Loan Origination Fee shall not be deemed to be a penalty.

26

**SIDLEY DRAFT – 10/8/10**

     **B.**    **Administration Fee.**  On the Effective Date, from the proceeds of the initial Disbursement, the Borrower the pay to the Administrative Agent a fee in the amount of $50,000.00, in consideration for administering the credit facility described herein (the "**Administration Fee**").  The Borrower acknowledges that the Administration Fee shall be fully earned upon the Effective Date and shall not be refundable under any circumstances.

**2.4**    **Repayments and Prepayments; General Provisions Regarding Payments.**

     **A.**    **Scheduled Payments of Loans**.  The Loans shall be repaid in full on the Maturity Date, in Cash, without further application to or order of the Bankruptcy Court.  If the Maturity Date is not a Business Day, then the repayment in full shall be made on the next preceding Business Day.

     **B.**    **Prepayments**.

       (i)    <u>Voluntary Prepayments</u>.  The Borrower may, upon no less than three (3) Business Days' prior irrevocable written or telephonic notice no later than 11 a.m. New York time, promptly confirm in writing to the Administrative Agent (which notice the Administrative Agent will promptly transmit to each Lender), at any time and from time to time prepay, without premium or penalty, the Loans on any Business Day in whole or in part in an aggregate minimum amount of $100,000 and integral multiples of $50,000 in excess of that amount or such lesser amount as is then outstanding at the Borrower's election in connection with any prepayment of the Loans pursuant to this <u>subsection 2.4B</u>, such prepayment shall not, so long as no Event of Default then exists, be applied to any Loan of a Defaulting Lender.  Notice of prepayment having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein.  Any voluntary prepayments pursuant to this <u>subsection 2.4B(i)</u>, including the remittance, if any, of Operating Cash Revenues received by Borrower and delivered to Administrative Agent pursuant to <u>Section 5.18</u>, shall be applied as specified in <u>subsections 2.4C</u>.

       (ii)    <u>Mandatory Prepayments</u>.  The Loans shall be prepaid in the manner provided in <u>subsection 2.4C</u> upon the occurrence of the following circumstances:

         (a)    <u>Prepayments Due to Insurance and Condemnation Proceeds</u>.  No later than the fifth (5th) Business Day following the date of receipt by the Borrower of (I) any cash payments under any insurance policy as a result of any damage to or loss of all or any portion of the Collateral net of (A) the cost of repair and restoration of the affected portion of the Collateral, to the extent the proceeds are permitted to be used for repair and restoration purposes by the Collateral Agent and (B) actual and documented reasonable costs actually incurred by the Borrower in connection with adjustment and settlement thereof, (the "**Insurance Proceeds**"), except to the extent such Insurance Proceeds are used to repair or restore in accordance with the terms determined by the Collateral Agent; provided, that, if the repair and restoration cannot reasonably be expected to be completed in accordance with the terms of the Collateral Agent before the Maturity Date, <u>then</u> the Borrower shall use the Insurance Proceeds to prepay the

27

**TAMARACK DIP CREDIT AGREEMENT**

Loans; or (II) any proceeds resulting from the taking of assets by the power of eminent domain, condemnation or otherwise (net of actual and documented reasonable costs incurred by the Borrower in connection with adjustment and settlement thereof, **"Condemnation Proceeds"**) (any such event resulting in the recovery of Insurance Proceeds or Condemnation Proceeds, a **"Recovery Event"**), the Borrower shall prepay the Loans in an amount equal to the Insurance Proceeds or Condemnation Proceeds, as the case may be, received. Concurrently with any prepayment of Loans pursuant to this subsection 2.4B(ii)(a), the Borrower shall deliver to the Administrative Agent an Officer's Certificate demonstrating in reasonable detail the derivation of the Insurance Proceeds or Condemnation Proceeds, as the case may be, of the correlative Recovery Event.

(b)     Prepayments Due to Asset Sales.  Promptly following the receipt by the Borrower of Cash or Cash Equivalents from an Asset Sale other than an Asset Sale of the kind, type or nature described in subsection 2.4E,  the Borrower shall deliver all such Cash or Cash Equivalents to the Administrative Agent for application pursuant to subsection 2.4C.  Nothing contained in this subsection 2.4B(ii)(b) shall be deemed to permit the Borrower to consummate any Asset Sale.

C.     **Application of Prepayments**.   Subject to the Carve-Out, each prepayment received by the Administrative Agent from the Borrower with respect to the Loans under subsection 2.4B shall be applied in the following order: (i) first, to the repayment of any amounts advanced by the Collateral Agent, the Administrative Agent and the Lenders for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent, the Administrative Agent, and the Lenders in connection with the collection of the Loans (including all financial advisors' and attorneys' fees and costs payable hereunder); (ii) second, to the payment of accrued and unpaid interest on the Loans; (iii) third, to the reduction of the outstanding principal balance of the Loans in an amount equal to the outstanding principal balance of the Loans minus the balance in the Accounts on the date of the repayment; and (iv) fourth, to the Administrative Agent for deposit to the Disbursement Account, which moneys the Administrative Agent shall be entitled to apply to prepay amounts described in the preceding clause (iii) as the balance in the Operating Account is reduced to fund payment of expenses pursuant to the Approved Budget. Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, the Administrative Agent shall apply any payments received in accordance with subsection 2.4E below.

D.     **General Provisions Regarding Payments**.

(i)     Manner and Time of Payment.  All payments by the Borrower of principal, interest, fees and other Obligations hereunder shall be made in same day funds and without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 12:00 noon (New York time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by the Administrative Agent after that time on such due date shall, at the Administrative Agent's discretion, be deemed to have been paid by the Borrower on the

28

**TAMARACK DIP CREDIT AGREEMENT**

next succeeding Business Day.  The Borrower hereby authorizes the Administrative Agent to charge the Accounts in order to cause timely payment to be made to the Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(ii)    <u>Application of Payments to Principal and Interest</u>.  Except as provided in <u>subsection 2.2C</u>, all payments in respect of the principal amount of any Loan shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and in any event any payments made in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest before application to principal.

(iii)    <u>Apportionment of Payments</u>.  The aggregate principal and interest payments shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to the Lenders' respective Pro Rata Shares.  The Administrative Agent shall promptly distribute to each Lender, at its applicable Lender Office, its Pro Rata Share of all such payments received by the Administrative Agent when received by the Administrative Agent.

(iv)    <u>Payments on Business Days</u>.  Except if expressly provided otherwise, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

**E.    Application of Proceeds of Collateral**.

All proceeds received by the Collateral Agent after an Event of Default or as a result of exercising remedies under the Loan Documents, or as a result of any transfer or deed in lieu of foreclosure of any Collateral, in respect of any sale of, collection from, or other realization upon all or any part of the Collateral under any Transaction Document, or pursuant to the sale of the Collateral in conformance with the Conforming Plan, shall be applied in full or in part by the Administrative Agent against the applicable Obligations in the following order of priority:

(i)    to payment of the Carve-Out;

(ii)    thereafter, to the extent of any excess proceeds, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to the Agents and their agents and counsel, and all other reasonable expenses, liabilities and advances made or incurred by the Agents in connection therewith, and all amounts for which such Agents are entitled to indemnification under such Collateral Document and all advances made by the Collateral Agent, the Administrative Agent and the Lenders thereunder for the account of the Borrower (excluding principal and interest in respect of any Loans to the Borrower), and to the payment of all reasonable costs and expenses paid or incurred by the Collateral Agent, the Administrative Agent and the Lenders in connection with the exercise of any right or

29

**TAMARACK DIP CREDIT AGREEMENT**

remedy under such Collateral Document, all in accordance with the terms of this Agreement and such Collateral Document;

(iii)    thereafter, to the extent of any excess proceeds and subject to the Disposition Fee Provisions, to the payment of all interest and principal outstanding under this Agreement, and then to the payment of all other Obligations;

(iv)    thereafter, to the extent of any excess proceeds, to the Borrower or as the Bankruptcy Court may otherwise direct; provided, however, such excess proceeds shall at all times remain subject to the Liens in favor of the Prepetition Lenders to the extent provided under the Prepetition Loan Documents or the DIP Orders; and

(v)    thereafter, to the extent of any excess proceeds, to the payment to or upon the order of the Borrower or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**2.5    Use of Proceeds.**

A.    **Loans.**  The proceeds of the Loans distributed to the Borrower shall be applied solely for the payment of expenses set forth in, and in accordance with, the Approved Budget. No portion of the Loans, the Collateral, including any cash collateral, or the Carve-Out shall be used to (i) challenge the validity, perfection, priority, extent or enforceability of the Loans or the Prepetition Obligations or the liens on or security interests in the assets of the Borrower securing any of the foregoing; or (ii) investigate or prosecute any other claims or causes of action against (a) the Lenders and/or the Agents and/or (b) the Prepetition Agents and/or Prepetition Lenders and/or their respective Related Parties, provided that a Committee may expend up to $10,000 in fees and expenses in investigating the foregoing (as opposed to asserting a claim or challenge under subparts (i) or (ii) above) during an investigation period that shall not extend beyond November 9, 2010.  No portion of the Loan shall be utilized for the purpose of making adequate protection or other payments to or for the benefit of Bank of America Leasing & Capital, LLC ("**BALC**"), West Mountain Golf LLC ("**WMG**"), Pacific Continental Bank, Raven Golf or any other person or entity who is a creditor of WMG or is a creditor of any Affiliate of Borrower, in each case without the prior written consent of the Requisite Lenders, which consent may be withheld in their sole discretion.

B.    **Compliance With Laws.**  The Borrower undertakes, represents and warrants that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by the Borrower in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

C.    **Margin Regulations.**  Without limiting the generality of subsection 2.5B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrower in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**2.6    Increased Costs; Taxes.**

    **A.    Increased Costs Generally.**  If any Change in Law shall: (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or (ii) impose on any Lender any other condition, cost or expense affecting this Agreement or the Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

    **B.    Capital Requirements.**  If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

    **C.    Certificates for Reimbursement.**  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsections 2.6A or 2.6B and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

    **D.    Delay in Requests.**  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2 for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

    **E.    Taxes**.

        (i)    Payments Free of Taxes.  Subject to subsection 2.6E(v) below, any and all payments by or on account of any obligation of the Borrower hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for

**TAMARACK DIP CREDIT AGREEMENT**

any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes or Other Taxes from such payments, then (a) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.6) the Agents and Lenders receive an amount equal to the sum they would have received had no such deductions been made, (b) the Borrower shall make such deductions and (c) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law. Borrower shall have no obligation under the preceding sentence to gross-up payments if Lender has failed to provide the appropriate IRS forms or statement as required by the first sentence of subsection 2.6E(v) and withholding was required with respect to such payments solely as a result of such failure.

(ii)    Payment of Other Taxes by the Borrower. Without limiting the provisions of paragraph (i) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(iii)    Indemnification by the Borrower.  The Borrower shall indemnify the Agents and each Lender within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this subsection 2.6E) paid by such Agents or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Any such amounts not timely paid by Borrower shall constitute a protective advance by Lenders under the Loans and be deemed secured by the First Priority Liens on the Collateral.  A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by an Agent or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(iv)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(v)    Status of Lenders.  Each Lender shall deliver documentation prescribed by applicable law or reasonably requested by the Borrower or the applicable Agent that evidences an exemption from United States withholding, backup withholding and/or information reporting requirements.  Without limiting the generality of the foregoing, in the event that the Borrower is a resident for tax purposes of the United States of America, each Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient), on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable: (a)  duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (b)  duly completed copies of Internal Revenue Service Form W-8ECI, (c) duly completed copies of Internal Revenue Service Form W-8IMY, together with applicable attachments, (d) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (I) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code and (II) duly completed copies of  Internal Revenue Service Form W-8BEN, or (e) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrower or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrower or the Administrative Agent to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.  A Foreign Lender shall not be required to deliver any form or statement pursuant to this underlined subsection 2.6E(v) that such Foreign Lender is not legally able to deliver.

(vi)    Treatment of Certain Refunds.  If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a deduction, credit or refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.6, it shall pay to the Borrower, on a dollar for dollar basis, an amount equal to such deduction, credit or refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.6 with respect to the Taxes or Other Taxes giving rise to such deduction, credit or refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such deduction, credit or refund), provided that the Borrower, upon the request of such Agents or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agents or such Lender in the event such Agents or such Lender is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

**2.7    Mitigation Obligations; Replacement of Lenders.**

**A.    Designation of a Different Lender Office.**  If any Lender requests compensation under subsections 2.6A or 2.6B, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.6E, then such Lender  shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Commitments or Loans hereunder or to assign its

**TAMARACK DIP CREDIT AGREEMENT**

rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.6 in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**B.    Replacement of Lenders.**    If any Lender requests compensation under subsections 2.6A or 2.6B, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.6E, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) the Borrower shall have paid to the Administrative Agent the assignment fee specified in subsection 9.1B(i)(c), (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued Fees and all other amounts payable to it hereunder and under the other Loan Documents from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and Fees) or the Borrower (in the case of all other amounts), (iii) in the case of any such assignment resulting from a claim for compensation under subsection 2.6A or 2.6B or payments required to be made pursuant to subsection 2.6E, such assignment will result in a reduction in such compensation or payments thereafter, and (iv) such assignment does not conflict with applicable law.  A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

## 2.8    Grants of Superpriority Nature of Obligations and Lenders' Liens.

**A.**    Pursuant to the DIP Order, the Borrower hereby covenants, represents and warrants that, upon entry of the DIP Order, the Obligations, subject to the Carve-Out:

(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed claims in the Chapter 11 Case having priority over any and all administrative expenses (including the superpriority claims granted to the Prepetition Lenders) and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code; provided however, that such priority administrative claim shall be payable out of all of the tangible and intangible property of the Borrower and its estate in the Chapter 11 Case other than the Excluded Assets;

(ii)    pursuant to section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Lien on all Collateral that is not otherwise subject to a

**TAMARACK DIP CREDIT AGREEMENT**

Case 09-03911-TLM    Doc 353-2    Filed 10/09/10    Entered 10/09/10 12:10:07    Desc
Exhibit to proposed Order    Ex. A to Motion Doc. 322    Page 42 of 111

SIDLEY DRAFT – 10/8/10

Lien, which shall include all tangible and intangible assets and property of the Borrower and its estate in the Chapter 11 Case; and

(iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior priming security interest in and senior priming Lien on all Collateral that is subject to existing Liens (including Liens that presently secure the Prepetition Obligations evidenced by the Prepetition Loan Documents).

**B.**    Subject to the priorities set forth in <u>subsection 2.8A</u> above and to the Carve-Out, the Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Collateral Agent on behalf of the Lenders all of the right, title and interest of the Borrower in all of all tangible and intangible property of the Borrower and its estate now or hereafter existing, including all present and future accounts, accounts receivable, cash, chattel paper, commercial tort claims, Deposit Accounts, documents, equipment, fixtures, general intangibles, goods, instruments, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, Intellectual Property, inventory, investment property, leaseholds, letter-of-credit rights, payment intangibles, software, real property, receivables and all proceeds of the foregoing (excluding, however, the Excluded Assets). The Borrower acknowledges that, pursuant to the DIP Order, the Liens in favor of the Collateral Agent on behalf of the Lenders in all of such Collateral shall be perfected without the recordation or filing of any instruments of mortgage, assignment or financing. The Borrower further agrees that, upon the request of the Collateral Agent the Borrower (i) shall enter into separate Mortgages in recordable form on terms reasonably satisfactory to the Collateral Agent with respect to any Real Property Collateral identified by Collateral Agent, (ii) authorize Agents to file and record such financing statements and fixture filings with respect to any Collateral identified by Collateral Agent, and (iii) take any such other action as required by Collateral Agent with respect to Collateral identified by Collateral Agent in order to perfect the Liens granted hereby.

## 2.9    **No Discharge; Survival of Claims.**

Borrower agrees that (i) the Obligations hereunder shall survive the entry of an order (a) confirming any plan of reorganization in any of the Chapter 11 Case (and Borrower, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge); (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; or (c) dismissing the Chapter 11 Case; and (ii) the superpriority administrative claim granted to Agents and Lenders pursuant to the DIP Order and described in <u>Section 2.10</u> and the Liens granted to Agents pursuant to the DIP Order and described in <u>Section 2.10</u> shall continue in full force and effect and maintain their priority as set forth in the DIP Order until all the Loans have been repaid in full and all other Obligations have been satisfied.

## 2.10    **Waiver of any Priming Rights.**

Upon the Effective Date, on behalf of itself and its estate, and for so long as any Obligation (other than any contingent indemnity obligation) shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy

**SIDLEY DRAFT – 10/8/10**

Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve or grant a claim of equal or greater priority than the Obligations.

**2.11    Pro Rata Treatment.**

Subject to the express provisions of this Agreement, including those that require or permit differing payments to be made to non-Defaulting Lenders as opposed to Defaulting Lenders, each Loan, each payment or prepayment of principal of any Loan, each payment of interest on the Loans and each payment of the Loan Origination Fee shall be allocated among the Lenders in accordance with their respective Pro Rata Share.

