# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 09-03911-TLM** |
| **TAMARACK RESORT, LLC,** | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

## INTRODUCTION

Pending before the Court are two motions in this chapter 11[1] case.  Both are filed by the chapter 11 debtor in possession[2] Tamarack Resort, LLC ("Tamarack").  Tamarack is a Delaware limited liability company organized for the purpose of developing and managing a master-planned, four-season ski and golf resort and real estate development in Valley County, Idaho (the "Resort").

The motions, both filed on September 25, 2010, are inter-related and co-dependent.  The first is a "Motion for Entry of Order (I) Authorizing Post-Petition Financing; (II) Authorizing the Debtor's Use of Cash Collateral; and (III) Granting

---

[1]  Unless otherwise indicated, all "chapter," "section," and other statutory references in this Decision are to the Bankruptcy Code, 11 U.S. Code §§ 101-1532 (the "Code").

[2]  A debtor in a chapter 11 case, unless supplanted by a trustee appointed under § 1104, is a "debtor in possession" and given many, though not all, of the powers of such a trustee.  *See* §§ 1101(1), 1107.

MEMORANDUM OF DECISION - 1

Adequate Protection."  Doc. No. 322 (the "§ 364 Motion").  The second is a

"Motion for Entry of an Order Approving the Appointment of Links Realty

Advisors, Inc., by and through Michael Fleischer, as Responsible Officer for the

Debtor Effective as of September 24, 2010."  Doc. No. 323 (the "Responsible

Officer Motion").

      The Motions drew numerous objections by creditors and parties in interest.

The Motions and objections were addressed in an evidentiary hearing held on

October 12 and 13, 2010, and taken under advisement.  This Decision resolves

them.  The Court concludes that the Motions are not well taken and were

inadequately supported by their proponents, and they will be denied.[3]

## BACKGROUND AND FACTS

      It has been stated, though in a different context, that "To understand how

we got where we are, it is necessary to understand where we were."[4]  So it is here.[5]

      Tamarack has for many years been engaged in the planning, development,

---

[3]  This Memorandum of Decision constitutes the Court's findings of fact and conclusions
of law.  Fed. R. Bankr. P. 7052, 9014.

[4]  Vern Countryman, *Scrambling to Define Bankruptcy Jurisdiction*, 22 HARV. J. ON
LEGIS. 1, 2 (1985) (quoted in *Marshall v. Stern (In re Marshall)*, 600 F.3d 1037, 1050 (9th Cir.
2010)).

[5]  This Court has presided over the present case since it was commenced as an
involuntary chapter 7 on December 11, 2009.  It also presided over two prior chapter 11 cases
related to Tamarack, as discussed below.  It takes notice of its files and records in all these cases
for purposes of providing this admittedly selective summary of the history of this matter.  It is
also noted that, though the background facts were not subject to evidence submitted at the
October, 2010, hearings, the parties all assumed they, and the Court, were familiar with them.

MEMORANDUM OF DECISION - 2

construction, and operation of the Resort, located near Donnelly, Idaho,

approximately 90 miles north of Boise.  The Resort is composed of a ski facility, a

golf course, numerous residential (home, cottage, condo) developments, a

conference facility, and commercial and retail facilities.  *See generally* Ex. 117

(masterplan map).  Tamarack does not own all of the 3,600+ acres of real property

comprising the Resort; a majority of the real estate is leased from the State of

Idaho.[6]  Though much has been accomplished, the Resort is only partially

complete.  For example, the "Village" complex is roughly 60% complete.[7]

In 2006, Tamarack obtained a loan in the principal amount of $250,000,000

from a syndicate of lenders for which Credit Suisse AG, Cayman Islands Branch

("Credit Suisse") is an "administrative agent" and a "collateral agent."[8]  Credit

Suisse took security in the Tamarack-owned and the leased land and other assets.

The obligation to Credit Suisse went into default, and negotiations ensued.

Tamarack, at one point, planned on refinancing this Credit Suisse debt, and other

---

[6]  In addition to land ownership by Tamarack and Tamarack-related entities (for convenience collectively referred to in this Decision as Tamarack) and the State of Idaho, many individuals have purchased and are now the owners of parcels within the overall Resort development.  Tamarack Municipal Association, Inc. ("TMA") has participated on behalf of its member homeowners.

[7]  Jean-Pierre Boespflug, manager and CEO of Tamarack, testified on October 12 that some $75,000,000 was spent in constructing this much of the Village, and that another $60,000,000 to $73,000,000 would be needed to complete it.

[8]  For simplicity's sake, the Court will at times refer to Credit Suisse alone, intending such reference to include recognition that it acts in such various roles for the lenders.

MEMORANDUM OF DECISION - 3

obligations, through a credit facility with Sociètè Gènèrale, though that refinancing fell apart in early 2008 just as it was scheduled to close due to this prospective lender's own serious financial problems.

On February 15, 2008, Cross Atlantic Real Estate, LLC, and VPG Investments, Inc., filed voluntary chapter 11 cases in this Court.[9]  Cross Atlantic and VPG were the limited liability company members of Tamarack, and were guarantors of Tamarack's debt to Credit Suisse.  These filings forestalled Credit Suisse's ability to take Cross Atlantic and VPG's membership rights in Tamarack, which had been pledged as collateral.[10]

Credit Suisse, in March, 2008, commenced an action in the District Court of the Fourth Judicial District, State of Idaho, for foreclosure, appointment of a receiver, and other relief, including adjudication of priorities of lien rights.[11]

On October 14, 2008, this Court entered a ruling dismissing the Cross Atlantic and VPG chapter 11 cases.  As the state court legal processes continued, a

---

[9]  *In re Cross Atlantic Real Estate, LLC.*, Case No. 08-00249-TLM; *In re VPG Investments, Inc.*, Case No. 08-00253-TLM.

[10]  Cross Atlantic is owned by Boespflug.  VPG is owned by Miguel Alfredo Afif. According to a pleading filed in the present case, Doc. No. 215, Tamarack is owned by Boespflug (18.5%), Cross Atlantic (32%), VPG (25.8%), Jerry Barnett (8.3%) and Richard Getty (8.3%).

[11]  *See* Case No. CV-08-114C (the "Foreclosure Action"), presided over by the Hon. Patrick H. Owen, Fourth Judicial District Judge.  Thereafter, dozens of other cases between and among Tamarack, Credit Suisse, and lien and other creditors have been consolidated into the Foreclosure Action.

MEMORANDUM OF DECISION - 4

receiver, Douglas Wilson, was appointed in late 2008, funded by Credit Suisse.[12]

The receivership terminated in mid-2009.

On December 11, 2009, an involuntary petition for chapter 7 bankruptcy relief was filed against Tamarack.  Doc. No. 1.  Tamarack answered and contested the Petition, and an evidentiary hearing was held on February 24, 2010.  On March 17, 2010, the Court entered a decision resolving numerous factual and legal issues presented in connection with the involuntary petition, and entered an order for relief against Tamarack under chapter 7.  Doc. Nos. 150, 151.

Prior to the entry of that order adjudicating Tamarack as a debtor under the Bankruptcy Code, the Court entered an oral ruling on January 15, 2010, and a related order on February 3, modifying and lifting the automatic stay of § 362(a) so that Judge Owen in the Foreclosure Action could "proceed to determine the validity, priority and amount (includ[ing] attorneys fees and costs) of any and all mortgages, liens, claims or interests regarding the Real Property, as to any party ... under applicable state law."  Doc. No. 101.  The State Court has diligently proceeded to hear and resolve a large number of complex and complicated disputes under Idaho state law, some of which are mentioned again below.  Litigation in the Foreclosure Action continues.

