Randal J. French
BAUER & FRENCH
1501 Tyrell Lane
Post Office Box 2730
Boise, Idaho 83701-2730
Telephone (208) 383-0090
Facsimile 383-0412
E-Mail rfrench@bauerandfrench.com
  ISB No. 3032

Attorneys for Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Bkr. Case No. 09-03911-TLM |
| TAMARACK RESORT, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376

COMES NOW Tamarack Resort, LLC, by and through its counsel of record, Randal J. French of the firm of Bauer & French, and moves this Court for an order denying CS' Motion to Convert or Dismiss the pending case, for the reasons stated below. Banner-Sabey II and TMG/DP Miller LLC JV have filed their joinder in the CS Motion to Convert but Opposition to CS' Motion to Dismiss.

CS is acting as agent for certain "Pre-petition Lenders" which loaned $250 million on or about May 19, 2006. See Proof of Claim No. 134, and attached documents. Upon information and belief, CS is also one of the members of that syndicate.

CS also acts as agent for the "Receivership Lenders." See Proof of Claim No. 134, and attached documents. These lenders have a lien, senior to that of the Pre-Petition Lenders, but not any other lienholders who are determined by the state court to have a lien senior to either the Pre-petition Lenders or the Receivership Lenders, on all of the same collateral as the Pre-petition Lenders. The interests of the Receivership Lenders therefore are at odds with the Pre-Petition

Lenders, in that a sale that would pay off the Receivership Lenders in full might pay little or nothing on the claims of the Pre-petition Lenders.

To know where we are and where we may go next, we must know where we have been and how we got here.  Memorandum of Decision, entered October 19, 2010, Doc. 366, p. 2.

In May, 2006, the CS original syndicate members made a $250 million loan to Tamarack, one of seven unfortunate, and unfortunately timed, loans to resorts that made CS significant loan fees.  All of those resorts defaulted and filed some form of bankruptcy protection.

As to Tamarack, CS filed a complaint seeking foreclosure and appointment of a receiver on or about March 11, 2008.  At CS' request, Douglas P. Wilson was appointed receiver in the state court by that Fourth Order [Proposed] Order Appointing a Receiver, entered on or about October 17, 2008.

That receivership came to an end on July 7, 2009, when an Order Re: Termination of Receivership, Discharge of Receiver, and Related Matters was entered in the State Court. Presumably, the purpose of the Receiver was to operate the resort at least to some extent while the Receiver arranged for a sale.

Over the course of the receivership, the Receiver borrowed and spent $12,162,810.00, with CS' knowledge, consent and active support, to maintain the facility and to pay the receiver. The Receivership ended in abject failure when CS pulled the plug and refused to fund the receivership further.  The Receiver was not able to arrange a sale satisfactory to the interested parties.

For a period of time from April, 2008 until July, 2008, Jean-Pierre Boespflug, CEO of Tamarack, and other equity owners of Tamarack, contributed money to an entity - Friends of Tamarack, LLC - that Mr. Boespflug started specifically for the purpose of befriending and financially supporting Tamarack.  Friends of Tamarack filed its Proof of Claim No. 138 on September 1, 2010, for $7,861,033.50.  Mr. Boespflug and his wife, personally, are also creditors of Tamarack Resort, having filed Claim No. 139 on September 1, 2010 for $875,000.

OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376, p. 2

Certain creditors filed an involuntary petition against Tamarack Resort, LLC on or about December 11, 2009.  This Court ultimately entered its order granting relief on the involuntary petition on or about March 19, 2010.  Doc. 157.  The petitioning creditors avowed goal is to use the bankruptcy court to pursue claims of equitable subordination claims against Credit Suisse, which they assert are only available in the bankruptcy court.  Those claims have not been adjudicated.  So far as Tamarack knows, litigation to address the equitable subordination claims has not commenced.

Tamarack moved to convert its case to Chapter 11 on April 9, 2010.  Doc.  187.  On April 11, 2010, this Court entered its order converting this case to chapter 11.  Doc. 190.

Tamarack spent over four months since the motion to convert, looking for alternative financing and negotiating financing with a subset of the Prepetition Lenders led by CS.  During that process, CS informed Tamarack it would not agree to any sale process, and would not negotiate the terms of any potential sale, or with any buyer, until new management was installed.  Given Tamarack's need for capital to fund such a process, Tamarack agreed to put the sale process on "hold" until the DIP loan and new management was approved.  Ultimately, the DIP loan and new management was not approved as proposed.

Since the filing of the motion to convert or dismiss, Tamarack has filed its Motion to Approve Use, Lease and Sublease of Property of the Estate and Compromise of Potential Claims.  Doc. 426, and supporting memorandum, Doc. 427.  Presumably this resolves the issues which were of concern to CS, and it should withdraw its Motion to Convert.  It is surely contradictory to enter into a consent that provides for the operation of the ski lifts and ski hill, and which provides for the payment and provision of insurance and still complain that the operations and insurance that CS consented to is inadequate.  Furthermore, CS has been kept informed of potential buyers as they have come up.  CS is aware of an offer made November 22, 2010, in a press conference at the Cottonwood Grill in Boise, Idaho.  With ever more seriously interested parties coming to the table, CS cannot seriously complain that Tamarack's efforts to sell the resort for the maximum possible value is not leading to results.

OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376, p. 3

CS put in place a receiver in state court and funded that receiver for almost nine months, at a cost of over $12 million, with no successful resolution. CS organized a third CS syndicate to provide DIP Financing, but insisted on milestones which the Court found overreaching and onerous.

CS, having failed to control the process through the DIP financing, now seeks to convert or dismiss the chapter 11 case, only to give CS more control over Tamarack's assets, at the expense of every other creditor involved in the process. CS will, if allowed, stop all progress towards a sale and starve out every other lienholder or creditor who might otherwise receive a benefit from the reorganization process. CS complaints about a loss of $18,000 on a resort that should sell for tens of millions of dollars? CS complaint about insurance and then consents to the operation of the ski hill that specifically addresses the insurance to be provided? CS asserts that the very financial reports that it was willing to rely on in lending $2 million dollars are now either deficient, misleading or fraudulent? CS complains in November about a payment Tamarack made to West Mountain Golf that CS learned about in June, that was designed to avoid a loss in sales price that might have amounted to millions?

## THE MOTION TO DISMISS APPEARS TO BE DOA

CS seeks, as an alternative, the dismissal of this case. It seems beyond comprehension, given the facts of this case, that this Court would dismiss this case. CS tied up the Debtor for over four months negotiating at an incredibly slow pace, all the while insisting that the Debtor not advance the sale process.

Tamarack vehemently opposed the involuntary petition that was filed December 11, 2009. Doc. 1. This Court carefully considered the merits of the petition, the evidence presented and the arguments made. It ruled against Tamarack's opposition to the involuntary petition. Doc. 150, 157. The time to appeal, Bankruptcy Rule 8002, to seek a new trial, or to seek to alter or amend a judgement, Rule 9023, or to seek relief from the judgment, Rule 9024, has long run.

CS' request for dismissal is curious at best. CS does not suggest that the Court's finding and conclusions made in its Memorandum of Decision entered March 17, 2010, Doc. 150 and

Order Granting Relief, entered March 19, 2010, Doc. 157, should be revisited.  CS does not

suggest that the creditors who sought the involuntary petition, specifically to sue CS on a theory

of equitable subordination, have changed their minds.  There is nothing that suggests that, in the

event of dismissal, the same creditors would not seek the entry of another involuntary petition.

CS does not seek dismissal under §305.

Under the circumstances, CS' request for dismissal seems to be unfounded and with no

analysis of what this Court has done previously.  Tamarack's only hope to sell the resort as a

going concern, and to maximize its value, is through a sale within the confines of chapter 11.

CS' request for dismissal seems to be ill-conceived and without consideration of the best

interests of the estate and creditors generally.

### CONVERSION GIVES EACH LIENHOLDER VETO POWER OVER THE DISPOSITION OF ALL ASSETS

CS is seeking to extend its control over the estate, to the detriment of the estate and

creditors.  CS knows, because its counsel argued the losing position, that a chapter 7 trustee will

not be able to sell a single asset without the consent of all lienholders.  The Ninth Circuit BAP

has ruled that a sale under 11 U.S.C. §363 can be made, and can be final, but cannot strip the

liens of lienholders without their consent.  See Clear Channel Outdoor, Inc. v. Knupfer (In re

PW, LLC) 391 B.R. 25 (9th Cir. BAP 2008).  Accord In re Gulf Coast Oil Corp., 404 B.R. 407

(Bankr. S.D. Tex. 2009)(rejecting proposed sale in the absence of compliance with chapter11

plan protections); cf. In re Jolan, Inc., 403 B.R. 866 (Bankr. W.D. Wash. 2009)(denying §363

sale motion, but stating that on the facts of that case, it would approve an auction).

Under Clear Channel, any lienholder can prevent the stripping of its junior lien, thereby

preventing the sale of any asset free and clear of liens, and here, the resort as a whole, by not

consenting to the proposed sale.  That gives any one lienholder veto power over any sale.  A

chapter 7 trustee cannot sell the assets of Tamarack without unanimous consent of lienholders.

CS has refused to make any commitment to allow the sale of any assets free and clear of its lien.

CS has given no commitment to approval of a sale in a chapter 7 case.  Any suggestion that CS

would at any time consent to such a sale free and clear of its lien is wholly speculative and entirely wishful thinking, and unlikely given past events.  If CS was willing to do so, it is unclear why CS would not have moved for a chapter 11 trustee.

CS asserts that liquidation of Tamarack's assets "is the only reasonable course for this case to take and it can be done more cheaply and efficiently by a chapter 7 trustee, or by the State Court in the Foreclosure action, than by the Debtor in this Chapter 11 case."  Credit Suisse AG's Motion to Convert, pp. 9-10.  It advances no analysis of how this might be.  In fact, the Debtor can use any and every means that would be available to a chapter 7 trustee or in the state court.

Tamarack can advance a sale through a chapter 11 plan confirmation process over the objection of any single creditor, such as CS, which seeks to control the sales process to its own advantage and to the disadvantage of creditors who are unable to litigate to the extent of a larger creditor.  It can do so by proposing a sale, through a plan if necessary, obtaining at least one class of creditors to vote for confirmation, and then cramming down on any dissenting creditors. Tamarack would need only persuade any one class of lienholders, each of which have their own separate class, to vote for a sale.  Then, Tamarack need only satisfy §1129(b).

