Randal J. French
BAUER & FRENCH
1501 Tyrell Lane
Post Office Box 2730
Boise, Idaho 83701-2730
Telephone (208) 383-0090
Facsimile 383-0412
E-Mail rfrench@bauerandfrench.com
  ISB No. 3032

Attorneys for Tamarack Resort, LLC

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In Re:           ) | Bkr. Case No. 09-03911-TLM |
|          ) | Chapter 11 |
| TAMARACK RESORT, LLC,   ) | |
|          ) | |
|     Debtor-in-Possession  ) | |

**TAMARACK RESORT, LLC'S DECEMBER 23, 2010 MOTION FOR ORDER
ALLOWING USE OF CASH COLLATERAL**

COMES NOW, Tamarack Resort, LLC ("TRLLC"), the Debtor-in-possession, by and through its counsel of record, Randal J. French of the firm of Bauer & French, and hereby submits its Second Amended Motion for Order Allowing Use of Cash Collateral. This relief is sought pursuant to Sections 105, 361, 362, 363, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the District of Idaho (the "Local Rules").

TRLLC seeks this Court's Order approving the use of cash collateral, in the amount of $101,000 in December 2010 and January 2011, through January 31, 2011, as stated in the attached proposed budget. See Exhibit A.

### IDENTITY OF SECURED CREDITORS

The Creditors having an interest in the Cash Collateral are the Receivership Lenders, and the Pre-Petition Lenders, as explained below. The Receivership Lenders are the second largest creditors in the case. The Pre-Petition Lenders are TRLLC's largest creditors. There is no relationship aside from debtor-creditor.

The Receivership Lenders have filed a proof of claim no. 135, in the amount of $13,269,459.10, secured by mortgages on real property and security interests on personal property. Tamarack believes that the Receivership Lenders have a lien senior to the Pre-Petition Lenders, and are fully secured. The value of their position is protected by using its cash collateral to provide insurance and to move the resort assets to a sale.

The Pre-Petition Lenders have filed a proof of claim no. 134, in the amount of $296,019,865.61, secured by mortgages on real property and security interests on personal property. Under the most likely of scenarios, they are likely to receive only $25,000,000 to $30,000,000 of their claim. They may have no motivation to support the maximization of the resort assets, as opposed to other strategies to hinder a reorganization to attempt to force senior lienholders to give up some part of their collateral and collateral proceeds to the Pre-Petition Lenders.

### USE OF CASH COLLATERAL

Tamarack requests the interim use of $4,500 for salary of David Papiez, $18,400 for utilities and $35,400 for insurance premiums.

A line item budget identified as "TRLLC Cash Usage Budget 122110" is attached as Exhibit A. The cash collateral consists of funds on hand ($34,500) and to be received, generated from operator agreements ($17,100) and merchandise sales ($7,500), and refunds of deposits, from the Idaho Department of Lands ($28,600) and Idaho Power ($13,675), not rent or accounts receivable.

TAMARACK RESORT, LLC'S DECEMBER 23, 2010 MOTION FOR ORDER ALLOWING USE OF CASH COLLATERAL p. 2
Cash Collateral Dec 20 2010 Motion to Use Cash Collateral.wpd\nrg\122310

The value of all of the resort assets collateral is estimated at $40,000,000. Tamarack has a pending Letter of Intent, Ex. B, to purchase at that amount, which Tamarack is negotiating to a binding Purchase and Sale Agreement. In that Letter of Intent, there is no allocation of value between the various parcels of real property, of which there are hundreds, and the equipment and other personal property which makes up the assets of Tamarack.

This court previously entered its Order Authorizing Debtor's Limited Use of Cash Collateral and Granting Adequate Protection to Agent Pursuant to Bankruptcy Code §§ 105, 361, 362, 363 and 507 and Bankruptcy Rule 4001, Doc. 303, on August 27, 2010. Of the $53,802.59 in cash collateral authorized, Tamarack used only $34,971.60. It did not use $18,830.99 of the amount it was authorized to use. In October and November, Tamarack also paid salary, benefits and workmens compensation for David Papiez, totaling about $4,336.

Since then, CS, as agent for the Receivership Lenders, and the Pre-Petition Lenders, has authorized the use of an additional $10,981.00 for Idaho Power bills, $1,100 for 1 week of salary for David Papiez, and $10,527 for half of the cost of the winterization expenses that Tamarack incurred. CS rejected Tamarack's request to pay the second half of the costs of winterization expenses, thus securing the benefit of the work performed to benefit the Receivership Lenders, and the Pre-Petition Lenders, and avoiding payment of the costs of that work.

SECURED CREDITORS WITH AN INTEREST IN CASH COLLATERAL

Credit Suisse acts as agent and is one of the lenders in 2 sets of lender syndicates which have loaned funds to Tamarack. Each has liens on the cash collateral of Tamarack, and on substantially all of the real estate of Tamarack.

A syndicate of lenders known as the Receivership Lenders have filed a proof of claim no. 135, in the amount of $13,269,459.10, secured by mortgages on real property and security interests on personal property. See Ex. C, an order of the state court granting the receivership Lenders a lien senior to the Pre-Petition Lenders, but not affecting the priority of any other lien

TAMARACK RESORT, LLC'S DECEMBER 23, 2010 MOTION FOR ORDER ALLOWING USE OF CASH COLLATERAL p. 3
Cash Collateral Dec 20 2010 Motion to Use Cash Collateral.wpd\nrg\122310

claimant; and Exhibit D hereto, an explanation of the Receivership Lenders claims provided by
the Receivership Lenders and attached to their proof of claim no. 135.

A syndicate of lenders known as the Pre-Petition Lenders have filed a proof of claim no.
134, in the amount of $296,019,865.61, secured by mortgages on real property and security
interests on personal property. See Exhibit E, an explanation of the Pre-Petition Lenders claims
provided by the Pre-Petition Lenders and attached to their proof of claim no. 134.

## SECURED CREDITORS WITH LIENS ON COLLATERAL
## OTHER THAN CASH COLLATERAL

The following lienholders claim the following amounts due as liens on real property, not
personal property, except for the Valley County personal property tax lien of $78,747.57, and not
cash collateral at issue in this motion, ahead of Credit Suisse.

1)      Valley County for taxes, in the current amount estimated at $268,536.21 for real
property taxes, plus accruing interest at 1% as stated in Claim no. 174, plus $78,747.57 for
personal property taxes plus accruing interest at 1% as stated in Claim no. 175; plus an estimated
$175,000 due for 2010 property taxes. These taxes are parcel-specific in amount.

2)      North Lake Sewer for LID assessments, with arrearages due in the amount of
$2,116,079.05 as stated in its proof of claim No. 137, plus any assessments that have come due
post-petition, estimated to be $1,756,390.00. The total amount due is $36,126,017.48, but
Tamarack expects that all amounts other than the arrearages will be assumed by a buyer. These
assessments are parcel-specific in amount.

3)      Banner-Sabey II, which claims a senior lien on Village Plaza and Lake Wing, in
an amount which the State Court is currently determining. Banner-Sabey, in its proof of claim
no. 146, asserts a claim of $7,268,000, plus interest and fees. The state court has not yet issued
any determination of the final amount, or priority of its liens. The value of the collateral has not
been determined.

4)      EZA dba Oz Architecture has filed proof of claim no.153, asserting a mechanics lien securing a claim $1,013,147.42 on Lot 16, Block 19, Tamarack Resort Phase 2, which is also part of Village Plaza.  The state court has not yet issued any determination of the final amount, or priority of its liens.  The value of the collateral has not been determined.

5)      BAG Holdings has filed a proof of claim no. 132 for $2,000,000 secured by Lots 24 and 25, Block 19, Tamarack Resort P.U.D. Phase 3 Village, subject to final determination by the state court.  The state court has not yet issued any determination of the final amount, or priority of its liens.  The value of the collateral has not been determined.

6)      Tri-State Electric Inc. asserts claim no. 49 of $1,500,511.18, secured by a mechanics liens on Lot 16, Block 19, Tamarack Resort P.U.D. Phase II, and claim no. 50 of $191,944.51 secured by other real estate, both of which liens Tri-State asserts are senior to the mortgage liens of Credit Suisse.  The state court has not yet issued any determination of the final amount, or priority of Tri-State's liens.   The value of the collateral has not been determined. Tri-State asserts a lien to secure its claim no. 48, in the amount of $58,782.60, but that lien may be junior to Credit Suisse's mortgages.

7)      MHTN asserts a claim no. 151, for $2,162,944.81 secured by Lot 16, Block 19, Tamarack Resort P.U.D. Phase II, senior to the mortgage liens of Credit Suisse.  The state court has not yet issued any determination of the final amount, or priority of its liens.   The value of the collateral has not been determined.

PROPOSED ADEQUATE PROTECTION

TRLLC proposes to provide adequate protection, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection for the use of any Cash Collateral and for any diminution in the value of the Receivership Lenders', and the Pre-Petition Lenders', interest in the Collateral, in the form of replacement security interests and liens (the "Adequate Protection Liens") in and upon all of the Collateral and all proceeds thereof, whether existing on the Petition Date or acquired thereafter (including, without limitation, all proceeds (as defined in the Uniform

Commercial Code) on account of the Collateral), and all assets of Debtor of the same nature and type as the Collateral whether presently owned or hereafter acquired by Debtor. Such Adequate Protection Liens shall be to the extent of cash collateral used, and shall be to the extent of, and enjoy a priority that, existed on the date of the filing of the petition. This replacement lien will not prime the lien of any other creditor who is determined to have a valid lien superior to that of the Receivership Lenders or the Pre-Petition Lenders. A proposed order is attached as Exhibit F.

The Receivership Lenders are adequately protected in that their claim is fully secured by the real estate on which the Receivership Lenders have a senior mortgage.

The Pre-Petition Lenders are under-secured, but may have some allowed secured claim secured by any cash collateral. Assuming so, the Pre-Petition Lenders have the right to adequate protection in the form of replacement liens, as offered by Tamarack.

In addition, the Receivership Lenders and the Pre-Petition Lenders shall receive adequate protection to the extent that, and by the fact that, the cash collateral is used to pay the premiums for insurance on the property and particularly the premiums for casualty insurance, $28,800.67. They also receive the benefit of paying the utilities necessary to continue the operations of the resort, which generates additional revenue and supports the continuing sales process.

The Receivership Lenders and the Pre-Petition Lenders receive additional adequate protection in that Tamarack has now chosen, subject to proof of funds, a stalking horse bidder and is moving to establish appropriate sales and overbidding procedures over the next few weeks. Doing so avoids the severe loss of value of the assets as to the Pre-Petition Lenders, in the event of a liquidation parcel by parcel, or a foreclosure sale parcel by parcel.

During the time the Debtor and Credit Suisse negotiated potential debtor in possession financing, roughly mid-August through mid-October, the Debtor put a hold on its marketing efforts, as required by Credit Suisse). Since then, the Debtor actively restarted its marketing efforts and has received strong indications of interest from three potential purchasers for substantially all of the assets of the Debtor's estate. The Debtor, through CBRE and counsel,

conducted a process to determine which of these potential bids were subject to least risk (or contingencies) and which potential buyers had adequate funds to consummate the proposed transaction. The Debtor, through its advisors, has been actively negotiating with each of these three buyers. The Debtor required the submission of final bids and financing term sheets (if any) by December 15, 2010.

The Debtor's board of directors meet on December 17, 2010 to consider the three bids and selected Green Valley Holdings' bid as the highest and best offer. The Green Valley Holding's bid is subject to higher and better offers solicited pursuant to bidding procedures as will be proposed for this Court's approval. The offer provides for a purchase price of $40 million as well as proposed DIP financing. The Debtor expects to document this offer over the next few weeks and then submit for approval by this Court shortly thereafter.

### 506(c) SURCHARGE

This Court may also order the payment of the utilities, $18,400, insurance premiums, $35,400, and winterization expenses, $11,000, as surcharges pursuant to §506(c). That section allows this Court to recover from the property the reasonable necessary costs and expenses of preserving such property to the extent of benefit to the secured creditor. These costs are reasonable in amount, and provide a concrete and quantifiable benefit to the Receivership Lenders and the Pre-petition Lenders. *E.g. In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061 (9th Cir. 2000); *In re Compton Impressions, Ltd.*, 217 F.3d 1256 (9th Cir. 2000).

### TERMS OF PROPOSED ORDER

TRLLC asserts that the proposed order, Exhibit F, includes those provisions normally approved, as identified in Appendix I, para (a), except that the Order contains no provisions reserving rights under §507(b).

TRLLC asserts that the proposed order does not contain provisions or findings of fact as to the validity, perfection or amount of CS's lien or debt, except that on p. 8, paras. f and g, CS

provides for the termination of the right to use cash collateral if any party seeks to disallow or subordinate its claim or challenge the validity or priority of its liens.

TRLLC does not believe that the proposed order contains provisions identified in subsection (b) of the Court's Guidelines, Appendix I, Local Rules.