**2.12    Assignment of Commitments Under Certain Circumstances; Duty to Mitigate.**

**A.**    In the event (i) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.6 or (ii) any Lender becomes a Defaulting Lender, then, in each case, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in subsection 9.1B(i)(c), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in subsection 9.1B), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such assigned obligations; *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower shall have received the prior written consent of the Administrative Agent, and (z) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loan of such Lender, plus all Fees and other amounts accrued for the account of such Lender hereunder with respect thereto; *provided further* that, if prior to any such transfer and assignment, the circumstances or event that resulted in the amounts paid pursuant to Section 2.6 cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to result in amounts being payable under Section 2.6, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or shall waive its right to further payments under Section 2.6 in respect of such circumstances or event, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender, as assignor, any Assignment and Assumption necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this subsection 2.12A.

**B.**    If (i) any Lender shall request compensation under this Section 2.12 or (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender, pursuant to Section 2.6, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights

36

**TAMARACK DIP CREDIT AGREEMENT**

and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce amounts payable pursuant to <u>Section 2.6</u> in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

**SECTION 3.**
**CONDITIONS TO EFFECTIVENESS**

**3.1**     <u>**Conditions to Effectiveness**</u>.

The effectiveness of this Agreement, and the obligation of each Lender to make the Loans requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of the applicable portions of such Loans on the Effective Date, of the following conditions precedent:

**A.**     <u>**Officer's Certificate**</u>.   On or before the Effective Date and on the date each Disbursement Authorization is delivered to the Administrative Agent, the Borrower shall deliver to the Administrative Agent an Officer's Certificate representing that as of the date of such Officer's Certificate and as of the proposed Disbursement Date:

       (i)     (a) no Default or Event of Default then exists under this Agreement or the other Loan Documents, (b) the aggregate amount of all Disbursements as of such date, including the Disbursement currently requested, does not exceed the DIP Loan Amount, (c) the amount of the Disbursement is fully consistent with and is made pursuant to the Approved Budget for payment of Permitted Expenses and in compliance with <u>subsection 2.5A</u>, (d) the Borrower has delivered to the Administrative Agent all such revenue and expense documents reasonably requested by the Administrative Agent to evidence conformity with the Approved Budget, (e) the Borrower has delivered to Collateral Agent all such documents reasonably requested by Collateral Agent to protect and preserve the Liens on the Collateral that secure the Obligations, (f) to the extent required under the DIP Order, the Bankruptcy Court shall have approved the Borrower's submission to the Administrative Agent of the subject Disbursement Authorization and (g) the final Disbursement shall be requested on or before **[March 1]**, 2011;

       (ii)     The representations and warranties contained herein and in the other Loan Documents are true and correct in all material respects on and as of each Disbursement Date to the same extent as though made on and as of that date, (a) except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date and (b) if a representation and warranty is qualified as to materiality, the applicable materiality qualifier set forth in this <u>subsection 3.1A(ii)</u> shall be disregarded with respect to such representation and warranty for purposes of this condition;

       (iii)     No event shall have occurred and be continuing or would result from the consumdation of the borrowing contemplated by the Loan Documents for the applicable Disbursement that would constitute a Default or Event of Default; and

37

LA1 1887102v.9

(iv)    No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date or the Administrative Agent from distributing Disbursements on any Disbursement Date.

**B.    Borrower's Documents.**  On or before the Effective Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following, each, unless otherwise noted, dated the Effective Date:

(i)    a certified copy of the Organizational Documents of the Borrower, together with good standing certificates from the applicable Governmental Authority of its jurisdiction of incorporation, organization or formation and each other state in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(ii)    copies of the Organizational Authorizations of the Borrower approving and authorizing the execution, delivery and performance of this Agreement and the Transaction Documents to which it is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by its corporate secretary, an assistant secretary or equivalent officer or manager of such Borrower as being in full force and effect without Modification;

(iii)    executed originals of this Agreement and the other Transaction Documents to which the Borrower is a party that are to be delivered on the Effective Date; and

(iv)    such other documents as the Administrative Agent may reasonably request.

**C.    Consummation of Transactions.**

(i)    (a)  Each of the Transaction Documents shall be in form and substance reasonably satisfactory to the Agents and the Requisite Lenders and each such Transaction Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Transaction Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Requisite Lenders, which consent may be withheld in their sole discretion;

(ii)    simultaneously with funding of the Loans, each of the other Transactions shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(iii)    On or before the Effective Date the DIP Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the written consent of the Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**D.    Lender Signatures.**  The following Persons shall have executed and delivered this Agreement:

>    (i)    the Borrower;

>    (ii)    the Lenders; and

>    (iii)    the Agents.

**E.    Necessary Consents.**  The Borrower shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrower and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent.

**F.    Perfection of Security Interests; Recordation of Chapter 11 Case.**

>    (i)    The Borrower shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority Liens on and in the Collateral (including the Real Property Collateral and Existing Notes Receivable) of the Borrower in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the applicable Collateral Documents.  All Accounts of the Borrower shall be subject to effective Control Agreements in favor of the Collateral Agent upon demand of Collateral Agent and in form and substance satisfactory to the Collateral Agent.  The Collateral Agent shall have received on or prior to the Effective Date from the Borrower and each applicable party thereto, including the applicable bank, a fully executed Control Agreement with respect to the Operating Account in form and substance satisfactory to the Collateral Agent.

>    (ii)    The Borrower shall have recorded against all of the Real Property Assets a notice of pendency of the Chapter 11 Case and the subordination of interests as ordered by the Bankruptcy Court in a form appropriate for recordation in each of Adams County and Valley County in the State of Idaho, and otherwise satisfactory to the Collateral Agent in its good faith discretion.

**G.    Bankruptcy Court Orders.**

>    (i)    The automatic stay shall have been modified to permit the creation and perfection of Agents' and Lenders' Liens and security interests and shall have been automatically vacated to permit enforcement of Agents' and Lenders' rights and remedies under this Agreement and the Loan Documents.

>    (ii)    The Bankruptcy Court shall have entered the DIP Order in form and substance satisfactory to the Agents and the Requisite Lenders in their sole discretion.

>    (iii)    The Prepetition Agents on behalf of the Prepetition Lenders shall have consented to the entry of the DIP Order.

39

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

(iv)    The Bankruptcy Court shall have confirmed to the satisfaction of the Agents and the Requisite Lenders in their sole discretion that all obligations of the Borrower under and with respect to the Loans will be secured by, pursuant to sections 364(c)(1), (2) and (3) and section 364(d)(1) of the Bankruptcy Code, a First Priority Lien senior to all prepetition liens, and that the Agents and Lenders will also receive and be entitled to a superpriority administrative expense claim over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out.

(v)    The Bankruptcy Court shall have confirmed to the satisfaction of the Administrative Agent and the Requisite Lenders in their sole discretion that the obligations of the Borrower under the Loans shall have super-priority over any and all other administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out.

(vi)    The Bankruptcy Court shall have entered an order approving the appointment of the Responsible Officer consistent with the Responsible Officer Motion.

(vii)    The Bankruptcy Court shall have confirmed to the satisfaction of the Administrative Agent and the Lenders that as adequate protection of the interests of the Prepetition Lenders, the Prepetition Lenders shall (a) maintain their Liens on the collateral under the Prepetition Loan Documents; (b) receive replacement Liens on and security interests in the Collateral granted to the Collateral Agent, junior and subordinate only to the Liens granted to the Collateral Agent and the Lenders; and (c) receive a super-priority administrative claim as contemplated by section 507(b) of the Bankruptcy Code subject only to the super-priority administrative claim granted to the Lenders and the Agents, and subject, in all cases, to the Carve-Out.

**H.    Non-Interference Agreement**.  (a) The Agents, the Existing Guarantors and, for limited purposes specified therein, the Prepetition Agents shall have delivered the Non-Interference Agreement; (b) the Non-Interference Agreement shall be in full force and effect; and (c) pursuant to the Non-Interference Agreement, the Prepetition Agents shall have joined in a motion with the Existing Guarantors seeking the entry of an order staying the proceedings in Case No.: CV 08-139-S-EJL pending in the District Court against the Existing Guarantors for a period of six (6) months from the Effective Date.

**I.    Transaction Costs, Fees and Expenses.**  Simultaneously with the funding of the Loans, and from the proceeds of the Loans, the Borrower shall have paid (i) to the Administrative Agent any and all Fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with the Transaction Documents or any of the documents, instruments or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including legal and financial advisors) incurred by the Agents through the Effective Date in connection with the negotiation, drafting and execution of the Transaction Documents.

**TAMARACK DIP CREDIT AGREEMENT**

Case 09-03911-TLM    Doc 353-2    Filed 10/09/10    Entered 10/09/10 12:10:07    Desc
Exhibit to proposed Order    Ex. A to Motion Doc. 322    Page 48 of 111

SIDLEY DRAFT – 10/8/10

**J.      Cash Management.**  On or before the Effective Date, the Administrative Agent shall have received from the Borrower evidence satisfactory to Administrative Agent and Collateral Agent of a secure cash management system (including cash dominion) with respect to all cash flows for the Project and Collateral (and through which cash management system all funds disbursed from the Operating Account shall be subject) (the "**Cash Management System**").

**K.      Evidence of Insurance.**  The Administrative Agent shall have received copies of certificates of insurance with respect to each of the insurance policies required pursuant to Section 5.6, and the Administrative Agent shall be reasonably satisfied with the nature and scope of these insurance policies.

**L.      Corporate and Capital Structure, Ownership, Management, Etc.**

(i)      Corporate Structure.  The corporate organizational structure of Borrower as of the Effective Date shall be as set forth on Schedule 3.1L.

(ii)      Capital Structure and Ownership.  The capital structure and ownership of the Borrower as of the Effective Date shall be as set forth on Schedule 4.5.

**M.      Representations and Warranties; Performance of Agreements.**  The Borrower shall have delivered to the Administrative Agent an Officer's Certificate, in form and substance satisfactory to the Administrative Agent to the effect that the representations and warranties in Section 4 and in the other Loan Documents are true and correct in all material respects on and as of the Effective Date and both before and after giving effect to the Transactions, to the same extent as though made on and as of that date and that the Borrower has performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Effective Date.

**N.      Completion of Proceedings.**   All partnership, corporate, limited liability company and other proceedings taken or to be taken in connection with the Transactions and all documents incidental thereto not previously found acceptable by the Administrative Agent and its counsel shall be satisfactory in form and substance to the Administrative Agent and such counsel, and the Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request.  Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on or prior to the Effective Date.

**O.      Money Laundering.**  The Administrative Agent shall have received, sufficiently in advance of the Effective Date, all documentation and other information required by bank regulatory authorities from the Borrower under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

**P.      Real Property.**  The Administrative Agent shall have received on or prior to the Effective Date from the Borrower fully executed and notarized Mortgages deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other

41

**TAMARACK DIP CREDIT AGREEMENT**

Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records in the Adams County and Valley County in the State of Idaho, encumbering the Real Property Collateral, in each case in form and substance satisfactory to the Collateral.

**Q.    Appointment of the Responsible Officer.**  The Administrative Agent shall have received satisfactory evidence, in its sole and exclusive discretion, that (i) the Borrower has appointed Links Realty Services, Inc. by and through Michael Fleischer (the "**Responsible Officer**") pursuant to that certain engagement letter agreement between the Borrower and the Company dated September 23, 2010, and such engagement letter agreement is in full force and effect and (ii) Michael Fleischer continues to serve as the Responsible Officer Representative.

**R.    Resignations**.    The Administrative Agent shall have received satisfactory evidence that Jean-Pierre Boespflug and all other Insider Parties have resigned from all offices and directorships held by any of them in the TMA, and that the Responsible Officer Representative and/or other employees of the Responsible Officer have been duly appointed to all offices, directorships and other positions with the TMA to which the Borrower is entitled to make appointments under the articles of incorporation, bylaws and/or declarations or other governing documents of the TMA.

**S.    No Material Adverse Effect.** Since September 1, 2010, there shall not have occurred any event, change or condition that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**SECTION 4.**
**REPRESENTATIONS AND WARRANTIES**

In order to induce the Lenders and Agents to, among other things, enter into this Agreement and to make the Loans and to induce the other Lenders to purchase participations therein, the Borrower represents and warrants to each Lender, on the date of this Agreement, on the Effective Date and on each other date as required hereunder, that the following statements are true and correct.

**4.1    Organization and Qualification.**

Borrower is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Borrower is duly qualified and is authorized to do business and to the extent required by law is in good standing as a foreign corporation or other organization in each state or jurisdiction in which the failure of such Person to be so qualified could reasonably be expected to have a Material Adverse Effect.

**4.2    Power and Authority.**

**A.**    Subject to the entry of the DIP Order by the Bankruptcy Court, the Borrower has the requisite corporate, limited liability company or limited partnership power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted.

42

B.     Upon the entry by of the DIP Order by the Bankruptcy Court, the execution, delivery and performance by the Borrower of the Loan Documents to which it is a party and the creation of all Liens provided for therein: (i) are within such Person's power; (ii) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, material lease, material agreement or other material instrument entered into after the Conversion Date to which such Person is a party or by which such Person or any of its property is bound, and (iii) have been duly authorized by all necessary corporate, limited liability company or limited partnership action.  Each of the Loan Documents shall be duly executed and delivered by the Borrower and, subject to the entry of the DIP Order, each such Loan Document shall constitute a legal, valid and binding obligation of Borrower enforceable against it in accordance with its terms.

## 4.3     Chapter 11 Case.

A.     Proper notice for the Bankruptcy Court hearing regarding the approval of the DIP Order has been given.

B.     After the entry of the DIP Order, and pursuant to and to the extent permitted in the DIP Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind whatsoever, to the extent provided and as more fully set forth in the DIP Order.

C.     After the entry of the DIP Order, the Obligations will be secured by a valid and perfected First Priority Lien on all of the Collateral, subject only to the Carve-Out and the Permitted Encumbrances.

D.     The DIP Order is in full force and effect has not been reversed, stayed, modified or amended without the consent of Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion.

## 4.4     No Conflict.

After giving effect to the Transactions (including the entry by the Bankruptcy Court of the DIP Order and the execution, delivery and performance by Borrower of the Transaction Documents (and the creation of all Liens provided for therein) and the consummation of the Transactions do not and will not (i) violate any provision of any law or any governmental rule or regulation applicable to the Borrower, or violate the organizational certificate or any other organizational documents of the Borrower or any order, judgment or decree of any court or other Governmental Authority binding on the Borrower, (ii) result in or require the creation or imposition of any Lien upon any of the properties or assets of the Borrower (other than any Liens created under any of the Loan Documents in favor of the Collateral Agent), (iii) require any approval of stockholders, partners or members or any approval or consent of any Person under any organizational certificate or other indenture, agreement, contract or instrument to which the Borrower is a party or by which any of them or any of their property may be bound, except for such approvals or consents obtained on or before the Effective Date or (iv) give rise to any

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

preemptive rights, rights of first refusal or other similar rights on behalf of any Person under any Applicable Law or any provision of the organizational documents of the Borrower or any Material Contract to which the Borrower is bound.

**4.5**     <u>**Capital Structure.**</u>

       <u>Schedule 4.5</u> hereto states (i) the correct name of the Borrower, its jurisdiction of incorporation and the percentage of its Capital Stock having voting powers owned by each Person, (ii) the name of the Borrower's corporate Affiliates (and Subsidiaries, if any) and the nature of the affiliation (except where a director of the Borrower is a director or officer of another Person) and (iii) the number of authorized and issued shares of Capital Stock (and treasury shares) of the Borrower.  Borrower has good title to all of the shares it purports to own of the Capital Stock of each of its respective Subsidiaries, free and clear in each case of any Lien (except as permitted by this Agreement).  All such Capital Stock has been duly issued and is fully paid and non-assessable.  Except as set forth on <u>Schedule 4.5</u> hereto, no Borrower has issued any options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell, or any Capital Stock or obligations convertible into, or any powers of attorney relating to, shares of the Capital Stock of the Borrower except as permitted pursuant to the terms of this Agreement.  Except as set forth on <u>Schedule 4.5</u> hereto, to the Borrower's Knowledge, there are no outstanding agreements or instruments binding upon the holders of a Borrower's Capital Stock relating to the ownership of its Capital Stock except as permitted pursuant to the terms of this Agreement.  The corporate organizational structure of Borrower as of the Effective Date is as set forth on <u>Schedule 3.1L</u>.

**4.6**     <u>**Insurance.**</u>  As of the Effective Date, the Borrower has in full force and effect the insurance policies listed on <u>Schedule 4.6</u> attached hereto.

**4.7**     <u>**Transactions with Affiliates.**</u>  As of the Effective Date, the Borrower has not directly or indirectly, engaged in any transaction of any kind with any Affiliate of the Borrower and for so long as any aspect of the Obligations under the Transaction Documents are outstanding shall comply with the terms and conditions set forth in <u>Section 6.10</u> hereof.

**4.8**     <u>**Business Locations; Agent for Process.**</u>  As of the Effective Date, the chief executive office and other places of business of the Borrower are as listed on <u>Schedule 4.8</u> hereto.