---

[12]  Counsel for Credit Suisse represented, in argument on October 13, that Credit Suisse had advanced over $12,000,000 through the receivership, an assertion Tamarack had echoed in a motion earlier in this case.  *See* Doc. No. 247 at 16–17.

MEMORANDUM OF DECISION - 5

After the March 17 order adjudicating Tamarack a chapter 7 debtor, Tamarack moved to convert this case to a chapter 11, which motion was granted on April 9, 2010.  Doc. No. 190.[13]

Following the conversion to chapter 11, Tamarack is responsible for performing all the duties and obligations imposed by the Bankruptcy Code, Bankruptcy Rules and case law on a debtor in possession (sometimes called "DIP").  In performing those duties, the responsible officer of Tamarack has been its CEO, Boespflug.  He and Tamarack have been assisted by counsel.[14]

Tamarack, in this chapter 11, has always had inadequate funds with which to operate, even on a skeletal basis.  An early motion for post-petition financing sought approval for Tamarack to borrow $530,000 from Boespflug, Afif, Barnett and Getty personally, noting that each was also a member of an Idaho limited liability company (Friends of Tamarack, LLC) that had previously provided some $10,000,000 of loans to Tamarack when other funding was unavailable.[15]

---

[13]  Some apparently interpret the conversion to chapter 11 as reflecting an evaluative decision by the Court as to the prospects for Tamarack's reorganization or the desirability of a chapter 11 rather than a chapter 7 liquidation.  That would be an erroneous view of the order.  Under § 706(a) and the case law, a debtor has an essentially absolute, one-time right to convert a chapter 7 to a chapter 11, and thus the order was here promptly entered on Tamarack's motion.

[14]  Randal J. French of Bauer & French, Boise, Idaho, is general counsel under § 327(a) (employment approval effective May 7, Doc. No. 275); Jorian Rose of Venable LLP, New York City, New York, is special counsel under § 327(e) (employment approval effective May 12, Doc. No. 276).

[15]  *See* Doc. No. 247.  That motion asserted that Tamarack had "been unable to obtain
(continued...)

MEMORANDUM OF DECISION - 6

This motion was never scheduled for hearing.  Credit Suisse subsequently filed a motion to prohibit use of cash collateral,[16] which resulted in motions by Tamarack seeking authority to use of cash collateral.[17]  *See* § 363(c).  Following hearings, an order was entered allowing Tamarack to use approximately $100,000 pursuant to an agreed budget, with such authorization expiring September 13, 2010.[18]

The post-petition authorizations sought and granted have concerned funding of only the most basic administrative functions.[19]  Nothing in these authorizations addressed a process by which Tamarack would either reorganize or liquidate, much less operate the Resort in the interim.

However, Tamarack did seek by an application filed in July, 2010, the

---

[15] (...continued)
financing of any nature since early 2008" and had exhausted other options to address illiquidity. *Id.* at 15.  The motion indicated that this proposed financing would be on a senior secured (priming) basis, carry a 1% loan fee and bear interest at 15% per annum and be paid upon asset sales but not later than March 31, 2011.  *Id.* at 5.  The motion indicated that Credit Suisse had proposed providing post-petition financing on "substantially more onerous terms."  *Id.* at 12–13.

[16]  Doc. No. 282.

[17]  Doc. Nos. 289, 290, 300.

[18]  Doc. No. 303.  That agreed use of funding was subject to certain conditions that could cause a termination of the granted authority before September 13.

[19]  The approved budget did not provide for, *inter alia*, payment of insurance, payment of land lease payments to the State of Idaho, or any winterization or maintenance on Resort facilities.  While the budget provided for payments to TMA and to the North Lake Recreational Sewer & Water District (the "District"), the full amounts of the post-petition accruing debts to TMA and the District were not funded.

MEMORANDUM OF DECISION - 7

judicial approval required under § 327(a) for its employment of CB Richard Ellis ("CBRE"), a real estate consulting and marketing firm, "to attempt to market [the Resort] as a going concern." Doc. No. 278. Credit Suisse objected to that request[20] as did the United States Trustee ("UST").[21] By agreement of those parties and Tamarack, two hearing dates set in September were vacated and the matter is presently set for a hearing on October 25. CBRE's employment by Tamarack remains unapproved.[22]

Tamarack also sought, and was granted, an extension of time through November 5, 2010, within which to assume under § 365 the State of Idaho land lease. Doc. Nos. 286, 287.

As noted, this history and context is important. However, the specific matters before the Court are only two: the § 364 Motion and the Responsible Officer Motion. These Motions must be evaluated on their specific terms, on the evidentiary record presented, and upon the requirements of the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules and case law that dictate whether they may be granted.

---

[20] Doc. Nos. 295, 296

[21] Doc. No. 310.

[22] Boespflug testified that, if the Responsible Officer Motion were granted, Links would have to determine whether to continue to pursue the approval of CBRE's employment or propose a different broker.

MEMORANDUM OF DECISION - 8

**The § 364 Motion**

On September 25, the § 364 Motion, Doc. No. 322, was filed. Tamarack noticed it for an October 12 evidentiary hearing.[23]

The § 364 Motion seeks authorization for Tamarack to borrow from an unidentified group of "DIP Lenders" the sum of $2,000,000, but indicates that "Candlewood Investment Group or its affiliates" will fund at least 51% and possibly as much as 100% of the amount. Credit Suisse is, again, the administrative agent and collateral agent for the DIP Lenders.[24] No specific DIP Lender appeared, nor testified, and Credit Suisse's long-standing counsel in this bankruptcy appeared simultaneously for Credit Suisse in its pre-petition capacity and for the DIP Lenders.

The Motion contained a summary of the proposed financing, *id.* at 5–11, noting that the terms were further explained in an attached "term sheet." The term sheet, *id.* at 46–65, suggested that the identity of the DIP Lenders was disclosed on a "schedule" thereto, but that schedule was blank. *Id.* at 66. No copy of a lending agreement was provided, and the term sheet, by its own language, indicated that it was incomplete, and did not contain all terms, provisions and conditions of the

---

[23]  Doc. Nos. 324, 325.

[24]  A verified statement of Boespflug included in the § 364 Motion asserted that Tamarack negotiated the terms of the proposed financing with the "DIP Agent" (*i.e.*, Credit Suisse) and the DIP Lenders. His testimony, however, suggested his involvement in negotiations was limited to interaction with Credit Suisse alone.

MEMORANDUM OF DECISION - 9

credit facility. It was, effectively, a September 24 draft.

Still, the same outlined a proposed financing arrangement that included the following features:

a) $2,000,000 in DIP financing secured by a first priority lien on all assets, senior to all pre-petition liens (a "priming lien"), and by a superpriority administrative expense claim;

b) the funds would be used to pay (I) the State of Idaho land lease that came due January 1, 2010, in the amount of $250,000 but was not paid; (II) costs and expenses for maintenance and preservation of Resort assets, but not for any "operations" other than such preservation; (III) marketing expenses; (IV) liability and casualty insurance premiums; (V) legal and accounting fees incurred by Tamarack; (VI) expenses of the DIP Lenders; and (VII) interest on the DIP Loan accruing at 15% per annum to the DIP Lenders;

c) the DIP financing would mature and be payable in 6 months from the closing date, or even earlier in the event of default;

d) a 1% "loan fee" would be paid the DIP Lenders from the DIP financing proceeds;

e) a $50,000 "administrative agency fee" would also be paid to the DIP Agent (Credit Suisse) from the DIP Loan proceeds;

MEMORANDUM OF DECISION - 10

f)      no portion of the DIP Loan proceeds nor any collateral[25] could be
used to challenge the validity, perfection, priority, extent or
enforceability of, or the security for, the DIP Loan, or the Credit
Suisse receivership claims, or Credit Suisse's pre-petition claims;[26]

g)      a carve out for some administrative expenses, specifically including
a "disposition fee," if necessary, to the Responsible Officer and
payments to the DIP Lenders;

h)      a closing date of October 29, 2010 for the DIP Loan subject to
satisfaction of all conditions to closing;

i)      conditions precedent to closing including (I) provision of an
acceptable 6-month budget; (II) retention of the Responsible Officer
by order acceptable to the DIP lenders, together with resignation of
Boespflug and Afif; and (III) entry of an order approving the DIP
Loan;[27]

---

[25] "Collateral" was later defined as a first priority security interest in virtually all pre-petition and all post-petition assets of Tamarack including all rights, claims and causes of action except those under certain specified sections of chapter 5 of the Code.