Banner-Sabey II and TMG/DP Miller, LLC JV have stated no reason to believe that CS will cooperate to achieve a sale through chapter 7.  This Court should require a meaningful commitment to that end or should conclude that conversion to chapter 7 means no sale will occur in chapter 7 and the state court lien foreclosure process will result in a sale piece-meal of the estate assets, to the detriment of the estate and all creditors.

Banner-Sabey II and TMG/DP Miller, LLC JV have joined in the CS Motion to Convert, but oppose dismissal.  TMG/DP Miller has filed its joinder in Banner-Sabey's position, without further analysis.

Banner-Sabey argues that conversion to chapter 7 will allow a chapter 7 trustee to sell the assets as a going concern.  It provides no analysis of Section 363, Clear Channel, or whether such a sale could occur in the absence of the resources that will not be available under chapter 7.

Its position is based upon an assertion that a chapter 7 sales procedure, using only

Section 363(f), would allow a sale of the assets.  Banner-Sabey Memorandum, Doc. 417, p. 3 of

8.  That assertion is demonstrably false.  As Clear Channel stated,

> if the Trustee's and DB's interpretation were accepted, paragraph (5) would
> swallow and render superfluous paragraph (3), a provision directed specifically at
> liens.  The specific provisions of paragraph (3) would never need to be used, since
> all liens would be covered, regardless of any negative or positive relationship
> between the value of a creditor's collateral and the amount of its claim.  A result
> that makes one of five paragraphs redundant should be avoided.

391 B.R. at 45.  CS has continually expressed concern that Clear Channel would prevent a sale

through any process other than a sale through a plan confirmation.

Banner-Sabey recognizes the harm that comes from a piece-meal sale of Tamarack's

assets when there is no bankruptcy approved sale process.  Id. Banner-Sabey's support of

conversion should be considered in light of its erroneous view of the results of its position, and

the impact on all other creditors and the estate.

## THE MERITS OF CS' POSITION

CS seeks either dismissal of the case entirely, or conversion to chapter 7.  Either is a

conclusive resolution of the case.  Should there be a determination later that chapter 7 spells an

end to any effort to sell the resort as an operating entity, the estate and its creditors will have

irrevocably lost the opportunity to realize the going concern value of this resort sold as an

integral master planned community.

Tamarack has operated on a lean budget, maintaining its facilities and pursuing the sale

of its four season destination resort as a going concern.  That is no small undertaking.  The value

of Tamarack's assets is significant, even in this depressed market.  The cost to complete the

construction that has been started is significant.  This is not the sale of a single family residence

or even a single commercial building.  This is a sale of a complex, multi-faceted resort operation

which will require a buyer with specific qualifications and significant resources.

Tamarack assets consist of an approximately 3,608 acre luxury resort ("Resort") comprised of certain real estate, owned and leased, with improvements and fixtures, and certain equipment and other personal property, some owned and some leased.

The leased real estate includes Commercial Lease No. M-5042 dated June 11, 2002 for the lease of 2,124 acres of state-owned land between the State of Idaho, acting by and through the State Board of Land Commissioners ("State"), and WestRock Associates, LLC, currently known as Tamarack Resort, LLC ("Tamarack") as amended (the "Commercial Lease Agreement"); that certain Landlord Estoppel and Agreement dated as of May 15, 2006, between the State and Credit Suisse, Cayman Islands Branch ("Credit Suisse"), as collateral agent for certain lenders (the "Estoppel Agreement"); and that certain Subordination, Attornment and Non-Disturbance Agreement between Tamarack, Credit Suisse, and the State (the "SNDA") plus expansion options for up to an additional 5,000 acres. That lease is a twenty-five (25) year lease, with an option to renew or extend. The State of Idaho has graciously agreed to extend the time for Tamarack to assume or reject that lease until June 30, 2011. See Second Stipulated Motion to Extend Time to Assume or Reject Unexpired Lease, Doc. 424, filed November 19, 2010.

The owned real estate includes approximately 1,484 acres that are owned in fee simple with entitlements for development of a luxury residential, commercial, hospitality and recreational community in Tamarack, Idaho, including

   (i) entitlements for 2,041 dwelling units and 300,000 square feet of commercial space;
   (ii) all related ski, hotel, lodging, lake, marina and recreational amenities, easements, appurtenances, water, development and mineral rights and entitlements;
   (iii) all infrastructure and vertical improvements, including private roads, fee or leasehold title to ski lifts free and clear of any liens and encumbrances, partially completed buildings and improvements and all water, sewer, storm drain, gas, electricity, telephone, fiber optics, waste disposal and information, technology and communication infrastructure, equipment and systems;
   (iv) all furniture, fixtures and equipment including snow cats, snow-making equipment and systems, trucks, vehicles, including all equipment, fixtures and vehicles described on Exhibit A;
   (v) all personal property and inventory;
   (vi) all intellectual property, including all copyrights, trade and service names and marks, all data bases, computer systems and software, marketing information and material, digital and electronic photographs, plans and surveys, customer lists, and copies of all prior contracts, escrow agreements and closing statements for the sale of condominium units;

(vii) all plans, specifications, warranties, contract rights and general intangibles related to or necessary for the use, operation, management, development, marketing, sale or leasing of the Resort.