## CONCLUSION

For the reasons stated above, this Court should order the use of cash collateral, as requested. Additionally, or alternatively, the Court may order the surcharge of property to pay the insurance premiums and the winterization costs.

This Court should order the interim use of cash collateral, in the amount of $4,500 for salary of David Papiez, $18,400 for utilities and $35,400 for insurance premiums.

RESPECTFULLY SUBMITTED this __23__ day of December, 2010.

BAUER & FRENCH

/s/

Randal J. French of the firm, Attorney for
Debtor

TAMARACK RESORT, LLC'S DECEMBER 23, 2010 MOTION FOR ORDER ALLOWING
USE OF CASH COLLATERAL p. 9
Cash Collateral Dec 20 2010 Motion to Use Cash Collateral.wpd\nrg\122310

**Tamarack Resort LLC**

# TRLLC Cash Usage Budget 122110

| | December (EMERGENCY) | January | Totals | NOTES |
|---|---|---|---|---|
| **Sources** | | | | |
| Beginning Balance | $ 34,500 | | | |
| Revenue from Operator Agreements | $ 2,100 | $ 15,000 | $ 17,100 | Increase based on opening of the ski mountain by TMA |
| Revenue from Merchandise Sales | $ - | $ 7,500 | $ 7,500 | Sale of retail merchandise through TMA operations |
| Idaho Department of Land Refund | $ 28,600 | $ - | $ 28,600 | Return of deposit for completed timber sale |
| Idaho Power Deposit Refund | $ 13,765 | $ - | $ 13,765 | Transfer of industrial account to TMA for winter 10/11 |
| **Total Sources** | $ 44,465 | $ 22,500 | $ 66,965 | |
| **Expenses** | | | | |
| **Payroll (labor and expenses, with fringes)** | | | | |
| David Papke | $ (4,500) | $ (4,500) | $ (9,000) | Full time Controller and Asset Manager |
| **Utilities** | | | | |
| Idaho Power - Industrial | $ (18,400) | $ (10,500) | $ (28,900) | Reduced as many buildings are now handled by TMA |
| Idaho Power - Commercial | $ (4,500) | $ (2,000) | $ (6,500) | TMA Operating taking over mountain power |
| Idaho Power - Residential | $ (6,100) | $ (5,500) | $ (11,600) | Village Plaza & misc. commercial |
| Sewer & Water District | $ (5,000) | $ (1,200) | $ (6,200) | Cabins & office used by TRLLC |
| Amerigas | $ (1,000) | $ (1,000) | $ (2,000) | Cabins & office used by TRLLC |
| Telephone | $ (300) | $ (300) | $ (600) | Telephone service for TRLLC |
| **Maintenance** | | | | |
| Maintenance & Cleaning | $ (1,750) | $ (1,000) | $ (2,750) | Reduced as many buildings are now handled by TMA |
| Inspection & Security | $ (500) | $ (500) | $ (1,000) | Service provided by TMA in exchange for cottage use |
| Snow Removal and Erosion Control | $ (1,000) | $ (1,000) | $ (2,000) | Service provided by TMA in exchange for cottage use |
| Lodge at Osprey Meadows Assessment | $ (1,250) | $ (500) | $ (1,750) | Fees covered by TMA in exchange for cottage use |
| **Winterization** | | | | |
| Village Plaza | $ (8,000) | $ - | $ (8,000) | Six Buildings forming the village under construction |
| Concrete Sealing | $ (4,000) | $ - | $ (4,000) | Final Payment on authorized program 50% paid already |
| Water Sealing | $ (1,000) | $ - | $ (1,000) | To maintain dry conditions in basement |
| Heat Tape Drains | $ (2,000) | $ - | $ (2,000) | To maintain dry conditions in basement |
| Roof | $ (1,000) | $ - | $ (1,000) | Integrity of drainage on partially flat roofs |
| Roof | $ (2,000) | $ - | $ (2,000) | Maintenance of temporary membrane on two buildings |
| Mid-Mountain | $ (3,000) | $ - | $ (3,000) | Protection of mid-mountain restaurant under construction |
| **Administration** | $ (2,500) | $ - | $ (2,500) | Postage, Office Supplies, Web Maintenance, Buyer Catering, etc... |
| **Legal & Accounting** | | | | |
| US Trustee | $ (975) | $ (975) | $ (1,950) | Quarterly Fees |
| **Insurance** | | | | |
| Property & Casualty | $ (35,400) | $ - | $ (35,400) | Reduced from past year with TMA operating |
| General Liability | $ (29,000) | $ - | $ (29,000) | TRLLC Buildings not occupied by TMA |
| D&O | $ (5,400) | $ - | $ (5,400) | Review Slim general liability for TRLLC |
| Auto | $ (1,000) | $ - | $ (1,000) | Postponed until closing of DIP Loan |
| **Contingency** | $ (3,000) | $ (4,000) | $ (7,000) | Yukon policy |
| **Total Expenses** | $ (77,525) | $ (23,475) | $ (101,000) | |
| **Cash Flow** | $ 1,440 | $ 465 | $ 465 | |

Confidential

Page 1 of 1

EXHIBIT A



**COPY**

December 15, 2010

Tamarack Resort, LLC
311 Village Drive
Suite 100
Tamarack, ID 83615
Attention: Jean-Pierre Boespflug, CEO

Dear Mr. Boespflug,

        This letter sets forth the general terms and conditions upon which Green Valley Holdings, LLC or a wholly-owned subsidiary to be formed by Green Valley Holdings, LLC ("*Purchaser*") proposes to purchase substantially all of the assets of Tamarack Resort, LLC, as debtor-in-possession ("*Seller*", which term shall also include any trustee appointed), used or useful in connection with the master planned resort development and ski area known as Tamarack Resort (the "*Resort*"), other than certain Excluded Assets (as defined below), pursuant to Sections 363(d), 365 and other applicable provisions of the Bankruptcy Code (as defined below) (the "*Transaction*")

1.    Seller's Bankruptcy Case.  On or about December 11, 2009, creditors of Seller filed an involuntary petition commencing a Chapter 7 bankruptcy case (the "*Bankruptcy Case*") in the United States Bankruptcy Court for the District of Idaho ("*Bankruptcy Court*")  On or about April 9, 2010, the Bankruptcy Court ordered that the Bankruptcy Case be converted to a Chapter 11 reorganization.  The Transaction would be consummated pursuant to a Sale Approval Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of Title 11 of the United States Code (11 U.S.C. § 101 *et seq.*), as amended (the "*Bankruptcy Code*").

2.    The Transaction.

        (a)    Subject to the terms and conditions of this letter agreement, including effecting the bidding procedures described herein, Seller would sell to Purchaser and Purchaser would purchase from Seller on the Closing Date (as defined below) all of Seller's right, title and interest in and to the assets, properties and rights, including, without limitation, those identified in Schedule 2(a) hereto (which schedule may be deleted, modified, amended or supplemented, in Purchaser's sole and absolute discretion at any time prior to the execution and delivery of the definitive asset purchase agreement to be entered into between the parties (the "*Asset Purchase Agreement*")), to the extent owned or held and used or useful in connection with the Resort (specifically excluding the Excluded Assets) (the "*Assets*").  The Assets would be purchased by Purchaser free and clear of any and all mortgages, liens, pledges, charges, security interests or other encumbrances

PO BOX 9467 · BOISE, ID 83708 · 855-484-4363
GREENVALLEYIDAHO.COM · INFO@GREENVALLEYIDAHO.COM
INTEGRITY · VISION · COMMITMENT

74358-0002/LEGAL18929393.5



**EXHIBIT**

*B*

("*Liens*") and Claims (as that term is defined in Section 101 of the Bankruptcy Code) to the maximum extent permitted by the Bankruptcy Code, except for the Assumed Liabilities (as defined below).

(b)     "*Excluded Assets*" means the following assets, properties and rights of Seller: (i) all avoidance actions in bankruptcy, including, without limitation, under 11 U.S.C. Sections 510, 542-553 and any rights, defenses, crossclaims or counterclaims with respect to any such avoidance actions; (ii) any pension plan, profit sharing plan, or other plan or program providing benefits to current or former employees of Seller or any of its affiliates; (iii) Seller's charter, taxpayer and other identification numbers, seals, minute books, transfer books, membership interest certificates and other documents relating to the organization, maintenance and existence of Seller as a limited liability company; and (iv) any claims against Purchaser, including those for breach of the Asset Purchase Agreement or any ancillary document.

(c)     "*Assumed Liabilities*" means only (i) obligations of Seller under the leases and contracts expressly assumed by Purchaser (as determined by Purchaser in its sole and absolute discretion), which obligations Purchaser primarily intends are not past due, are incurred in the ordinary course and are not the result of a default under any such lease or contract occurring prior to the Closing Date; (ii) all obligations of Seller to the extent arising after the Closing Date under governmental consents, authorizations, approvals, licenses, permits and similar items to the extent assignable to Purchaser and included in the Assets; (iii) all obligations of Seller to the extent arising after the Closing Date under trademarks, trade names and service marks included in the Assets, and (iv) all obligations of Seller to the North Lake Recreational Sewer and Water District local improvement district (the "*LID*").    To the extent Seller expressly assumes obligations of Seller under leases, contracts or to the LID that are past due or relate to a default thereunder, the cost, if any, of paying such past due amounts or curing such defaults under such leases, contracts and LID obligations would be deducted from the amount of the Purchase Price (as defined below).

(d)     Based on certain information previously provided to Purchaser and subject to any reductions as described in Section 2(c) above, Purchaser would provide consideration of $40 million (the "*Purchase Price*") for all Assets, which would be payable as follows:

(i)     Within three business days of the execution and delivery of this letter agreement by Seller, Purchaser would deposit $250,000 in cash into an escrow account (the "*Initial Deposit*").    The Initial Deposit shall be refunded to Purchaser if the parties fail to finalize and agree to the form of the Asset Purchase Agreement by January 31, 2010.    If the parties finalize and agree to the form of the Asset Purchase Agreement by such date, as certified in writing by each party, Purchaser shall deposit an additional sum of $750,000 in cash into the escrow account pending the closing of the Transaction (the "*Second Deposit*" and together with the Initial

Deposit, the "***Deposit***"). The Deposit shall be non-refundable and released to Seller (A) upon the closing of the Transaction, or (B) if the Transaction fails to close due to Purchaser's breach or default; and

(ii)    Purchaser would pay to Seller the remaining balance of the Purchase Price in cash on the Closing Date.

(e)    The closing date (the "***Closing Date***") would be the second business day after entry of the Sale Approval Order (as defined below) by the Bankruptcy Court, but in any event no later than March 31, 2011, unless Purchaser and Seller agree otherwise.

3.    Liabilities.  Except as specifically set forth as Assumed Liabilities or otherwise set forth in the Asset Purchase Agreement, Purchaser would not, directly or indirectly, assume or otherwise pay or perform any obligations, liabilities, duties, claims or other responsibilities of Seller or any of its affiliates relating to the ownership, operation or use of the Assets or the ownership or operation of the Resort prior to the Closing Date or otherwise.

4.    Employees.  Purchaser would have no obligation of any kind to employ any of the existing employees of Seller or employees of any of Seller's affiliates or of the management company, if applicable, of the Resort.  Purchaser may offer employment to employees of Seller, on terms acceptable to Purchaser, in its sole and absolute discretion. Employees who are offered and accept offers of employment by Purchaser are referred to herein as "***Transferred Employees***."  Purchaser would have no liability with respect to any employees other than post-Closing Date obligations arising with respect to Transferred Employees, and will have no liability with respect to any obligations (including, without limitation, Claims, severance, paid time off, general liability, workers compensation, COBRA or other liability), with respect to any Transferred Employees arising out of or in connection with such employees' termination, severance, hiring by Purchaser or any pre-Closing activities or liabilities.

5.    Operating Resort Pending Execution of Asset Purchase Agreement and the Closing Date. Pending the execution of the Asset Purchase Agreement and the Closing Date, Seller would operate the Resort in a manner consistent with Seller's normal course of business subsequent to the commencement of the Bankruptcy Case.  Following the date of this letter agreement, Seller shall not transfer any assets other than in the ordinary course of business absent Bankruptcy Court approval.

6.    Timing/Procedure Generally; Asset Purchase Agreement.

(a)    The parties would use reasonable best efforts to negotiate and finalize the Asset Purchase Agreement by January 16, 2011.  Counsel for the Purchaser would prepare the initial draft of the Asset Purchase Agreement.  If executed, the Asset Purchase Agreement would be the definitive agreement between the parties hereto.  The Asset Purchase Agreement would contain customary provisions and conditions for acquisitions of this type.  In addition, on the Closing Date,

74358-0002/LEGAL18929393.5

Purchaser and Seller would each deliver such usual and customary documents that would be delivered in acquisitions of this type.

(b)    Seller would effect the Approval Process (defined below) in accordance with Section 7.