**4.9**     <u>**Title to Properties.**</u>

       **A.**     The Borrower has good and marketable title to and fee simple ownership of, or valid and subsisting leasehold interests in (if any), all of its Real Property Assets (including the Real Property Collateral), and good title to all of its personal property, including all property reflected in the financial statements referred to in <u>Section 4.12</u> or delivered pursuant to <u>Section 5.3</u>, in each case free and clear of all Liens except for Liens permitted by this Agreement.  The Borrower has paid or discharged, and has caused each Subsidiary, if any, to pay and discharge, all lawful claims arising after the Effective Date which, if unpaid, could reasonably be expected to become a Lien against any properties of the Borrower that is not permitted by this Agreement, except to the extent such claim is being Properly Contested.  The Liens granted to the Collateral

**TAMARACK DIP CREDIT AGREEMENT**

Case 09-03911-TLM    Doc 353-2    Filed 10/09/10    Entered 10/09/10 12:10:07    Desc
Exhibit to proposed Order    Ex. A to Motion Doc. 322    Page 52 of 111

**SIDLEY DRAFT – 10/8/10**

Agent pursuant to the Collateral Documents are First Priority Liens, subject only to the Permitted Encumbrances that are expressly permitted by the terms of this Agreement.

**B.** To the Borrower's Knowledge, there are no exceptions or adverse matters affecting the Real Property Collateral that would be disclosed by a survey of the Real Property Collateral except for those matters that would not, individually or in the aggregate, have a Material Adverse Effect. A general depiction of the Project is set forth on the map attached hereto as <u>Exhibit VI</u>.

**C.** Except as disclosed on <u>Schedule 4.9C</u>, Borrower has not received any written notice of any special assessment or proceeding affecting the Project, change in the tax rate or the assessed valuation of Project or any other changes affecting the taxes, assessments or other charges with respect to the Project that in any case could reasonably be expected to result in a Material Adverse Effect. As of the Effective Date, there are no special assessment districts, or plans for the same, or for any other scheme that would involve the imposition of taxes other than those disclosed on <u>Schedule 4.9C</u> relating to the Project and other than increases in taxes payable as a result of land use changes in a special assessment district. Other than as set forth on <u>Schedule 4.9C</u>, to the Borrower's Knowledge, there are no zoning or other land-use regulation proceedings or changes or proposed changes in any applicable laws, regulations or the Entitlements that could materially and detrimentally affect the use, value, development or operation of the Project, including the Real Property Collateral.

**D.** No portion of the Real Property Collateral is subject to a lease or license constituting a Material Contract, except as set forth on <u>Schedule 4.22</u> or as permitted pursuant to the terms of this Agreement.

### 4.10  <u>Permits; Franchises.</u>

The Borrower possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade names, trade name rights, patents, patent rights and fictitious name rights necessary to enable it to conduct the business in which it is now engaged without conflict with the rights of others, except to the extent the failure to possess any thereof could not reasonably be expected to result in a Material Adverse Effect.

### 4.11  <u>Financial Condition; Approved Budget.</u>

**A.** The Borrower has heretofore delivered to the Lenders a schedule attached hereto as <u>Schedule 4.11A</u> of all of the Accounts established by Borrower or on behalf of the Borrower.

**B.** The initial Approved Budget is attached hereto as <u>Exhibit I</u>. The current Approved Budget has been prepared by Borrower in light of the current status of the Project, but including future payments of known contingent liabilities, and reflects projections for the period beginning on [September] [__], 2010 on a month-by-month basis and ending on the Maturity Date. The current Approved Budget reasonably presents, in all material respects, the projected financial operations of Borrower for the period set forth in such Approved Budget, which in the view of the Responsible Officer are reasonably achievable based upon the estimates and assumptions stated therein, all of which Borrower believed at the time of delivery to be

**TAMARACK DIP CREDIT AGREEMENT**

reasonable in light of current conditions and current facts known to Borrower as of such delivery date.

### 4.12   Disclosure.

The representations and warranties of the Borrower contained in the Transaction Documents and the information contained in the other documents, certificates and written statements furnished to any of the Agents or the Lenders by or on behalf of Borrower for use in connection with the transactions contemplated by this Agreement or any other Transaction Document, when taken together, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made; provided that (a) with respect to information relating to the Borrower's industry generally and trade data which relates to a Person that is not the Borrower or a Subsidiary thereof, the Borrower represents and warrants only that such information is believed by it in good faith to be accurate in all material respects, and (b) with respect to financial statements, other than projected financial information, the Borrower only represents that such financial statements present fairly in all material respects the consolidated financial condition of the applicable Person as of the dates indicated.  Any projections and other forward looking financial information contained in such materials are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that the differences may be material.  There is no fact known to the Borrower that has had, or could reasonably be expected to result in, a Material Adverse Effect and that has not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders for use in connection with the transactions contemplated hereby.

### 4.13   Surety Obligations.

Except as exists on the date hereof or as is set forth on Schedule 4.13 hereto, the Borrower is not obligated as surety or indemnitor under any surety or similar bond or other contract issued or entered into any agreement to assure payment, performance or completion of performance of any undertaking or obligation of any Person.

### 4.14   Taxes.

The FEIN of the Borrower is as shown on Schedule 4.14 hereto.  Except as disclosed on Schedule 4.14, the Borrower has filed all federal, state and other material Tax returns and other reports it is required by law to file in respect of periods following the Conversion Date and has paid, or made provision for the payment of, all Taxes upon it, its income and properties (in any case solely to the extent payable in respect of periods after the Conversion Date) as and when such Taxes are due and payable, except to the extent being Properly Contested.  The Borrower has elected to be treated as a partnership for United States federal income tax purposes.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**4.15** **Brokers.**

Except as otherwise disclosed on Schedule 4.15, there are no claims against the Borrower or amounts owing or to be owed by the Borrower for brokerage commissions, finder's fees or investment banking fees in connection with the origination, arrangement and funding of the Loans, the Borrower hereby indemnifies the Agents and the Lenders against, and agrees that it will hold the Agents and the Lenders harmless from, any claim, demand or liability for any such commission or broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

**4.16** **Intellectual Property.**

Borrower owns or has the lawful right to use all patents, trademarks, service marks, trade names, copyrights, licenses and other similar rights necessary for the present and planned future conduct of its business without, to Borrower's Knowledge, any conflict with the rights of others; there is no objection to, or pending (or, to Borrower's Knowledge, threatened) claim with respect to, such Borrower's right to use any such Intellectual Property and Borrower is not aware of any grounds for challenge or objection thereto; and, except as may be disclosed on Schedule 4.17 hereto, the Borrower does not pay any royalty or other compensation to any Person for the right to use any Intellectual Property (other than with respect to off-the-shelf or prepackaged software).  All such patents, trademarks, service marks, trade names, copyrights, licenses and other similar rights are listed on Schedule 4.16 hereto, to the extent they are registered under any Applicable Law, applications for registration have been made under any Applicable Law or are otherwise material to a Borrower's business.

**4.17** **Governmental Authorization.**

Except as disclosed on Schedule 4.17 hereto, Borrower is in good standing with respect to, all Governmental Authorizations necessary to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its properties as now owned or leased by it, except where the failure to have such Governmental Authorization could not reasonably be expected to have a Material Adverse Effect.

**4.18** **Compliance with Laws.**

Except as disclosed on Schedule 4.18 hereto, the Borrower, the Project and the use, development and operations of the Project are in compliance in all material respects with, the provisions of all Applicable Laws and there have been no citations, notices, orders, writs, injunctions, judgments, or decrees issued to the Borrower with respect to such compliance, except to the extent any of the foregoing could not reasonably be expected to result in a Material Adverse Effect.  Except as set forth on Schedule 4.18, the Borrower is in material compliance with all Environmental Laws applicable to it and properties owned by it.

**4.19** **Litigation.**

Except as set forth on Schedule 4.19 hereto, there are no actions, suits, proceedings or investigations pending, or orders, writs, injunctions, judgments, or decrees issued in connection

**TAMARACK DIP CREDIT AGREEMENT**

with any such matters that are no longer pending, or to the Borrower's Knowledge, threatened on the Effective Date against or affecting the Borrower, or the business, operations, properties, prospects, profits or condition of the Borrower, (i) which relate to any of the Loan Documents or any of the transactions contemplated thereby or (ii) which could reasonably be expected to have a Material Adverse Effect.

**4.20    No Defaults.**

No event has occurred and no condition exists which would, upon or after the execution and delivery of this Agreement or the Borrower's performance hereunder, constitute a Default or an Event of Default.

**4.21    Leases.**

Schedule 4.21 hereto is a complete listing of each Capital Lease and Operating Lease of the Borrower on the Effective Date that constitutes a Material Contract.

**4.22    Employee Benefit Plans.**

**A.**    Except as disclosed on Schedule 4.22 hereto, neither the Borrower nor any of its ERISA Affiliates maintains, contributes or participates in or may incur any liability under any Pension Plan as of the Effective Date.  The Borrower and each ERISA Affiliate thereof are in compliance in all material respects with all applicable provisions and requirements of ERISA and the Internal Revenue Code with respect to each Pension Plan and Borrower Pension Plan, and have performed all their obligations under each Pension Plan and Borrower Pension Plan, except those where failure to perform such obligations could not reasonably be expected to result in material liability to the Borrower.  With respect to each Pension Plan and Borrower Pension Plan, no material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any such Pension Plan or Borrower Pension Plan or any trust established under Title IV of ERISA has been, or is expected by the Borrower or any ERISA Affiliate to be, incurred by the Borrower or any ERISA Affiliate.

**B.**    No ERISA Event has occurred or could reasonably be expected to occur which has resulted or is reasonably likely to result in any material liability to the Borrower.  No fact or situation that could reasonably be expected to have a Material Adverse Effect exists with respect to any Pension Plan or Borrower Pension Plan.

**C.**    Except as could not reasonably be expected to result in material liability to the Borrower, the Borrower does not maintain or contribute to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employees of Borrower or any of its Subsidiaries other than as required under Section 4980B of the Internal Revenue Code or Part 6 of Subtitle B of Title I of ERISA.

**D.**    Except as could not reasonably be expected to result in material liability to the Borrower, no Pension Plan has any "unfunded benefit liability" as defined in Section 4001(a)(18) of ERISA (but excluding from the definition of "current value" of "assets" of such Pension Plan, accrued but unpaid contributions).

48

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

E.        Except as could not reasonably be expected to result in material liability to the Borrower, the Borrower and each ERISA Affiliate has complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and is not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan. Neither the Borrower nor any ERISA Affiliates of the Borrower has incurred or could reasonably be expected to incur any withdrawal liability in connection with a Multiemployer Plan.

## 4.23    Labor Relations.

Except as described on Schedule 4.23 hereto, the Borrower is not a party to any collective bargaining agreement on the Effective Date.  There are no material grievances, disputes or controversies with any union or any other labor or worker representative organization of the Borrower.

## 4.24    Not a Regulated Entity.

The Borrower is not (i) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; or (ii) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Indebtedness.

## 4.25    Margin Stock.

The Borrower is not engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

## 4.26    Environmental Matters.

Except for (a) those violations of the Consent Decree existing as of the date hereof and (b) as otherwise as disclosed on Schedule 4.26 hereto:

(i)        The Borrower, (including all operations and conditions at or in the Real Property Assets), and, to the Borrower's Knowledge, each of the tenants under any leases or occupancy agreements affecting any portion of any Real Property Assets, are in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by the Borrower, and each of such tenants of all permits and other Governmental Authorizations required under applicable Environmental Laws, and compliance with the terms and conditions thereof), except where failure to be in compliance could not reasonably be expected to have a Material Adverse Effect.  Neither the Borrower, nor, to the Borrower's Knowledge, any tenants under any leases or occupancy agreements affecting any portion of the Real Property Assets has received any written communication, whether from a Governmental Authority, citizens group, employee or otherwise, alleging that the Borrower or any such tenant is not in such compliance, and to the Borrower's Knowledge there are no past or present actions, activities, circumstances, conditions, events or incidents that could reasonably be expected to prevent or interfere with such compliance in the future.

49

**TAMARACK DIP CREDIT AGREEMENT**

(ii)    There is no Environmental Claim pending or, to the Borrower's Knowledge, threatened against the Borrower, to the Borrower's Knowledge, against any Person whose liability for any Environmental Claim the Borrower has retained or assumed either contractually or by operation of law, in each such case which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(iii)    There are no past or present actions, activities, circumstances, conditions, events or incidents, including the Release or presence of any Hazardous Material, which could reasonably be expected to form the basis of any Environmental Claim against the Borrower, or to the Borrower's Knowledge, against any Person whose liability for any Environmental Claim the Borrower has retained or assumed either contractually or by operation of law, in each such case which could reasonably be expected to have a Material Adverse Effect.

(iv)    The Borrower has not, and to the Borrower's Knowledge, no other Person has placed, stored, deposited, discharged, buried, dumped or disposed of Hazardous Materials on, beneath or adjacent to any property currently or formerly owned, operated or leased by the Borrower, in each case, which, individually or in the aggregate, which could reasonably be expected to have a Material Adverse Effect.

(v)    No Lien in favor of any Person relating to or in connection with any Environmental Claim has been filed or has been attached to any Real Property Asset.

(vi)    Without in any way limiting the generality of the foregoing, except as would not have a Material Adverse Effect, none of the Real Property Assets contain any: underground storage tanks; asbestos; polychlorinated biphenyls (PCBs); underground injection wells; radioactive materials; or septic tanks or waste disposal pits in which process wastewater or any Hazardous Materials have been discharged or disposed.

(vii)    There are no environmental conditions at any of the Real Property Collateral that impair or inhibit the use of any such Real Property Collateral for its intended use, in any case which could reasonably be expected to have a Material Adverse Effect.

## 4.27    **Material Contracts; Affiliate Agreements.**

**A.**    As of the Effective Date, there are no Material Contracts, except as set forth on Schedule 4.27 (collectively, the **"Existing Material Contracts"**).

**B.**    The Borrower has heretofore furnished to the Administrative Agent a true, correct and complete copy of each document described on <u>Schedule 4.27</u> annexed hereto and made a part hereof, and all Modifications thereto.

**C.**    None of rights and privileges under the Existing Material Contracts inuring to the Borrower has lapsed, and no party has any right as of the Effective Date to terminate any of the Existing Material Contracts.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**4.28    Utilities.**

Except for specific utility facilities required to be installed within the undeveloped portions of the Project as and when such portions are developed, all material water, sewer, gas, electric, telephone and drainage facilities and all other utilities required by law or for the full use, development and operation of the Project are installed to the boundaries of the Project, are all connected and operating pursuant to valid permits, are adequate to service the Project (including the full contemplated development of the Real Property Collateral) and to permit full compliance with all applicable laws and regulations to the extent applicable to the current configuration of the Project and the future contemplated development of the Real Property Collateral, and are connected to the Project by means of one or more public or private easements extending from the Project to one or more public streets, public rights-of-way or utility facilities.

**4.29    Licenses.**

The Borrower has obtained (or caused to be obtained) all material licenses, permits, approvals, easements and rights of way (and all such items are currently in full force and effect) required from any governmental or regulatory authority having jurisdiction over the Project, or from private parties, for the current development status of the Project and to ensure free and unimpeded vehicular and pedestrian ingress to and egress from the Project.

**4.30    Entitlements.**

**A.**    All of the Existing Entitlements have been obtained and are in full force and effect. All such Existing Entitlements (i) are vested in one or more of the Persons comprising the Borrower, (ii) run with the land, and (iii) are not affected by the consummation of the Transactions nor any exercise of remedies by the Lenders under the Loan Documents (including any sale or foreclosure upon the Real Property Collateral). There are no material unperformed obligations or conditions with respect to the effectiveness of any of such Existing Entitlements and there are no uncured defaults under any of the same. Except as otherwise set forth on Part I of Schedule 4.30A, the Borrower has not received notice of any changes to any of the Existing Entitlements that could reasonably be expected to result in a Material Adverse Effect. All of the material documents relating to the Existing Entitlements in existence on the Effective Date are identified on Part II of Schedule 4.30A annexed hereto and made a part hereof (collectively, the **"Entitlement Documents"**), and, as of the Effective Date, there are no other material documents relating to the Existing Entitlements other than those set forth on Schedule 4.30A.

**B.**    With respect to the Real Property Collateral, other than the material Entitlements listed on Schedule 4.30B, there are no other material Entitlements necessary to permit the development of the Real Property Collateral.

**4.31    Notes Receivable.** As of the Effective Date, the Borrower does not own or hold any notes receivable other than as set forth on Schedule 4.31 (collectively, the "Existing Notes Receivable"). Borrower has taken or caused to be taken such actions to create a valid and perfected First Priority Lien in favor of the Lenders on the Existing Notes Receivable.

51

**TAMARACK DIP CREDIT AGREEMENT**

**4.32    Transaction Documents.**

       **A.    Delivery of Transaction Documents.**  The Borrower has delivered to the Agents complete and correct copies of each Transaction Document and of all exhibits and schedules thereto.

       **B.    Representations and Warranties.**  Except to the extent otherwise set forth herein or in the schedules hereto, each of the representations and warranties of the Borrower made in any other Transaction Document, except to the extent qualified in the schedules to such Transaction Documents, was true and correct in all material respects as of the Effective Date (or as of any (i) date remade or deemed to be remade after the Effective Date or (ii) earlier date to which such representation and warranty specifically relates).

       **C.    Governmental Authorizations.**  All Governmental Authorizations and all other authorizations, approvals and consents of any other Person required by the Transaction Documents or to consummate the Transactions have been obtained and are in full force and effect.