[26] The term sheet did indicate that, if an unsecured creditors committee was appointed, it could expend up to $10,000 in fees and expenses to "investigate" such claims against Credit Suisse and its underlying lenders ("as opposed to asserting a claim or challenge" to those claims) provided that such investigation conclude before the earlier of 60 days of the entry of a DIP financing order or 60 days after the date of appointment of such a committee. *Id.* at 49. The outside date for exercise of this $10,000 concession was later established as November 9, 2010. Doc. No. 353-2 at 37.

[27] The term sheet also provided that such order had to be entered within 10 days of the
(continued...)

MEMORANDUM OF DECISION - 11

j)      the requirement of the filing of a "sales procedure motion" with the Court within 30 days after the closing[28] which motion had to be acceptable in form and substance to the Credit Suisse Lenders, and the filing of a plan and disclosure statement within 60 days of closing similarly acceptable to Credit Suisse;[29]

k)      identification of numerous "events of default" including failure to meet any of the "milestones" or conditions to closing, failure to timely make any payments, and prohibition on Tamarack or any of its insiders or affiliates engaging in or supporting any challenge to or even investigation of claims against Credit Suisse as pre- or post-petition agent or against any of the DIP Lenders or the pre-petition lenders;

l)      a stay of litigation in United States District Court Case No. CV 08-

---

[27] (...continued)
conclusion of the hearing.

[28] This *post*-closing event could not be a condition *precedent* to closing, though seemingly so styled, and it was subsequently characterized as a post-closing "milestone" that, if unmet, would constitute a default.

[29] The plan filing date was also later characterized as a milestone rather than a condition of closing. Additionally, the term sheet required that such a plan had to waive and release any and all claims of Tamarack arising from or related to the Credit Suisse pre-petition claims, liens, priorities or actions, including waiver of any challenge to validity, enforceability or priority of its liens, including but not limited to any attempt to equitably subordinate or avoid such liens. The term sheet also contained a "negative covenant" that prohibited Tamarack from asserting or consenting to claims against the DIP Agent, DIP Lenders, Credit Suisse as pre-petition agent or the pre-petition Credit Suisse lenders under certain Code provisions or otherwise adverse to their interests.

MEMORANDUM OF DECISION - 12

139-S-EJL between Credit Suisse and Tamarack's guarantors, and a
stand-still agreement under which Credit Suisse would agree not to
bring other actions against the guarantors and the guarantors would
agree not to bring actions against Credit Suisse of the sort
immediately above described;

m)    Tamarack paying the expenses of the DIP Agent and the DIP
Lenders including their counsel, advisors, appraisers, agents,
internally allocated expenses, etc.;

n)    entry of a DIP Order consistent with all the foregoing and all other
terms of the DIP Loan;

o)    a replacement lien and security interest, and an administrative
expense, to the benefit of the Credit Suisse pre-petition lenders,
subject to the DIP Loan and carve out only, to provide adequate
protection to such pre-petition Credit Suisse lenders for any
diminution in value of their interests due to the priming lien in favor
of the DIP Lenders or the continuation of the automatic stay, or the
use of Tamarack's property or the lenders' collateral.[30]

There was no budget provided with the Motions explaining how the DIP
Loan proceeds could or would be used.

---

[30] The § 364 Motion proposed no similar adequate protection to any other creditors.

MEMORANDUM OF DECISION - 13

On September 27, Tamarack filed an addendum to the § 364 Motion, consisting of a one-page Sept. 2010 – March 2011 budget.[31]

On September 28, Tamarack filed another addendum to the § 364 Motion. Doc. No. 331.  This filing contained a more legible copy of the budget, and a copy of a letter agreement between Tamarack and Links Realty Advisors, Inc. ("Links"), discussed below.

Following numerous objections to the § 364 Motion and the Responsible Officer Motion, Tamarack filed, on Saturday, October 9, another addendum to the § 364 Motion, Doc. No. 353 (the "Saturday Addendum").  The Saturday Addendum provided:

a)      a "schedule" of the DIP Lenders, replacing the blank one from the prior term sheet.  This schedule disclosed five entities by name only[32] together with their respective "commitment amounts" totaling $2,000,000.  No information about any of the entities was ever provided.

b)      a 111-page draft of the DIP Credit Agreement.  This heretofore undisclosed document bore a notation that it was a "Sidley draft –

---

[31]  Doc. No. 327.

[32]  Candlewood Special Situations Master Fund Ltd.; Credit Suisse Loan Funding LLC; GSC Recovery III, LP; GSC Recovery III Parallel Fund, LP; and Airlie CLO 2006-II Ltd.

MEMORANDUM OF DECISION - 14

10/8/10."[33]

**The Responsible Officer Motion**

The Responsible Officer Motion is brought, according to Tamarack, under

§ 105(a) and § 1107 of the Code, and also pursuant to or under § 18-407 of the

Delaware Limited Liability Company Act.

This Motion asks that Links (by and through its principal, Michael

Fleischer) be the "responsible person (the 'Responsible Officer') to act as or on

behalf of the Debtor, effective as of the date of the filing of this Motion[.]"  It

suggests that the Responsible Officer will "act as the manager and governing body

for the Debtor in all respects, including to exercise any and all rights and powers of

the Members, the Directors, the Board of Directors, the Chief Executive Officer,

and all other Officers of the Debtor[.]"[34]

---

[33]  Credit Suisse's *pro hac vice* counsel in this case is the firm of Sidley Austin LLP in Los Angeles, California.

[34]  The Motion also indicates that the governing documents of Tamarack require a Board of Directors of not less than four nor more than eight directors.  (An excerpted page from what is alleged to be the governing document is attached to the Motion and so indicates, though it is but one of just a few selected pages provided from what is evidently a much longer document.)  The Motion asserts that two of Tamarack's directors "recently resigned" leaving only Boespflug and Afif.  Whether that was before or after the alleged "consent of a majority of the Debtor's Board and a majority of its members" to the appointment of Links as a Responsible Officer is not clear in the text of the Motion.  However, exhibits to the Motion reflect that Barnett and Getty resigned as directors before Boespflug and Afif entered into their "unanimous" consent as Board members to the appointment of Links.  Even if Boespflug, Cross Atlantic and VPG constituted a majority of the members of the Tamarack limited liability company, the attempted act of a two-member Board of Directors appears questionable under the entity's governing documents.

Additionally, in considering this point, the Court notes that an exhibit, Ex. 119, was
(continued...)

MEMORANDUM OF DECISION - 15

This Motion is clear that Boespflug and Afif agree to surrender and delegate to Links their powers to manage and control Tamarack, the DIP. *Id.* at 10. A list of duties to be assumed by Links is specified. *Id.* at 10–11 (para. 30). However, the employment is also subject to a proposed agreement or engagement letter with Links. That document was not provided with the Motion on September 25, but later provided with the September 28 addendum, Doc. No. 331.