The real estate includes seven building in Village Plaza, 21 cabins and the Mid Mountain Restaurant that are in various stages of completion.  It includes the Canoe Grill Building, the Sports Dome Building, and the Ski Area Maintenance Facility.  It also includes five buildings for public use (Canoe Grill, Sports Dome, Seven Devils Pub, Children Center, Market Dome), and 11 operations and maintenance buildings, including the Ski Maintenance Building, the Mountain Control building, the Patrol Headquarters, the Operation Dome, six modular buildings and a warehouse in Donnelly.  Tamarack also owns one completed condominium, four completed cabins, and 12 fully platted and amenitized lots.  The estate also owns bare land, not as advanced in development, but with substantial future value.

The equipment is substantial and varied as is identified on Schedule B of the Debtor's schedules.  Tamarack has over $3,000,000 in personal property that it owns, and additional leased equipment, including two ski lifts which Tamarack values at $3,500,000 and BALC, the Lessor of those ski lifts, may value at more.  Tamarack owns five chairlifts (the Tamarack Express, Summit Express, Discovery, Poma and Magic Carpet), the TechnoAlpin Snowmaking System and numerous snow groomers and various and sundry items of equipment necessary and appropriate for a four season destination resort.

Any sale of the resort as a functioning resort will require significant expertise in addressing the transfer of leases, the addressing of environmental issues, the assignment of insurance polices, tax issues, and other matters that are common to transactions of this magnitude.

Assuming that the purpose of a receiver was to negotiate such a sale, CS's chosen receiver was unable to accomplish that goal on a budget of $12 million over almost nine months. In eight months, on a budget of about $172,000 through October, 2010, Tamarack and CBRE, the marketing firm whose employment CS still objects to, have marketed the resort and obtained numerous and substantial expressions of interest.  The most recent offer has been that of Green

OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376, p. 9

Valley Holdings, LLC, See Exhibit 1 to this Opposition, which has offered $40,000,000, with its offer subject to its due diligence, Green Valley obtaining "all consents , authorizations, approvals, licenses, permits and similar items of federal state and local governmental bodies and agencies," and other conditions.  Green Valley's offer demonstrates both the interest in the purchase of Tamarack and the substantial hurdles that have to be overcome by any buyer.

CS opposed any DIP Financing from any source other than through itself.  Though the parties started negotiating in June, 2010, CS could not reach agreement among its own syndicate members on terms of financing until days before a scheduled hearing on the motion to seek approval of its financing.  Even then, the terms were not complete.  The proposed Credit Agreement read "Sidley draft 10-8-10."  Only then did CS provide a list of the actual lenders which were participating in the proposed financing.  As a result, Tamarack failed to comply with the procedural requirements of the rules applicable to seek approval of DIP Financing.

As this Court noted, the only financing which CS would support was its own financing, on terms which this Court found problematic at best and unrealistic given the milestones which CS demanded.  Even so, CS uses the failure of its own financing proposal and the delay in the sales process demanded by it, caused in significant part by CS' inability to reach agreement with its proposed DIP Lenders on terms in a timely fashion, and in significant part on its inability to propose terms which this Court might find acceptable, as a basis to show Tamarack's inability to sell its assets.  CS bears significant responsibility for the failure of that financing proposal.

CS consumed almost five months, from June through the conclusion of the hearing on its ill-fated financing offer.  CS had a variety of alternatives to respond to this Court's decision, addressing the likelihood that CS' proposed financing doomed Tamarack to default and failure. It could have taken to heart this Court's ruling and revised its offer of financing to come into line with this Court's concerns and those of the creditors who opposed the CS DIP Financing.  It could have acknowledged that it did not want to provide financing on any terms other than those which it felt confident would lead to a default.  It could have informed Tamarack that it would

allow Tamarack to seek other sources of financing.  It could have made some commitment to a limit on its credit bidding rights to as to encourage potential buyers to move forward.

Instead, on November 2, fourteen days after this Court rejected the CS proposed DIP Financing, CS showed its predatory lending side and moved to convert or dismiss the case.  The goal is, of course, to prevent Tamarack from moving forward on any terms that might actually benefit anyone other than CS.  CS does not want to take the chance that Tamarack will obtain DIP Financing on reasonable terms that make a successful disposition of the resort likely.  CS, for reasons that are entirely counter-intuitive and perhaps senseless, sees benefit in making sure that Tamarack cannot sell the resort as a functioning four season destination resort.

Having used up most of the time negotiating a predatory DIP Financing proposal and discouraging any other, CS now complains that Tamarack has not yet closed a sale.  Were the consequences of that position not so potentially tragic for real people trying to make a living, and if CS were the only party to bear the harm that its self-destructive position is destined to lead to, then it might seem appropriate to allow CS to inflict that kind of damage on itself and its syndicate members.  But there are others to consider.

As CEO Boespflug testified, without dispute, at the hearing on the motion to secure DIP Financing provided by a third CS syndicate, CS has opposed every effort to move forward other than by its hand-picked route.  CS has made clear that if it was able to provide financing itself, it would seek to have any benefit in value from that financing attributed to it and its syndicate, rather than shared among all secured parties.  As this Court saw, CS would only agree to provide financing on terms which this Court found were troublesome at best.