7.    Approval Process.  Within ten business days of finalizing the form Asset Purchase Agreement, Seller would seek an order or orders from the Bankruptcy Court as follows:

(a)    Filing of Stalking Horse Motion.  Seller would file with the Bankruptcy Court a motion (the "*Stalking Horse Motion*") seeking entry of an order approving bidding procedures substantially consistent with the provisions described herein (the "*Stalking Horse Order*").

(b)    Bidding Procedures.  In the Stalking Horse Motion, Seller would seek, among other things, approval of the following procedures (the "*Bidding Procedures*"), which would be incorporated into the Stalking Horse Order:

(i)    Any third party (other than Purchaser) that is interested in being a participant in the Auction (as defined below) and acquiring all or substantially all of the Assets (each an "*Overbidder*"), must submit an "*Initial Overbid*" as provided herein prior to 5:00 p.m. Mountain time on the date 10 business days prior to the earlier of the Auction or the sale hearing (the "*Bid Deadline*").  Any such Initial Overbid must:

(A)    Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Asset Purchase Agreement) with, at a minimum, the following requirements:  (v) designating the Assets or other assets of the Seller to be acquired (which shall include all or substantially all of the Assets) and having similar terms and conditions at least as favorable to the Seller as those in the Asset Purchase Agreement (as determined by the Seller, including any trustee appointed, after consultation with counsel for the Secured Lender and the Committee); (w) provide for a purchase price with respect to the Assets in excess of the sum of (1) the Purchase Price, (2) the Breakup Fee (as defined below), and (3) $250,000; (x) provide that the purchaser thereunder will forfeit to Seller the good faith deposit, in the amount described below, as liquidated damages if such purchaser defaults under the purchase agreement signed by such Overbidder; (y) specifying that the transactions subject to such purchase agreement are not subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the Overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the Overbidder's obligation to purchase the Assets, other than those

included in this letter agreement; and (z) no Initial Overbid shall provide for the payment to the Overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement.

(B) Include a deposit in the form of a certified check in the amount of $1,000,000 payable to the order of Seller and such deposit shall be held in escrow in a segregated account pending the closing of the asset sale;

(C) Include an executed confidentiality agreement (in form and substance reasonably satisfactory to Seller);

(D) To the extent not previously provided to Seller, be accompanied by evidence satisfactory to Seller, in its commercially reasonable discretion, that the Overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under its purchase agreement in the event that it submits the Prevailing Bid (as hereinafter defined) at the Auction; and

(E) Be submitted to Seller (including any trustee appointed), the Office of the United States Trustee, Credit Suisse AG ("*Secured Lender*"), the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case (the "*Committee*"), and any other parties, as directed by the Bankruptcy Court, Purchaser and Purchaser's counsel, in each case so as to be received not later than the Bid Deadline.

(ii) Auction. In the event that Seller determines, in its reasonable discretion, that it has received a qualifying Initial Overbid from a prospective purchaser (a "*Qualified Bidder*"), then Seller will conduct an auction (the "*Auction*") with respect to the sale of the assets at the Bankruptcy Court or at such other location as may be reasonably designated by Seller. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bidding Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bidding Procedures. Seller will provide no less than 48 hours' notice to Purchaser and all Qualified Bidders that the Auction will be held. Seller will schedule the initial date for the Auction to be no later than 45 calendar days after entry of the Stalking Horse Order. If the Purchaser and any Qualified Bidder propose to purchase different groups of assets on varying contract terms, Seller, including any trustee appointed, shall, after consultation with counsel for the Secured Lender, and the Committee, determine, for purposes of bidding, the relative value of such offers. The "*Final Purchaser*" shall be the party (including Purchaser) that, in the sole discretion of the Seller, including any trustee appointed, after consultation with counsel for the Secured Lender and the Committee and



subject to Bankruptcy Court approval, submits the highest and best bid at the Auction. At the Auction, Qualified Bidders and Purchaser may submit successive bids in increments of at least $250,000 greater than the prior bid for the purchase of all or substantially all of the Assets until there is only one offer that is determined, in the sole discretion of the Seller, including any trustee appointed, after consultation with counsel for the Secured Lender and the Committee and subject to Bankruptcy Court approval, is the highest and best offer (the "*Prevailing Bid*"); provided, however, that in the event the Bankruptcy Court permits bids to be submitted by Qualified Bidders for different groups of assets and different contract terms, then Seller, including any trustee appointed, shall, after consultation with counsel for the Secured Lender and the Committee, determine which party is, or which parties are, the Final Purchaser, subject to Bankruptcy Court approval. If no conforming Initial Overbid shall have been received at or prior to the Bid Deadline, no Auction will be held and the Bankruptcy Court hearing held in the Bankruptcy Case to approve the highest and best bid for the Assets will proceed with respect to the Asset Purchase Agreement. In the event that the Final Purchaser (other than Purchaser) defaults or fails to close the proposed transaction, then the party who, in the sole discretion of Seller, including any trustee appointed (after consultation with counsel for the Secured Lender and the Committee), submitted the next highest and best bid for the Assets shall be deemed to be the Final Purchaser (subject to Bankruptcy Court approval), and the purchase price shall be the amount of such next highest and best bid.

(iii)    <u>Breakup Fee</u>. Upon the consummation of a sale of all or substantially all of the Assets to a Final Purchaser other than Purchaser, Seller shall pay to Purchaser at the closing of such sale from the sale proceeds in cash or other immediately available funds an amount equal to two and one-half percent (2.5%) of the Purchase Price set forth herein (and not as it may be increased at the Auction) (the "*Breakup Fee*"); provided, however, that the Breakup Fee shall not be due and payable if Purchaser has committed a material breach of the Asset Purchase Agreement prior to the consummation of such sale to the third party. The provisions of this Section shall survive any termination of the Asset Purchase Agreement. The Breakup Fee shall be treated as an administrative expense claim in the Bankruptcy Case and shall be paid to Purchaser at the closing of such sale prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Assets, including Secured Lender, and shall be free and clear of any such Lien.

(c)    <u>Bankruptcy Court Approval of Sale</u>. Seller and the Final Purchaser shall each use commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an order (the "*Sale Approval Order*"), which is reasonably acceptable to the Final Purchaser, of the Bankruptcy Court in the Bankruptcy Case (i) approving the applicable purchase agreement, (ii) authorizing



the sale of the Assets pursuant to section 363 of the Bankruptcy Code under a plan of reorganization advanced by the Seller as debtor in possession, and (iii) authorizing the assumption and assignment of the executory contracts pursuant to section 365 of the Bankruptcy Code; provided, however, that Seller shall be entitled to take such actions as may be required in connection with the discharge of its fiduciary duties in the Bankruptcy Case (including soliciting higher or better offers for the Assets). In connection with the assumption and assignment of the executory contracts pursuant to section 365 of the Bankruptcy Code, the Final Purchaser shall take all reasonable actions required to provide "adequate assurance of future performance" by the Final Purchaser after the closing of such sale. Seller and the Final Purchaser shall consult with one another regarding pleadings that either of them intends to file, or positions either of them intend to take, with the Bankruptcy Court in connection with or that might reasonably affect, the Bankruptcy Court's entry of the Sale Approval Order approving the Final Purchaser. Purchaser shall not be obligated to consult with Seller regarding any pleadings if Purchaser is not the Final Purchaser.

8.   Conditions to Closing. The Transaction would be subject to the following conditions, unless waived by Purchaser in its sole and absolute discretion:

   (a)   Execution of an Asset Purchase Agreement acceptable to Purchaser;

   (b)   Entry by the Bankruptcy Court of the Stalking Horse Order and the Sale Approval Order;

   (c)   Purchaser shall have obtained all consents, authorizations, approvals, licenses, permits and similar items of federal, state and local governmental bodies and agencies necessary for the consummation of the Transaction and the operation of the Resort as contemplated by Purchaser (including, without limitation, such items described above relating to the assignment to Purchaser of Seller's rights under the State of Idaho Commercial Lease No- M5042); and

   (d)   Absence of any threatened, instituted or pending action or proceeding by any federal, state and local governmental body or agency (i) challenging or seeking to, or which could reasonably be expected to, make illegal or materially impede, delay or otherwise directly or indirectly restrain, prohibit or make materially more costly the Transaction, or (ii) seeking to prohibit or materially limit the ownership or operation by Purchaser of all or any material portion of the Assets.

9.   Termination. This letter agreement shall terminate upon the occurrence of any of the following, provided, however, that the party so terminating may, in its discretion, extend the time periods provided below or waive the condition, as it sees fit in its sole discretion:

   (a)   at any time by mutual agreement of Purchaser and Seller; and

   (b)   by Purchaser, upon failure of the parties to negotiate and finalize the form Asset Purchase Agreement by January 31, 2011.

10.   <u>Access</u>.  Seller shall afford Purchaser and its employees, auditors, investors, legal counsel and other authorized representatives all reasonable opportunity to inspect, investigate, and audit the Assets, operations and business of Seller prior to the Closing Date and to interview its officers, employees, agents, and representatives.

11.   <u>Non-binding Effect of this Letter Agreement.</u>  Each party acknowledges that this letter agreement is not intended to create or constitute any legally binding obligation between Purchaser and Seller, and neither Purchaser nor Seller shall have any liability to the other party with respect to the Transaction unless and until the Asset Purchase Agreement and other related documents, are prepared, authorized, executed and delivered by and between the parties.  If the Asset Purchase Agreement is not prepared, authorized, executed or delivered for any reason, no party to this letter agreement shall have any liability to any other party to this letter agreement.  This letter agreement does not create any exclusive rights to purchase the Assets unless and until an Asset Purchase Agreement is executed and delivered by the Seller and Purchaser and approved by the Bankruptcy Court.  At such time, the respective rights of the parties will be governed by the Asset Purchase Agreement.

Seller hereby represents and warrants that it has full right, power and authority to enter into this letter agreement.

*[Remainder of the Page Intentionally Left Blank]*



If the terms of this letter agreement are acceptable to you, please sign and date this letter agreement in the space provided below to confirm our mutual understandings and return a signed copy to the undersigned.

If we do not receive a signed copy of this letter on or before 5:00 p.m. Mountain Time, on December 19, 2010, this letter agreement shall be null and void and of no further force or effect.

Very truly yours,

**Green Valley Holdings, LLC,**
an Idaho limited liability company

By: _____
Matthew D. Hutcheson, Member

By: _____
Larry Givens, Member

ACKNOWLEDGED:

**Tamarack Resort, LLC,**
a Delaware limited liability company

By: _____
Its: _____

74358-0002/LEGAL18929393.5

**SCHEDULE A**
**TAMARACK RESORT LLC OWNED PROPERTY AND**
**RELATED RESORT PROPERTY NOT OWNED BY TAMARACK RESORT LLC**

**ESTATE OWNED REAL PROPERTY**

**1,484 Acres of land owned Fee Simple and 2,124 Acres Leased from the State of Idaho:**

**Built and Partially Built Real Estate intended for sale:**
- **Village Plaza:** partially constructed with 6 buildings, 129 condo units and 18 retail boutiques
- **Lake Wing:** partially constructed with programming for 51 condo units
- **Lodge at Osprey Meadows Unit 201:** Two bedroom condo with lock-off (unit 203)
- **Lodge at Osprey Meadows Hotel Rooms:** Fourteen (14) standard hotel rooms on the 2nd and 3rd floor of lodge owned by Tamarack Resort LLC that are part of the bankruptcy estate.
- **4 completed and furnished cottages**
- **5 partially completed cottages**
- **16 partially completed townhomes**
- **12 finished lots in Whitewater Subdivision**
- **3 finished lots in the Northlake Subdivision South of the Tamarack PUD.**
- **17 hotel, condominiums and/or fractional pad sites**
- **112 single family lots with preliminary plat and pioneered roads**

**Additional Development Opportunities:**
- **349 fully entitled but not platted single family lots**
- **1,319 fully entitled condominium units to be built on platted PAD to the North of the PUD and unplatted PADs to the South**
- **165 additional single family lots expected to be entitled**
- **158 additional condo units expected to be entitled**

**Recreation Operations: (Buildings presently used and insured by TMA as part of a ski operation sublease)**

- **Canoe Grill:** 10,000 SF cafeteria style dining facility with seating for 300 that serves as the principal snow front eatery. The vertical bar, also located within the Canoe Grill, has a cordoned off seating area for 30 +/-.
- **Seven Devils Pub:** 5,000 SF pub style après ski eatery with a mix of table and bar service all within a comfy fire side lounge. A pool table and small gaming facility complements the offering within a facility that can accommodate 140.
- **Sports Dome:** 9,000 SF sports center that contains rental/retail, lift ticket sales, the activity/ski school reservation desk and a coffee shop with seating for roughly 30. A 1,000 SF mezzanine provides retail and F&B storage.
- **Operations Dome:** 5,000 SF structure used to house the employee locker room facility, ski patrol, a conference room and several offices for operations managers.
- **Wildhorse Children's Center:** 4,000 SF children's center that houses children's ski school, rental and day care located on the beginner skiing snow front.
- **Ski Maintenance Facility:** 11,000 SF facility containing an eight (8) bay snow cat and vehicle maintenance shop that includes lifts and a wash bay. An employee locker room and office space complement the shop and currently house Tamarack Resort Security.
- **Ski Patrol Headquarters:** 1,000 SF building located at the summit which serves as the on mountain headquarters for ski patrol.
- **Mountain Control Building:** 2,000 SF on mountain building that houses snowmaking operations and a chlorination facility for the local water district.