       **D.    Conditions and Consummation.**  On the Effective Date, (i) all of the conditions to the effectiveness of the Transactions set forth in the Transaction Documents have been duly satisfied or, with the consent of the Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion, waived, and (ii) each of the Transactions has been consummated in all material respects in accordance with the Transaction Documents and all Applicable Laws.

**SECTION 5.**
**AFFIRMATIVE COVENANTS**

       The Borrower covenants and agrees that, until payment in full of all of the Loans and other Obligations, the Borrower shall:

**5.1    Visits and Inspections.**

       Permit representatives of the Agents and the Lenders from time to time, as often as may be reasonably requested, upon prior notice to Borrower, to visit and inspect the properties of such Borrower, conduct appraisals of the Borrower's properties, inspect, audit and make extracts from the Borrower's books and records, view, inspect and receive copies of maps, plats, plans, specifications and all due diligence information to be provided by the Borrower in connection with its marketing of its properties and assets, and discuss with their officers and independent accountants, the Borrower's properties and assets, business, financial condition and results of operations.  Representatives of the Borrower shall be authorized to accompany the Agents and/or Lenders (or representatives thereof) on any such visit or inspection, but such authorization shall in no manner be deemed to be a requirement or condition of the Agents' or Lenders' visits or inspections, and to the extent any of the Borrower's representatives accompany the Agents or Lenders on any visit or audit, such Persons shall in no manner hinder or delay the audits or inspections of the Agents or Lenders.  Neither the Agents nor any Lender shall have any duty to make any such inspection and shall not incur any liability by reason of its failure to conduct or delay in conducting any such inspection.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

5.2    **Notices.**

Notify the Administrative Agent and Lenders in writing, promptly after the Borrower obtains knowledge of the following:

(i)    the institution of, or written threat of, any action, suit, proceeding, governmental investigation or arbitration against or affecting the Borrower and not previously disclosed, which action, suit, proceeding, governmental investigation or arbitration (a) exposes, or in the case of multiple actions, suits, proceedings, governmental investigations or arbitrations arising out of the same general allegations or circumstances expose, such Persons, in the Borrower's reasonable judgment, to liability in an amount aggregating $50,000 or more and is or are not covered by insurance, or (b) seeks injunctive or other relief which, if obtained, could reasonably be expected to have a Material Adverse Effect, providing such other information as may be reasonably available to enable Administrative Agent and its counsel to evaluate such matters.  The Borrower, upon request of the Administrative Agent, shall promptly give written notice of the status of any action, suit, proceeding, governmental investigation or arbitration;

(ii)    any labor dispute to which the Borrower may become a party, any strikes or walkouts relating to any of its property or facilities, and the expiration of any labor contract to which it is a party or by which it is bound, which could reasonably be expected to have a Material Adverse Effect;

(iii)    following the Effective Date, any default by the Borrower under, or termination of, any Material Contract or any note, indenture, loan agreement, mortgage, lease, deed, guaranty or other similar agreement relating to any Indebtedness;

(iv)    termination, suspension or revocation of any Entitlements which could reasonably be expected to have a Material Adverse Effect;

(v)    the existence of any (a) Default, (b) Event of Default or (c) event or change that has caused or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect;

(vi)    the occurrence of or forthcoming occurrence of any ERISA Event or the receipt by the Borrower or any ERISA Affiliate of notice from a Multiemployer Plan sponsor concerning an ERISA Event;

(vii)    any judgment against the Borrower in an amount exceeding $50,000;

(viii)    any violation or asserted violation of the Borrower of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws), the adverse resolution of which could reasonably be expected to have a Material Adverse Effect or result in liability of such Borrower in an amount in excess of $50,000;

(ix)    any Release on any property owned or occupied by the Borrower if such Release could reasonably be expected to require remedial action to correct the presence of Hazardous Materials in, around, or under the Real Property Collateral;

53

**TAMARACK DIP CREDIT AGREEMENT**

(x)     the discharge of Borrower's independent accountants or any withdrawal or resignation by such independent accountants from their acting in such capacity.  In addition, Borrower shall give the Administrative Agent at least ten (10) Business Days' prior written notice of Borrower's opening of any new office or place of business;

(xi)     copies of all environmental audits and reports, whether prepared by personnel of Borrower or by independent consultants, with respect to environmental matters affecting any property owned or operated by Borrower or which relate to any Environmental Liabilities of Borrower, to the extent reflecting any matters which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(xii)     copies of any Tax assessments;

(xiii)     notice of any material changes in the executive officers of the Borrower;

(xiv)     notice of any material changes to the material operations of the Project;

(xv)     notice of significant changes, since the Conversion Date, including new Material Contracts with suppliers, contractors, utility providers, governmental authorities, merchant builders and other customers; and

(xvi)     such other information and data with respect to Borrower as from time to time may be reasonably requested by the Administrative Agent or any Lender.

**5.3     Financial Statements and Other Reports.**

The Borrower will maintain proper books and records including a system of accounting established and administered in accordance with sound business practices.  In addition to the monthly operating reports required under the United States Trustee Guidelines, the Borrower will deliver to the Administrative Agent for distribution to each Lender:

(i)     Biweekly Reports:  No later than the third Business Day of every second calendar week commencing following the week of the Effective Date, a consolidated financial report of actual cash flow versus the budgeted cash flow forecast set forth in the Approved Budget; provided, however, that with respect to the consolidated nature of the financial reports, it is hereby acknowledged that the inclusion of information from Persons in which Borrower has a minority or non-controlling interest is dependent on the receipt by Borrower of such information from such Persons.

(ii)     Monthly Financials:  As soon as available and in any event within twenty five (25) days after each calendar month-end commencing with the calendar month ending October 30, 2010, consolidated monthly financial statements (including a monthly comparison of actual financial results to the projected financial results set forth in the Approved Budget, a monthly analysis of capital expenditures, and a monthly listing of payments to and receipts from related parties), which statements shall be in reasonable detail, and accompanied by a certificate from the chief executive officer and the chief financial officer (or other principal financial officer) of the Borrower certifying that the

**SIDLEY DRAFT – 10/8/10**

financial statements fairly present, in all material respects, the consolidated (subject to the caveat set forth in subsection (i) above) financial condition of the Borrower as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year end adjustments and the absence of footnotes.

(iii)    _Events of Default, etc._:  Promptly upon the Responsible Officer obtaining knowledge (a) of any condition or event that constitutes a Default or an Event of Default, (b) that any Person has given any written notice to the Borrower  or its Affiliates or taken any other action that could reasonably be expected to have an adverse effect on the Borrower with respect to a claimed default or event or condition of the type referred to in subsection 7.1F of this Agreement, or (c) of the occurrence of any event or change that has caused or evidences or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect, an Officer's Certificate specifying the nature and period of existence of such condition, event or change, or specifying the written notice given or action taken by any such Person and the nature of such claimed Default, Event of Default, default, event or condition, and what action the Borrower and/or its agents have taken, is taking and proposes to take with respect thereto.

(iv)    _Litigation or Other Proceedings_:  (a) Promptly upon Responsible Officer obtaining knowledge of (1) the institution of, or written threat of, any action, suit, proceeding (whether administrative, judicial or otherwise), Environmental Claim, governmental investigation or arbitration against or affecting the Loan Parties or any of their Subsidiaries or any property of the Loan Parties or any of their Subsidiaries (collectively, **"Proceedings"**) not previously disclosed in writing by the Borrower to the Lenders or (2) any material development in any Proceeding that, in any case:

(I)    could reasonably be expected to have a Material Adverse Effect; or

(II)    seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

written notice thereof together with such other information as may be reasonably available to the Borrower and as the Borrower and its counsel shall reasonably determine would not jeopardize the attorney-client privilege with respect to such Proceeding, to enable the Lenders and their counsel to evaluate such matters; and (b) within forty five (45) days after the end of each Fiscal Quarter of the Borrower, a schedule of all Proceedings involving an alleged liability of, or claims against or affecting, the Borrower equal to or greater than $50,000 and promptly after request by the Administrative Agent such other information as may be reasonably requested by the Administrative Agent to enable the Administrative Agent and its counsel to evaluate any of such Proceedings;

(v)    _ERISA Events_:  promptly upon the Borrower becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrower or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and,

**TAMARACK DIP CREDIT AGREEMENT**

Case 09-03911-TLM   Doc 353-2   Filed 10/09/10   Entered 10/09/10 12:10:07   Desc
Exhibit to proposed Order   Ex. A to Motion Doc. 322   Page 63 of 111

**SIDLEY DRAFT – 10/8/10**

when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto;

(vi)    ERISA Notices:  with reasonable promptness, copies of (a) all written notices received by the Borrower or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (b) such other documents or governmental reports or filings relating to any Pension Plan or Borrower Pension Plan as the Administrative Agent shall reasonably request;

(vii)    Environmental Audits and Reports:  promptly following receipt thereof, copies of all environmental audits and reports, whether prepared by personnel of the Borrower or by independent consultants, or by any Governmental Authority, with respect to environmental matters at any Real Property Asset presently owned or operated by the Borrower or which relate to any Environmental Liabilities of the Borrower;

(viii)    Regulatory Notices:  as soon as practicable, notification of any change in any law, rule or regulation relating to the business of the Loan Parties and their Subsidiaries which could reasonably be expected to have a Material Adverse Effect;

(ix)    Material Contracts:  promptly after (a) any Material Contract is terminated or expires or is renewed or is, amended or otherwise Modified in any manner which is materially adverse to the Borrower or their Subsidiaries by reason of a default thereunder, or (b) any notice or other communication is delivered by any party to any Material Contract pursuant thereto or in respect thereof relating to (x) any financial matter or other matter having adverse financial consequences to the Borrower in excess of $25,000 or (y) any other non financial matter which could reasonably be expected to have material adverse consequence to the Project or the assets of the Borrower (whether or not constituting a Material Adverse Effect), notice and a copy thereof and, in the case of any such renewal, amendment, other Modification or new Material Contract, a description in reasonable detail of the material terms thereof;

(x)    Notices of Events:  promptly after the occurrence thereof any: (a) significant changes to any Material Contracts and (b) notice of any material changes in the executive officers of any Loan Party, including the failure of the Responsible Officer to serve as the Responsible Officer of the Borrower, and/or the failure of Michael Fleischer to serve in the capacity of Responsible Officer Representative and/or to Control and direct the Responsible Officer; and

(xi)    Other Information:  With reasonable promptness, such other information and data with respect to the Borrower as from time to time may be reasonably requested by the Administrative Agent or any Lenders.

(xii)    Monthly Conference Calls:

(a)    At least once per calendar month, the Borrower shall provide a dial-in number and host a telephone conference call with the Administrative Agent and Lenders for the purpose of providing the Administrative Agent and Lenders with a meaningful update on the Chapter 11 Case.

56

(b)     Upon reasonable notice under the then applicable circumstances, the Responsible Officer Representative shall make himself or herself available for telephonic and/or in-person meetings to provide information to, and answer any questions posed by, the Administrative Agent and Lenders with respect to the Project, the most recent financial statements provided to the Lenders regarding the Project, and the Project's marketing and sales process.

(c)     From time to time upon reasonable prior notice, the Borrower and the Responsible Officer shall make the broker retained to market and sell the Project available for telephonic and/or in-person meetings with any of the Agents and/or Lenders to discuss the progress of the marketing and sale of the Project.

**5.4     Corporate Existence.**

Except as occasioned by the Chapter 11 Case, the Borrower will, at all times preserve and keep in full force and effect its organizational existence and all rights and franchises material to the business of the Borrower and/or its assets.

**5.5     Payment of Taxes and Claims; Tax Consolidation.**

**A.**     To the extend provided for in the Approved Budget, Borrower will pay all taxes, assessments and other governmental charges imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises that accrue and/or are payable subsequent to the Conversion Date and before any penalty accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable which, if unpaid, might become a Lien (other than a Permitted Encumbrance) upon any of its properties or assets; <u>provided</u> that no such tax, charge or claim need be paid if being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if such reserve or other appropriate provision, if any, as shall be required by the Requisite Lenders shall have been made therefore; and provided further that the Borrower shall not be required to pay any such tax, charge or claim, the nonpayment of which is permitted by the Bankruptcy Code.

**B.**     Except as occasioned by the Chapter 11 Case, the Borrower will not file or consent to the filing of any consolidated, combined or other similar income tax return with any Person.

**C.**     Except as occasioned by the Chapter 11 Case, the Borrower will continue to be treated as a partnership for United States federal income tax purposes.

**5.6     Maintenance of Properties; Insurance.**

**A.**     In accordance with and to the extent provided for the Approved Budget, the Borrower will maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used in the business of the Borrower and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**B.**     To the extent provided for in the Approved Budget, Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business against loss or damage of the kinds and with respect to liability customarily carried or maintained under similar circumstances by corporations of established reputation engaged in similar businesses.  Each such policy of casualty insurance covering damage to or loss of property shall name the Collateral Agent for the benefit of the Secured Parties as additional insured and as the loss payee thereunder for all losses, subject to application of proceeds as required by <u>subsection 2.4B(ii)(a)</u>, each such policy of liability insurance coverage shall name the Collateral Agent, for the benefit of themselves and the Lenders, as additional insureds, and all such policies of insurance shall provide for at least thirty (30) days' prior written notice to the Collateral Agent of any Modification or cancellation of such policy. In all cases, such insurance shall be in amounts with deductibles in amount satisfactory to the Collateral Agent and Requisite Lenders.

## 5.7    Service of All Chapter 11 Case Notices.

The Borrower shall provide service on the Administrative Agent of all pleadings filed by Borrower in the Chapter 11 Case.

## 5.8    Compliance with Laws, etc.

The Borrower shall comply with the requirements of all Applicable Laws, noncompliance with which, individually or in the aggregate with other noncompliances, could reasonably be expected to cause a Material Adverse Effect.

## 5.9    Environmental Disclosure and Inspection.

**A.**     The Borrower shall exercise all due diligence in order to comply and cause (i) all tenants or subtenants under any leases or occupancy agreements affecting the Real Property Assets, (ii) all contractors, engineers, architects and similar vendors and contractors, and (iii) all other Persons on or occupying the Real Property Assets, to comply with all Environmental Laws and Governmental Authorities, except for any such noncompliance which could not reasonably be expected to cause a Material Adverse Effect.  To the extent funds therefor are provided for in the Approved Budget, Borrower shall use its diligent efforts to rectify and cure within 60 days after the Effective Date all violations of the Consent Decree existing as of the Effective Date.

**B.**     The Borrower agrees that the Administrative Agent may, from time to time, retain, at the Borrower's expense, an independent professional consultant to review any report relating to Hazardous Materials prepared by or for the Borrower and to conduct their own investigation (the scope of which investigation shall be reasonable based upon the circumstances and shall not be duplicative of existing work product when feasible) of any Real Property Asset currently owned, leased, operated or used by the Borrower, if (i) a Default or an Event of Default shall have occurred and be continuing, or (ii) the Administrative Agent reasonably believes (a) that an occurrence relating to such Real Property Asset is likely to give rise to an Environmental Claim or an Environmental Liability or (b) that a violation of an Environmental Law on or around such Real Property Asset has occurred or is likely to occur, which could, in either such case, reasonably be expected to result in a Material Adverse Effect.  The Borrower shall use its

**TAMARACK DIP CREDIT AGREEMENT**

reasonable efforts to obtain for the Administrative Agent and its agents, employees, consultants and contractors the right, upon reasonable notice to the Borrower, to enter into or on to the Real Property Assets currently owned, leased, operated or used by the Borrower to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation. Any such investigation of any Real Property Asset shall be conducted, unless otherwise agreed to by the Borrower and the Administrative Agent, during normal business hours and, shall be conducted so as not to cause any damage or loss to any property at such Real Property Asset. The Borrower and the Administrative Agent hereby acknowledge and agree that any report of any investigation conducted at the request of the Administrative Agent pursuant to this <u>subsection 5.9B</u> will be obtained and shall be used by the Administrative Agent and the Lenders for the purposes of the Lenders' internal credit decisions, to monitor and police the Loans and to protect the Lenders' security interests, if any, created by the Loan Documents. The Administrative Agent agrees to deliver a copy of any such report to the Borrower with the understanding that the Borrower acknowledges and agrees that (I) it will indemnify and hold harmless the Administrative Agent and each Lender from any costs, losses or liabilities relating to the Borrower's use of or reliance on such report, (II) neither the Administrative Agent nor any Lender makes any representation or warranty with respect to such report, and (III) by delivering such report to the Borrower, neither the Administrative Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report.

C.    The Borrower shall promptly advise the Administrative Agent in writing and in reasonable detail of (i) any Release or threatened Release of any Hazardous Materials, or to the Borrower's Knowledge any tenants under any leases or occupancy agreements affecting any portion of any Real Property Asset, to any federal, state, local or foreign governmental or regulatory agency under any applicable Environmental Laws, (ii) any and all written communications with respect to any pending or threatened Environmental Claims and any and all material written communications with respect to any Release or threatened Release of Hazardous Materials the existence of which has a reasonable possibility of resulting in a Material Environmental Liability, (iii) any Cleanup performed by the Borrower or any other Person in response to any Hazardous Materials on, under or about any Real Property Asset, the existence of which has a reasonable possibility of resulting in a Material Environmental Liability, (iv) the Borrower's discovery of any occurrence or condition on any property that could cause any Real Property Asset to be subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws, and (v) any written request for information from any Governmental Authority that fairly suggests such agency is investigating whether the Borrower may be potentially responsible for a Release or threatened Release of Hazardous Materials which has a reasonable possibility of giving rise to a Material Environmental Liability.