The engagement letter reflects that Links' willingness to serve is conditioned upon the following occurring by October 30, 2010, unless Links agrees to an extension of that deadline:

    a)     provision of D&O insurance in amount acceptable to Links;

    b)     Court approval of Links' employment; and

    c)     funding of a DIP Loan adequate to fund the agreed compensation to be paid Links (more fully discussed below) on a current and ongoing basis.

The engagement letter also indicates that compensation is expected to be approved under § 328(a).[35] Links reserves the right to terminate services at any time if it is

_____

[34] (...continued)
marked by Tamarack for use at the October 12 hearing. It, like all of Tamarack's marked exhibits, was never offered by counsel and consequently never admitted into evidence. The only exhibits admitted at hearing on October 12 and 13 were Ex. 117 (Masterplan map, for illustrative purposes) and Ex. 800 (9/10–3/11 budget). *See* Doc. Nos. 361, 362 (minute entries).

[35] Section 328(a) deals with compensation payable to a "professional person" whose employment under § 327 is approved by the Court. Clarification of § 328 compensation, as opposed to § 330 compensation, of § 327 professionals is important in this Circuit. *See In re*
(continued...)

MEMORANDUM OF DECISION - 16

not timely paid.[36]  The agreement also terminates automatically six months from the first day of the first full month following execution, though Tamarack and Links could agree on successive 30-day extensions of the engagement, while reserving to either the ability to terminate without cause on 30-days' notice.[37]

The Motion also indicated that certain indemnity and exculpation provisions would be provided Links.  The later-provided engagement letter in Doc. No. 331 contained an "annex A" that set out the same.  *Id.* at 15–17.  Its provisions are broad.[38]

Links' compensation is to consist of:

a)      A $33,500 nonrefundable retainer, fully earned upon execution of the agreement and payable at closing of the DIP loan, though the amount would be credited against the "disposition fee" if skiing operations are not reopened;

b)      an initial (first) monthly fee of $67,000 and a set fee of $33,500 per

---

[35] (...continued)
*Circle K Corp.*, 279 F.3d 669 (9th Cir. 2002).  Tamarack, however, has not sought approval of Links' employment under § 327.

[36]  Fleischer expressly and candidly testified at hearing that he would exercise that right, and not work without the agreed payment.

[37]  The concept that "Tamarack" and Links would negotiate with one another in six months is illusory when Tamarack, under the engagement, would be controlled and managed by Links.

[38]  Fleischer also testified on October 13 that, without such provisions, he and his firm would be unwilling to serve.

MEMORANDUM OF DECISION - 17

month thereafter, payable in advance;

c)      a "disposition fee" in the event of a transfer or sale of the Resort

pursuant to an agreement entered into during Links' engagement (or

in the 12 months following termination of the engagement if the

agreement is with any person with whom Tamarack or Links had

contact within the engagement period regarding such a transaction),

calculated as follows:

i)      in a non-credit bid structure, 1% of the aggregate

Transaction Amount[39] minus an amount ("Creditable

Amount") calculated in reference to the number of

monthly payments made to Links; or

ii)     in a Credit Suisse credit bid scenario, $250,000 minus

the Creditable Amount; or

iii)    if a chapter 7 sale or a nonbankruptcy foreclosure sale,

$175,000;

d)      monthly reimbursement for all expenses;

e)      additional compensation, and expense reimbursement, for any post-

termination attendance at or participation in judicial proceedings

relating to the engagement.

---

[39]  This term is defined in a complicated, though expansive, way.  It includes all forms of
consideration, including deferred consideration.

MEMORANDUM OF DECISION - 18

On Monday, October 11, a legal holiday[40] and the day before the hearing was to commence, Tamarack filed yet another addendum.  Doc. No. 358.  It contained a "revised" retainer agreement between Tamarack and Links, to replace that attached to the September 28 addendum.  It also contained a proposed order approving the employment of Links.

**The Hearing**

Objections to both Motions were raised and asserted by the United States Trustee ("UST"); the District; Wells Fargo Bank (as trustee in connection with certain revenue bonds for a District LID); BAG Property Holdings, LLC; Banner/Sabey II, LLC; Tri-State Electric, Inc.; Scott Hedrick Construction; MHTN Architects, Inc.; EZA, P.C. dba Oz Architecture; and Quality Tile Roofing, Inc.

Tamarack's Motions were supported by Credit Suisse (in both pre- and post-petition capacities).  The Motions were also supported by TMA, and to a limited degree by the Unsecured Creditors Committee.[41]

Boespflug, CBRE broker Russell Johnson, and Fleischer testified.

---

[40]  *See* Fed. R. Bankr. P. 9006(a)(6)(A).

[41]  The Unsecured Creditors Committee filed an objection to the Motions noting a number of defects and problems, and expressly requesting that the Court deny the Motions.  Doc. No. 335.  It subsequently filed an "amended statement of support of, with qualification and limited objection to" the Motions.  Doc. No. 354.  At the October 12 hearing, its counsel effectively conceded the tepid nature of the support for the Motions, but explained that it was clear to the Committee that there was no recovery possible for unsecured creditors should the Motions be denied and, though any recovery were the Motions to be granted was similarly unlikely, they would support the Motions as a "Hail Mary" pass.  Counsel departed at the conclusion of the October 12 hearing without having examined witnesses, and did not attend the October 13 hearing.

MEMORANDUM OF DECISION - 19

**Boespflug**

Boespflug testified that the negotiations on possible DIP financing started with Credit Suisse in June, 2010. He indicated that another entity, from southern California, had earlier indicated during "serious discussions" an interest in providing a $3,000,000 DIP credit facility, but that it did not want to get into due diligence unless it knew that Credit Suisse was "on board" with such financing given Credit Suisse's position as the main lender. Boespflug testified that Credit Suisse did not go along with this proposal, and wanted to handle DIP financing itself.

Boespflug also testified in regard to the 6-month budget submitted in support of the Motion. Ex. 800.[42] In cross examination, Boespflug acknowledged several points:

a)  The "cash balance" shown in the budget as presently available (provided the ability to use cash collateral was extended beyond its present September 13 ending date) was inaccurate when compared to either his initial testimonial estimate or the amounts shown on Tamarack's monthly operating reports;

b)  The projected receipt of $69,000 in March, 2011, was not certain, as it reflected a claim against the State of Idaho in connection with a

---

[42]  Boespflug testified that the budget was prepared by Fleischer, with Boespflug's input.

MEMORANDUM OF DECISION - 20

reclamation bond that was in dispute;

c)    Though the budget did anticipate payment upon DIP Loan approval
of $250,000 to the State of Idaho, this would satisfy only the
principal amount of the unpaid 1/1/10 lease payment, with no
provision made for costs, fees or other charges, and that there was no
agreement with the State that it would accept such amount as
satisfying the obligation;[43]

d)    Some $200,000 to $260,000 of the budget (slightly more than 10%)
would be dedicated to maintenance, utilities, and winterizing the
property at the Resort,[44] while some 2/3 of the budget was earmarked
for legal fees and payments to Credit Suisse or the Responsible
Officer; and

e)    Only partial payments are projected to be made to the District and to
TMA on their ongoing, post-petition claims.

Boespflug additionally acknowledged that Tamarack had no ability to
generate cash.  And, while the negotiations with Credit Suisse for DIP financing

---

[43]    Additionally, as noted above, the lease with the State of Idaho is subject to a pending
November 3, 2010, deadline for assumption or rejection under § 365.  Doc. No. 287.  No
testimony was provided in connection with how Tamarack proposed to deal with that issue, or
how assumption, which requires both cure of defaults and adequate assurance of future
performance, would be effected.  Boespflug did acknowledge that the budget contained no
provision for payment of the 1/1/11 lease payment that would come due during the 6-month
period covered by the budget.