Against this backdrop, CS complains that nothing is getting done, that Tamarack is spending too much money and that the process should start from scratch in a chapter 7, with a chapter 7 trustee who would have no knowledge of the resort and no expertise to sell a four season ski resort as a going concern.  CS has made no concrete commitment of substance that it will cooperate with any sales process, that it will limit its credit bid or that it will, itself, make a

bid so as to give to other creditors the cash proceeds they might receive from a third party cash buyer.

CS admitted at the closing argument on the hearing for its DIP Financing that the alternative, which it decried then and demands now, was a chapter 7 in which the parties would "watch this property be sold off in bits and pieces."  Doc. 378-1, Exhibit A to Declaration of Elizabeth Walker, p. 117 of 123.  CS admitted that "[n]o one will benefit from the sale of pieces of this land."  Id. at 119 of 123.

CS is playing fast and loose with the rules when, fourteen days after this Court's decision, it asserts that a chapter 7 sales process will provide a result equal to a sale through chapter 11.  While that may not rise to the level of judicial estoppel, it is telling that the only difference in position is that CS does not have a senior, priming lien.

So long as CS was given a senior lien for $2 million, CS was satisfied that a six month sales process, from October, was acceptable.  What changed in fourteen days?  There is no DIP Financing at this time, and no CS senior lien.  All of the lienholders end up benefitted that their liens have not been primed.  That is not to say that Tamarack will not seek DIP Financing.  But, as of this point in time, all of the lienholders have maintained their relative positions.

CS was satisfied that all parties were adequately protected because funding a sales process would lead to an enhanced sales price, compared to any alternative.  This should be treated as a binding admission by CS that any other proposed DIP Financing proposal for $2,000,000 or less is acceptable and that CS' interests are adequately protected by the mere provision of any such financing.

**UNUSUAL CIRCUMSTANCES PRECLUDE CONVERSION**

Section 1112(b)(1) provides that, if this Court otherwise rules that a moving party establishes cause for conversion or dismissal, this Court may deny conversion or dismissal if it finds unusual circumstances that establish that the requested relief is not in the best interests of creditors and the estate.  Should this Court find cause to convert, Tamarack asserts that unusual

circumstances exist which make either conversion or dismissal not in the best interests of the

creditors or the estate.  Those circumstances include but are not limited to

    a)  the advanced stage of marketing the property, and the substantial interest Tamarack
has generated, as evidenced by potential buyers announcing their interest at press conferences;
    b)  the virtual certainty that a sale can only be consummated through a chapter 11 plan
confirmation process;
    c)  the significant complexity involved in negotiating a sale, walking potentially
interested parties through appropriate due diligence period, explaining how all of the moving
pieces fit into the puzzle that makes up the whole;
    d)  the absolute certainty of the need for an institutional knowledge that only those
involved with Tamarack for a considerable period of time may bring;
    e) the absolute certainty that any sale process will need an overbidding period, to
maximize the price and give other parties an opportunity to bid; and
    f) the very strong likelihood that any potential purchaser will insist on negotiating some
change in terms of the state lease and perhaps other leases, as part of its offer.

## CS CANNOT CARRY ITS BURDEN ON ANY OF THE BASES ALLEGED

CS alleges that cause exists under §1112(b)(4)(A), (B), (C) and (D).  CS cannot carry its

burden on any of these provisions.

CS' specific arguments are that Tamarack has had continuing losses and has no

reasonable prospect for reorganization. §1112(b)(4)(A).  This subsection is written in the

conjunctive.  Both conditions must be met to establish cause.  E.G. In re Motel Properties, Inc.,

314 B.R. 889 (Bankr. S.D. Ga. 2004).

This case has always been about selling Tamarack as a going concern, to maximize the

value for the estate and creditors.  A sale under any other set of circumstances reduces the value

of all of the assets to a mere pittance.  Tamarack has operated at about a break even basis,

excluding accruing legal fees and lease payments.  The LID assessments and property taxes that

CS trumpets are pre-petition claims, not accruing post-petition liabilities.  Tamarack

acknowledges that it will not be able to pay large fixed accruing expenses such as post-petition

property taxes.  Neither would a chapter 7 trustee.  The most timely means of generating the

funds to pay those taxes is to move to a sale.  For the value of assets at issue, this Court should

not find that Tamarack is operating at such a loss as to warrant conversion to chapter 7.

By CS' own admission, the only hope of realizing the value of the resort is by confirming

a plan providing for the sale of the resort as a whole.  As CS acknowledged at the October

hearing, Tamarack has marketed the properties and has had substantial responses.  CS has been involved with the marketing efforts, and has been informed of much of the interest that CBRE has generated for Tamarack.  At a minimum, CS cannot show now that Tamarack does not have a reasonable prospect for reorganization.

CS has acknowledged that the assets of Tamarack will sell.  Tamarack will successfully sell these assets through a chapter 11 plan to a buyer who will pay a value reflective of a going concern, or the assets will be liquidated piecemeal at sheriff's sales or foreclosure sales, in bits and pieces.

## CS CANNOT SHOW GROSS MISMANAGEMENT OF THE ESTATE

CS insists that Tamarack has engaged in gross mismanagement of its estate.  It bases its assertion on the failure of Tamarack to maintain an effective management team and by its failure to file monthly operating reports.

CS cannot escape from its insistence that Tamarack's directors resign, as a condition of the DIP Financing proposal that it insisted be pursued.  Where CS has created the very condition that it complains of, it may not seek relief based on that condition.