**Recreation Operations: (Buildings presently under Tamarack custody and insurance)**

Schedule A, p.1

- **Crane Creek Market:** 5,000 SF grocery store that historically housed a full service gourmet market. A deli facility and three large walk-in coolers complement the facility.
- 
- **Operations Modular:** 2,000 SF modular building located on the snow front that historically housed the operations management team.
- **Medical Clinic:** 2,000 SF modular building located on the snow front that operated as an on-site medical clinic in conjuncture with the Cascade Medical Clinic.
- **Mid-Mountain Lodge:** 11,000 SF completed shell with an incomplete interior located 2,000 FT above the base area, the original programming planned for seating 200 inside with a substantial 4,500 SF outdoor dining terrace.
- **Summit Snowmobile Shed:** 2,000 SF building located at the summit that serves as a base for guided snowmobile tours. An underground tank fuel facility is also located at the sled shed.

**Real Estate Operations:**

- **Design Plaza:** Nine (9) 2,000 SF modular buildings - three (3) owned & six (6) leased. The owned modulars are are used two for Tamarack Records and one by TVT. The leased modular are used as follows: i) one by the TMA as municipal office who keeps the lease and insurance current; ii) two formerly used by Tamarack Construction Management team, currently winterized with lease not kept current; iii) two formerly leased to construction contractors, winterized with lease not kept current.
- **Village Plaza:** Two (2) additional leased modular formerly used to house the Village Plaza General Contractor and the Village Plaza Heating and Plumbing Contractor, winterized with lease not kept current.
- **School:** One (1) 2000 SF modular building leased historically to a small sports and school academy located on the Resort – now occupied by the ZIP line operation paying a revenue share to Tamarack. Casualty insurance is paid by Tamarack.
- **Real Estate Office:** 3,500 SF office building with sales center greatroom, one conference room, four (4) offices and ten (10) cubes  used to house sales team and real estate recordsWarehouse in Donnelly: This building contains primarily furniture and video equipment intented for unfinished cabins and miscellaneous other resort operations equipment not on-line during the present winter season.

**ESTATE OWNED PERSONAL PROPERTY (EQUIPMENT OF NOTE):**

**Mountain Operations Equipment**
**Chairlifts:**

- **Tamarack Express:** Leitner-Poma high speed detachable quad
- **Summit Express:** Leitner-Poma high speed detachable quad
- **Discovery:** Leitner-Poma fixed grip quad – beginner chair
- **Poma:** Poma surface tow
- **Magic Carpet:** Beginner conveyer belt in the snow
  - **Note:** Two other lifts, Wildwood Express and Buttercup, are in place on the mountain. Ownership of these lifts is claimed by Banc of America Leasing (see further comments below)

**TechnoAlpin Snow Making System:**

- 17 Movable Fan Guns
- 8 Fixed "Lance" Guns
- 70 Hydrants off Three Principal Lines
- 8 Cooling Towers

**Snow Cats:**

- Three (3) 2001 Bombardier ME275 Groomers
- One (1) 2005 Pisten Bully PB100 Nordic Groomer

- o **Note:** See additional comments below regarding other leased Groomer

**Vehicles:**
- Twelve (12) Arctic Cat and Polaris Snowmobiles
- Seven (7) Polaris and Honda ATV's
- Two (2) Hobie Cat Sailboats
- One (1) 2005 Chevy Yukon XL
  - o **Note:** See additional comments below regarding other leased vehicles

**Zipline:**
- Eight (8) individual ziplines lines totaling 4,425 feet in length extending over roughly 2000 vertical feet (one of the longest in the United States)

**Golf Operations Equipment:**
**Mowers:**
- One (1) 2007 Toro Walk Behind Rotary Mower
- One (1) 2005 Toro Walk Behind Rotary Mower
- One (1) 2004 Eastman Hover Mower
- One (1) 2006 Tri-Spiker Greens Spiker

**Other:**
- Two (2) 2007 Clubcar 252 Gas Carts
- One (1) 2006 John Deere 6x4 Gator
- One (1) Sullair 750 H Compressor

**Heavy Equipment:**
- One (1) 2005 Caterpillar Skid Steer
- One (1) 2005 Caterpillar Trencher
- Two (2) 2005 John Deere Utility Tractors

**FF&E of Note:**
- Fully developed commercial kitchen fitting the space of former Morels
- Full set of furniture for Arling Conference Center
- Full set of furniture for spa and gym with (high end) exercise equipment
- Furniture for 80 seat Morel restaurant, Terrace Bar & Grill and lobby bar

**RELATED PROPERTY AND EQUIPMENT <u>NOT</u> UNDER CONTROL OF TAMARACK RESORT LLC:**

The Property and equipment described below are no longer controlled by the Estate, but could be important to Buyers wishing to restore full operations. In the cases noted, the Estate is still claiming an interest, subject to final resolution of pending judicial proceedings.

Schedule A, p.3

**Ski Mountain Operations Equipment (Banc of America Leasing Corporation)**

This equipment was originally leased from Bank of America Leasing Corporation ("BALC") on various leases of which TRLLC is in default.

- **Chairlifts:**
  - o Wildwood Express: Doppelmayr high speed detachable quad
  - o Buttercup: Doppelmayr fixed grip quad
    - ▪ **Note:** BALC has filed a recent motion in Bankruptcy Court to receive permission to remove the lifts. Tamarack plans to oppose this motion.
- **Snow Cats**
  - o One (1) 2006 Pisten Bully PB600 Groomer (leased)
- **Vehicles**
  - o Two (2) 2006 Glaval Titan Busses (leased)
  - o One (1) 2006 Mack 613 Dump Truck (leased)
    - ▪ **Note:** Bankruptcy Court has granted permission to BALC to remove the above Snow Cats and Vehicles. BALC has not done so as of December 10, 2010.

**Golf Assets (West Mountain Golf LLC)**

TRLLC has a 40% interest in West Mountain Golf LLC. The majority position in the LLC is owned by Hopkins Financial. A first lien by Pacific Continental Bank encumbers West Mountain Golf's assets, which include:

- 18 hole Golf Course with automated Irrigation System
  - o Two holes are on State Land subject to the same Lease previously described for the Ski Hill.
- Golf Maintenance Facility (9000 sf)
  - o Fuel tanks, washing bay, sharpening room
  - o Six Bays with rolling doors opening to parking on both sides
  - o Administrative area with four offices, an open area with six cubes and locker rooms
  - o Outside independent storage for cheminals
  - o Five covered and open stalls for sand, fertilizer, etc...
- Club House within the common space of the Lodge at Osprey Meadows including:
  - o 80 seat fine dining restaurant known as Morels
  - o Lobby Bar
  - o Fitness Room
  - o Men and Women Locker rooms with steam shower in each
  - o Spa with three treatment rooms, hair salon, relaxation room, storage room, office and retail space doubling as lobby
  - o Storage for golf cars with electrical charging equipment
  - o Pro-shop space used in summer for golf and winter for nordic

**Golf Assets (Raven Golf) Operator during Summer 09 and 10:**

This equipment was repossessed by various lessors and purchased back by Raven Equipment Leasing to the extent it was needed for maintenance of a high end quality mountain course and not part of the fully owned Tamarack inventory. A list is available from them.

**Convention Facility (Pelorus Group), aka Arling Center:**

These buildings were foreclosed away from Tamarack in August 2009 by Bank-of-America who held the original note and sold to Pelorus Group in June 2010.

- o Grange (9000 sf) containing ballroom and two midsize function rooms, staging kitchen with partial cooking capability and storage space.
- o School House (3800sf) containing two smaller boardroom style function rooms, an office and a small staging kitchen.
- o Chapel (2000sf) 100 seats with built in pews, one office and one storage room.

FILED _____ P.M. 4:46

OCT 1 7 2008

Archie _____ Clerk

Randall A. Peterman, ISB No. 1944
John C. Ward, ISB No. 1146
MOFFATT, THOMAS, BARRETT, ROCK &
    FIELDS, CHARTERED
101 S. Capitol Blvd., 10th Floor
Post Office Box 829
Boise, Idaho 83701
Telephone (208) 345-2000
Facsimile (208) 385-5384
rap@moffatt.com
jcw@moffatt.com

Elizabeth W. Walker, California State Bar No. 113545
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone (213) 896-6000
Facsimile (213) 896-6600
ewalker@sidley.com

Attorneys for Plaintiff Credit Suisse, as Agent for Lenders

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF VALLEY

|  |  |
|---|---|
| IN RE<br>TAMARACK RESORT FORECLOSURE<br>AND RELATED PROCEEDINGS | Case No. CV 08-114C<br><br>**FOURTH [PROPOSED] ORDER<br>APPOINTING RECEIVER**<br><br>Consolidated Cases:<br>    No. CV-08-310C<br>    No. CV-08-311C<br>    No. CV-08-312C<br>    No. CV-08-324C<br>    No. CV-08-335C<br>    No. CV-08-356C<br>    No. CV-08-357C |

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 1**

LA1 1272880v.1

ORI

EXHIBIT
C

The Motion of Plaintiff Credit Suisse ("Plaintiff") to Appoint Receiver ("Receiver Motion") pursuant to Idaho Code Section 8-601 through 8-606 came on for hearing on October 15, 2008.  The Court, having considered the papers filed and the arguments presented in connection with the aforementioned Motion, and good cause appearing therefore, hereby orders that:

**Appointment of Receiver**

      1.      Douglas P. Wilson shall be appointed as receiver ("Receiver") in this action and shall take possession, custody and control of and operate, manage and maintain the Property upon the terms and conditions set forth herein (the "Receivership").  A true and correct copy of Douglas P. Wilson's curriculum vitae is attached hereto as Exhibit "A."  The "Property" shall have the same definition as used in the Receiver Motion and Affidavit of Michael Criscito, filed September 23, 2008 (collectively, the "Receiver Motion Papers"), and includes the real property legally described in Exhibit "B".

**Oath and Bond**

      2.      On or before the _30_ day of _October_, 2008, and before performing any duties, pursuant to Idaho Code Section 8-604, the Receiver shall file (i) the required oath swearing and affirming to faithfully discharge the duties of the receiver, and (ii) an undertaking, with one or more admitted sureties thereon, in the sum total of $100,000.

**Disclosure**

      3.      The Receiver shall immediately disclose to all parties any financial relationship between the Receiver and any company hired to assist in the management of the Property.  The Receiver shall be an officer of the Court and not the agent of any party to this action.

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 2**

LA1 1272880v.1

**Receiver's Fees and Management Company**

        4.      The Receiver may charge for the Receiver's services no more than $415.00 per hour.

        5.      The Receiver may employ Douglas Wilson Companies and shall pay Douglas Wilson Companies not more than the fees set forth in the fee schedule attached as Exhibit "C."

        6.      The Receiver may pay the Receiver's own fees and expenses (including Douglas Wilson Companies) only by the following procedures:

        a.      By serving on all parties a notice of intent to pay to which no objection is served on the Receiver within 20 days of the date the notice is served;

        b.      By serving and filing a request for interim payment, which the Court then approves; or

        c.      By obtaining and filing an agreement among all parties approving the payment, which the Court then approves.

        7.      The Receiver shall not reimburse the Receiver for the Receiver's general office administration expenses or overhead without Court approval. These expenses include, for example, office supplies and employee payroll, benefits and taxes.

**Receiver's General and Specific Duties and Powers**

        8.      Pursuant to Idaho Code Section 8-605, and under the control of the Court, the Receiver shall have the general duties of a court-appointed receiver to bring and defend actions in his own name, as receiver; and to take possession of the Property; to receive rents, collect debts, to compound for and compromise the same, to make transfers, and generally do such acts respecting the Property as the court may authorize.