D.    The Borrower shall promptly notify the Administrative Agent of (i) any proposed acquisition of stock, assets, or property by the Borrower that could reasonably be expected to expose the Borrower to, or result in, Environmental Liability that could reasonably be expected to have a Material Adverse Effect and (ii) any proposed action to be taken by the Borrower to commence manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrower to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrower as of the Effective Date.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

E.      The Borrower shall, at its own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this Section 5.9.

**5.10    The Borrower's Remedial Action Regarding Hazardous Materials.**

The Borrower shall promptly take any and all necessary remedial action in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset in order to comply in all material respects with all applicable Environmental Laws and Governmental Authorizations.  In the event the Borrower undertakes any Cleanup action with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrower shall conduct and complete such Cleanup action in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrower's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested.

**5.11    Future Subsidiaries; New Collateral.**

A.      No Subsidiaries shall be formed by the Borrower and no Person shall be acquired by the Borrower in any manner (including by merger, consolidation or otherwise) without the prior written approval of the Requisite Lenders in their sole discretion.

B.      If the Borrower acquires any property (including any real property) after the Effective Date as to which the Collateral Agent, for the benefit of the Secured Parties, does not have a perfected First Priority Lien on the Effective Date (such assets **"New Collateral"**), then Borrower shall promptly (i) notify the Administrative Agent of that fact, (ii) execute and deliver (or cause to be executed and delivered (and, in the case of any documents, instruments or consents to be executed by a Person that is not the Borrower or any Affiliate thereof, use commercially reasonable efforts to obtain)) to the Administrative Agent and the Collateral Agent, such amendments to the applicable Transaction Documents, and take all such further action and execute all such further documents and instruments as any Agent may deem reasonably necessary or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a First Priority Lien in such New Collateral.  To the extent such New Collateral is subject to pre-existing Indebtedness, such New Collateral shall automatically be subject to a perfected First Priority Lien in accordance with the preceding sentence, with the amount secured by such First Priority Lien equal to the consideration given by the Borrower in connection with such acquisition.  If and to the extent requested by the Administrative Agent or the Collateral Agent, the Borrower shall deliver to the Administrative Agent and the Collateral Agent, together with such Loan Documents, a favorable opinion of counsel to the Borrower, that is reasonably satisfactory to the Administrative Agent, Collateral Agent and their counsel, as to (a) the valid existence and good standing of the Borrower, (b) the due authorization, execution and delivery by the Borrower of such Collateral Documents to which it is a party, (c) the enforceability of such Collateral Documents against the Borrower, (d) the validity and perfection of the security interests granted by the Borrower in favor of the Collateral Agent pursuant to the

**TAMARACK DIP CREDIT AGREEMENT**

Collateral Documents and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent.

**5.12**   **Landlords', Mortgagees' and Bailees' Letters and Agreements.**

As reasonably requested by the Collateral Agent and to the extent not otherwise addressed to the Collateral Agent's reasonable satisfaction in the DIP Order, the Borrower shall use commercially reasonable efforts to obtain a landlord's agreement, mortgagee agreement or bailee letter, as applicable, from the lessor of each leased property, mortgagee of owned property or bailee with respect to any real property facility or other location where Collateral is stored or located, which agreement or letter shall contain a waiver or subordination of all Liens or claims that the landlord, mortgagee or bailee may assert against the Collateral at that location, and shall otherwise be reasonably satisfactory in form and substance to the Collateral Agent.

**5.13**   **Further Assurances.**

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, the Borrower shall, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents and to provide for payment of the Obligations in accordance with the terms of this Agreement and the other Loan Documents. In furtherance and not in limitation of the foregoing, the Borrower shall take such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are secured by First Priority Liens on the Collateral (subject to the Carve-Out).

**5.14**   **Title.**

The Borrower shall warrant and defend (a) title to the Real Property Collateral held by it, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity, perfection and priority of the Liens of the applicable Collateral Documents, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. The Borrower shall reimburse each Agent for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by such Agent if an interest in the Collateral, other than as permitted hereunder, is claimed by another Person.

**5.15**   **Estoppels.**

Borrower will at any time and from time to time, within ten (10) days after written demand by Administrative Agent, deliver to Administrative Agent a certificate duly executed, and in form satisfactory to Administrative Agent, stating and acknowledging the then

61

Case 09-03911-TLM   Doc 353-2   Filed 10/09/10   Entered 10/09/10 12:10:07   Desc
Exhibit to proposed Order   Ex. A to Motion Doc. 322   Page 69 of 111

SIDLEY DRAFT – 10/8/10

outstanding principal balance of the Loans and that, to the Borrower's Knowledge, there are no defenses, offsets or counterclaims (or, if such should not be the fact, then the facts and circumstances relating to such defenses, offsets or counterclaims) and such other information as may reasonably be requested by Administrative Agent.

**5.16**   **Entity Covenants.**   The Borrower:

    **A.**   does not own and will not own any asset or property other than its interests in the Project, and together with personal property reasonably necessary for the ownership or operation of the Project;

    **B.**   unless otherwise approved in writing by the Administrative Agent, will not engage in any business other than the ownership, management and operation of the Project, and personal property reasonably necessary thereto;

    **C.**   except to the extent permitted by this Agreement, has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity; and

    **D.**   except to the extent permitted by this Agreement, shall not acquire obligations or securities of its Affiliates.

**5.17**   **Maintenance of Entitlements.**

The Borrower shall warrant and defend, and otherwise maintain, all of the Existing Entitlements, except to the extent any such Existing Entitlements are not necessary for the development of the Project.  To the extent the Existing Entitlements require any obligations or conditions to be fulfilled by the Borrower, the Borrower will perform (or caused to be performed) such obligations or conditions and provided further that during the pendency of the Chapter 11 Case the Borrower shall not be required to perform such obligations, the non-performance of which is permitted by the Bankruptcy Code.

**5.18**   **Operating Cash Revenues.**

Promptly following the receipt by the Borrower of Operating Cash Revenues, the Borrower shall deposit all such Operating Cash Revenues into the Operating Account, which Operating Cash Revenues shall be held in the Contingency Reserve Subaccount for application pursuant to the Approved Budget; provided, however, that in the event that the amount of funds held in the Contingency Reserve Subaccount at any time equals or exceeds Fifty Thousand Dollars ($50,000), then all such Operating Cash Revenues in excess of the Fifty Thousand Dollar ($50,000) threshold shall be delivered within five (5) Business Days to the Administrative Agent for deposit into the Disbursement Account.

**5.19**   **Continued Retention of Responsible Officer.**

So long as any Obligation is outstanding (A) the Borrower shall continue to retain the Responsible Officer in accordance with the terms and conditions of <u>subsection 3.1Q</u> of this Agreement , (B) the Responsible Officer, acting by, through and under the direction of Michael

**SIDLEY DRAFT – 10/8/10**

Fleischer, shall solely direct, Control, and manage the Borrower and (C) Michael Fleischer shall solely Control and direct the Responsible Officer.

**5.20** **Chapter 11 Case Actions.** The Borrower shall:

A. deliver to Administrative Agent and the Lenders a Proposed Plan and Disclosure Statement within forty-five (45) days after the Closing Date;

B. file with the Bankruptcy Court of a motion seeking approval of sale procedures ("**Sale Procedures Motion**") within thirty (30) days after the Closing Date, with respect to the marketing and sale of all or substantially all of Borrower's properties and assets (including all rights of redemption), including proposed marketing and due diligence periods; procedures and qualifications for the identification of qualified bidders; deadline for the submission of bids by qualified bidders; maximum overbid protections that may be provided to any "stalking horse" bidder that may be identified and proposed to the Bankruptcy Court; procedures with respect to the conducting of an auction in the Bankruptcy Court at which qualified bidders may submit their final bids or any overbids; procedures acceptable to the Requisite Lenders with respect to the exercise of credit bid rights by Administrative Agent on behalf of the Lenders; and other procedures of a type ordinarily included in sale procedures motions with respect to the sale of all or substantially all of a debtor's properties and assets. The Sale Procedures Motion shall be in form and substance satisfactory to the Requisite Lenders in their sole discretion.

C. file with the Bankruptcy Court within sixty (60) days after the Closing Date a Conforming Plan and Disclosure Statement, which shall include, among other provisions, (i) provisions with respect to the sale of all or substantially all of Borrower's properties and assets (including all rights of redemption) to the highest qualified bidder (which may, in accordance with the Sale Procedures Motion, be the Administrative Agent to the extent of the exercise by the Administrative Agent of its right to credit bid) in accordance with the Sale Procedures Motion, and (ii) waivers and releases of any and all claims of Borrower and its bankruptcy estate arising from or related to the Prepetition Lenders' and Prepetition Agents' claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of the Loans or the Prepetition Credit Agreements or the liens on or security interests in the assets of Borrower securing the Loan or the Prepetition Credit Agreements, including seeking to equitably subordinate or avoid the liens securing the Prepetition Credit Agreements. For avoidance of doubt but without limiting the foregoing, it is understood that a plan of reorganization that purports in any way to compensate, pay or distribute proceeds of sale of Collateral to persons that are not creditors of the Borrower or otherwise purports to use assets of the estate of Borrower for the benefit of Insider Parties or non-debtor Affiliates of Borrower shall not be deemed acceptable (for example, and not in limitation, a plan shall not be deemed acceptable which proposes to pay persons who are creditors of Insider Parties or non-debtor Affiliates of the Borrower but not creditors of the Borrower, or which seeks to use assets of the Borrower's estate to acquire other assets not in the estate of Borrower as of the Closing Date (except to the extent otherwise expressly approved by the Administrative Agent in its sole and absolute discretion in accordance with the Approved Budget) in order to sell such assets together with the estate's assets in a bulk sale).

**5.21** **Accounts.**

**TAMARACK DIP CREDIT AGREEMENT**

LA1 1887102v.9

A. Each Account shall at all times be (i) held as collateral for the Obligations, (ii) held at a financial institution selected by the Administrative Agent from a list of approved financial institutions published by the Trustee (KeyBank N.A. is an acceptable financial institution for these purposes), and (iii) subject to an effective Control Agreement in favor of the Collateral Agent (for the benefit of the Lenders) in form and substance satisfactory to the Collateral Agent and in which the Collateral Agent (for the benefit of the Lenders) has a perfected First Priority Lien, with all rights and remedies in respect thereto as shall be set forth in the Loan Documents.  The funds held in each of the Accounts shall at all times constitute cash collateral of the Agent on behalf of the Lenders and shall be disbursed only in accordance with the terms and provisions of this Agreement.

B. Borrower may not open new Accounts or any other account at a financial institution without the prior written consent of the Requisite Lenders.

**5.22    Approved Budget.**

A. The Borrower, subject to <u>subsection 5.22B</u>, shall not incur or pay any expenses unless contemplated in the Approved Budget.  Notwithstanding the foregoing sentence: (i) no Borrower shall be required to pay any expenses, charges or fees to parties other than Agents and Lenders the nonpayment of which is permitted by the Bankruptcy Code and (ii) on or before the fifth Business Day of each calendar month (commencing on December 7, 2010), Borrower shall deliver an updated budget (for the period from such month to the Scheduled Maturity Date) to the Administrative Agent.  Each such updated budget provided to the Administrative Agent shall be of no force and effect unless and until it is approved in writing by the Requisite Lenders.  Such proposed budget, upon the written approval of the Requisite Lenders shall become, as of the date of such approval, the Approved Budget, and shall prospectively replace the prior Approved Budget.

B. Regardless of whether an updated budget has been delivered to Administrative Agent, Borrower shall comply at all times with the then existing Approved Budget on a line-item basis (subject to re-allocation among categories of expenses provided no category of expense increases more than 10% in the aggregate over that provided in the Approved Budget for such category, net of application of the budgeted contingency, and provided further that the total actual expenses shall not exceed the total expenses provided in the Approved Budget, measured on a rolling monthly basis, and including the carryover for prior periods) with the sole exception of reasonable contingency expenses paid in accordance with the contingency category of the Approved Budget.  Each updated budget submitted to Administrative Agent pursuant to <u>subsection 5.22A</u> shall account for any expense variations in the preceding month.

**5.23    Milestone Requirements.**

Borrower shall satisfy  each Specific Milestone Requirement on or before its applicable Specific Milestone Date. The Requisite Lenders may, in their sole discretion, waive, extend or Modify any or all applicable Specific Milestone Requirements, Specific Milestone Dates or General Milestone Requirements.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

# SECTION 6.
## NEGATIVE COVENANTS

The Borrower covenants and agrees that, until payment in full of all of the Loans and other Obligations, the Borrower shall perform all covenants in this <u>Section 6</u>.

**6.1    Indebtedness.**

The Borrower shall not directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or preferred stock, except that the Borrower may create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to Indebtedness or preferred stock, as follows:

(i)    The Borrower may become and remain liable with respect to its respective Obligations in accordance with the terms of this Agreement and the other Transaction Documents;

(ii)    The Borrower may remain liable for the Permitted Existing Indebtedness; and

(iii)    The Borrower may become and remain liable with respect to trade payables incurred in the Ordinary Course of Business of the Borrower to the extent contemplated in the Approved Budget.

**6.2    Liens and Related Matters.**

**A.    Prohibition on Liens.**  The Borrower shall not directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of the Borrower (or a Lien on the Capital Stock of the Borrower), whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement, or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or under any similar recording or notice statute, except (solely with respect to the Borrower):

(i)    any Permitted Encumbrances; provided, however, that (a) with respect to the Real Property Collateral no Permitted Encumbrances except the Permitted Title Exceptions shall be senior or prior to the First Priority Liens granted in favor of Agents and Lenders hereunder and the DIP Order; and (b) no such Permitted Encumbrances shall result in a Lien on the Capital Stock of Borrower;

(ii)    Liens in favor of the Collateral Agent granted pursuant to the Collateral Documents or granted in favor of any Agent or Lender pursuant to the terms of this Agreement and the other Transaction Documents; and

(iii)    any Liens securing Capital Lease or purchase money obligations, but only to the extent contemplated by the Approved Budget.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**B.     No Further Negative Pledges.**  The Borrower shall not enter into any agreement (other than the Loan Documents) prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**C.     No Material Adverse Change.**  Other than the filing of the Chapter 11 Case (and those associated changes customarily caused by such a filing) or such other matters as previously disclosed to the Administrative Agent in writing prior to the Effective Date, the Borrower shall not permit any event, change or condition that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on the Collateral.

**D.     Additional General Restrictions.**  The prohibitions provided for in this <u>Section 6.2</u> specifically include, without limitation, any effort by Borrower, any Committee, or any other party-in-interest in the Chapter 11 Case to create priming, *pari passu* or junior liens or interests on or in any Collateral irrespective of whether the Agents' and Lenders' liens or interests on or in such Collateral may be "adequately protected".

**6.3     <u>Investments</u>.**

The Borrower shall not directly or indirectly, make or own any Investments except:

(i)     Investments existing on the Effective Date, including in respect of the Existing Notes Receivable;

(ii)     The Borrower may make Investments directly related to the Project to the extent expressly contemplated in the Approved Budget;

(iii)     The Borrower may make and own Investments in Cash and Cash Equivalents; and

(iv)     Investments in respect of prepaid expenses, negotiable instruments held for collection or lease, workers' compensation, performance and other similar deposits provided to third parties in the Ordinary Course of Business.

**6.4     <u>Contingent Obligations</u>.**

The Borrower shall not directly or indirectly, create or become or remain liable with respect to any Contingent Obligation, except:

(i)     The Borrower may become and remain liable with respect to Contingent Obligations in respect of any of the Indebtedness, which if outstanding, would be permitted under <u>Section 6.1;</u> and

(ii)     The Borrower may become and remain liable with respect of Contingent Obligations arising in connection with Operating Leases permitted hereunder as entered into by the Borrower from time to time.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**6.5**     **Restricted Payments.**

Except as otherwise expressly provided herein, Borrower shall neither directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment nor issue any class of stock of, or membership interest in, the Borrower.

**6.6**     **Restriction on Fundamental Changes or Change of Control.**

The Borrower shall not, without the prior written consent of Requisite Lenders, which consent may be withheld in their sole discretion:

**A.**     directly or indirectly enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve, or cause or consent to any the Borrower to enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve; and/or

**B.**     with the sole exception of the appointment of the Responsible Officer as contemplated by subsection 3.1Q of this Agreement, no change of Control of the Borrower or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, or any non-member manager of Borrower shall be permitted.

**6.7**     **Asset Sales; Other Transfers.**

Without the prior written consent of the Requisite Lenders in their sole discretion, except as provided in a Conforming Plan, Borrower shall not engage in any Asset Sales or the sale, assignment, exchange, transfer or other disposition of any direct or indirect ownership interest in the Borrower or the Collateral.

**6.8**     **Transactions with Shareholders and Affiliates.**

The Borrower shall not directly or indirectly, engage in any transaction with any Affiliate of the Borrower including (i) the rendering of any service, (ii) the payment of any development fees, management fees, consulting fees or the making of other disbursements, or (iii) the entering into any Material Contract.