[44]    Boespflug testified that $30,000 to $40,000 would be required for winterization, and
the budget dedicated $50,000 to such efforts.

MEMORANDUM OF DECISION - 21

had started in the summer, the proposal put before the Court was prepared only in

late September, after the authority to use cash under the prior cash collateral order

had expired on September 13.  Lack of cash also meant no skiing operations, and

Boespflug acknowledged that there was no provision in the budget for renewal of

skiing at the Resort.

Boespflug indicated that there were three existing letters of intent ("LOI")

from interested buyers of the Resort, and another "mature interest" without LOI,

and perhaps five or six potentially interested parties.  However, some, and perhaps

all, of these parties would require Credit Suisse to discount its debt in order to go

forward with a purchase proposal.  Tamarack, according to Boespflug, has an idea

of what sort of "discount" by Credit Suisse would be a target, but no specific

number was disclosed in his testimony, and no indication given that there was any

agreement.[45]

Boespflug indicated that the number of lenders involved in the Credit

Suisse syndicate and the complexity of its loan structure complicated the situation,

including potential sale.  He admitted that the details of potential sale are

unformed, and that no draft sale motion has been prepared, even though it would

---

[45]  Boespflug also testified that the potential buyers had inquired about Credit Suisse's
ability to "credit bid" in the event of a sale process, an issue not addressed in the Motions.  He
stated that he conveyed to buyers what he understood to be Credit Suisse's position, which was
that it reserved the right to credit bid but might not exercise that right if there were a "reasonable
offer."  Specifics as to what might be a "reasonable offer" would help Tamarack's marketing
efforts, he testified, but had not been provided by Credit Suisse.

MEMORANDUM OF DECISION - 22

be required within 30 days of closing of the DIP financing.

Finally, Boespflug testified that he had wanted more than the $2,000,000 in DIP financing, and a financing period longer than 6 months, but was unsuccessful in getting those terms. He also stated that Fleischer was identified by Credit Suisse as the intended Responsible Officer, and that Tamarack did not consult with creditors other than Credit Suisse in connection with the Responsible Officer proposals.

### Johnson

Russell Johnson of CBRE testified regarding the efforts it has made on behalf of Tamarack over the past year. Charged with "making a market" for sale of the Resort, CBRE has attempted to develop and sustain interest from potential buyers. Such parties were advised that the Resort was a "$68,000,000 asset" – a figure CBRE developed with Tamarack. Johnson indicated, however, that the absence of any organized pathway to consummate a purchase has been a significant deterrent in ripening and sustaining the interest of possible buyers. Still, he stated, four very interested parties were developed, some having provided LOIs. The problem now facing CBRE and Tamarack, he said, is getting someone with the authority on behalf of Tamarack to negotiate a final deal, and having a process structured where such a deal could be consummated. He also testified

MEMORANDUM OF DECISION - 23

renewal of skiing was important,[46] and that, if skiing were to occur and if coupled with the potential of a certain sale process, the value of the Resort could be five to six times its liquidation value (often called "salvage" value). What that salvage value was thought to be was never explained.[47]

Johnson felt that the 6-month milestone for a sale motion was "tight" but, given knowledge developed by buyers over the prior year, might be achievable. The primary difficulty, in his view, was the absence of a clear and certain process by which a sale would occur and be closed.

### Fleischer

Much of Fleischer's testimony concerned his experience and qualifications to be a Responsible Officer,[48] and the proposed terms of his engagement which have been addressed above. He acknowledged that the Resort was a tough asset to sell, primarily because of the complexity of the project. But he felt that the time lines could be met, as there was general "market awareness" of the availability of

---

[46] Johnson felt that renewal of skiing operations was critical to the process, given the target group of potential purchasers and the segment of the population that they would need to appeal to were they to acquire the Resort. Fleischer, on the other hand, testified that renewed skiing might have some potential benefit, but would not be a necessity in marketing and selling the Resort.

[47] Boespflug had opined that, with skiing and a certain sale procedure, a sales price four to five times the "liquidation" value might be obtained, but he did not identify what the liquidation value was.

[48] In cross examination, he acknowledged that he had never been a Responsible Officer before, and also that he was not conversant with the role or duties of a chapter 11 trustee. His familiarity with the duties of a debtor in possession, and how those duties would be addressed if he were the sole officer as well as the Responsible Officer, were issues not fully addressed.

MEMORANDUM OF DECISION - 24

the Resort, even though the process of negotiation and closing of a sale was

unsettled.  He emphasized that buyers needed to have confidence in the authority

and ability of the person with whom they were negotiating, and that the removal of

Boespflug was critical to a successful marketing process.

Fleischer had dealt primarily with Credit Suisse and its underlying lenders,

but stated that he advised them he would insist on independence.  As noted above,

Fleischer confirmed several provisions of the engagement, including his position

that the compensation structure and indemnification provisions were essential.

These were the only witnesses.  As noted earlier, only two exhibits were

admitted.  That evidentiary record was closed.[49]  The disputed matters are

presented on that record, plus what is disclosed in or reflected by the several

pleadings the Court has outlined above, and on the legal arguments of counsel.

## DISCUSSION AND DISPOSITION

### A.    § 364 Motion

Tamarack's § 364 Motion specifically seeks authority under § 364(c) and

§ 364(d), characterizing its request as one for "secured superpriority financing."[50]

Section 364(c) provides that, if the trustee (here DIP) is unable to obtain

---

[49]  On October 14, Tamarack filed a "fourth addendum" and a "fifth addendum" to the § 364 Motion.  Doc. Nos. 363, 364.  These post-hearing submissions are untimely, the record before the Court having been closed.  Consideration of them, especially without the ability of adverse parties to evaluate and address them, would be improper.

[50]  The Motion also seeks authority to use cash collateral, *see* § 363(c), and proposes to provide adequate protection for that use to Credit Suisse.

MEMORANDUM OF DECISION - 25

unsecured credit allowable as an administrative expense under § 503(b)(1), the court may authorize obtaining of credit or incurring of debt (1) with priority over any or all administrative expenses, (2) secured by a lien on otherwise unencumbered property of the estate, or (3) secured by a junior lien on property.[51] Section 364(d)(1) provides that the Court may authorize the obtaining of credit or incurring of debt secured by a senior or equal lien on property that is already subject to a lien (a so-called "priming lien") but only if (A) the DIP cannot obtain credit otherwise, and (B) there is adequate protection of the interest of any holder of a lien on the property on which the proposed senior lien is to be granted.

The DIP has the burden of showing that it was unable to obtain financing other than on a superpriority or priming basis.  *See* §§ 364(c), (d)(1)(A).  It also has the burden of proof on adequate protection under § 364(d)(2).[52]

### 1.    Procedural deficiencies

Before considering whether Tamarack has met its burden under §§ 364(c) and (d), the Court first addresses the objecting parties' procedural objections to the Motions.

Bankruptcy Code provisions are implemented by the Bankruptcy Rules, and

---

[51]  *See generally* 3 Collier on Bankruptcy ¶ 364.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (hereafter "Collier").

[52]  *See generally* Collier at ¶ 364.05; *see also In re Utah 7000, LLC*, 2008 WL 2654919, at *1 (Bankr. D. Utah July 3, 2008) (noting burden on debtor to show a) inability to obtain credit otherwise; b) the transaction is within debtor's business judgment; and c) the interests of all primed lienholders are adequately protected).

MEMORANDUM OF DECISION - 26

Fed. R. Bankr. P. 4001(c) provides that a motion for authority to obtain credit "shall be accompanied by a copy of the credit agreement and a proposed form of order." Rule 4001(c)(1)(A). The motion, if over 5 pages in length, as it is here, must also contain a summary of the relief requested, and a summary of "all material provisions of the proposed credit agreement" together with setting out the location in the relevant document(s) of such provisions. Rule 4001(c)(1)(B). That Rule also lists eleven special provisions, any of which, if included in the borrowing, must be specifically identified and summarized, with their respective locations in the relevant document identified. *Id.* Hearing can commence no earlier than 14 days from the filing and service of the motion (except for emergency relief pending a final hearing, a situation not here presented).