Furthermore, CEO Boespflug has been severely hampered because CS has refused to work with him.  CS has opposed every step taken and every effort made for no reason other than because personalities at CS have refused to work with CEO Boespflug.  CS cannot argue with any credibility that every executive that it fights must be replaced because it fights the executive.

CS asserts only that CEO Boespflug has liability on personal guarantees and that he may be trying to lessen that liability.  The concern is conceptually understandable but lacking in any factual support.

CS' sole factual argument is that Mr. Boespflug made a payment of $38,000 to West Mountain Golf.  In its Motion to Prohibit Use of Cash Collateral, CS admitted that it knew that the expense was for maintenance of the West Mountain Golf Course, and that it was pursuant to an agreement by which Tamarack agreed to pay 40% of the operating expenses of the golf course, to keep that golf course open.

OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376, p. 14

CS does not suggest that it has any new or different information.  Without any factual support, CS falsely suggests that the payment was instead to "minimize the guaranty exposure that Mr. Boespflug has to WMG's lender, Pacific Continental Bank."  CS Motion to Convert, p. 11.  It is difficult to see this as anything other than a deliberate attempt to mislead this Court.  Nor is there an explanation as to how a payment of operating expenses to WMG becomes any kind of a payment to Pacific Continental Bank, the actual holder of a personal guarantee.

Tamarack had a compelling business reason to make that payment.  Based upon discussions with potential buyers, Tamarack determined that maintaining and using the golf course would avoid a price reduction that might have exceeded one million dollars, compared to allowing the course to go brown and leaving a buyer to repair it.

CS insists that Tamarack has failed in its obligation to provide financial reporting, but then refers to the financial reporting that Tamarack has filed to support its argument.  Recall that this was the financial reporting that CS had in its possession when it proposed to make a loan of $2 million.  The reporting seemed to be good enough then, or at least not sufficiently late, sufficiently deficient or sufficiently fraudulent or misleading to dissuade CS from making its DIP Financing proposal.

CS is correct that the financial reports were not filed by the twentieth of the month following the end of the month for which reports were made.  Still, the latest a report was filed was 20 days late.  All reports, through the August report, were filed at the time CS' filed its motion to convert.  Tamarack filed its September report the day after the motion to convert was filed, and was as of that time caught up.  Tamarack takes very seriously its obligation to file complete and correct reports.  CS' complaint in this regard does not arise to the level of gross mismanagement.

Tamarack's claim that the reports filed have been at best deficient and at worst fraudulent is laugh out loud baseless.  CS compares information from a profit and loss statement Tamarack provided to it in June, 2010, presented on an accrual basis, to Monthly Operating Reports.  It

complains that the profit and loss statement were not accurate, not that the Monthly Operating reports are not accurate.

The April monthly operating statement showing no expenditures is accurate. CS does not suggest otherwise. CS acknowledges that the May and June reports show expenditures which it does not like, but that those statements are accurate. CS does not suggest otherwise.

CS asserts that Tamarack failed to disclose unpaid fees to Tamarack's retained professionals, specifically Venable LLP. The unpaid professional fees owed to Bauer & French were consistently disclosed each month. The unpaid professional fees owed to Venable LLP were disclosed in the September statement. Venable's employment was approved by order entered July 16, 2010. Doc. 276. Tamarack did not receive a statement from Venable until some time in September. Tamarack disclosed the balance of unpaid and unapproved fees for the month in which it first received a statement.

CS asserts that Tamarack has failed to maintain appropriate insurance. It offers no analysis by which it suggests what level of insurance is appropriate and what level is not appropriate. Since it filed its motion to convert, CS has consented to a Sublease and Lease of Tamarack property that provides that TMA will provide insurance for both general liability for its operations, and environmental insurance policies. See Docs. 426, 427. Tamarack believes that TMA has already done so, and the State of Idaho, as lessor, has accepted TMA's proof of insurance. Implicit in CS' consent, given after it filed its Motion to Convert, is that TMA's proposal for insurance is entirely adequate.

## CONVERSION IS NOT APPROPRIATE FOR TAMARACK'S ALLEGED USE OF CASH COLLATERAL

CS asserts that Tamarack's asserted use of cash collateral in the past constitutes grounds for conversion. CS has the burden of establishing what cash collateral were subject to any properly perfected lien that it may have had, what funds Tamarack used which were cash collateral, and that one or more creditors suffered substantial harm as a result of any unauthorized use of cash collateral. Tamarack will hold CS strictly to its burden of proof on

these issues.  In re Las Vegas Monorail Co., 429 B.R. 317, 328 (Bankr. D. Nev. 2010).  The use

of cash collateral is not, ipso facto, proof of harm to a creditor; if it were, then the statute would

not require a separate showing of substantial harm to a creditor.  In re Gateway Access

Solutions, Inc., 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007).

Here, the largest part of the cash which Tamarack used, $77,256, was a payment from

Idaho Power arising out of payment of "late comer fees" by developers who tapped into the

utility lines Idaho Power installed, at Tamarack's expense.  CS did not include in its security

agreement any description which might cover "late comer fees," such as contract rights or any

more specific description.  Thus, it had no perfected security interest in these funds.

Tamarack also received commissions from an independent contractor who leased out

condominiums, cottages and cabins owned by third parties.  The right to receive these payments

arose post-petition and did not involve any the sale or rental of Tamarack owned real property.