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 3**

LAI 1272880v.1

9.      The Receiver additionally shall have the following specific powers and

duties to:

a.      Operate and manage the Property and all other Collateral (as used

herein, "Collateral" shall have the same meaning as in the Receiver Motion Papers) and all

businesses and enterprises conducted thereon, including, but not limited to, collecting revenues,

taking possession of all accounts (including, but not limited to, bank accounts) and receivables,

and leasing the Property and all other Collateral;

b.      Not later than forty-five (45) days following the Court's Order

Appointing the Receiver ("the Appointment"), file with the Court an inventory of all fixtures,

equipment, machinery, personal property and inventory of the Property and all other Collateral

of which he has taken possession;

c.      Demand, collect and receive all rents, issues, profits, proceeds,

cash, revenues, monies, deposits, security deposits, prepaid rent, impounds and accounts

receivable in the possession of Defendant Tamarack Resort LLC ("Borrower") and/or its agents

that arise from the Property and all other Collateral after the date of appointment, which shall be

deposited into a deposit account ("Deposit Account") to be opened and maintained by the

Receiver;

d.      Continue in effect any contracts, agreements, letters of credit and

all other instruments presently existing and not in default relating to the Property and all other

Collateral and make and enter into contracts or agreements affecting any part or all of the

Property and all other Collateral or become the beneficiary of any letters of credit relating to the

Property and all other Collateral and terminate any existing contract, agreement or instrument

which is not commercially reasonable or beneficial to the Property and all other Collateral;

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 4**

provided, however, that if the Receiver terminates any contract to which Borrower is a party, the Receiver shall provide twenty-four (24) hours written notice to the Borrower prior to such termination, unless such notice would compromise or interfere with the Receiver's ability to perform its duties, in which case, no notice to the Borrower will be required.

      e.     Continue in effect all entitlements related to the development of the Property, all other Collateral and/or the Project (as used herein, "Project" shall have the same definition as in the Receiver Motion Papers);

      f.     Negotiate leases or modifications of existing leases provided any such leases or modifications are approved or confirmed by the Court;

      g.     Obtain and/or eject tenants, and set or modify rents and terms of rent without prior Court approval, and employ and compensate unlawful detainer attorneys or eviction services with respect to the operation of the Property without prior Court approval;

      h.     Each month, prepare and serve on the parties a monthly accounting which shall include, but not necessarily be limited to the following, (i) the income and expenses incurred in the administration of the Property, (ii) the records of receipts and disbursements, reconciliations, receivables and accounts payable, and (iii) the Receiver's fees and expenses, including fees and costs of accountants and attorneys authorized by the Court;

      i.     Pay and discharge from the Receivership funds all of the expenses of the Receivership and the costs and expenses of operation, maintenance and all other aspects of the Property and all other Collateral and all businesses conducted thereon, including, without limitation, all taxes, governmental assessments and charges in the nature thereof lawfully imposed upon the Property;

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 5**

j.       Hire, employ and retain attorneys and pay reasonable fees for services rendered (after notice to all parties and Court approval);

k.       Employ agents, employees, clerks, accountants, and property managers to administer the Receivership estate, purchase materials, supplies and services, and pay for them at the ordinary and usual rates out of Receivership funds and do all things and incur the risks and obligations ordinarily incurred by owners, managers and operators of similar properties, businesses and enterprises, provided, however, that no risk or obligation incurred by the Receiver shall be the personal risk or obligation of the Receiver, but shall be the risk and obligation of the estate of the Receiver;

l.       Pay any federal, state and local payroll taxes due in connection with employees of the Receiver and/or any property managers;

m.       Advance funds to keep current liens encumbering the Property and all other Collateral, if any, which are senior to the liens of Plaintiff Credit Suisse ("Plaintiff");

n.       Apply for, obtain, maintain, obtain and file all documents and reports required in connection with, and pay any reasonable fees related to, any lawful licenses, permits, entitlements, or other governmental approvals relating to the Property, the enterprises and businesses conducted thereon, or the operation thereof; confirm the existence of and, to the extent permitted by law, exercise the privileges of any existing licenses, permits, entitlements, and government approvals or the operation thereof, and do all things necessary to protect and maintain such licenses, permits, entitlements and approvals;

o.       Do all things necessary to protect, maintain and operate all businesses and enterprises conducted upon the Property;

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 6**

LA1 1272880v.1

p.        Borrow or otherwise receive funds from Plaintiff or any other appropriate bank, financial institution or lender as may be necessary to satisfy the costs and expenses of the Receivership, to the extent that the net revenues derived from the Property are insufficient to satisfy such costs and expenses and on such economic terms as are approved by the Court after notice to all parties;

q.        Bring and prosecute all proper actions for (i) collection of proceeds of the Property, (ii) removal from the Property of persons not entitled to entry thereon, (iii) protection of the Property, (iv) any damages caused to the Property or other Collateral during the Receivership, and (v) any indemnification from insurers;

r.        As necessary to protect and preserve the Property, retain any consultants, engineers, architects, appraisers, and any other consultants (including land use consultants and environmental specialists) to perform (i) environmental inspections, investigations and assessments of the Property (including, but not limited to, Phase I and Phase II environmental surveys), (ii) any other inspections and assessments and prepare any reports or other documents required to obtain or maintain any licenses, permits or approvals required in connection with the operation of the Property, and (iii) any other inspections and assessments and prepare any other reports which the Receiver deems necessary to assist him or her in the discharge of his or her duties;

s.        Market, sell, convey or transfer the Property, in whole or in part, or refinance the Loan; provided, however, that (i) any such sale, conveyance, transfer or refinance is approved and/or confirmed by this Court, and (ii) the Receiver shall not undertake to market, sell, convey or transfer the Property, in whole or in part, or negotiate or accept offers in connection therewith, or refinance the Loan, until sixty (60) days after the entry of this Order;

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 7**

LA1 1272880v.1

> t.    Establish bank accounts for the deposit of monies and funds collected and received in connection with the Receivership estate, at federally-insured banking institutions or savings associations which are not parties to this action, nor any of the "Lenders", as the same have been and shall continue to be periodically disclosed to the Court;

> u.    Determine upon taking possession of the Property and any other Collateral whether in the Receiver's judgment there is sufficient insurance coverage and, with respect to any insurance coverage, identify the Receiver, Plaintiff, and Borrower as named insureds, additional insureds and loss payees on the policies, as appropriate, at least for the period that the Receiver shall be in possession of the Property; if sufficient insurance coverage does not exist, notify the parties to this lawsuit and have thirty (30) calendar days to procure sufficient all-risk and liability insurance (including environmental, earthquake and/or flood insurance) on the Property; provided, however, that if the Receiver does not have sufficient funds to do so, seek instructions from the Court with regard to whether insurance shall be obtained and how it is to be paid and/or seek leave of Court to issue a Receiver's Certificate to borrow the funds necessary to procure such insurance;

> v.    Borrow funds from some or all of the Lenders (as used herein, "Lenders" shall have the same definition as in the Receiver Motion Papers) as a direct loan and, in connection therewith, bring a motion (the "Receiver Certificate Motion") and obtain an order from the Court allowing the issuance of a Receiver's Certificate of Indebtedness ("Receiver Certificate") to Plaintiff evidencing the obligation of the Receivership estate (and not the Receiver individually) to repay such loan, which loan facility ("Receivership Facility"), among other things, (i) shall accrue interest at an annual rate of 30-day LIBOR plus 6.5%, (ii) provide for two percent of the Lenders' commitment to the Receivership Facility to be paid on the date

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 8**

such Receivership Facility is funded, (iii) have a priority senior to that of the Loan (as used herein, "Loan" shall have the same definition as in the Receiver Motion Papers) but junior to all other liens that are senior to the Loan, and (iv) be considered a protective advance for the maintenance and/or preservation of the Property and Collateral securing the Loan; provided further that funds received from the Receivership Facility shall be disbursed in accordance with a 90-day budget approved by Lenders ("Lender Approved Initial Budget"), which Lender Approved Initial Budget shall be attached to the Receiver Motion;

        w.     Upon receipt by the Receiver of a Sheriff's Deed, or such other order from the Court, or notice from Plaintiff that Borrower has cured the defaults existing under the Loan, or that Plaintiff has accepted a deed and assignment in lieu of foreclosure, turn over possession, custody and control of the Property and Collateral to either Plaintiff, Borrower, or to the successful purchaser (whichever is appropriate) without further order of this Court; and

        x.     Do such other things as may be necessary or incidental to the foregoing specific powers, directions and general authorities and take actions relating to the Property and/or other Collateral and the businesses and enterprises conducted thereon, beyond the scope contemplated by the provisions set forth above, provided the Receiver obtains prior Court approval for any actions beyond the scope contemplated herein.

**Further Instructions and Powers**

        10.     The Receiver and the parties may at any time apply to this Court for further instructions and orders and for additional powers necessary to enable the Receiver to perform the Receiver's duties properly.

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 9**

LA1 1272880v.1

**Impairment of State Lease**

        11.     Should the Idaho State Board of Land Commissioners or any other authorized representative of the State of Idaho serve written notice of default of State of Idaho Commercial Lease No. M-5042 ("the State Lease") on the ground that the appointment of the Receiver provided for in this Order constitutes a default under the State Lease, the Receiver shall provide notice thereof to all parties in this case.

**Keys, Books And Records**

        12.     Borrower shall turn over to the Receiver (who shall retain such items at the Property) all keys and the original leases, contracts, agreements, instruments, books, records, books of account, ledgers, operating statements, budgets, real estate tax bills, insurance policies, plans, specifications, drawings, and all other business records relating to the Property, wherever located, and in whatever mode maintained, including information contained on computers and any and all software relating thereto as well as all banking records, statements and cancelled checks (collectively, the "Keys, Books and Records"); provided, however, that the Borrower may exclude any privileged communications so long as (i) Borrower provides a written privilege log of such communications to the Receiver and Plaintiff, and (ii) the Receiver may seek to challenge the asserted privilege with respect to such communication through motion made to the Court.

**Access to Land Use/Entitlements Counsel**

        13.     Borrower shall cause land use/entitlements counsel for Borrower to be made available to, and permit the engagement by, the Receiver to provide, at the expense of the Receiver, information in connection with the entitlements for the development, operations, marketing and/or sale of the Property; provided, however, any such disclosure of information or

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 10**

communications between land use/entitlements counsel shall not be deemed to be a waiver of any attorney-client privilege, or affect the attorney-client relationship, between land use/entitlements counsel and Borrower; and provided further that as a condition to providing such information, such land use/entitlements counsel shall be entitled to receive reasonable documentation from the Receiver and Borrower evidencing the preservation of attorney-client privilege and confidentiality between such counsel and Borrower, the fee arrangement with the Receiver, and such other matters as may be reasonably required by applicable legal or ethical rules.

**Use of 313 Modular Building**

14.    Jean-Pierre Boespflug shall have a license to occupy that certain modular building located at 313 Village Drive, in Design Plaza, Tamarack Resort, Idaho (the "313 Modular Building") during the term of the receivership; provided, however, that (i) all Keys, Books and Records are removed from the 313 Modular Building and turned over to the Receiver prior to the effectiveness of the license to occupy the 313 Modular Building by Mr. Boespflug, and (ii) the Receiver shall have the option to terminate the license of the 313 Modular Building by Mr. Boespflug if, in the Receiver's sole discretion, the Receiver determines that Mr. Boespflug has interfered, or is interfering, with the discharge of the Receiver's duties under this Order and the Receiver's possession of and operation or management of the Property.

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 11**

**Non-Transferability of Receivership**

15.     The Receivership shall be non-transferable and non-assignable to any

other person or entity, and any transfer of such rights shall terminate the Receivership.

**IT IS SO ORDERED.**

Dated: October 17 2008    _____
The Honorable Patrick Owen, District Judge

**FOURTH [PROPOSED] ORDER APPOINTING RECEIVER - 12**

LA1 1272880v.1

## ADDENDUM TO MASTER PROOF OF CLAIM FILED BY CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH AS AGENT FOR RECEIVERSHIP LENDERS

1.    This Addendum to Master Proof of Claim ("Addendum") shall be deemed to be a part of, and incorporated by reference in, the attached master proof of claim (together with this Addendum, the "Master Proof of Claim") filed by Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), in its capacities as Administrative Agent and Collateral Agent (in such capacities, "Agent") for the Receivership Lenders (as defined below). Agent files this Master Proof of Claim against Tamarack Resort, LLC ("Debtor") on behalf of the Receivership Lenders on account of their claims arising under the Receivership Credit Documents (as defined below).

2.    On December 11, 2009 (the "Petition Date"), an involuntary petition under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Idaho was filed against Debtor. On April 9, 2010, this Court granted Debtor's motion to convert its case from a case under chapter 7 of the Bankruptcy Code to a case under chapter 11 of the Bankruptcy Code (CR 190). Debtor's bankruptcy case has been designated as Case No. 09-03911-TLM.

3.    Prior to the Petition Date, on or about March 11, 2008, Agent filed a Complaint for Foreclosure of Mortgages, Appointment of Receiver and Injunctive Relief in the action (the "State Court Action") entitled In Re Tamarack Resort Foreclosure and Related Proceedings, Case No. CV-08-114C, in the Fourth Judicial District of the State of Idaho (the "State Court"). On or about October 17, 2008, Douglas P. Wilson was appointed receiver (the "Receiver") in the State Court Action. In connection with the appointment of the Receiver, the following orders, among others, were entered in the State Court Action: (i) on October 17, 2008, that certain Fourth [Proposed] Order Appointing a Receiver, (ii) on October 29, 2008, that certain Amended [Proposed] Order Authorizing Issuance of a Receiver's Certificate of Indebtedness Secured by Mortgages, (iii) on March 17, 2009, that certain Order Amending the Receivership Facility, Authorizing the Issuance of Amended and Restated Receiver's Certificate No. 1, and Approving the Budget for March 1, 2009 through April 30, 2009 (the "First Amended Receiver's Certificate Order") and (iv) on May 1, 2009 (the "Second Amendment Approval Date") that certain Order Amending the Restructured Receivership Facility and Authorizing the Issuance of Second Amended and Restated Receiver's Certificate No. 1 (the "Second Amended Receiver's Certificate Order") (items 3(i) through 3(iv) are sometimes hereinafter referred to collectively as the "Receivership Orders").