**6.9**     **Conduct of Business.**

The Borrower shall not engage in any business other than the businesses engaged in by the Borrower on the Effective Date except as may otherwise be approved by the Requisite Lenders in their sole discretion.

**6.10**     **Amendments or Waivers of Certain Agreements.**

The Borrower shall not terminate or agree to any amendment, restatement, supplement or other Modification to, or waive any of its rights under, any (i) Transaction Document, or (ii) Organizational Certificates or Organizational Documents of the Borrower, if such termination, amendment, restatement, supplement, Modification or waiver would be materially adverse to the

67

**TAMARACK DIP CREDIT AGREEMENT**

Case 09-03911-TLM   Doc 353-2   Filed 10/09/10   Entered 10/09/10 12:10:07   Desc
Exhibit to proposed Order   Ex. A to Motion Doc. 322   Page 75 of 111

**SIDLEY DRAFT – 10/8/10**

Borrower or the Lenders, or otherwise in violation of any of the terms of the Transaction Documents.

**6.11    Fiscal Year.**

The Borrower shall not change its Fiscal Year end from December 31.

**6.12    Limitation on Development.**

The Borrower shall not develop or construct any improvements located on the Real Property Collateral except as otherwise contemplated in the Approved Budget.

**6.13    Material Contracts.**

The Borrower shall not enter into any Material Contracts after the Effective Date unless same are on arms length, fair market terms and are automatically assignable to the Collateral Agent (for the benefit of the Secured Parties) or any successor-in-interest thereto and are contemplated in the Approved Budget.  The Borrower shall not enter into any Material Contract without the prior written consent of the Requisite Lenders, which consent may be withheld in their sole discretion.  A copy of each Material Contract shall be delivered to the Administrative Agent promptly following execution thereof.

**6.14    Repayment of Indebtedness.**

Except pursuant to a Conforming Plan and except as specifically permitted hereunder, Borrower shall not, without the prior written consent of the Requisite Lenders, which consent may be withheld in their sole discretion, make any payment or transfer with respect to any Lien, Indebtedness or other obligation incurred or arising prior to the Conversion Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.  Borrower shall not, without the express prior written consent of the Requisite Lenders, which consent may be withheld in their sole discretion, use any Loan proceeds to make any payments or transfers described in the preceding sentence, except as otherwise permitted or contemplated by the preceding sentence or by the Approved Budget.

**6.15    Chapter 11 Claims and Case.**

**A.**    Borrower shall not incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claims of Agents and Lenders against Borrower, except with respect to the Carve-Out or as set forth in subsection 2.10B.

**B.**    Without the prior written consent of the Requisite Lenders, which consent may be withheld in their sole discretion, Borrower shall not support or endorse any plan of reorganization or propose any sale of substantially all of the assets of the Borrower other than pursuant to the Conforming Plan and Disclosure Statement and Sales Procedures Motion as approved by the Requisite Lenders.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**C.**     Borrower shall not support or endorse a change or permit or make any changes to any Court Document without the prior written consent of the Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion.

**D.**     Borrower shall not consent to or assert any claims under Sections 506(c) or 552(b) of the Bankruptcy Code against the Lenders or the Agents or the Prepetition Lenders or the Prepetition Agents regarding the Loans or the Prepetition Obligations, respectively; nor shall the Borrower consent to or commence against such entities of any other actions adverse to their respective rights and remedies under the Loan Documents, the Prepetition Loan Documents or any Bankruptcy Court order.

**E.**     Borrower shall not consent to or permit any new claims or Liens to exist against the Collateral (other than those created by the Transaction Documents) that would be entitled to super-priority Lien status under section 364(c)(1) of the Bankruptcy Code equal to or greater than the Liens in favor of the Lenders or Prepetition Lenders as of the Effective Date.

**F.**     The Agents expressly reserve (i) all rights to seek additional adequate protection of (a) their and the Lenders' rights and interests under the Loans and the Loan Documents and (b) the Prepetition Lenders' and Prepetition Agents' rights and interests under the Prepetition Obligations and Prepetition Loan Documents, and (ii) the right to move the Bankruptcy Court for relief from the automatic stay imposed by section 362 of the Bankruptcy Court to permit the Agents to enforce the rights granted to (a) them and the Lenders under the Loan Documents and (b) the Prepetition Agents and  Prepetition Lenders under the Prepetition Loan Documents.

**SECTION 7.**
**EVENTS OF DEFAULT; REMEDIES**

**7.1**     **Events of Default.**

Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to the Borrower, and subject to Section 7.2, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an **"Event of Default"** hereunder:

**A.**     <u>Payment of Obligations</u>.  The Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise) and, in the case of the failure to pay any such Obligations (other than the payment of principal when due) such failure continues for ten (10) days.

**B.**     <u>Misrepresentations</u>.  Any representation, warranty or other written statement to any Agent or any Lender by or on behalf of the Borrower, whether made in or furnished in compliance with or in reference to any of the Transaction Documents, proves to have been false or misleading in any material respect when made or furnished.

**C.**     <u>Breach of Certain Covenants</u>.  The Borrower shall fail or neglect to perform, keep or observe any covenant contained in <u>Sections 5.2(iii)</u>, <u>5.7</u>, <u>5.18</u>, <u>5.19</u>, <u>5.20</u>, <u>5.23</u> and <u>Section 6</u> hereof on the date that Borrower is required to perform, keep or observe such covenant.

69

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

    **D.**    <u>Services of Responsible Officer</u>.  If at any time (a) the Borrower shall fail to retain the Responsible Officer in accordance with the terms and conditions of <u>subsection 3.1Q</u> of this Agreement, (B) the Responsible Officer, acting by, through and under the direction of Michael Fleischer, shall fail solely to direct, Control, and manage the Borrower or (C) Michael Fleischer shall fail solely to Control and direct the Responsible Officer.

    **E.**    <u>Breach of Other Covenants</u>.  The Borrower shall fail or neglect to perform, keep or observe any covenant (not included in <u>subsections 7.1A</u> and <u>7.1C</u> above) contained in this Agreement (and the breach of such other covenant is not cured to the Administrative Agent's and the Requisite Lenders' satisfaction) within ten (10) Business Days after the sooner to occur of the Responsible Officer's receipt of notice of such breach from the Administrative Agent or the date on which such failure or neglect first becomes actually known to the Responsible Officer.

    **F.**    <u>Default Under Transaction Documents</u>.  The Borrower shall default in the due and punctual observance or performance (taking into account any applicable grace periods) (other than certain specified affirmative covenants that are not curable or subject to any grace period, including the Borrower's obligations under <u>Section 5.23</u> of this Agreement to fully perform and satisfy each of the Specific Milestone Requirements on or before its respective Specific Milestone Date) of any of its obligations under the Transaction Documents and such default shall continue unremedied for a period of ten (10) days following the earlier of (i) the date on which Borrower became aware of such default and (ii) the date on which notice of such failure is given by the Administrative Agent or any Lender.

    **G.**    <u>Other Defaults</u>.  There shall occur subsequent to the Effective Date any default or event of default on the part of Borrower beyond any applicable cure or grace period under any agreement, document or instrument to which Borrower is a party or by which Borrower or any of its properties is bound, creating or relating to any Indebtedness (other than the Obligations) if the payment or maturity of such Indebtedness may be accelerated in consequence of such event of default or demand for payment of such Indebtedness may be made without relief from the automatic stay imposed by the Bankruptcy Code or where the Person seeking to accelerate or make demand seeks relief from the automatic stay to accelerate or make such demand.

    **H.**    <u>Uninsured Losses</u>.  Any loss (other than a loss relating to an account), theft, damage or destruction of any of the Collateral not fully covered (subject to such deductibles as the Administrative Agent shall have permitted) by insurance if the aggregate amount not covered by insurance exceeds $250,000 in any Fiscal Year.

    **I.**    <u>Material Adverse Effect</u>.  There shall occur any event or condition that has a Material Adverse Effect.

    **J.**    <u>ERISA</u>.  An ERISA Event shall occur which could reasonably be expected to result in a Material Adverse Effect or which the Administrative Agent in its reasonable discretion shall determine constitutes grounds for the termination by the PBGC of any Pension Plan or for the appointment by the appropriate United States district court of a trustee for any Pension Plan; or if any Pension Plan shall be terminated or any such trustee shall be requested or appointed; or if Borrower is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments

70

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

to a Multiemployer Plan resulting from Borrower's complete or partial withdrawal from such Pension Plan.

**K.**    Challenge to or Enforceability of the Loan Documents.  The Borrower or any of its Affiliates or any of the Insider Parties shall challenge or contest in any action, suit or proceeding the validity or enforceability of any of the Transaction Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to the Collateral Agent or Lenders; or if any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by the applicable Agent and Lenders in accordance with the terms thereof.

**L.**    Judgment.  One or more judgments or orders for the payment of money in an amount that exceeds, individually or in the aggregate, $250,000 shall be entered against Borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

**M.**    Criminal Forfeiture.  Borrower shall be convicted under any criminal law that could lead to a forfeiture of any property of the Borrower.

**N.**    Chapter 11 Case.  The occurrence of any of the following in any Chapter 11 Case:

(i)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by Borrower in the Chapter 11 Case: (a) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement except with the consent of Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion; (b) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (c) except as provided in the DIP Order, to use cash collateral of Agents under section 363(c) of the Bankruptcy Code without the prior written consent of Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion; (d) any other action or actions adverse to Agents and the Lenders or their rights and remedies hereunder or their interest in the Collateral, including any such action or actions which seek to reduce, set-off or subordinate the Obligations or challenge any Agent's Lien in any of the Collateral; or (e) any other action or actions that seek to reduce, set-off or subordinate the Obligations or challenge the Agents' Liens in any of the Collateral;

(ii)    the filing or support by Borrower of any plan of reorganization that is not expressly permitted hereunder or is otherwise not acceptable to Agents and the Requisite Lenders;

(iii)    either the filing of  pleading by the Borrower (or any Affiliate of the Borrower or the Borrower's members), or the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Transaction Documents (specifically including the DIP Order) without the written consent of the Administrative

71

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion, or the filing of a motion for reconsideration with respect to the DIP Order;

(iv)     the payment of, or application for authority to pay, any prepetition claim except pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement;

(v)     either the filing of pleading by the Borrower (or any Affiliate of the Borrower or the Borrower's members), or the entry of an order in the Chapter 11 Case under sections 506(c) and/or 552(b) of the Bankruptcy Code against the Agents or the Lenders or the Prepetition Lenders or the Prepetition Agents regarding the Loan or the Prepetition Obligations adverse to their respective rights and remedies under the Loan Documents or the Prepetition Loan Documents, respectively; or any Bankruptcy Court order;

(vi)     without the prior written consent of the Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion, either the filing of a pleading by the Borrower (or any Affiliate of the Borrower or the Borrower's members), or the entry of an order of the Bankruptcy Court that is not stayed within 10 calendar days, of a plan of reorganization that proposes appointing an interim or permanent trustee in the Chapter 11 Case or a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Borrower; or the sale without the prior written consent of the Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion, of all or substantially all of Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in any Chapter 11 Case, or otherwise that does not provide for payment in full of the Obligations (other than contingent indemnity obligations);

(vii)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the Borrower (or any Affiliate of the Borrower or the Borrower's Related Parties) shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise that, in each case, is not stayed within ten (10) calendar days following the entry of any such order;

(viii)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code without the prior written consent of Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion, (a) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (b) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority that would have a Material Adverse Effect;

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

(ix)     the commencement of a suit or action against any Agent or any Lender and, as to any suit or action brought by any Person other than the Borrower or an officer or employee of the Borrower, the continuation thereof without dismissal for thirty (30) days after service thereof on such Agent or such Lender, as applicable, that asserts by or on behalf of the Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency, or any official committee in any Chapter 11 Case, any claim or legal or equitable remedy which seeks (a) to reduce, set off or subordinate any claim or Lien of Agents or the Lenders or (b) challenge the Lien of any Agent in any Collateral;

(x)     the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(xi)     the failure of Borrower to perform its obligations under the Court Documents;

(xii)     the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to any Agent, on behalf of such Agent and the Lenders (other than the Carve-Out);

(xiii)     after the entry of the DIP Order, the DIP Order ceases to be in full force and effect;

(xiv)     (a) the Borrower engaging in or supporting any challenge to the validity, perfection, priority, extent or enforceability of the Loans, Obligations, the Liens securing the Loans, or the Prepetition Obligations, including seeking to equitably subordinate or avoid the liens securing the Prepetition Obligations, or (b) the Borrower engaging in or supporting any investigation or their assertion of any claims or causes of action (or supporting the assertion of the same) against (I) the Lenders or Agents, and (II) the Prepetition Lenders and the Prepetition Agents;

(xv)     the Committee shall file a complaint or initiate any other action against the Administrative Agent, Collateral Agent or any of the Lenders or otherwise file an objection to such Agents' or Lenders' claims or file any similar pleading which seeks to affect such Agents' or Lenders' claims or liens on the Collateral;

(xvi)     there shall occur a cessation of work contemplated in the Approved Budget in excess of thirty (30) days, or a strike or labor unrest at or adversely affecting any of the Borrower's properties for a period in excess of thirty (30) days;

(xvii)     the sale of any of Borrower's assets, except as expressly permitted in this Agreement;

(xviii)     the failure of the Borrower to satisfy any of the Specific Milestone Requirements and each of their associated General Milestone Requirements;

73

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

(xix)   the failure of the Conforming Plan to become effective on or before the date thirty (30) days after it is confirmed; or

(xx)   the filing by the Borrower of any motion or proceeding which could reasonably be expected to result in material impairment of the Lenders' rights under the Transaction Documents.

**O.**   <u>DIP Order; Appeals</u>.   (i) the DIP Order shall have been vacated, reversed, Modified or amended without the consent of Administrative Agent after receiving the consent of the Requisite Lenders, which consent may be withheld in their sole discretion, (ii) a motion for reconsideration of the DIP Order shall have been timely filed, (iii) an appeal of any such DIP Order shall have been timely filed, or (vi) if the DIP Order is the subject of a pending appeal in any respect, any of (a) the making of any Loans, (b) the granting of superpriority claim status with respect to the Obligations, (c) the granting of the First Priority Liens described herein, or (d) the performance by Borrower of any of their obligations under this Agreement or any other Loan Document or under any other instrument or agreement referred to in this Agreement shall be the subject of a presently effective stay pending appeal.

**7.2**   **Remedies.**

Upon the occurrence and during the continuation of an Event of Default and notwithstanding section 362 of the Bankruptcy Code, the automatic stay shall be deemed automatically vacated upon such Event of Default, the Agents, without further order of or application to the Bankruptcy Court may, and at the direction of the Requisite Lenders, shall:

**A.**   without prior written notice to any Person, exercise the Agents' remedies under any Control Agreement with respect to the Operating Account and any other Account held by a Borrower prior to the Conversion Date (including any and all Accounts associated in any way with the Prepetition Credit Agreements in which Accounts the Prepetition Lenders and/or the Prepetition Agents have a security interest), to order the institutions that are parties to such Control Agreements to: immediately dishonor all withdrawals from such Accounts ordered by any Person other than an Agent, and immediately transfer all funds in such Accounts into the Disbursement Account and then transfer any additional funds deposited into such Accounts into the Disbursement Account on a daily basis.

**B.**   upon ten (10) days' written notice to the Borrower, counsel to any Committees, and the Trustee, take one or more of the following actions, at the same or different times: (i) reduce the amount of any outstanding Commitments or suspend or terminate any outstanding Commitments; (ii) charge the Default Rate on the Loans; (iii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (iv) realize on any or all of the Collateral and exercise any and all remedies under the Loan Documents and applicable law (all of which rights, powers and remedies are cumulative and not exclusive); and

**TAMARACK DIP CREDIT AGREEMENT**

Case 09-03911-TLM    Doc 353-2    Filed 10/09/10    Entered 10/09/10 12:10:07    Desc
Exhibit to proposed Order    Ex. A to Motion Doc. 322    Page 82 of 111

SIDLEY DRAFT – 10/8/10

in any event with respect to any Borrower described in either subsections 7.1N or O above, Default Interest shall automatically accrue on the Loans and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

### 7.3    Waivers by Borrower.

Except as otherwise provided for in this Agreement or by applicable law or the DIP Order, Borrower waives: (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by any Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever such Agent may do in this regard (other than any breach of any Transaction Document or any violation of applicable law), (ii) all rights to notice and a hearing prior to any Agent's taking possession or control of, or to any Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing any Agent to exercise any of its remedies, (iii) the benefit of all valuation, appraisal, marshaling and exemption laws, and (iv) upon acceleration of the Loans and the demand for the repayment thereof, all rights of notice or the present of any demand prior to the Administrative Agent withdrawing and applying all funds in every Account for the repayment of the Obligations in accordance with subsection 2.4E.

**SECTION 8.**
**AGENTS**

### 8.1    Appointment.

**A.    Appointment Authority.**  Each of the Lenders hereby irrevocably appoints Credit Suisse as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes Credit Suisse, in such capacities, to take such actions on its behalf and to exercise such powers as are delegated to Credit Suisse, in such capacities by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable.  In performing its functions and duties under this Agreement, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries or Affiliates.  The provisions of this Section 8 are solely for the benefit of the Agents.  The Lenders and the Borrower shall not have rights as third party beneficiaries of any of such provisions.