In addition to these provisions of Rule 4001, this Court has enacted LBR 4001.1, which addresses use of cash collateral and obtaining post-petition credit. LBR 4001.1(b) specifies that a request under § 364 must, in addition to the disclosures required by Rule 4001: (1) identify the proposed "lender" and its relationship to the debtor; (2) explain the timing of funding; (3) be accompanied by a line-item budget; (4) provide information on the lender's pre-petition creditor status; (5) describe the collateral intended to secure the borrowing, with an assertion of that collateral's fair market value; (6) if any other entity has an interest in such collateral, identify the creditor and the balance owed such creditor and, if such creditor is to be subordinated or made junior to the lending, disclose whether

MEMORANDUM OF DECISION - 27

that creditor has consented and, if not, how it is to be adequately protected; and (7)

disclose whether the proposed financing will include any provision contained in

the "Guidelines Regarding Motions to Use Cash Collateral or to Obtain Credit"

which are other than provisions normally approved by the Court, clearly

identifying any such provisions.[53]

The § 364 Motion was filed and served on September 25 and hearing

noticed for October 12.  Doc. Nos. 322, 324, 325.[54]  As noted by several of the

objectors, and in the Court's findings above, the § 364 Motion lacked a copy of the

credit agreement as required by Rule 4001(c)(1)(A).  It contained instead a

"summary of preliminary terms and conditions" bearing a date of September 24,

which expressly indicated it was "intended as an outline of certain of the material

terms of a DIP loan" and did not include description of all terms and conditions.

Doc. No. 322 at 46.  That summary did not identify the DIP Lenders, as the

"schedule" was blank.  *Id.* at 66.  The "copy of the credit agreement" required

under Rule 4001(c)(1)(A) was not provided in any form until the Saturday

---

[53]  The Guidelines are contained in Appendix I to the Local Bankruptcy Rules, and note eight provisions normally approved and, under part (b) of that Appendix, twenty provisions that are normally not approved.  Appendix I notes that approval of any of the latter twenty provisions at a final hearing under § 364 and Rule 4001 "is dependent on adequate notice and cause having been shown.  Inclusion of any of these provisions will be scrutinized by the Court even in the absence of an objection by a party in interest."

[54]  The Motion was filed on a Saturday.  The fourteenth day thereafter fell on a weekend, and the following Monday, October 11, was a legal holiday.  Under Rule 9006(a)(1), October 12 was the first day (*i.e.*, "no earlier than 14 days") on which a hearing could properly be held under Rule 4001(c)(2).

MEMORANDUM OF DECISION - 28

Addendum filed on October 9.  Even then, it was not the final agreement, but a draft.

The Rule and Local Rule provisions just summarized recognize the seriousness of post-petition financing motions, and the special circumstances in which they arise.  Debtors often need access to credit in order to advance a reorganization, and often on emergent bases.  But creditors are entitled to know precisely what is being proposed and provided an opportunity to evaluate the facts, and legal sufficiency, of the request.  This is true for all creditors, and even more critical for those creditors whose liens are proposed to be primed under § 364(d).

Fourteen days is relatively little time for interested parties to digest and evaluate a proposed financing arrangement, especially where the financing is complicated, and the agreements governing the financing are long, dense and complicated.  Thus, the Rule requires significant disclosure, and the Local Rule requires additional focus on specific issues that commonly arise.

Tamarack's piece-meal disclosure, including its Saturday Addendum which provided for the first time a copy of the 111-page lending agreement, fails to accord with the intent and purpose of these Rules.  That last minute disclosure is *per se* unreasonable and objectionable.  These violations of the Rules are not, in this case, harmless or nonprejudicial.

Even overlooking the timing issue, the substance of the Motion and serial addenda, fails to provide what the law requires.  The identity of the DIP Lenders

MEMORANDUM OF DECISION - 29

Case 09-03911-TLM   Doc 366   Filed 10/19/10   Entered 10/19/10 10:46:33   Desc Main
Document   Page 30 of 41

was disclosed inadequately as well as late. The relationships between Credit Suisse's pre-petition lenders and the DIP Lenders is unclear. The pleadings fail to assert the fair market value of the collateral, and there is no disclosure of the fact that, as several objections have pointed out, Judge Owen has determined that some lienors have priority positions as to Credit Suisse. LBR 4001.1(b)(1), (3), (4), (5) and (6) are implicated.

In addition, the lending agreement, once it was disclosed, clearly contains provisions that fall within LBR 4001.1(b)(7), and require special disclosure.[55] The provisions found in part (b) of LBR Appendix I are clearly specified, and are available to parties as they draft proposed credit agreements.[56] They were promulgated by the Court based upon experience, and with the awareness that a DIP often lacks significant negotiating leverage and that creditors may be tempted to overreach. As one court has stated:

> Courts recognize that in connection with postpetition financing, lenders often exact favorable terms that may or may not have the effect of

---

[55] Many of those relate to special terms favoring Credit Suisse in plan treatment or litigation. These include provisions that bind the estate and all parties in interest with respect to the validity, perfection and amount of the Credit Suisse pre-petition debts; provisions that operate as a practical matter to limit or divest Tamarack of any discretion in the formulation of a plan or administration of the estate, or limit access to the court to seek any relief under applicable law; releases of potential pre-petition liabilities of Credit Suisse lenders, as well as releases of pre-petition and post-petition defenses and/or counterclaims; and provisions that waive causes of action. *See* LBR Appendix I at (b)(2), (9), (10), and (11).

[56] Tamarack was certainly aware of these provisions as its motion for financing in June, 2010, not only referred to Appendix I, *see* Doc. No. 247 at 6, but also stated that in unsuccessfully negotiating post-petition financing with Credit Suisse, Credit Suisse "sought to impose a variety of terms which [Tamarack] believed were overly burdensome, and which would likely have run afoul of BR 4001(c) and Local 4001.1," *id.* at 15.

MEMORANDUM OF DECISION - 30

causing harm to the estate and creditors. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992), citing *Ames Department Stores*, 115 B.R. [34 (Bankr. S.D. N.Y. 1990)] at 38; *In re Tenney Village Co., Inc.*, 104 B.R. 562, 567–570 (Bankr. D. N.H. 1989). As the court in *Defender Drug Stores* pointed out,

[w]hile certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender. Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest.

*In re Mid-State Raceway, Inc.*, 323 B.R. 40 (Bankr. N.D. N.Y. 2005). While Tamarack mentioned a few such provisions in the Motion, Doc. No. 322 at 16–17, not all were, and no required cross references to the credit agreement were made. *See* LBR 4001.1(b)(7); *see also* Rule 4001(c)(1)(B).

One of the substantive areas addressed by the objectors is the failure of the § 364 Motion to identify the fair market value of the collateral, which is a factor related in part to the adequacy of disclosure of how Tamarack proposes to provide adequate protection to affected creditors. *See* Rule 4001(c)(1)(B); LBR 4001.1(b)(5), (6)(B)(ii).[57]

---

[57] Adequate protection, when required under § 364, may be provided by cash payments or an additional or replacement lien, or other relief as will provide the affected creditor the indubitable equivalent of its interest. *See* § 361. Tamarack proposes no cash payments nor any replacement or additional liens to primed non-Credit Suisse creditors. Adequate protection is effectively premised on the value of the property, now and after DIP financing.

(continued...)