These likely were not CS' cash collateral.  CS must prove exactly what funds received are

collateral within the meaning of the security agreement which governs the parties' relationship.

CS filed a Motion (I) to Prohibit Use of Cash Collateral, and (II) for Sequestration and an

Accounting on July 26, 2010.  Doc. 282.  CS did not seek conversion or dismissal in that motion.

Tamarack subsequently filed Tamarack Resort, LLC's Motion for Order Allowing Use of

Cash Collateral on August 8, 2010, Doc. 289, its Amended Motion for Order Allowing Use of

Cash Collateral on August 9, 2010, Doc. 290, and its Second Amended Motion for Order

Allowing Use of Cash Collateral on August 19, 2010, Doc. 300.

CS appeared at the hearing on the Second Amended Motion and could not consent but

did not oppose the motion and the relief sought in that motion.  This Court granted the Second

Amended Motion and entered its Order Authorizing Debtor's Limited Use of Cash Collateral

and Granting Adequate Protection to Agent Pursuant to Bankruptcy Code §§ 105, 361, 362, 363

and 507 and Bankruptcy Rule 4001, Doc. 303, on August 27, 2010.

CS did not seek any further relief on its Motion (I) to Prohibit Use of Cash Collateral,

and (II) for Sequestration and an Accounting on July 26, 2010.  Doc. 282.

On November 3, 2010, over three months later, having stipulated to the use of cash collateral in the interim, having given further informal consent to use limited amounts of cash collateral after the first cash collateral order expired, and having failed in a bid to take control of the chapter 11 by its proposed DIP Financing, CS now seeks a remedy it did not seek before.

CS may not sit on its rights and wait to use the alleged misuse of cash collateral to take control again by means of this motion to convert. In re Czyzk, 297 B.R. 406, (Bankr. D. N.J. 2003); In re Kleather, 208 B.R. 406, (Bankr. S.D. Ohio 1997). If CS cannot argue that it suffered some substantial harm to its interests, but not so substantial as to require it to act immediately. That it waited as long as it did says much about CS' good faith in making the assertions it now makes.

CS does not suggest any facts to support the notion that Tamarack is currently using cash collateral without authorization. Any alleged misuse of cash collateral occurred at a time when CS refused to provide the supporting documentation of its claim that it had perfected security interest in cash collateral. CS was asked to provide documentation establishing that it had a perfected security interest in cash collateral. Incredibly, by email from Joel Samuels dated June 28, 2010, it specifically refused to provide that documentation. Mr. Samuels, in response to a request for that documentation, replied

> As you know, these are a matter of public record. It should not be difficult for you or one of the Debtor's other counsel to track these down. You may want to check with Steve Millemann who presumably has copies, but in any event they can certainly be ordered and this will ensure that you get a complete set of what has been filed.

A month later, on July 27, 2010, CS filed its motion to Prohibit Use of Cash Collateral. Only then did CS provide the information Tamarack had requested June 23, 2010.

On these facts, this Court should rule that CS does not have a perfected security interest in a substantial part of the funds at issue. In the event that any of the funds Tamarack used were CS cash collateral, this Court should determine that CS has not shown that the use of that cash collateral "substantially harmed" any creditor. Finally, this Court should rule that CS may not sit on its rights that were intended as a shield to protect its cash collateral. CS may not wait until it

OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376, p. 18

determines that it is not getting the control of the chapter 11 that it sought, by way of the failed

DIP Financing proposal, and then later use those rights as a sword to cut off Tamarack's

reorganization and take control of Tamarack's assets outside of bankruptcy court.

## **CONCLUSION**

For the reasons stated above, this Court should deny CS' motion to convert or dismiss

this chapter 11 case.  CS cannot show cause to support conversion or dismissal.  Tamarack has

demonstrated unusual circumstances, within the meaning of §1112(b)(1), that show that

conversion or dismissal is not in the best interests of creditors or the estate.

CS cannot show that either conversion or dismissal is in the best interest of the estate or

creditors, as required by §1112(b)(2).  Tamarack has shown that there is a reasonable likelihood

that a plan will be confirmed within a reasonable time, as required by §11112(b)(2)(A).

Tamarack has shown that there exists a reasonable justification for grounds CS alleges other than

under paragraph (4)(a), that Tamarack will cure within a reasonable time, as required by

§11112(b)(2)(B).

RESPECTFULLY SUBMITTED this    29    day of November, 2010.

BAUER & FRENCH

/s/
Randal J. French of the firm, Attorney for
Debtor-in-Possession

## CERTIFICATION OF SERVICE

I HEREBY CERTIFY that on the __29__ day of November, 2010, a true and correct copy of the foregoing was served electronically through the CM/ECF system upon:

Office of the U.S. Trustee
Washington Group Central Plaza
720 Park Blvd., Ste. 220
Boise, ID 83712-7764

Monte Gray
Gray Law Offices, PLLC
PO Box 37
Pocatello, ID 83204-0037

Brad A. Goergen
Graham & Dunn PC
2801 Alaskan Way Ste 300
Seattle, WA 98121-1128

Thomas G. Walker
Cosho Humphrey, LLP
PO Box 9518
Boise, ID 83707-9518

David Penny
Cosho Humphrey, LLP
PO Box 9518
Boise, ID 83707-9518

Jill S. Holinka
Moore Smith Buxton & Turcke, Chtd.
950 W Bannock St Ste 520
Boise, ID 83702-6118