4.    Through the Receivership Orders, the State Court authorized the Receiver to make certain borrowings from the Receivership Lenders. Pursuant to the Second Amended Receiver's Certificate Order, the State Court authorized the Receiver to, among other things, increase and amend the borrowings under the First Amended Receiver's Certificate Order (including, without limitation, to increase the aggregate principal amount of the Loans to $12,162,810.00) and to otherwise receive funds from the Receivership Lenders on the terms and conditions therein contained. In connection therewith, the Receiver entered into a Second Amended and Restated Receivership Credit Facility Agreement dated as of May 18, 2009 (the "Receivership Credit Agreement"), a true and correct copy of which is attached hereto as Exhibit 1. The Receivership Credit Agreement, along with all other agreements, instruments, notes, guaranties and other documents executed in connection therewith, including, without limitation, the Receivership Collateral Documents (as defined below) are collectively referred to herein as the "Receivership Credit Documents." All obligations of Debtor or Debtor's estate arising under the Receivership Credit Agreement or any other Receivership Credit

1

LA1 1854217



EXHIBIT

Document, including all loans, advances, debts, liabilities, fees, charges, expenses, indemnification obligations and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to Agent or the Receivership Lenders, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be refer to as the "Receivership Obligations."

     5.    To secure payment of the Receivership Obligations, the following documents, among others were executed and delivered to Agent:

        a.    A Second Amended and Restated Mortgage, Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Financing Statement (the "Second Amended Receivership Mortgage") dated May 18, 2009, in favor of Agent and encumbering the Collateral (as defined in the Second Amended Receiver Mortgage, and hereinafter referred to as the "Receivership Collateral"), which was recorded (i) with the County Recorder of Adams County, Idaho on May 21, 2009 as Instrument No. 118348, a true and correct copy of which is attached hereto as Exhibit 2, and (ii) with the County Recorder of Valley County, Idaho on May 21, 2009 as Instrument No. 341638, a true and correct copy of which is attached hereto as Exhibit 3; and

        b.    A Second Amended and Restated General Security Agreement dated as of May 18, 2009 ("Second Amended Security Agreement") by Douglas P. Wilson for the benefit of Agent, a true and correct copy of which is attached hereto as Exhibit 4.

     6.    Prior to the Petition Date, the following documents, among others were also executed and delivered to Agent to secure payment of the Receivership Obligations:

        a.    A UCC Financing Statement (with Addenda), filed with the California Secretary of State on November 3, 2008 as No. 08-7177511542, with Tamarack Resort LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached hereto as Exhibit 5;

        b.    A UCC Financing Statement (with Addenda), filed with the California Secretary of State on November 3, 2008 as No. 08-7177516355, with Douglas P. Wilson (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached hereto as Exhibit 6; and

        c.    A UCC Financing Statement (with Addenda) which was filed with the State of Delaware on November 3, 2008 as No. 2008 3686480, in favor of Agent (as Secured Party), a true and correct copy of which is attached hereto as Exhibit 7 (items 6(a) through 6(c), collectively, the "Receivership UCC Statements").

     7.    The Second Amended Receivership Mortgage, the Second Amended Security Agreement and the Receivership UCC Statements are collectively referred to herein as the "Receivership Collateral Documents." The Receivership Collateral Documents reflect Agent's properly perfected liens on all of the Receivership Collateral pledged pursuant to the Receivership Credit Documents (the "Receivership Liens"). The Receivership Liens constitute valid, binding, enforceable and perfected priority liens and security interests in the Receivership Collateral and are not subject to avoidance, disallowance or subordination pursuant to the Bankruptcy Code or other applicable non-bankruptcy law.

2

8.     As of the Petition Date, the aggregate amount of the Receivership Obligations owing by Debtor under the Receivership Credit Agreement and the other Receivership Credit Documents was not less than $13,269,459.10, consisting of principal obligations owing under the Receivership Credit Agreement, and accrued and unpaid interest owing under the Receivership Credit Agreement; plus an unliquidated amount for accrued and unpaid fees and expenses as of the Petition Date (including, without limitation, professional fees of Agent) chargeable or reimbursable under the Receivership Credit Documents and all thereafter accruing and unpaid interest, fees and expenses (including, without limitation, professional fees) that are chargeable or reimbursable under the Receivership Credit Documents, and any other Receivership Obligations that were or are contingent, unmatured or unliquidated (collectively, the "Receivership Lender Claims"). The consideration for the Receivership Lender Claims is monies loaned and other financial accommodations extended for Debtor's benefit under the Receivership Credit Documents. Agent expressly reserves the right to seek payment of all interest, charges, fees and expenses (including, without limitation, professional fees) that have accrued and are continuing to accrue under the Receivership Credit Documents.

9.     To Agent's knowledge, the Receivership Lender Claims are not subject to any setoff or counterclaim by Debtor. Agent reserves and asserts, on behalf of the Receivership Lenders, any and all setoff rights to which the Receivership Lenders are entitled under section 553 of the Bankruptcy Code or otherwise.

10.     The Receivership Lender Claims are filed as secured claims; provided, however, to the extent the Receivership Liens, any of the Receivership Lenders' setoff rights, and any adequate protection replacement liens and claims granted to Agent or the Receivership Lenders under sections 361, 364, and 507 are insufficient to satisfy the Receivership Lender Claims in full, the remaining amount of Receivership Lender Claims are filed as unsecured claims.

11.     Agent expressly reserves the right to (i) amend, update and/or supplement this Master Proof of Claim at any time and in any respect, (ii) file additional proofs of claim, or (iii) file a request for payment of administrative expense claims in accordance with sections 503 and 507 of the Bankruptcy Code, or allowance of postpetition interest and fees in accordance with section 506(b) of the Bankruptcy Code.

12.     Nothing contained in this Master Proof of Claim shall be construed as limiting any of Agent's or the Receivership Lenders' rights, remedies and interests under the Receivership Credit Documents or otherwise. To the extent of any conflict between the terms of this Master Proof of Claim and the terms of the Receivership Credit Documents, the terms of the Receivership Credit Documents shall govern.

13.     The filing of this Master Proof of Claim shall not constitute: (i) a waiver or release of Agent's or the Receivership Lenders' rights against any person, entity or property, including, without limitation, any person or entity that is a guarantor of the Receivership Obligations; (ii) a consent by Agent or the Receivership Lenders to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Master Proof of Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in this case against or otherwise involving Agent or the Receivership Lenders; (iii) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court; (iv) an election of remedies; or (v) a waiver of any past, present or future Defaults or Events of Default under (and as defined in) any of the Receivership Credit Documents. Agent and the Receivership Lenders expressly reserve all of their procedural and substantive defenses and rights with respect to any claim that may be asserted against

3

Agent and/or the Receivership Lenders by Debtor, any bankruptcy trustee or any other party.  In addition, Agent reserves the right to withdraw this Master Proof of Claim with respect to the claims asserted herein, or any portion thereof, for any reason whatsoever.

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as Agent for the Receivership Lenders

By: _____
Name: Megan Kane
Title:    Authorized Signatory

By: _____
Name: _____
Title: _____

Adam Zausmer
Authorized Signatory

LA1 1854217

## ADDENDUM TO MASTER PROOF OF CLAIM FILED BY CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH AS AGENT FOR PREPETITION LENDERS

1.      This Addendum to Master Proof of Claim ("Addendum") shall be deemed to be a part of, and incorporated by reference in, the attached master proof of claim (together with this Addendum, the "Master Proof of Claim") filed by Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), in its capacities as Administrative Agent and Collateral Agent (in such capacities, "Agent") for the Prepetition Lenders (as defined below).  Agent files this Master Proof of Claim against Tamarack Resort, LLC ("Debtor") on behalf of the Prepetition Lenders on account of their claims arising under the Prepetition Credit Documents (as defined below).

2.      On December 11, 2009 (the "Petition Date"), an involuntary petition under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Idaho was filed against Debtor.  On April 9, 2010, this Court granted Debtor's motion to convert its case from a case under chapter 7 of the Bankruptcy Code to a case under chapter 11 of the Bankruptcy Code (CR 190).  Debtor's bankruptcy case has been designated as Case No. 09-03911-TLM.

3.      Prior to the Petition Date, pursuant to that certain Credit Agreement dated as of May 19, 2006 (the "Prepetition Credit Agreement") by and among Debtor as borrower, Agent and the lenders party thereto (collectively, the "Prepetition Lenders"), the Prepetition Lenders extended revolving and term credit facilities to Debtor from time to time in the aggregate principal amount of $250,000,000.  A true and correct copy of the Prepetition Credit Agreement is attached to the *Affidavit of Megan Kane in Support of Credit Suisse AG's Motion (I) to Prohibit Use of Cash Collateral, and (II) For Sequestration and an Accounting* (CR 284) (the "Kane Affidavit") as Exhibit 2.  The Prepetition Credit Agreement, along with all other agreements, instruments, notes, guaranties and other documents executed in connection therewith, including, without limitation, the Prepetition Collateral Documents (as defined below) are collectively referred to herein as the "Prepetition Credit Documents."  All obligations of Debtor arising under the Prepetition Credit Agreement or any other Prepetition Credit Document, including all loans, advances, debts, liabilities, fees, charges, expenses, indemnification obligations and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to Agent or the Prepetition Lenders, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be refer to as the "Prepetition Obligations."

4.      To secure payment of the Prepetition Obligations, the following documents, among others were executed and delivered to Agent:

    a.   A Mortgage, Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Financing Statement (the "Borrower Mortgage") dated as of May 19, 2006, in favor of Agent as Mortgagee and encumbering the Collateral (as defined in the Borrower Mortgage), which was recorded (i) with the County Recorder of Valley County, Idaho on May 19, 2006 as Instrument No. 308953, a true and correct copy of which is attached to the Kane Affidavit as Exhibit 3, and (ii) with the County Recorder of Adams County, Idaho on May 22, 2006 as Instrument No. 111741, a true and correct copy of which is attached to the Kane Affidavit as Exhibit 4;

    b.   A Mortgage, Security Agreement, Assignment of Rents and Leases and Financing Statement (the "TRC Whitewater/TRC Village Plaza Mortgage", together with the

1


EXHIBIT
E

Borrower Mortgage, sometimes hereinafter referred to collectively as the "Mortgages") dated May 19, 2006, in favor of Agent as Mortgagee and encumbering the Collateral (as defined in the TRC Whitewater/TRC Village Plaza Mortgage), which was recorded with the County Recorder of Valley County, Idaho on May 19, 2006 as Instrument No. 308952, a true and correct copy of which is attached to the Kane Affidavit as Exhibit 5;

c. A Security Agreement dated as of May 19, 2006 (the "Security Agreement"), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 6, by Tamarack Resort LLC, Tamarack Whitewater Construction LLC, Village Plaza Construction LLC, Tamarack Resort Realty LLC, The Club at Tamarack LLC, Tamarack Video & Telecom LLC, Lake Plaza LLC, and West Mountain Resort Rentals LLC for the benefit of Agent;

d. A Subsidiary Guaranty dated as of May 19, 2006 (the "Subsidiary Guaranty"), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 7, by TRC Whitewater and TRC Village Plaza and other subsidiaries of Debtor for the benefit of Agent, pursuant to which the Guarantors (as defined in the Subsidiary Guaranty) unconditionally, absolutely and irrevocably guaranteed Debtor's prompt and complete payment, observance, fulfillment and performance of all Guarantied Obligations (as defined in the Subsidiary Guaranty); and

e. On or about June 16, 2006, to reform and correct a typographical error contained in the legal description of the Borrower Mortgage, Debtor executed the Affidavit To Correct Legal Description (the "Correction Affidavit"), recorded with the County Recorder of Valley County, Idaho on June 19, 2006 as Instrument No. 309965, a true and correct copy of which is attached to the Kane Affidavit as Exhibit 8.