**B.    Appointment of Supplemental Collateral Agents**.  It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent deems that by reason of any present or future law of any jurisdiction the Administrative Agent or the Collateral Agent may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Administrative Agent or the Collateral Agent appoint an additional individual or institution as a separate trustee, co trustee, collateral agent or collateral co agent (any such additional individual or institution being referred to herein individually as a **"Supplemental Collateral Agent"** and collectively as **"Supplemental Collateral Agents"**).

In the event that the Administrative Agent or the Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or the Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either the Administrative Agent or the Collateral Agent or such Supplemental Collateral Agent, and (ii) the provisions of this Section 8 and of Section 9.2 that refer to the Administrative Agent or the Collateral Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to the Administrative Agent or the Collateral Agent shall be deemed to be references to the Administrative Agent or the Collateral Agent and/or such Supplemental Collateral Agent, as the context may require.

Should any instrument in writing from the Borrower be required by any Supplemental Collateral Agent so appointed by the Administrative Agent or the Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent or the Collateral Agent.  In case any Supplemental Collateral Agent, or a successor thereto, shall dissolve, die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Supplemental Collateral Agent.

## 8.2    Rights as a Lender.

The Persons serving as the Agents hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Persons serving as the Agents hereunder in their individual capacity.  Such Persons and their Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind

**TAMARACK DIP CREDIT AGREEMENT**

of business with the Borrower Affiliate thereof as if such Persons were not Agents hereunder and without any duty to account therefor to the Lenders.

## 8.3    Exculpatory Provisions.

The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agents (i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred or is continuing, (ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agents are required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the relevant Lenders as shall be necessary under the circumstances as provided in Section 9.5), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, and (iii) shall not, except as expressly set forth herein and in the other Loan Documents have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.  No Agent shall be liable to the Lenders for any action taken or not taken by it with the consent or at the direction or request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.5) or in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender.  The Agents shall not be responsible for or have any duty to ascertain or inquire into (a) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (b) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (c) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (d) the validity, enforceability, effectiveness or genuineness of this Agreement or any other Loan Document or any other agreement, instrument or document or (e) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

## 8.4    Advances of Costs in Exercise of Remedies.

If the Requisite Lenders shall request that the Agents commence or otherwise take any actions in connection with the exercise of remedies or enforcement or collection of Obligations (including litigation) against the Borrower or any Collateral and the Agents determine in their reasonable discretion that the Borrower does not or is not likely to pay the fees and costs of counsel and other professionals (including third party consultants and advisors) retained or to be retained by Agents for such purposes, then each Lender shall advance from time to time its Pro Rata Share of such amount as the Agents reasonably demand for such purposes, within five (5) Business Days after written demand.  If a Lender fails to advance its Pro Rata Share of such amount when and as demanded, then so long as such failure continues, such Lender shall be deemed a Defaulting Lender for purposes of the definition of Requisite Lenders hereunder.

**TAMARACK DIP CREDIT AGREEMENT**

Further, if the Lenders do not advance in the aggregate such amounts as the Agents reasonably demand from time to time and the Agents determine in their discretion that the amounts advanced are insufficient to commence or carry out the enforcement or exercise of remedies requested by the Requisite Lenders or to defend against claims brought or asserted in response thereto, then the Agent may cease, or not commence, to do the acts requested until the Lenders advance such amounts; provided, in no event shall this paragraph require any Lender to advance more than its Pro Rata Share of such amounts.

**8.5    Reliance by the Agents.**

The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agents also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of such Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Agents shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Agents may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**8.6    Delegation of Duties.**

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent.  The Agents and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of Section 8.3 shall apply to any such sub-agent and to the Related Parties of such Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent.

**8.7    Resignation of Administrative Agent and/or Collateral Agent.**

**A.**    The Administrative Agent and/or Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower.

**B.**    Upon receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the written consent of the Borrower if no Default or Event of Default shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed), to appoint a successor Administrative Agent and/or Collateral Agent, as applicable, which shall be a bank with an office in New York, or an Affiliate of any such bank with an office in New York.

**C.**    If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within ten (10) days after the retiring Administrative Agent and/or Collateral Agent, as the case may be, gives notice of its resignation, then the

**SIDLEY DRAFT – 10/8/10**

retiring Administrative Agent may, with the written consent of the Borrower if no Default or Event of Default shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed), on behalf of the Lenders, appoint a successor Administrative Agent and/or Collateral Agent, as applicable, meeting the qualifications set forth above.

**D.**     Upon the acceptance of a successor's appointment as Administrative Agent and/or Collateral Agent, as applicable hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent and/or Collateral Agent, as applicable, and the retiring Administrative Agent and/or Collateral Agent, as applicable shall be discharged from all of its duties and obligations hereunder or under the Loan Documents.

**E.**     Upon the acceptance of a successor's appointment as Collateral Agent, the retiring Collateral Agent shall assign and transfer to the successor Collateral Agent all rights of the retiring Collateral Agent in, to and under the Collateral, and shall execute and deliver any and all instruments of transfer and assignment in appropriate form for filing and/or recordation in the applicable government records to effect such assignment, all at the cost and expense of the Lenders.

**F.**     If the Administrative Agent and/or Collateral Agent, as applicable, shall notify the Borrower and the Lenders that no such successor is willing to accept such appointment, then such resignation shall nonetheless become effective in accordance with such notice and:

(i)     the retiring Administrative Agent and/or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents;

(ii)     if any of the Agents (in its capacity as an Agent under this Agreement) is party to any litigation, arbitration or other legal action or proceeding as a result of or related to (i) any action taken by such Agent at the request or direction of the Requisite Lenders in connection with this Agreement, (ii) any matter for which the Agents are entitled to indemnification under Section 9.2 of this Agreement, or (iii) such Agent's service as an Agent under this Agreement pursuant to its terms, then the retiring Agent may cause the Lenders individually to be substituted in as parties to such litigation, arbitration or other legal action or proceeding in the place and stead of such retiring Agent and/or may take any and all other actions as such retiring Agent reasonably deems necessary to withdraw from any such ligation, arbitration or other legal action or proceeding, all at the sole cost and expense of the Lenders; provided, however, that if the retiring Agent is a party to any such litigation, arbitration or other  legal action or proceeding in any capacity *other than* as an Agent under this Agreement, such retiring Agent shall have no right to substitute in any Lender as a party in place of such Agent in such other capacity;

(iii)     the retiring Collateral Agent shall assign and transfer to the Lenders, in accordance with their Pro Rata shares, all rights of the retiring Collateral Agent in, to and under the Collateral, and shall execute and deliver any and all instruments of transfer and

**TAMARACK DIP CREDIT AGREEMENT**

assignment in appropriate form for filing and/or recordation in the applicable government records to effect such assignment, all at the cost and expense of the Lenders; and

(iv)    all payments, communications and determinations provided to be made by, to or through the Administrative Agent and/or Collateral Agent, as applicable, shall instead be made by or to each Lender directly, until such time as the Requisite Lenders appoint a successor Administrative Agent and/or Collateral Agent, as applicable, as provided for above in this <u>Section 8.7</u>.

**G.**    The fees payable by the Borrower to a successor Administrative Agent and/or Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.

**H.**    After the retiring Administrative Agent's and/or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this <u>Section 8</u> and <u>Section 9.2</u> shall continue in effect for the benefit of such retiring Administrative Agent and/or Collateral Agent, as applicable, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent and/or Collateral Agent, as applicable, was acting in such capacity.

## 8.8    <u>Collateral Documents; Successor Collateral Agent</u>.

Each Lender hereby further authorizes the Collateral Agent to enter into each Collateral Document as secured party on behalf of and for the benefit of the Secured Parties and the other beneficiaries named therein and agrees to be bound by the terms of each Collateral Document; <u>provided</u> that the Collateral Agent shall not enter into or consent to any amendment, Modification, termination or waiver of any provision contained in any Collateral Document without the prior consent of the Requisite Lenders; <u>provided</u> <u>further</u>, <u>however</u>, that, without further written consent or authorization from any Lender, the Collateral Agent may execute any documents or instruments necessary to effect the release of any asset constituting Collateral from the Lien of the applicable Collateral Document in the event that such asset is sold or otherwise disposed of in a transaction effected in compliance with this Agreement or to the extent otherwise required by any Collateral Document. Anything contained in any of the Loan Documents to the contrary notwithstanding, each Lender agrees that no Secured Party other than the Collateral Agent (or its successor(s) pursuant to <u>Section 8.7</u>) shall have any right individually to realize upon any of the Collateral under any Collateral Document, it being understood and agreed that all rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent or its successor(s) pursuant to <u>Section 8.7</u>) for the benefit of the Secured Parties and the other beneficiaries named therein in accordance with the terms thereof.

## 8.9    <u>Non-Reliance on Agents and Other Lenders</u>.

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**8.10    Withholding.**

To the extent required by Applicable Law, the Agents may withhold from any payment to any Lender or other Person receiving payment under the Loan Documents an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that an Agent did not properly withhold tax from amounts paid to or for the account of any Lender or other Person receiving payment under the Loan Documents because such Lender or other Person failed to notify the applicable Agent that withholding on payments was required, including because of a change in circumstances which rendered an exemption from or reduction of withholding Tax ineffective or for any other reason, such Lender shall indemnify such Agent fully for all amounts paid, directly or indirectly, by such Agent, as applicable, as tax or otherwise, including any penalties or interest and together with all expenses incurred.

**SECTION 9.**
**MISCELLANEOUS**

**9.1    Assignments and Participations in Loans.**

**A.    Successors and Assigns Generally.** This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Transaction Document shall be binding upon Borrower, the estate of Borrower, and any trustee or successor in interest of Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agents and Lenders and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Transaction Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law. The Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the Administrative Agent and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection 9.1B, (ii) by way of participation in accordance with the provisions of subsection 9.1D or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection 9.1F (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection 9.1D and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

81

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

B.      **Assignments by Lenders.**

(i)      Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it); provided that

(a)      except in the case of an assignment of entire remaining amount of the assigning Lender's Loans or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Loans subject to each such assignment (determined as of the date of the Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $50,000 or an integral multiple of $10,000 in excess thereof, unless the Administrative Agent otherwise consents (provided, however, that simultaneous assignments by or to Approved Funds shall be aggregated for this purpose);

(b)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Commitments or Loans assigned; and

(c)      subject to subsection 9.1B(ii), the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment Agreement, together with a processing and recordation fee of $3,500 (which fee may be waived in the sole discretion of the Administrative Agent and no more than one such fee shall be payable in connection with simultaneous assignments by or to Approved Funds), and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and if required, applicable tax forms; and

(ii)      Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection 9.1C, from and after the effective date specified in each Assignment Agreement, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 2.6 with respect to facts and circumstances occurring prior to the effective date of such assignment.  An Eligible Assignee shall not be entitled to receive any greater payment under Section 2.6 than the assigning Lender would have been entitled to receive with respect to the Loan or portion of the Loan assigned to such Eligible Assignee, unless the grant to such Eligible Assignee is made with the Borrower's prior written consent.  Except in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund with respect to a Lender, any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>subsection 9.1D</u>.

       **C.**    **The Register.**  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders and principal amounts of the Loans (each, a **"Registered Loan"**) owing to, each Lender pursuant to the terms hereof from time to time (the **"Register"**). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

       **D.**    **Participations.**  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or a Borrower or any of the Affiliates or Subsidiaries of Borrower or any of the Insider Parties) (each, a **"Participant"**) in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that

              (i)    such Lender's obligations under this Agreement shall remain unchanged,

              (ii)    such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and

              (iii)    the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

       Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, Modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, Modification or waiver with respect to any action (a) effecting the extension of the final maturity of the Loan allocated to such participation, (b) effecting a reduction of the principal amount of or affecting the rate of interest payable on any Loan or any fee allocated to such participation, and (c) releasing all or substantially all of the Collateral. Subject to <u>subsection 9.1E</u>, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Section 2.6</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>subsection 9.1B</u>; provided that such Participant agrees to be subject to <u>Section 2.8</u> as though it were a Lender. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 9.3</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Section 9.4</u> as though it were a Lender.

       **E.**    **Limitations Upon Participant Rights.**  A Participant shall not be entitled to receive any greater payment under <u>Section 2.6</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

participation to such Participant is made with the Borrower's prior written consent. Without limiting the generality of the foregoing, a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of <u>subsection 2.6E</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with <u>subsection 2.6E(v)</u> as though it were a Lender.

F. **Certain Pledges.** Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it to the trustee for holders of obligations owed, or Securities issued, by such Fund as security for such obligations or Securities; <u>provided</u> that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this <u>Section 9.1</u>, (i) no such pledge shall release the pledging Lender from any of its obligations under this Agreement and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under this Agreement even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

G. **SPV Lender.** Notwithstanding anything to the contrary contained herein, any Lender (a **"Granting Lender"**) may grant to a special purpose funding vehicle (a **"SPV"**), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; <u>provided</u> that (i) nothing herein shall constitute a commitment by any SPV to make any Loan, (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). An SPV shall not be entitled to receive any greater payment under <u>Section 2.6</u> that the Granting Lender would have been entitled to receive with respect to the Loan or portion of the Loan granted to such SPV, unless the grant to such SPV is made with the Borrower's prior written consent. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this <u>Section 9.1</u>, any SPV may (a) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefore, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (b) disclose on a confidential basis any non-public information relating to its Loans to any rating

84

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.  This <u>Section 9.1</u> may not be amended without the written consent of the SPV.

**9.2**     **Expenses; Indemnity; Damage Waiver.**

 **A.**     **Costs and Expenses.**  The Borrower shall pay on or before the Effective Date and thereafter promptly following receipt of invoices therefor:  (i) all out of pocket expenses incurred by the Agents or any Lender and their Affiliates, including the reasonable fees, charges and disbursements of third party appraisers, collateral agents, consultants, advisors, auditors, counsel and financial advisors for the Administrative Agent and Collateral Agent (and fees and time charges for attorneys who may be employees of the Administrative Agent and Collateral Agent), in connection with (a) the syndication of the credit facilities provided for herein, or (b) the preparation, negotiation, execution, delivery and administration of (I) this Agreement and the other Transaction Documents or any amendments, Modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or (II) all other pleadings, documents and reports related to the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code; and (ii) all out of pocket expenses incurred by the Agents or any Lender and their Affiliates, including the fees, charges and disbursements of any third party appraisers, collateral agents, consultants, advisors, auditors, financial advisor or counsel for the Administrative Agent or any Lender (and fees and time charges for attorneys who may be employees of the Administrative Agent, the Collateral Agent or any Lender), in connection with (a) the attendance at meetings, court hearings or conferences related to the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code; (b) the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this <u>subsection 9.2A</u>, or in connection with the Loans made hereunder, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loan; and (c) periodic field audits and monthly monitoring of the Borrower and the Collateral

 **B.**     **Indemnification by the Borrower.**  The Borrower shall indemnify each Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an **"<u>Indemnitee</u>"**) against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (and fees and time charges for attorneys who may be employees of any Agent or any Lender), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii)  any actual or alleged presence or Release of Hazardous Materials on or from any property, or any Environmental Claim related in any way to Borrower, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including under applicable laws relating to preference and fraudulent transfers and conveyances) and regardless of whether any Indemnitee is a party thereto, provided that such

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted solely from the gross negligence or willful misconduct of any Indemnitee.

**C.     Lenders' Payment of Expenses.**  To the extent that the Borrower fails to take any action required to be taken by them or pay any amount required to be paid by them to the Administrative Agent or the Collateral Agent or any Related Party thereof under paragraph A or B of this <u>subsection 9.2</u>, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as the case may be, upon demand, such Lender's Pro Rata Share (determined as of the time that the applicable unpaid expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent in its capacity as such.  The Agents shall not be required to first advance or pay any such costs or expenses before they may make demand on the Lenders under this paragraph; for example, and not by way of limitation, if the Agents incur attorneys' or other professionals' fees and costs in connection with the exercise of remedies against the Borrower, the Agents shall not be required first to pay such fees and costs before they may demand under this paragraph or before the Lenders are required to make payment thereof under this paragraph.

**D.     Indemnification by the Lenders.**  Each Lender severally agrees to indemnify the Administrative Agent, the Collateral Agent and any and all Related Parties thereof related Persons and each Lender agrees to indemnify the Administrative Agent and the Collateral Agent against, and to defend and hold harmless the Administrative Agent, the Collateral Agent and each Related Party thereof from and against any and all Liabilities (including any Liabilities for Indemnified Taxes or Other Taxes) incurred by or asserted against any such Agent or Related Party thereof  arising out of, in any way connected with, or as a result of, (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby, (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Agent or Related Party thereof is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower or its Affiliates), or (iv) any actual or alleged presence or Release of Hazardous Materials on any property currently or formerly owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Liabilities related in any way to the Borrower or the Subsidiaries; *provided* that such indemnity shall not, as to any Agent or Related Party thereof, be available to the extent that such Liabilities are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Agent or Related Party thereof.