MEMORANDUM OF DECISION - 31

There is also no description of adequate protection proposed to be provided any creditor other than Credit Suisse. This is true even though the State Court in the Foreclosure Action has entered decisions addressing the lien priority of several non-Credit Suisse creditors who are proposed to be primed and are statutorily entitled to adequate protection.[58]

The Court could, as one creditor's counsel suggested in argument, summarily deny the § 364 Motion for the failures to comply in so many separate regards with applicable disclosure requirements and the balance of the Rules. However, in its discretion, the Court has also considered the substance of the disclosures, though untimely, and the evidence presented by Tamarack in its

---

[57] (...continued)
Collier at ¶ 364.05[1], states in pertinent part:

> The ability to prime an existing lien is extraordinary, and in addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide adequate protection for the interest of the holder of the existing lien or obtain such lien holder's consent. ...

> In most cases, adequate protection is provided by conditioning or limiting the borrowing in order to maintain a sufficient equity in the subject property to protect the existing lienholder. ...

> When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied absent the lien holder's consent. The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide additional protection for a new, postpetition lender.

[58] Credit Suisse acknowledged in argument what Banner/Sabey, BAG and the District alleged – that Judge Owen had entered decisions indicating priority of liens held by those creditors over the liens of Credit Suisse. That Credit Suisse intended on continuing litigation, or contested the amount of those creditors' priority liens, did not negate the requirement that Tamarack identify those creditors, propose adequate protection, and prove that the protection offered was indeed adequate.

MEMORANDUM OF DECISION - 32

attempt to meet the burdens placed on it by § 364(c), § 364(d) and the case law.

### 2.      Evidentiary deficiencies

Tamarack's allegation that it extensively investigated and explored financing options to the DIP Loan ultimately proposed and could not otherwise obtain credit was belied by the evidence. Not only was there inadequate proof of those efforts actually being made, Boespflug testified that there was a $3,000,000 DIP financing possibility that was lost because Credit Suisse wished to control the lending.

Similarly, Tamarack's assertion that the interests of the objecting creditors will be adequately protected is not supported by the evidence. The suggestion made by Tamarack as to "adequate protection" was not premised on the existence of an equity cushion (value over secured debt) as to any one or all creditors.[59] Rather, Tamarack essentially concedes that the value of the Resort will be grossly insufficient to secure the Credit Suisse pre-petition debts under the $250,000,000 facility, the receivership debts of $12,000,000 and the several other lien claims (whether prior to or junior to Credit Suisse).[60] Instead, Tamarack appears to

---

[59]   *Cf. Utah 7000, LLC*, 2008 WL 2654919, at *3–4 (rejecting an argument by Credit Suisse as agent for pre-petition lenders that the value to be used in evaluating adequate protection was a liquidation value and concluding, instead, that the court should determine value on a case-by-case basis, and also concluding that affirmative evidence of value presented in that case established an equity cushion sufficiently in excess of secured claims so as to provide adequate protection).

[60]   The schedules set forth secured creditors' claims totaling over $347,000,000 and another $5,000,000 in "unsecured" creditors, many of whom are noted as "lien claims." Doc. No.
(continued...)

contend that the value of the Resort, should the DIP Loan be approved, would be

sufficient to secure the DIP Lenders' $2,000,000 interest, as well as protect the

interests of those secured creditors with liens prior to the lien held by the Credit

Suisse pre-petition lenders.  The Motion, however, did not identify those

lienholders or specify the amount of those claims or the collateral therefore.  Thus,

the argument appears to be that the Credit Suisse pre-petition lenders, who have

consented to the DIP Loan (and who are also offered adequate protection), would

be the only secured creditors whose primed interests might be adversely affected.

The argument presumes there will be no value left in the Resort for any interests

junior to the Credit Suisse pre-petition lenders.

      Tamarack's evidence regarding the value of the Resort is unclear and

widely variable.  Tamarack asserted, in its bankruptcy schedules, that its real and

personal property together was worth just under $58,000,000.[61]  Such filed

schedules signed under penalty of perjury have some evidentiary effect[62] though

they are not conclusive.  CBRE was instructed to "make a market" for the Resort

at a value of $68,000,000 according to the testimony of its vice president, Russell

---

[60] (...continued)
213.

[61]  Doc. No. 213.

[62]  *See In re Martell*, 349 B.R. 233, 234 n.1 (Bankr. D. Idaho 2005) (assertions in a
debtor's schedules made under penalty of perjury may be considered by the court as evidentiary
admissions).

MEMORANDUM OF DECISION - 34

Johnson.[63]  Johnson, Boespflug and Fleischer were all quite circumspect in
discussing the ranges of potential values of the Resort reflected by letters of intent
or other expressions of buyer interest, given that there were confidentiality
agreements entered into with prospective buyers or bidders.  Though their
hesitancy was understandable, this left Tamarack with thin evidentiary bases for
suggesting the present value, or prospective sale value, of the Resort.

  Complicating this case is the complex nature of the Resort.  Several of the
objectors hold liens on properties that represent only portions of the entire Resort;
properties on which they performed labor or for which they furnished materials or
services.[64]  Yet, Tamarack provided no evidence as to the fair market values of
those separate properties.  Instead, the evidence, as unclear and variable as it was,
related to the value of the Resort as whole.  Thus, no evidence was presented to
show that, should a sale of the Resort as a whole not be accomplished, the non-
Credit Suisse primed creditors would nonetheless be protected to the same extent
they would be without approval of the DIP Loan.  It was Tamarack's burden to
present such evidence.  It did not.

---

[63]  During his testimony, Boespflug indicated another estimate of value would be "15
times" the $2,000,000 provided under the proposed DIP Loan.  However, the context of this
$30,000,000 "valuation" was rather vague and never clarified.

[64]  For example, Banner/Sabey asserts a mechanic's lien on the Village Plaza property, a
property upon which it performed labor or furnished materials as general contractor.  *See* Doc.
No. 340 and 341.  Similarly, EZA claims a mechanic's lien on the Village Plaza and the Trillium
Townhomes properties, Resort properties for which it provided architectural services.  *See* Doc.
No. 352.

MEMORANDUM OF DECISION - 35

On the evidence presented, the DIP Loan would appear headed for default. There is no sale process motion yet drafted, even though it is due 30 days after DIP Loan closing in order to avoid a default.  There is no Credit Suisse commitment to a discount or to how it would credit bid.  Boespflug testified only that the subjects had been raised, and that Credit Suisse suggested it would reserve the right to credit bid but perhaps waive that right if a "reasonable" offer were made, though what that amount might be is unknown to Tamarack.  Johnson and Fleischer both noted that the financial and legal situation at the Resort was complex, and that this complicated the creation of a sales structure.  That makes the short time frames even more problematic and, indeed, unrealistic at least on the evidence the parties presented.

The "milestones" are all weighty and on short fuses.  And, the requirements of a sales procedure motion and a plan and disclosure statement are not only time sensitive; the agreement Tamarack proposes gives Credit Suisse (in some capacity) approval authority over their terms.[65]  Not only is such control over the

_____

[65]  Milestone requirements are shown on schedule 1.1(c) on pages 109–110 of Doc. No. 353-2, part of the Saturday Addendum.  The sales procedures motion must be in accordance with § 5.20B of the agreement.  *Id.*  That section requires that the terms and conditions of the sales procedures motion be in form and substance acceptable to the "Requisite Lenders" in their sole discretion.  *Id.* at 70.  Requisite Lenders is defined as holders of more than 50% of the aggregate loan exposure of all "Lenders."  *Id.* at 28.  Lenders is defined by reference to the agreements "preamble," *see id.* at 21, and that preamble, *id.* at 8, refers to the (presently draft) signature pages.  The approach leaves ambiguous whether "Requisite Lenders" includes lenders in Credit Suisse's pre-petition syndicate as well as the so-called DIP Lenders, in large part because of inadequate disclosure of the identity and connections of the putative post-petition lenders.  In this regard, it is also noted that the milestones also include a "conforming plan" that meets § 5.20C of

(continued...)