Paul J. Fitzer
Moore Smith Buxton & Turcke, Chtd.
950 W Bannock St Ste 520
Boise, ID 83702-6118

T.J. Angstman
Angstman, Johnson & Associates, PLLC
3649 N Lakeharbor Ln
Boise, ID 83703-6913

Wyatt B. Johnson
Angstman, Johnson & Associates, PLLC
3649 N Lakeharbor Ln
Boise, ID 83703-6913

Jeffrey M Wilson
Wilson & McColl
PO Box 1544
Boise, ID 83701-1544

Mark D. Perison
Mark D. Perison, P.A.
PO Box 6575
Boise, ID 83707-6575

Charles W. Fawcett
Skinner Fawcett
PO Box 700
Boise, ID 83701-0700

David T. Krueck
Trout Jones Gledhill Fuhrman, P.A.
PO Box 1097
Boise, ID 83701-1617

Terry C. Copple
Davison Copple Copple & Copple, LLP
PO Box 1583
Boise, ID 83701-1583

Soo Y. Kang
Greener Burke Shoemaker P.A.
950 W Bannock St Ste 900
Boise, ID 83702-6138

Lynnette Davis
Hawley Troxell Ennis & Hawley LLP
PO Box 1617
Boise, ID 83701-1617

P. Bruce Badger
Fabian & Clendenin
215 S State St Ste 1200
Salt Lake City, UT 84111-2334

Bart W. Harwood
Hall Farley Oberrecht & Blanton PA
PO Box 1271
Boise, ID 83701-1271

OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376, p. 20

Opp to CS Mtn to Convert or Dismiss\nrg\112910

Suzanne M. Fegelein
Elsaesser Jarzabek Anderson Elliott &
McDonald, Chtd.
PO Box 1049
Sandpoint, ID  83864-0855

Ford Elsaesser
Elsaesser Jarzabek Anderson Elliott &
McDonald, Chtd.
PO Box 1049
Sandpoint, ID  83864-0855

Randall A. Peterman
Moffatt Thomas Barrett Rock & Fields, Chtd
PO Box 829
Boise, ID 83701-0829

Joel G. Samuels
Sidley Austin, LLP
3269 N Knoll Dr
Los Angeles, CA  90068-1517

Larry E. Prince
Holland & Hart LLP
PO Box 2527
Boise, ID 83701-2527

John R. Hammond, Jr.
Batt Fisher Pusch & Alderman LLP
PO Box 1308
Boise, ID  83701-1308
Anna E. Eberlin
Meuleman Mollerup LLP
755 W Front St Ste 200
Boise, ID  83702-5802

Arnold L. Wagner
Meuleman Mollerup LLP
755 W Front St Ste 200
Boise, ID  83702-5802

Jason G. Dykstra
Meuleman Mollerup LLP
755 W Front St Ste 200
Boise, ID  83702-5802

Kenneth C. Howell
Hawley Troxell Ennis & Hawley LLP
PO Box 1617
Boise, ID  83701-1617

Kevin A. Bay
Ryan, Swanson & Cleveland, PLLC
1201 3rd Ave Ste 3400
Seattle, WA  98101-3268

Terri R. Pickens
Pickens Law, PA
PO Box 915
Boise, ID 83701-0915

John W. Kluksdal
Hepworth Janis & Brody, Chtd.
PO Box 2582
Boise, ID 83701-2582

Elizabeth W. Walker
Sidley Austin, LLP
555 W 5th St
Los Angeles, CA  90013-1010

Stephen J. Lord
Attorney At Law
800 W State St Ste 200
Boise, ID  83702-5851

William F. Nichols
Davis F. VanderVelde
White Peterson
5700 E Franklin Rd Ste 200
Nampa, ID  83687-7901

Daniel C. Green
Racine Olson Nye Budge & Bailey Chartered
PO Box 1391
Pocatello, ID 83204-1391

Kelly Greene McConnell
Givens Pursley LLP
PO Box 2720
Boise, ID 83701-2720

Kimbell D. Gourley
Trout Jones Gledhill Fuhrman Gourley, P.A.
PO Box 1097
Boise, ID  83701-1097

Cindy Elliott
Elsaesser Jarzabek Anderson Elliott &
McDonald, Chtd.
PO Box 1049
Sandpoint, ID  83864-0855

OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376, p. 21

Nancy L. Isserlis
Winston & Cashatt, Lawyers
250 Northwest Blvd Ste 107A
Coeur d'Alene, ID 83814-2971

Laura E. Burri
RINGERT LAW CHARTERED
PO Box 2773
Boise, ID 83701-2773

David P. Gardner
Winston & Cashatt, Lawyers
250 Northwest Blvd Ste 107A
Coeur d'Alene, ID 83814-2971

Clay Shockley
Sasser & Inglis, P.C.
PO Box 5880
Boise, ID  83705-0880

Susan E. Hamlin
Deputy Attorney General
Department of Environmental Quality
1410 N Hilton St 2nd Fl
Boise, ID  83706-1253

DATED this   29   day of November, 2010.

BAUER & FRENCH

/s/
Randal J. French of the firm, Attorney for
Debtor-in-Possession

OPPOSITION TO MOTION TO CONVERT OR DISMISS, DOCKET NO. 376, p. 22