5. Prior to the Petition Date, the following documents, among others were also executed and delivered to Agent to secure payment of the Prepetition Obligations:

a. A UCC-1 Financing Statement, filed with the Delaware Department of State on May 19, 2006, as Filing No. 6170342 0, with Tamarack Resort LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 9;

b. A UCC-1 Financing Statement, filed with the Delaware Department of State on May 19, 2006, as Filing No. 6170349 5, with Lake Plaza LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 10;

c. A UCC-1 Financing Statement, filed with the Delaware Department of State on May 19, 2006, as Filing No. 6170355 2, with Village Plaza Construction LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 11;

d. A UCC-1 Financing Statement, filed with the Delaware Department of State on May 19, 2006, as Filing No. 6170363 6, with The Club at Tamarack LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 12;

2

e.  A UCC-1 Financing Statement, filed with the Delaware Department of State on May 19, 2006, as Filing No. 6170406 3, with West Mountain Resort Rentals LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 13;

f.  A UCC-1 Financing Statement, filed with the Delaware Department of State on May 19, 2006, as Filing No. 6170447 7, with Tamarack Whitewater Construction LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 14;

g.  A UCC-1 Financing Statement, filed with the Idaho Secretary of State on May 19, 2006, as Filing No. B 2006-1005789-9, with Tamarack Resort Realty LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 15; and

h.  A UCC-1 Financing Statement, filed with the Idaho Secretary of Sate on May 19, 2006, as Filing No. B 2006-1005790-6, with Tamarack Video & Telecom LLC (as Debtor) in favor of Agent (as Secured Party), a true and correct copy of which is attached to the Kane Affidavit as Exhibit 16 (items 5(a) through 5(h), collectively, the "Prepetition UCC-1 Statements").

6.      The Mortgages, the Security Agreement, the Subsidiary Guaranty, the Correction Affidavit and the Prepetition UCC-1 Statements are collectively referred to herein as the "Prepetition Collateral Documents." The Prepetition Collateral Documents reflect Agent's properly perfected liens on all of the collateral (the "Collateral") pledged pursuant to the Prepetition Credit Documents (the "Prepetition Liens"). The Prepetition Liens constitute valid, binding, enforceable and perfected priority liens and security interests in the Collateral and are not subject to avoidance, disallowance or subordination pursuant to the Bankruptcy Code or other applicable non-bankruptcy law.

7.      As of the Petition Date, the aggregate amount of the Prepetition Obligations owing by Debtor under the Prepetition Credit Agreement and the other Prepetition Credit Documents was not less than $296,019,865.61, consisting of principal obligations owing under the Prepetition Credit Agreement and accrued and unpaid interest owing under the Prepetition Credit Agreement; plus an unliquidated amount for accrued and unpaid fees and expenses as of the Petition Date (including, without limitation, professional fees of Agent) chargeable or reimbursable under the Prepetition Credit Documents and all thereafter accruing and unpaid interest, fees and expenses (including, without limitation, professional fees) that are chargeable or reimbursable under the Prepetition Credit Documents, and any other Prepetition Obligations that were or are contingent, unmatured or unliquidated (collectively, the "Prepetition Lender Claims"). The consideration for the Prepetition Lender Claims is monies loaned or otherwise made available and other financial accommodations extended to or for Debtor's benefit under the Prepetition Credit Documents. Agent expressly reserves the right to seek payment of all interest, charges, fees and expenses (including, without limitation, professional fees) that have accrued and are continuing to accrue under the Prepetition Credit Documents.

8.      To Agent's knowledge, the Prepetition Lender Claims are not subject to any setoff or counterclaim by Debtor. Agent reserves and asserts, on behalf of the Prepetition Lenders, any and all setoff rights to which the Prepetition Lenders are entitled under section 553 of the Bankruptcy Code or otherwise.

9.      The Prepetition Lender Claims are filed as secured claims, provided, however, to the extent the Prepetition Liens, any of the Prepetition Lenders' setoff rights, and any adequate protection replacement liens and claims granted to Agent or the Prepetition Lenders under sections 361, 364, and 507 are insufficient to satisfy the Prepetition Lender Claims in full, the remaining amount of Prepetition Lender Claims are filed as unsecured claims.

10.     Agent expressly reserves the right to (i) amend, update and/or supplement this Master Proof of Claim at any time and in any respect, (ii) file additional proofs of claim, or (iii) file a request for payment of administrative expense claims in accordance with sections 503 and 507 of the Bankruptcy Code, or allowance of postpetition interest and fees in accordance with section 506(b) of the Bankruptcy Code.

11.     Nothing contained in this Master Proof of Claim shall be construed as limiting any of Agent's or the Prepetition Lenders' rights, remedies and interests under the Prepetition Credit Documents or otherwise. To the extent of any conflict between the terms of this Master Proof of Claim and the terms of the Prepetition Credit Documents, the terms of the Prepetition Credit Documents shall govern.

12.     The filing of this Master Proof of Claim shall not constitute: (i) a waiver or release of Agent's or the Prepetition Lenders' rights against any person, entity or property, including, without limitation, any person or entity that is a guarantor of the Prepetition Obligations; (ii) a consent by Agent or the Prepetition Lenders to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Master Proof of Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in this case against or otherwise involving Agent or the Prepetition Lenders; (iii) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court; (iv) an election of remedies; or (v) a waiver of any past, present or future Defaults or Events of Default under (and as defined in) any of the Prepetition Credit Documents. Agent and the Prepetition Lenders expressly reserve all of their procedural and substantive defenses and rights with respect to any claim that may be asserted against Agent and/or the Prepetition Lenders by Debtor, any bankruptcy trustee or any other party. In addition, Agent reserves the right to withdraw this Master Proof of Claim with respect to the claims asserted herein, or any portion thereof, for any reason whatsoever.

### Supporting Documents

13.     Copies of the Prepetition Credit Documents referenced herein were previously filed with the Bankruptcy Court, as indicated herein, and are available upon reasonable request to counsel for Agent.

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as Agent for the Prepetition Lenders

By:_____
Name: Megan Kane
Title:   Authorized Signatory

By:_____
Name:   Adam Zausmer
Title:   Authorized Signatory

4

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In Re: | ) |
| | ) |
| TAMARACK RESORT, LLC, | ) |
| | ) |
| Debtor. | ) |
| | ) |

Bkr. Case No. 09-03911-TLM
Chapter 11

**ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND
GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY
CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001**

Upon the Motion of the debtor and debtor-in-possession ("Debtor") in the

above-captioned chapter 11 case (the "Chapter 11 Case"), filed December 23, 2010 (the

"Motion"), requesting the entry of an order (this "Order") pursuant to sections 105, 361, 362,

363, and 507 of title 11 of the United States Code, 11 U.S.C. § 101–1532 (the "Bankruptcy

Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and seeking, among other things: (i) authorization for Debtor's limited use of Agent's (as

defined below) cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code

and supplemented below (as so defined, "Cash Collateral"), on the terms and conditions set forth

in this Order; (ii) the grant of adequate protection to Credit Suisse AG, Cayman Islands Branch,

as administrative agent and collateral agent (in such capacity, the "Pre-Petition Agent") under the

Pre-Petition Credit Agreement (as defined below); (iii) the grant of adequate protection to Credit

Suisse AG, Cayman Islands Branch, as administrative agent and as collateral agent (in such

capacity, the "Receivership Agent", and together with the Pre-Petition Agent, "Agent") under the

Receivership Credit Agreement (as defined below) and (iv) the modification of the automatic

stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit Debtor

and Agent to implement the terms of this Order.

A hearing on the Motion was held by this Court on December ___, 2010 (the "Hearing").

The Court read and considered the Motion, and all pleadings related thereto, as well as the record

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL A[ND]
GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRU[PTCY]
CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 1
09-03911_TLM_ORDER_Cash_Collateral3.wpd\nrg\122310


EXHIBIT
F

made by Debtor and other parties at the Hearing, and after due deliberation and consideration, and good and sufficient cause appearing therefor:

THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

I. **Background, Jurisdiction and Notice.**

    A.    On December 11, 2009, an involuntary petition under chapter 7 of the Bankruptcy Code was filed against Debtor (the "Petition Date").

    B.    Prior to the Petition Date, the Pre-Petition Lenders made certain loans and other financial accommodations to Debtor pursuant to that certain Credit Agreement dated as of May 19, 2006, among Debtor, the lenders party thereto (the "Pre-Petition Lenders"), the Pre-Petition Agent, and other persons party thereto (as amended, the "Pre-Petition Credit Agreement"). Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Lenders agreed to extend revolving and term credit facilities to Debtor from time to time in the aggregate principal amount of $250,000,000.

    C.    Prior to the Petition Date, the Receivership Lenders made certain loans and other financial accommodations to the receiver for the receivership estate of Debtor, pursuant to that certain Second Amended and Restated Receivership Credit Facility Agreement dated as of May 18, 2009, by and among Douglas P. Wilson as court-appointed receiver (the "Receiver"), the lenders party thereto (the "Receivership Lenders" and, together with the Pre-Petition Credit Agreement Lenders, the "Lenders"), and the Receivership Agent (the "Receivership Credit Agreement" and, collectively with the Pre-Petition Credit Agreement, the "Credit Agreements"). Pursuant to the Receivership Credit Agreement, the Receivership Lenders agreed to extend term loans to the Receiver as court-appointed receiver

on behalf of Debtor, from time to time, in the aggregate principal amount of
$12,162,810.

D.  On February 3, 2010, this Court entered its *Order Regarding the Amended Motion
of Credit Suisse AG for Relief From the Automatic Stay* (CR 101) (the "Stay
Relief Order").  The Stay Relief Order allows the state court in *In re Tamarack
Resort Foreclosure And Related Proceedings*, Case No. CV-08-114C, filed in the
Fourth Judicial District of the State of Idaho, in and for the County of Valley (the
"State Court Proceeding"), to proceed to determine the validity, priority and
amount (including attorneys fees and costs) of any and all mortgages, liens, claims
or interests regarding Debtor's Real Property (as defined in the Stay Relief Order).

E.  On April 9, 2010, this Court granted Debtor's motion to convert its case from a
case under chapter 7 of the Bankruptcy Code to the Chapter 11 Case (CR 190).
Debtor is managing its respective properties as a debtor-in-possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code.

F.  As of the date hereof, a statutory committee of unsecured creditors has been
appointed in this Chapter 11 Case.

G.  This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b) and
1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is
proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

H.  Debtor has complied with Bankruptcy Rule 4001(b) and (d), and Local Rule
4001.1(a) of the Local Rules of Bankruptcy Practice of the United States
Bankruptcy Court for the District of Idaho (the "Local Rules") by serving the
Motion and providing notice of the Hearing to:  (i) the U.S. Trustee; (ii) counsel
for the Unsecured Creditors Committee; (iii) counsel to Agent and (iv) all other
creditors identified on the certificate of service filed herewith.  Given the nature of

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND
GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY
CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 3

the relief sought in this Motion, the Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rule 4001 and Local Rule 4001.1 in all respects.

## II.    Findings Regarding the Use of Cash Collateral.

A.    Debtor has an immediate need to use Cash Collateral in order to, among other things, fund amounts necessary to pay the payroll, utilities, maintenance, winterization, and administration expenses, U. S. Trustee quarterly fees, and the property, general liability and auto insurance expenses, all as more fully set forth in and only to the extent set forth in the Approved Budget (as hereinafter defined). Debtor's access to working capital and liquidity through the use of Cash Collateral under the terms of this Order is necessary for the preservation of value of Debtor's estate.  Consequently, without access to the Cash Collateral, to the extent authorized pursuant to this Order, Debtor and its estate would suffer immediate and irreparable harm.

B.    Agent has a perfected security interest in the Cash Collateral pursuant to the Credit Agreements and related loan documents (the "Loan Documents").

C.    After considering all of its alternatives, Debtor has concluded, in an exercise of its sound business judgment, that the access to Cash Collateral to be provided pursuant to the terms of this Order represents the best option to maintain the estate that is presently available to Debtor.

D.    Debtor's use of Cash Collateral pursuant to the terms of this Order does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by Agent that its interests in all collateral granted or pledged by Debtor pursuant to the Credit Agreements, the Loan Documents, or this Order, along with

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 4

any and all proceeds thereof (collectively, the "Collateral") are adequately protected pursuant to this Order or otherwise.

E.    Good cause has been shown for immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2), Local Bankruptcy Rule 4001.1, and, to the extent it applies, Bankruptcy Rule 6003, as the Court finds that entry of this Order is necessary to avoid immediate and irreparable harm to Debtor and its estate.

F.    Entry of this Order is in the best interests of Debtor, its estate and its creditors. The terms of Debtor's use of Cash Collateral are fair and reasonable under the circumstances, reflect Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

G.    Debtor asserts and the Court finds that in making the decision to permit Debtor to use the Cash Collateral, or in taking any other actions permitted by this Order, none of Agent or the Lenders, as applicable, shall deemed to be in control of the operations of Debtor or to be acting as a "responsible person," "owner or operator" or part of any "control group" with respect to Debtor or the operation or management of Debtor.

H.    Based on the foregoing, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is approved on the terms and conditions set forth in this Order. The foregoing findings are incorporated herein by reference. Any objections to the Motion that have not been withdrawn or resolved are hereby overruled on the merits. This Order shall become effective immediately upon its entry.