**E.     Waiver of Consequential Damages, Etc.**  To the greatest extent permitted by applicable law, Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, the Loans or the use of the proceeds thereof.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

F.    **Payments.**   All amounts due under this <u>Section 9.2</u> shall be payable promptly after demand therefor.

G.    **Limitations.**   Nothing in this <u>Section 9.2</u> shall be deemed to obligate the Borrower or the Lenders to pay, reimburse or indemnify the Agents or any of their Related Parties for any costs, expenses or liabilities that the Agents or their Related Parties incur in any capacity other than as Agents (or Related Parties to Agents) under this Agreement. For example, and not in limitation of the foregoing, nothing in this <u>Section 9.2</u> shall be deemed to obligate the Borrower or the Lenders to reimburse or indemnify the Agents or their Related Parties for professional fees incurred in connection with the exercise of remedies under the Prepetition Credit Agreements.

## 9.3   <u>Right of Set Off</u>.

Without limitation of any other rights of the Agents or Lenders, if an Event of Default shall have occurred and be continuing, each Agent, Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Agent, Lender, or any such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Agent or Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations of the Borrower may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Agent, Lender and their respective Affiliates under this <u>Section 9.3</u> are in addition to other rights and remedies (including other rights of setoff) which such Agent, Lender or their respective Affiliates may have.  Each Agent and Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

## 9.4   <u>Sharing of Payments by Lenders</u>.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder, the Lender shall (i) notify the Administrative Agent of such fact, and (ii) shall segregate such funds and hold them in trust and shall then pay such funds over to the Administrative Agent, in the form of the funds, currency or property received with any necessary endorsements, for application in accordance with <u>subsection 2.4C</u>; <u>provided</u> that if all or any portion of the payment giving rise thereto is recovered, the amount paid to by such Lender to the Administrative Agent shall be restored to the Lender to the extent of such recovery, without interest.  Furthermore, the provisions of this paragraph shall not be construed to apply to (a) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (b) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to a Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).  The

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.  The Lenders hereby instruct the Agents to apply all proceeds of Collateral received by them in accordance with this <u>Section 9.4</u>.  Notwithstanding anything herein to the contrary, the Agents may retain proceeds of Collateral for application to pay the Obligations in respect of any expense reimbursements or indemnities then due to the Agents.

**9.5**     <u>**Amendments and Waivers.**</u>

**A.     Amendment and Waivers.**   Neither this Agreement nor any provision hereof may be waived, amended or Modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Requisite Lenders; <u>provided</u> that no such waiver, amendment or Modification shall: (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan, without the prior written consent of each Lender directly adversely affected thereby, (ii) increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of such Lender, (iii) permit principal or interest payable with respect to the Loans to be paid other than in Cash; (iv) amend or modify the definition of "Pro Rata Share" or the pro rata requirements of <u>Section 2.11</u> without the prior written consent of all Lenders; (v) amend or modify the provisions contained in <u>subsection 7.1A</u>, <u>subsection 9.1A</u>, <u>Section 9.4</u> or this <u>Section 9.5</u> without the prior written consent of all Lenders; (vi) modify the protections afforded to an SPV pursuant to the provisions of <u>subsection 9.1G</u> without the written consent of such SPV or (vii) reduce the percentage contained in the definition of the term "Requisite Lenders" without the prior written consent of each Lender (it being understood that with the consent of the Requisite Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Requisite Lenders on substantially the same basis as the Commitments on the date hereof); provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent. For avoidance of doubt, it is understood and agreed by the Lenders that forbearance from the exercise of remedies or enforcement of the Obligations or any portion thereof requires only the written agreement of the Requisite Lenders and the Borrower.

Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

The Administrative Agent and the Borrower may amend any Loan Document to correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender.  Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

Any amendment, Modification, termination, waiver or consent effected in accordance with this <u>Section 9.5</u> shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by the Borrower, on the Borrower.

**B.      Non-Consenting Lenders.**   Each Lender grants (i) to the Administrative Agent the right to purchase all (but not less than all) of such Lender's Commitments and Loans owing to it and all of its rights and obligations hereunder and under the other Loan Documents, and (ii) to the Borrower the right to cause an assignment of all (but not less than all) of such Lender's Loans owing to it and all of its rights and obligations hereunder and under the other Loan Documents to Eligible Assignees, which right may be exercised by the Administrative Agent or the Borrower, as the case may be, if such Lender (a **"Non-Consenting Lender"**) refuses to execute any amendment, waiver or consent which requires the written consent of Lenders other than Requisite Lenders and to which the Requisite Lenders, the Administrative Agent and the Borrower have otherwise agreed; provided that such Non-Consenting Lender shall receive, in connection with such assignments, payment, in Cash, equal to the aggregate amount of outstanding Loans owed to such Lender (together with all accrued and unpaid interest, fees and other amounts (other than indemnities) owed to such Lender).   Each Lender agrees that if the Administrative Agent or the Borrower, as the case may be, exercises their option hereunder, it shall promptly execute and deliver all agreements and documentation necessary to effectuate such assignment as set forth in <u>Section 9.1</u>.   The Borrower shall be entitled (but not obligated) to execute and deliver such agreement and documentation on behalf of such Non-Consenting Lender and any such agreement and/or documentation so executed by the Borrower shall be effective for purposes of documenting an assignment pursuant to <u>Section 9.1</u>.

**9.6      <u>Independence of Covenants</u>.**

All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another such covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken or condition exists.

**9.7      <u>Notices</u>.**

Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

|  |  |
|---|---|
| If to Borrower: | Tamarack Resort LLC |
|  | 311 Village Drive, PMB 3026 |
|  | Tamarack, Idaho 83615 |
|  | Attn: Responsible Officer |
|  | Facsimile No.: (208) 634-4516 |
|  |  |
| with copies to: | Venable LLP |
|  | Rockefeller Center |
|  | 1270 Avenue of the Americas |

**TAMARACK DIP CREDIT AGREEMENT**

LA1 1887102v.9

**SIDLEY DRAFT – 10/8/10**

New York, New York  10020
Attention: Jorian L. Rose
Facsimile No.: (212) 307-5598

Millemann Pittenger McMahan & Pemberton LLP
706 North 1st Street
McCall, Idaho  83638
Attention: Steven J. Millemann, Esq.
Facsimile No.: (208) 634-4516

If to the Administrative Agent or
the Collateral Agent, or to Credit Suisse:

Credit Suisse AG
One Madison Avenue
New York, New York 10010
Attention: Agency Group
Facsimile No. (212) 322-2291
e-mail: agency.loanops@credit-suisse.com

with copies to:

Credit Suisse AG
Eleven Madison Avenue
New York, New York 10010
Attention:  [_____]
Facsimile No.  [_____]

Credit Suisse AG
Eleven Madison Avenue
New York, New York 10010
Attention:  Megan Kane
Facsimile No.  (917) 326-8227

Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Attention: Paul R. Walker
Facsimile No. (213) 896-6600

If to a Lender:

To its address (or fax number) set forth on Schedule 9.7 or in the Assignment and Assumption pursuant to which such Lender shall have become a party hereto.

The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article V,

**TAMARACK DIP CREDIT AGREEMENT**

Case 09-03911-TLM   Doc 353-2   Filed 10/09/10   Entered 10/09/10 12:10:07   Desc
Exhibit to proposed Order   Ex. A to Motion Doc. 322   Page 98 of 111

SIDLEY DRAFT – 10/8/10

including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Disbursement Request, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Loan (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "**Public Lender**").  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States federal and state securities laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents and (2) notification of changes in the terms of the Loans.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO BORROWER, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

**9.8     Survival of Representations, Warranties and Agreements.**

All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

Notwithstanding anything in this Agreement to the contrary, neither the Responsible Officer nor the Responsible Officer Representative nor any Related Parties of the Responsible Officer have any personal liability for any representations and/or warranties made by the Borrower pursuant to this Agreement or the other Loan Documents.

Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of the Borrower set forth in Sections 9.2, 9.3 and 9.18 and the agreements of the Lenders set forth in Sections 8.2, 8.3, 8.5, 9.2B, 9.2C, 9.2D, 9.3, 9.4 and 9.19 shall survive the payment of the Loans and the reimbursement of any amounts drawn or paid thereunder, and the termination of this Agreement.

92

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**9.9**   **Failure or Indulgence Not Waiver; Remedies Cumulative.**

No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**9.10**   **Marshalling; Payments Set Aside.**

Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of the Borrower or any other party or against or in payment of any or all of the Obligations. To the extent that the Borrower makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent or Collateral Agent for the benefit of the Lenders), or any Agent or the Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**9.11**   **Severability.**

In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**9.12**   **Obligations Several; Independent Nature of the Lenders' Rights.**

The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitments of any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**9.13**   **Maximum Amount.**

**A.**    It is the intention of the Borrower and the Lenders to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between the Borrower and the Lenders, whether now existing or hereafter arising and whether oral or written,

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to the Lenders as interest (whether or not designated as interest, and including any amount otherwise designated but deemed to constitute interest by a court of competent jurisdiction) hereunder or under the other Loan Documents or in any other agreement given to secure the Indebtedness or obligations of the Borrower to the Lenders, or in any other document evidencing, securing or pertaining to the Indebtedness evidenced hereby, exceed the maximum amount permissible under applicable usury or such other laws (the **"Maximum Amount"**).  If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the Maximum Amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount.  For the purposes of calculating the actual amount of interest paid and/or payable hereunder in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the Indebtedness of the Borrower evidenced hereby, outstanding from time to time shall, to the extent permitted by Applicable Law, be amortized, pro rated, allocated and spread from the date of disbursement of the proceeds of the Loans until payment in full of all of such Indebtedness, so that the actual rate of interest on account of such Indebtedness is uniform through the term hereof.  The terms and provisions of this Section shall control and supersede every other provision of all agreements between the Borrower and the Lenders.

      **B.**     If under any circumstances any Lender shall ever receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of the Loans and shall be treated as a voluntary prepayment under Section 2.4B(i) and shall be so applied in accordance with Section 2.4 hereof or if such excessive interest exceeds the unpaid balance of the Loans and any other Indebtedness of the Borrower in favor of such Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to the Borrower.

**9.14**    **Headings.**

      Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**9.15**    **Applicable Law.**

      **THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

**9.16**    **Successors and Assigns.**

      This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of the Lenders (it being understood that the Lenders' rights of assignment are subject to

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

Section 9.1).  Neither the Borrower's rights or obligations hereunder nor any interest therein may be assigned or delegated by the Borrower without the prior written consent of all Lenders.

**9.17    Consent to Jurisdiction and Service of Process.**

A.    EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE BORROWER, AGENTS AND LENDERS PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED, THAT AGENTS, LENDERS AND THE BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A UNITED STATES DISTRICT COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF AGENT.  BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND BORROWER HEREBY WAIVES ANY OBJECTION THAT THE BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

B.    SUBMISSION TO JURISDICTION AND VENUE.  NOTWITHSTANDING THE FOREGOING, WITH RESPECT TO CLAIMS OR DISPUTES BETWEEN OR AMONG LENDERS AND AGENTS ONLY, EACH OF THE AGENTS AND/OR LENDERS, AS APPLICABLE, IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF (i) THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES DISTRICT COURT SITTING IN NEW YORK CITY, AND (ii) ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT TO THE EXTENT SUCH COURTS WOULD HAVE SUBJECT MATTER JURISDICTION WITH RESPECT THERETO, AND EACH SUCH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN EITHER SUCH FEDERAL COURT.  EACH SUCH PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, OR THAT ITS

95

**TAMARACK DIP CREDIT AGREEMENT**

PROPERTY IS EXEMPT OR IMMUNE FROM ATTACHMENT OR EXECUTION. EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO ABOVE. EACH SUCH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

     **C.**    **Service of Process.**  Each party hereto irrevocably consents to service of process in the manner provided for notices in <u>Section 9.7</u>.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

**9.18**    <u>**Waiver of Jury Trial**</u>.

    **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**9.19**    <u>**Confidentiality**</u>.

    Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to it, its Affiliates and their respective partners, directors, officers, employees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential as provided herein), (b) to the extent requested by any regulatory authority (including any self regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 9.19</u>, to (i) any assignee or pledgee of or Participant in, or any prospective assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower (such consent not to be unreasonably withheld or delayed) or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.19 or (y) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than the Borrower or any of its Affiliates.

For purposes of this Section 9.19, **"Information"** means all written information received from the Borrower or any of its Subsidiaries or Affiliates relating to a Borrower or any of its Affiliates or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower, which to the extent received on or after the date hereof, is identified as confidential by the Borrower.  Any Person required to maintain the confidentiality of Information as provided in this Section 9.19 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**9.20**   **Time of the Essence.**  Time shall be of the essence with respect to all time periods and deadlines under this Agreement.

**9.21**   **Counterparts; Integration; Effectiveness; Electronic Execution.**

**A.**   **Counterparts; Integration; Effectiveness.**  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto required pursuant to Section 3, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**B.**   **Electronic Execution of Assignments.**   The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**9.22    Lender Action.**

Each Lender agrees that it has no standing to take or institute, and shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against the Borrower or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of the Borrower, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent and the Requisite Lenders in their sole discretion.  The provisions of this Section 9.22 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, the Borrower.

**9.23    USA Patriot Act Notification.**

The following notification is provided to the Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.

What this means for the Borrower:  When a Borrower opens an account, if the Borrower is an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, residential address, tax identification number, date of birth, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower, and, if the Borrower is not an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, tax identification number, business address, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower.  The Administrative Agent and the Lenders may also ask, if the Borrower is an individual, to see the Borrower's driver's license or other identifying documents, and, if the Borrower is not an individual, to see the Borrower's legal Organizational Documents or other identifying documents.

**9.24    Prepetition Credit Agreements.**

Borrower hereby acknowledges and agrees that (i) this Agreement is separate and distinct from each of the Prepetition Credit Agreements and (ii) that each of the Prepetition Credit Agreements is in full force and effect.  Borrower further acknowledges and agrees that by entering into this Agreement, none of the Prepetition Lenders nor any of the  Prepetition Agents waive any "Default" or "Event of Default" under (and as defined in) each of the Prepetition Credit Agreements.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWER:**

TAMARACK RESORT LLC,
a Delaware limited liability company


By:_____
        Name:
        Title:

99

**SIDLEY DRAFT – 10/8/10**

**AGENTS AND LENDERS:**

**AGENTS**:                    **CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH**,
individually as the Administrative Agent and Collateral Agent


By:    _____
       Name:
       Title:


By:    _____
       Name:
       Title:

**TAMARACK DIP CREDIT AGREEMENT**

**SIDLEY DRAFT – 10/8/10**

**LENDERS:**                    **CANDLEWOOD SPECIAL SITUATIONS**
                               **MASTER FUND LTD.**


By_____
     Name:
     Title:


**CREDIT SUISSE LOAN FUNDING LLC**


By_____
     Name:
     Title: Authorized Signatory


By_____
     Name:
     Title: Authorized Signatory


**AIRLIE CLO 2006-II LTD.**


By_____
     Name:
     Title:


**GSC RECOVERY III, L.P.**


By_____
     Name:
     Title:


**GSC RECOVERY III PARALLEL FUND, L.P.**


By_____
     Name:
     Title:

SIDLEY DRAFT – 10/8/10

**SCHEDULE 1.1(c)**
**Specific Milestone Requirements**

| <u>Specific Milestone Requirement</u> | <u>Specific Milestone Date</u> |
|---|---|
| 1. The Bankruptcy Court shall have entered the DIP Order. | Ten (10) days after the completion of the hearings thereon. |
| 2. The Bankruptcy Court shall have entered an order approving the appointment of the Responsible Officer consistent with the Responsible Officer Motion. | Prior to or concurrently with the entry of the DIP Order. |
| 3. Borrower shall have filed with the Bankruptcy Court a Sale Procedures Motion in accordance with the terms and conditions of <u>subsection 5.20B</u> of this Agreement. | Thirty (30) days after the Closing Date. |
| 4. Borrower shall have delivered to the Administrative Agent a Proposed Plan and Disclosure Statement. | Forty-five (45) days after the Closing Date. |
| 5. The Bankruptcy Court shall have entered an order approving the Sale Procedures Motion, in accordance with the terms and conditions of <u>subsection 5.20B</u> of this Agreement. | Forty-five (45) days after the Closing Date. |
| 6. Borrower shall have filed with the Bankruptcy Court a Conforming Plan and Disclosure Statement in accordance with <u>subsection 5.20C</u> of this Agreement. | Sixty (60) days after the Closing Date. |
| 7. The Bankruptcy Court shall have approved a Conforming Disclosure Statement. | Ninety (90) days after the Closing Date. |
| 8. The Bankruptcy Court shall have confirmed a Conforming Plan in accordance with the terms and conditions of <u>subsection 5.20C</u> of this | One hundred fifty (150) days after the Closing Date. |

| | |
|---|---|
| Agreement. | |
| 9.  The  Conforming  Plan  shall  have become effective. | Within thirty (30) days after the Bankruptcy Court has confirmed the Conforming Plan. |

**SIDLEY DRAFT – 10/8/10**

## SCHEDULE 2.1A
### Commitments

| Lender | Commitment Amount |
|---|---|
| CANDLEWOOD SPECIAL SITUATIONS MASTER FUND LTD. | $1,020,000.00 |
| CREDIT SUISSE LOAN FUNDING LLC | $843,499.00 |
| GSC RECOVERY III, L.P. | $50,948.00 |
| GSC RECOVERY III PARALLEL FUND, L.P. | $45,553.00 |
| AIRLIE CLO 2006-II LTD. | $40,000.00 |