MEMORANDUM OF DECISION - 36

DIP suspect, *see* LBR 4001.1(b)(7) and Appendix I at (b)(2), (9), (10), (11), it

suggests the likelihood of default is high.

Default under the proposed agreement gives Credit Suisse the benefit of the

priming loan.[66]  Default also defeats the theory advanced regarding adequate

protection for the non-Credit Suisse lien holders.  Their protection, it is argued,

comes from the likelihood of increased fair market value, and a protection against

loss of existing value, of the Resort should the DIP Loan be approved.  Default

could erase that alleged protection, and the higher the risk of default, the more

speculative the protection.  Credit Suisse's control over the sale and plan process,

and the short milestone deadlines, especially given the balance of the evidence as

to the complexity of sale and the lack of commitment of Credit Suisse to discount

or credit bid, make the risk of default high, and concomitantly reduce the

"adequacy" of the alleged protection.

It was Tamarack's burden to establish the adequate protection to non-Credit

Suisse lienholders proposed to be primed, and it did not meet that burden.

Even though DIP financing would have the potential benefit of providing

---

[65] (...continued)
the agreement, which section, *id.* at 70, includes a requirement of waiver and release of claims
(including but not limited to equitable subordination) against the Credit Suisse pre-petition
lenders.

[66]   The UST and Wells Fargo Bank cogently observed in argument that in return for a
short-term $2,000,000 in DIP financing, a very small percentage of what Credit Suisse already
has at stake, Credit Suisse potentially gains significant benefits whether Tamarack moved
forward with sale and a plan (on Credit Suisse-approved terms) or defaulted.

MEMORANDUM OF DECISION - 37

funds for winterization and for casualty and liability insurance (expenditures no one argued were unreasonable), and provided sums for a partial payment of amounts owed the State of Idaho under its lease, Tamarack had to show that the financing was properly structured, disclosed and supported by evidence. It did not.

All of the foregoing provides ample grounds for the denial of the § 364 Motion.

### B.      Responsible Officer Motion

The fact that the § 364 Motion is inextricably linked to the Responsible Officer Motion is additional justification for denial.[67]

Tamarack suggests the appointment of a Responsible Officer is proper under § 105(a) and § 1107.[68] Recognizing these provisions do not directly provide authority for the relief sought in the Motion, Tamarack cites *Matter of Gaslight Club, Inc.*, 782 F.2d 767 (7th Cir. 1986), and *In re Boileau*, 736 F.2d 503 (9th Cir. 1984), as "implicitly" approving its approach. Neither case offers persuasive support. They are distinguishable and, at best, limited to their facts, and they do

---

[67] That linkage is Tamarack's and Credit Suisse's. *See*, *e.g.*, Responsible Officer Motion, Doc. No. 323 at 2 n.1; § 364 Motion, Doc. No. 322 at 2.

[68] Section 1107(a) defines generally the powers of a DIP. Section 105(a) grants the Court the power to enter any order "that is necessary or appropriate to carry out the provisions of [the Code]." Despite the breadth of § 105(a), it may not be used to create new rights or remedies but, rather, is designed to allow for implementation or enforcement of other Code provisions. *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002); *S & C Home Loans, Inc. v. Farr (In re Farr)*, 278 B.R. 171, 179 (9th Cir. BAP) (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

MEMORANDUM OF DECISION - 38

not provide the sort of broad pronouncement of power under § 1107 and § 105

that Tamarack suggests.

The term "corporate restructuring officer" (or "CRO") has been used in

reorganization practice.  It often refers to those hired by financially distressed

businesses before, and as a way to avoid, bankruptcy.  However, it is not so easily

transported into the post-bankruptcy context.  As noted in *In re Kobra Props.*, 406

B.R. 396 (Bankr. E.D. Cal. 2009):

> At the outset of the case, the debtors in possession proposed hiring
> a "chief restructuring officer" (CRO) in an effort to defuse fear and
> loathing by various banks regarding self-dealing and lack of
> transparency.  This elicited skepticism because of the vagueness of the
> CRO concept in the context of chapter 11 (as opposed to the
> turnaround and workout environment) and the inability to articulate
> whether and to whom a CRO would owe fiduciary and loyalty duties
> and how those duties would contrast with the duties of a chapter 11
> trustee.  The initial CRO request was withdrawn.
>
> When, months later, the debtors in possession revived their CRO
> proposal in the face of persistent cash collateral issues, the denouement
> was agreement that the proposed CRO could be appointed as chapter
> 11 trustee.

406 B.R. at 400–01.  And in *In re Blue Stone Real Estate, Constr. & Dev. Corp.*,

392 B.R. 897 (Bankr. M.D. Fla 2008), the court rejected an attempt to use § 363 as

support for employment of a CRO because it avoided the analysis required under

§ 327(a), which governs the estate's employment of a professional.  392 B.R. at

906–07.

Employment of Links under 327(a) is not, however, what the Responsible

Officer Motion advocates.  It doesn't attempt to comply with the requirements for

MEMORANDUM OF DECISION - 39

approval of employment under § 327 and related authority.[69]  It suggests, instead,

that the Responsible Officer be the sole and only management authority for the

DIP.  Boespflug and Afif would, under the Motion, be gone; no one else with any

authority would be left to supervise and direct the performance of the duties of

DIP, other than Links.

The point is not whether Links has the skill and expertise to be a

Responsible Officer or even a CRO outside bankruptcy.  Here, it is that the

proposed Responsible Officer would assume and perform some, but not all, of

Tamarack's DIP duties.[70]  That would leave a vacuum in this chapter 11.  All

creditors are entitled to a DIP bound to the full performance and accountability

required by the Code.  Exclusion of DIP duties, coupled with the proposed

indemnification, exposes the estate and its creditors.

Chapter 11 is a flexible process.  It tolerates DIPs, chapter 11 trustees,

examiners, and a host of potential professionals.  Tamarack has not persuaded the

Court that it tolerates, under the alleged aegis of § 1107 and § 105, a Responsible

Officer on the specific terms here proposed, and the facts established by the

---

[69]  Fleischer did file what purports to be a Rule 2014(a) statement, *see* Doc. No. 323 at Ex. C, which is odd because that Rule applies to § 327 employment proposals, which is not what the Responsible Officer Motion advocates.

[70]  This is true notwithstanding the statement in the Motion that the Responsible Officer be appointed "to act as and on behalf of the Debtor as a debtor in possession in all respects." *See* Doc. No. 323 at 5.  The balance of the Motion and submissions does not support the allegation that Links is assuming all the responsibilities and obligations that would entail, nor did Fleischer's testimony (which *inter alia* indicated he would terminate the engagement absent payment or indemnification).

MEMORANDUM OF DECISION - 40

evidence.

**CONCLUSION**

This is not about the desirability of a ski season at Tamarack in 2010.   Nor

is it about what ultimate result (reorganization, sale, or other) would best serve the

area or its residents.  Nor is it an invitation to dictate by judicial fiat a perceived

better approach to sale of the Resort and satisfaction of the competing interests of

all creditors and other parties.

At bottom, it is a question of whether *this* specific financial and

management proposal, made by Tamarack and supported by Credit Suisse, meets

the standards that federal law imposes as a condition of its granting.  It does not.

The objections of the UST, the District, Wells Fargo Bank, Banner/Sabey,

BAG, EZA and the others joining therewith are well taken and will be sustained.

The Motions will be denied.  The Court will enter such an order.

DATED: October 19, 2010

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 41