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND
GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY
CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 5
09-03911_TLM_ORDER_Cash_Collateral3.wpd\nrg\122310

**III      Authorization of Use of Cash Collateral.**

2.      Debtor is hereby authorized to use Cash Collateral for the period (the "Interim Period") beginning on the date of the entry of this Order and ending on the Termination Date (as defined below) solely in accordance with the Approved Budget (as defined below) and the financial covenants and other terms and conditions set forth in this Order.  For purposes of this Order, the term Cash Collateral shall be deemed to include, without limitation, (a) all "Cash Collateral" as defined under section 363 of the Bankruptcy Code, and (b) all cash proceeds of the Collateral, including without limitation all deposits subject to setoff and cash arising from the collection or other conversion to cash of property in which Agent asserts security interests, liens or mortgages, regardless of (i) whether such security interests, liens or mortgages existed as of the Petition Date or arose thereafter pursuant to this Order, and (ii) whether such property converted to cash existed as of the Petition Date or arose thereafter.

3.      The term "Approved Budget" shall mean the cash flow forecast prepared by Debtor and annexed hereto as Exhibit A, as such cash flow forecast may be amended or supplemented in accordance with the terms of this Order.  The Approved Budget may only be amended or supplemented if Agent gives its prior consent (which consent may be granted or withheld in its sole and absolute discretion).

4.      Debtor may use Cash Collateral (a) during the Interim Period, (b) only for maintenance of its estate as set forth in the Approved Budget, and (c) in respect of each disbursement line item in the Approved Budget, in an amount not to exceed the amount specified for expenditure in such line item; provided, however, that Debtor may reallocate amounts among line items provided no disbursement line item increases more than fifteen percent (15%) in the aggregate over that provided in the Approved Budget for such line item, net of application of any budgeted contingency, and provided further that the total actual disbursements shall not exceed the total disbursement amounts provided in the Approved Budget.

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND
GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY
CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 6

5.    All of the Cash Collateral shall be deposited and maintained at all times in an account in the name of Debtor that is subject to the "control" of Agent within the meaning of the Uniform Commercial Code, and not commingled with any funds upon which Agent does not have control, until disbursed in accordance with the Approved Budget and this Order.  Debtor shall execute an appropriate control agreement for the benefit of Agent with respect to any financial institution at which Cash Collateral is deposited and maintained.

**IV.    Grant of Adequate Protection.**

6.    Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection for the use of any Cash Collateral and for any diminution in the value of Agent's interest in the Collateral, Agent shall receive replacement security interests and liens (the "Adequate Protection Liens") in and upon all of the Collateral and all proceeds thereof, whether existing on the Petition Date or acquired thereafter (including, without limitation, all proceeds (as defined in the Uniform Commercial Code) on account of the Collateral), and all assets of Debtor of the same nature and type as the Collateral whether presently owned or hereafter acquired by Debtor.  Such Adequate Protection Liens shall be to the extent of cash collateral used, and shall be to the extent of, and enjoy a priority that, existed on the date of the filing of the petition.

**V.    Termination.**

7.    Debtor's authorization to use Cash Collateral under this Order shall terminate (the "Termination Date"), unless Debtor obtains Agent's prior written consent (which consent may be withheld in its sole discretion), on the earliest to occur of:

a)    January 31, 2011;

b)    the closing or dismissal of Debtor's Chapter 11 Case or the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

c)    the appointment of a trustee or an examiner with expanded powers in Debtor's Chapter 11 Case;

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 7

     d)      the sale of all or substantially all of Debtor's assets outside the ordinary course of business;

     e)      Debtor's disbursements exceeding those permitted by the Approved Budget (subject to the permitted variance) or this Order without prior written consent of Agent;

     f)      Debtor, or any other person, filing a Motion to disallow or subordinate in whole or in part Agent's or any Lender's claim;

     g)      other than in connection with the State Court Proceeding, Debtor, or any other person, filing a Motion challenging the validity or priority of the liens in favor of Agent;

     h)      the entry of an order by this Court, or any other court having jurisdiction, amending, supplementing, staying, vacating, reversing, revoking, rescinding or otherwise modifying this Order (or any of the provisions hereof), without the express written consent of Agent;

     i)      the entry of an order by this Court, other than the Stay Relief Order, granting relief from the automatic stay under section 362 of the Bankruptcy Code that would permit a party, other than Agent, to exercise any rights or remedies or consummate a foreclosure or foreclosures upon any material asset of Debtor or upon all or any material portion of the Collateral; or

     j)      the failure by Debtor to comply with any material provision of this Order.

    8.     Termination of Debtor's authority to use Cash Collateral shall not negate, impact or otherwise affect any liens granted by, or payments made pursuant to, this Order.

## VI.    **Restrictions on the Use of Cash Collateral.**

9.      Cash Collateral may only be used in the amounts (subject to the 15% variance provision) and for the purposes set forth in the Approved Budget, and for no other purpose without the express prior written consent of Agent.

**VII.    Miscellaneous Provisions.**

10.      Financial Reporting.  In addition to compliance with the applicable reporting requirements under the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Idaho, and the Guidelines of the United States Trustee (with copies of all reports provided by Debtor pursuant to such requirements to be delivered concurrently to Agent), Debtor shall provide Agent, within fourteen (14) days following the entry of this Order, with copies of the following, in each case from the date of entry of the order for relief through the date of delivery:  (i) general ledgers; (ii) bank statements; (iii) check registers; (iv) accounts payable; (v) accounts receivable; and (vi) a report of all cash receipts itemized by source.  In addition, Debtor shall make itself available to discuss the foregoing financial issues and issues regarding the Chapter 11 Case with Agent on a weekly basis.

11.      Access to Debtor's Property.  A designee of Agent (as identified by Agent to Debtor, the "Agent's Designee") shall be Agent's onsite auditor/consultant in respect of Debtor's property.  The Agent's Designee shall provide reasonable notice of his or her presence at Debtor's property and shall be given access to Debtor's onsite facilities and books and records.

12.      Binding Effect.  The provisions of this Order shall be binding upon and inure to the benefit of Agent, the Lenders and Debtor.

13.      Limitations on Additional Indebtedness.  No portion of the Collateral (including any Cash Collateral) whenever generated or acquired shall be distributed by Debtor to any parent entity, affiliated entity, officer, director, principal, equity holder, other "affiliate" as defined in section 101(2) of the Bankruptcy Code, or other "insider" as defined in section 101(31) of the

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 9

Bankruptcy Code, in the form of an upstream or sidestream dividend, intercompany loan, salary or other remuneration to any individual or entity, or any distribution for less than reasonably equivalent value.

14.   <u>No Findings Regarding Adequate Protection</u>.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by Agent that the adequate protection granted herein does in fact adequately protect Agent against Debtor's use of Cash Collateral and for any diminution in the value of their respective interests in the Collateral (including Cash Collateral).

15.   <u>No Prejudice</u>.  Nothing contained herein shall prejudice Agent or any of the Lenders with respect to any matter, including, without limitation, any prior use or misuse of Cash Collateral by Debtor without the consent of Agent, relief from the automatic stay, appointment of a trustee or examiner, sale of any or all of the assets of Debtor, assumption or rejection of executory contracts, or dismissal or conversion of Debtor's Chapter 11 Case, or requests for additional or different adequate protection of Agent's interests in the Collateral.  All rights with respect to such matters, and all other matters not expressly the subject of this Order, are reserved.

16.   <u>No Prejudice to Others</u>.  Nothing in this order shall bar or condition the right of the Debtor, the U.S. Trustee or any other party-in-interest from seeking carve-outs from future financing orders, sufficient to pay any and all U.S. Trustee fees, or compensation for the Debtor, any official unsecured creditors committee which is appointed at any time, or any compensation for professionals employed by the Debtor or an official unsecured creditor's committee.

17.   <u>No Release of Non-Debtors</u>.  Nothing contained in this Order shall be deemed to terminate, modify or release any obligations of any non-debtor party liable to Agent and/or the Lenders with respect to any of the Obligations or otherwise.

18.   <u>Findings of Fact and Conclusions of Law</u>.  The findings of fact and conclusions of law of this Court pursuant to this Order shall be deemed effective upon the entry of this Order.

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND
GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY
CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 10

To the extent that such findings may constitute conclusions, and vice versa, they hereby are deemed as such.

19. <u>Retention of Jurisdiction</u>. This Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Order.

IT IS SO ORDERED. //end of text//

Order Submitted by: Randal J. French, Attorney for Debtor

APPROVED AS TO FORM:

DATED:

OFFICE OF THE UNITED STATES TRUSTEE

By _____
David W. Newman

ORDER AUTHORIZING DEBTOR'S LIMITED USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO AGENT PURSUANT TO BANKRUPTCY CODE §§ 105, 361, 362, 363 AND 507 AND BANKRUPTCY RULE 4001, p. 11

09-03911_TLM_ORDER_Cash_Collateral3.wpd\nrg\122310

Tamarack Resort LLC

# TRLLC Cash Usage Budget 122110

| | December (EMERGENCY) | January | Totals | NOTES |
|---|---|---|---|---|
| **Sources** | | | | |
| Revenue from Operator Agreements | $  2,100 | $  15,000 | $  17,100 | Increase based on opening of the ski mountain by TMA |
| Revenue from Merchandise Sales | $  - | $  7,500 | $  7,500 | Sale of retail merchandise through TMA operations |
| Idaho Department of Land Refund | $  28,600 | $  - | $  28,600 | Return of deposit for completed timber sale |
| Idaho Power Deposit Refund | $  13,765 | $  - | $  13,765 | Transfer of industrial account to TMA for winter 10/11 |
| **Total Sources** | $  44,465 | $  22,500 | $  66,965 | |
| **Expenses** | | | | |
| **Payroll (labor and expenses, with fringes)** | | | | |
| David Papiez | $  (4,500) | $  (4,500) | $  (9,000) | Full time Controller and Asset Manager |
| **Utilities** | $  (18,400) | $  (10,500) | $  (28,900) | |
| Idaho Power - Industrial | $  (4,500) | $  (4,500) | $  (9,000) | Reduced as many buildings are now handled by TMA |
| Idaho Power - Commercial | $  (6,100) | $  (2,000) | $  (8,100) | TMA Operating taking over mountain power |
| Idaho Power - Residential | $  (4,500) | $  (5,500) | $  (10,000) | |
| Sewer & Water District | $  (1,000) | $  (1,000) | $  (2,000) | Village Plaza & misc. commercial |
| Amerigas | $  (5,000) | $  (1,200) | $  (6,200) | Cabins & office used by TRLLC |
| Telephone | $  (800) | $  (300) | $  (1,100) | Cabins & office used by TRLLC |
| | $  (1,500) | $  (500) | $  (2,000) | Telephone service for TRLLC |
| **Maintenance** | $  (1,500) | $  (1,000) | $  (2,250) | Reduced as many buildings are now handled by TMA |
| Maintenance & Cleaning | $  (750) | $  (500) | $  (1,000) | Service provided by TMA in exchange for cottage use |
| Inspection & Security | $  - | $  (500) | $  (1,750) | Service provided by TMA in exchange for cottage use |
| Snow Removal and Erosion Control | $  (1,250) | $  - | $  - | Fees covered by TMA in exchange for cottage use |
| Lodge at Osprey Meadows Assessment | $  - | $  - | $  - | |
| **Winterization** | $  (11,000) | $  - | $  (11,000) | |
| Village Plaza | $  (8,000) | $  - | $  (8,000) | Final Payment on authorized program 50% paid already |
| Concrete Sealing | $  (4,000) | $  - | $  (4,000) | Six buildings forming the village under construction |
| Water Sealing | $  (1,000) | $  - | $  (1,000) | To maintain dry conditions in basement |
| Heat Tape Drains | $  (1,000) | $  - | $  (1,000) | To maintain dry conditions in basement |
| Roof | $  (2,000) | $  - | $  (2,000) | Integrity of drainage on partially flat roofs |
| Mid-Mountain | $  (3,000) | $  - | $  (3,000) | Maintenance of temporary membrane on two buildings |
| **Administration** | $  (2,500) | $  (2,500) | $  (5,000) | Protection of mid-mountain restaurant under construction |
| **Legal & Accounting** | $  (975) | $  (975) | $  (1,950) | Postage, Office Supplies, Web Maintenance, Buyer Catering, etc... |
| US Trustee | $  (975) | $  (975) | $  (1,950) | Quarterly Fees |
| **Insurance** | $  (35,400) | $  - | $  (35,400) | Reduced from past year with TMA operating |
| Property & Casualty | $  (29,000) | $  - | $  (29,000) | TRLLC Buildings not occupied by TMA |
| General Liability | $  (5,400) | $  - | $  (5,400) | Renew $1m general liability for TRLLC |
| D&O | $  - | $  - | $  - | Postponed until closing of DIP Loan |
| Auto | $  (1,000) | $  - | $  (1,000) | Yukon policy |
| **Contingency** | $  (3,000) | $  (4,000) | $  (7,000) | |
| **Total Expenses** | $  (77,525) | $  (23,475) | $  (101,000) | |
| **Cash Flow** | $  1,440 | $  465 | $  465 | |

| | |
|---|---|
| Beginning Balance | $  34,500 |
| | $  465 |
| | $  34,500 |